IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

HENRY BENITEZ,

                                        Civil Action No.
                    Plaintiff,          9:12-CV-0448 (GTS/DEP)

        v.

WILLIAM PARMER, *et al.*,

                    Defendants.

_____

APPEARANCES

FOR PLAINTIFF:

HENRY BENITEZ, *Pro Se*
97-a-2553
Upstate Correctional Facility
P.O. Box 2001
309 Bare Hill Road
Malone, NY 12953

FOR DEFENDANT:

ERIC T. SCHNEIDERMAN            CATHY SHEEHAN, ESQ.
The Capitol                     Assistant Attorney General
Albany, NY 12224-0341


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Henry Benitez, a New York State prison inmate, has commenced this action, pursuant to 42 U.S.C. § 1983, claiming deprivation of his rights under the First and Eighth Amendments ro the United States Constitution. In his complaint, plaintiff generally alleges that he was denied necessary medical treatment for Hepatitis C by several prison employees in retaliation for filling of several grievances against them.

Defendants have responded to plaintiff's most recent amended complaint by filing a motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that defendants' motion be denied in part and granted in part.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Sec. Am. Compl. (Dkt. No. 30). Although plaintiff's claims arise from the conduct of defendants employed at Upstate Correctional Facility ("Upstate"), before being transferred to Upstate, he was confined in the Auburn Correctional Facility ("Auburn"). *Id.* ¶¶ 4, 16, 19.

On July 26, 2002, plaintiff's primary medical provider at Auburn informed him that a blood test indicated he "'might' have contracted hepatitis B and C viruses and that a liver biopsy was necessary to verify or refute such conclusion." Sec. Am. Comp. (Dkt. No. 30) at ¶ 16. On September 13, 2002, before plaintiff was given the opportunity to request a liver biopsy, he was transferred to Upstate. *Id*. at ¶ 19.

During the month of September 2002, plaintiff repeatedly asked his

_____

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's second amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

primary medical care provider at Upstate, Dr. Richards, who is not a party

to this case, to recommend that he be afforded a liver biopsy and antiviral

therapy. Sec. Am. Comp. (Dkt. No. 30) at ¶ 20. On April 29, 2003, nearly

seven months later, Dr. Richards formally recommended that plaintiff be

given medicinal therapy for the Hepatitis C virus. *Id*. at ¶ 21. On July 23,

2003, a liver biopsy was performed at the direction of Upstate's program

director at the time, Dr. Weissman. *Id*. at ¶ 23. The biopsy indicated that

plaintiff's liver contained "enlarged portal areas containing many chronic

inflammatory cells" and "increased connective tissue" due to "chronic

hepatitis grade 1." *Id.* at ¶ 24. On August 20, 2003, Dr. Lester Wright, the

then-Chief Medical Officer for DOCCS, rejected a recommendation by Dr.

Richard that plaintiff be administered antiviral therapy. *Id*. at ¶ 25. Dr.

Wright explained that, because plaintiff's liver was "this intact," he need

only be monitored every six months. *Id.* Dr. Wright advised that "if there is

a significant increase [indicating fibrosis,] treatment could be indicated at

that time." *Id.*

Plaintiff's second amended complaint alleges that, over the course

of nine years, from 2002 to 2011, he filed numerous formal grievances

against Upstate medical staff members for refusing to provide him with

adequate medical treatment for Hepatitis C. Sec. Am. Comp. (Dkt. No. 30) at ¶ 26. Those grievances were investigated and reviewed by defendant Smith, a Nurse Administrator employed at Upstate; defendants Parmer[2] and Lashway, both of whom are Nurse Practitioners employed at Upstate; defendant Powers, an Infection Control Nurse employed at Upstate; defendant Schroyer, a physician employed at Upstate and the Director of Upstate Health and Services; defendant Otis, Deputy Superintendent for Administrative Services at Upstate; defendant Rock, Upstate's Superintendent; and defendant Koenigsmann, the DOCCS Chief Medical Officer. *Id*. at ¶¶ 5-12, 28.

As a result of their investigation or review of plaintiff's grievances, defendants Parmer, Smith, Lashway, Powers, Schroyer, Otis, Rock, and Koenigsmann were aware of plaintiff's blood test results, which revealed that his alanine aminotransferase level ("ALT") remained elevated. *Id*. at ¶ 32. Relying on DOCCS's Hepatitis C Practice Guidelines (March 2011) ("DOCCS Hepatitis C Guidelines"), plaintiff alleges that, in light of his elevated ALT levels, he should have been provided a repeat liver biopsy every five years. *Id.* at ¶ 31. Plaintiff alleges that, despite their awareness

---

[2]      From 2008 to March 2012, defendant Parmer acted as plaintiff's primary medical provider. Sec. Am. Compl. (Dkt. No. 30) at ¶ 27.

of his need for repeat liver biopsies and antiviral therapy, defendants merely monitored his ALT levels, and that the failure to properly assess his condition was in retaliation for the filing of grievances against Upstate medical staff between 2002 and 2011. *Id*. at ¶ 33.

On September 30, 2011, defendant Parmer recommended that plaintiff be considered for Hepatitis C treatment therapy, but refused to recommend an additional liver biopsy. Sec. Am. Compl. (Dkt. No. 30) at ¶ 38. In October 2011, defendant Schroyer postponed defendant Parmer's recommendation for treatment, but recommended a liver biopsy, which was conducted on November 9, 2011.[3] *Id*. at ¶¶ 39-40. The report of that biopsy indicated "cirrhosis consistent with Hepatitis C, grade 3/4, stage 4/4." *Id*. at ¶ 41.

On March 7, 2012, defendant Powers e-mailed defendant Koenigsmann a Hepatitis C consult form that contained, *inter alia*, a recommendation that plaintiff be considered for antiviral therapy. Sec. Am. Compl. (Dkt. No. 30) at ¶ 44. The e-mail also included a statement that

---

[3]       Plaintiff alleges that when defendant Parmer recommended viral therapy on September 30, 2011, he knew that treatment would be delayed due to the absence of an updated liver biopsy report. Sec. Am. Compl. (Dkt. No. 30) at ¶ 30. Instead of recommending the biopsy in September, plaintiff alleges that defendant Parmer intentionally delayed the biopsy by recommending viral therapy that he knew would inevitably be denied. *Id.*

plaintiff has a history of "non-compliance with medical care." *Id.* On March 8, 2012, defendant Koenigsmann rejected the request for antiviral treatment for plaintiff, explaining that plaintiff had

> an ANC below the recommended tx level of 1000, in addition he has a low plt count in the face of stage 4 dz this likely represents early decompensation of his cirrhosis. You indicate he is noncompliant with medical care. I would regard this as too many contraindications to tx and cannot approve tx.

*Id* at ¶ 45. The next day, defendant Parmer informed plaintiff of defendant Koenigsmann's decision. *Id*. at ¶ 46.

Plaintiff alleges that defendant Power's inclusion of the comment to defendant Koenigsmann that plaintiff had a history of noncompliance with medical treatment was prompted by a conspiracy among defendants Parmer, Schroyer, Smith, Powers, and Lashway to retaliate against him for filing grievances against Upstate medical staff. Sec. Am. Compl. (Dkt. No. 30) at ¶ 43. More specifically, he contends that the inclusion of that particular comment was calculated to provide defendant Koenigsmann justification for denying the recommendation that plaintiff begin antiviral therapy for Hepatitis C. *Id.* In an effort to corroborate these allegations, plaintiff further alleges that, on March 16, 2012, John Marinelli, an employee from the New York State Office of Mental Health ("OMH"),

verbally informed him that, on March 7, he witnessed defendants Parmer and Schroyer, and three apparently unknown "members of Upstate's treatment team" discussing plaintiff's grievances. *Id*. at ¶ 47. Marinelli also informed plaintiff that he had been asked evaluate plaintiff to determine whether he was suffering from any psychological harm as a result of having been denied therapy. *Id*. at ¶ 48.

Plaintiff alleges that, as a result of the lack of treatment provided by defendants, he has experienced extreme fatigue, prolonged abdominal pains, nausea, vomiting, severe dizziness, and severe psychological distress. Sec. Am. Compl. (Dkt. No. 30) at ¶ 34. He claims to have filed several grievances in 2011 complaining that these symptoms were the result of defendant Parmer's refusal to recommend a liver biopsy or Hepatitis C treatment. *Id*. Plaintiff further alleges that, notwithstanding their knowledge of his condition, defendants Rock, Otis, and Koenigsmann failed to refer Benitez to a specialist and instead allowed defendant Parmer to remain as his primary medical care provider. *Id*. at ¶36.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on March 13, 2012, by the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Compl. (Dkt. No. 1). On April 10, 2012, plaintiff's initial complaint was superseded through the filing of a first amended complaint. Am. Compl. (Dkt. No. 5). Thereafter, on September 24, 2012, the court accepted for filing plaintiff's second amended complaint, which is now the operative pleading in this matter. Sec. Am. Compl. (Dkt. No. 30). In the meantime, plaintiff was granted permission to proceed IFP*, and has twice been denied requests that the court appoint *pro bono* counsel to represent him in the action. Dkt. Nos. 9, 14, 47.

Plaintiff's second amended complaint names eight Upstate employees as defendants, including (1) William Parmer, a Nurse Practitioner; (2) Nancy Smith, a Nurse Administrator; (3) Pauline Powers, an Infection Control Nurse; (4) Amber Lashway, a Nurse Practitioner; (5) Glenn Schroyer, M.D., the Upstate Health Services Director, (6) Carl Koenigsmann, M.D., the DOCCS Chief Medical Officer; (7) Gerald Otis, Upstate's Deputy Superintendent for Administrative Services; and (8) David Rock, the Superintendent at Upstate. Sec. Am. Compl. (Dkt. No.

30) at ¶¶ 5-12. Generally, the second amended complaint asserts four causes of action against defendants, including (1) failure to protect, against defendants Rock, Otis, and Koenigsmann; (2) retaliation, against defendants Parmer, Smith, Schroyer, Powers, and Lashway; (3) conspiracy to retaliate, against defendants Parmer, Smith, Schroyer, Powers, and Lashway; and (4) deliberate medical indifference, against all eight defendants. *See generally* Sec. Am. Compl. (Dkt. No. 30). Plaintiff seeks a variety of relief, including an injunction that affirmatively directs defendants to provide him with specified medical treatment, compensatory and punitive damages, and attorney's fees. Sec. Am. Compl. (Dkt. No. 30) at 21-23.

On October 25, 2012, in lieu of an answer, defendants filed a motion seeking dismissal of plaintiff's complaint in its entirety.[4] Dkt. No. 32. In support of their motion, defendants argue that (1) plaintiff's second amended complaint fails to state a claim upon which relief may be granted

---

[4] At the time defendants filed their motion to dismiss, the court had not yet ruled on plaintiff's motion for leave to file a second amended complaint. Upon granting plaintiff's motion and the court's acceptance of that pleading, defendants filed a supplemental memorandum of law in support of their motion. Dkt. Nos. 44, 45. Because the second amended complaint added three additional defendants (Lashway, Powers, and Smith), defendants' supplemental filing joined those additional defendants in the motion, and asserted an additional defense. Defs.' Suppl. Memo. of Law (Dkt. No. 32-5).

with respect to any of the asserted retaliation, conspiracy, or deliberate medical indifference causes of action; (2) plaintiff's second amended complaint fails to sufficiently allege the personal involvement of defendants Otis and Rock; (3) the court lacks subject matter jurisdiction over plaintiff's state law claims; (4) the claims asserted against defendants Koenigsmann, Otis, and Rock in their official capacities are precluded by Eleventh Amendment; and (5) any claims arising from defendants' conduct occurring more than three years prior to the commencement of this action are barred by the applicable statute of limitations. *See generally* Defs.' Memo. of Law (Dkt. No. 32-1); Defs.' Suppl. Memo. of Law (Dkt. No. 32-5). Plaintiff has since responded in opposition to defendants' motion, addressing all of their arguments. Plf.'s Resp. (Dkt. No. 42); Plf.'s Suppl. Resp. (Dkt. No. 46).

Defendants' motion, which has been fully briefed is now ripe for determination, has been referred to me for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Motion to Dismiss Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94

(2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551

U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

B.    Personal Involvement

In their motion, defendants argue that plaintiff's second amended complaint fails to allege facts plausibly suggesting the personal involvement of some of the named defendants. Defs.' Memo. of Law (Dkt. No. 32-1) at 14-15.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). In order to prevail on a

section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Certain of the defendants named in plaintiff's second amended complaint hold supervisory positions within the DOCCS. It is well-established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.

1995); *Wright*, 21 F.3d at 501.

    1.    Deliberate Medical Indifference

Plaintiff's second amended complaint asserts an Eighth Amendment deliberate medical indifference claim against all eight defendants. *See generally* Sec. Am. Comp. (Dkt. No. 30). The allegations supporting this claim against defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock are insufficient to plausibly suggest their personal involvement. Plaintiff alleges that defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock either investigated or reviewed all of the grievances filed by him against Upstate medical staff between 2002 and 2011, but did nothing in response. *Id.* at ¶ 26, 28. It is also alleged that these defendants knew of the DOCCS Hepatitis C Guidelines, which recommend that inmates with elevated ALT levels be provided repeat liver biopsies, and that plaintiff's blood test results in fact revealed elevated ALT levels from 2008 until 2011. *Id.* at ¶¶ 29-32. These allegations, however, do not plausibly suggest a tangible connection between plaintiff's injury and the defendants' conduct. *Bass*, 790 F.2d at 263. To satisfy the personal involvement requirement of a section 1983 claim, a plaintiff must do more than allege that a prison official ignored or failed to respond to a plaintiff's

grievance. *See Parks v. Smith,* No. 08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *report and recommendation adopted by*, 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.), ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."); *Greenwaldt v. Coughlin*, No. 93-CV-6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).[5]

It should also be noted that plaintiff's second amended complaint does not allege that defendant Otis, the Superintendent at Upstate, and defendant Rock, the Deputy Superintendent for Administrative Services at the facility, did anything more than rely on the conclusions provided by the Upstate medical staff in failing to address his grievances. Sec. Am.

---

[5]     Copies of all unreported decisions are attached to this report and recommendation for the convenience of the *pro se* plaintiff.

Compl. (Dkt. No. 30) at ¶¶ 31-37. It is well established that supervisory prison officials are entitled to rely on the opinions of medical professionals concerning the proper course of treatment. *Mercer v. Benson*, No. 08-CV-0537, 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009) (Homer, M.J.) (citing *Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 203 (S.D.N.Y .2004)).

Plaintiff's allegations against defendant Parmer, however, are considerably more compelling insofar as his direct involvement in the deprivations alleged by plaintiff are concerned. In his second amended complaint, plaintiff alleges that defendant Parmer was plaintiff's primary medical provider from 2008 until March 2012, and that during that period, he intentionally neglected to provide plaintiff with the treatment recommended in the DOCCS Hepatitis C Guidelines, in retaliation for plaintiff filing grievances against him. Sec. Am. Compl. (Dkt. No. 30) at ¶ 27-34. These allegations are sufficient to implicate defendant Parmer in the constitutional violations asserted. *Compare Johnson v. Wright*, 234 F. Supp. 2d 352, 364 (S.D.N.Y. 2002) (finding no personal involvement for plaintiff's primary medical provider where it was alleged that the medical provider recommended treatment and took no part in the refusal to provide plaintiff with treatment).

Turning to plaintiff's claims against defendant Koenigsmann, Benitez alleges that he reviewed, and ultimately denied, a recommendation that plaintiff be afforded antiviral treatment in March 2012, after reviewing plaintiff's medical records. *Id.* at ¶ 45. This allegation is also sufficient to allege personal involement. *See Veloz v. N.Y.*, 339 F. Supp. 2d 505, 521 (S.D.N.Y. 2004) (finding that the defendant's "alleged involvement in denying plaintiff UPD housing for discriminatory reasons" was sufficient to establish personal involvement because the defendant was "directly and ultimately responsible for determining who is placed in UPD housing").

In sum, I find that plaintiff's second amended complaint alleges sufficient facts to plausibly suggest that defendants Parmer and Koenigsmann were personally involved in any alleged deliberate medical indifference, but lacks sufficient allegations giving rise to a basis to hold defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock accountable. Therefore, I recommend dismissal of plaintiff's deliberate medical indifference claims against those six defendants.

## 2. Failure to Protect

Plaintiff's second amended complaint also asserts a failure to protect claim against defendants Rock, Otis, and Koenigsmann. Specifically, it is alleged that those three defendants were aware of the possibility that defendant Parmer might retaliate against Benitez for filing a grievance against him, but failed to protect him from that retaliation. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 36-37. These allegations are insufficient to support a failure to protect claim because, as discussed more completely below,[6] plaintiff's retaliation claim asserted against defendant Parmer, upon which the failure to protect cause of action hinges, is facially deficient. Simply stated, defendants Rock, Otis, and Koenigsmann cannot be liable for failing to protect plaintiff from a non-event.

Even assuming plaintiff's second amended complaint plausibly stated a claim of deliberate indifference against defendant Parmer, defendants Rock, Otis, and Koenigsmann would not necessarily be accountable to the plaintiff under a failure to protect theory. To establish liability on the part of a defendant for failure to protect or intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a

---

[6] *See* Part III.C.1., *post*.

realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)). Here, plaintiff's second amended complaint fails to allege facts that plausibly suggest defendants Rock, Otis, or Koenigsmann had a realistic opportunity to intervene. For example, it fails to allege facts that plausibly suggest awareness on the part of those three defendants as to when, or in what manner, defendant Parmer might retaliate against Benitez. Accordingly, those three defendants should not deemed to have had knowledge that defendant Parmer's unconfirmed, prospective conduct would violate plaintiff's constitutional rights. Moreover, plaintiff's second amended complaint alleges no facts concerning the timing of plaintiff's grievance against defendant Parmer in relation to when defendants Rock, Otis, and Koenigsmann allegedly knew that defendant Parmer might retaliate against him.

For all these reasons, I recommend that plaintiff's failure to protect

claim be dismissed as against defendants Rock, Otis, and Koenigsmann.

### C.     First Amendment Claims

Among the claims asserted by the plaintiff is a First Amendment retaliation cause of action against defendants Parmer, Smith, Powers, Lashway, Schroyer, and Koenigsmann. *See generally* Sec. Am. Compl. (Dkt. No. 30). Plaintiff also alleges that defendants  Parmer, Smith, Powers, Lashway, and Schroyer conspired to retaliate against him, also in violation of the First Amendment. *Id.* In their motion, defendants argue that neither of these causes of action has been sufficiently pleaded. Defs.' Memo. of Law (Dkt. No. 32-1) at 7-10.

#### 1.     Retaliation

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must

advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.). "[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

Plaintiff's second amended complaint alleges that he submitted numerous grievances related to defendants' failure to provide him with treatment for Hepatitis C, and that defendants retaliated against him for filing those grievances by refusing him medical treatment. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 26, 31-34, 38, 42-44, 47-49. It is well-settled

that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). In addition, courts have found that "denial of medical evaluation, treatment, and adequate pain medication" can suffice to establish adverse action under a First Amendment retaliation analysis. *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009). Accordingly, I find that plaintiff's second amended complaint satisfies the first two elements of a retaliation claim.

As it relates to the third element of causation, a more careful review of the operative pleading is necessary. Analysis of that element is informed by several relevant factors, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act, (2) the inmate's prior good disciplinary record, (3) vindication at a hearing on the matter, and (4) statements by the defendant concerning his . . . motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013) (Dancks, M.J.), *report and recommendation adopted by* 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) (Mordue, J.).

Plaintiff's second amended complaint alleges only that he specifically filed a grievance against defendant Parmer for neglecting to

provide adequate medical treatment. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 34, 35, 37. Although the second amended complaint contains general allegations to the effect that, for example, "[f]rom 2002 to 2011, the plaintiff filed numerous grievances against Upstate medical staff members concerning various medical related problems," these vague and conclusory allegations are insufficient to plausibly suggest that (1) plaintiff filed any grievances against defendants Schroyer, Koenigsmann, Powers, Smith, or Lashway; (2) those defendants retaliated against plaintiff for filing a grievance against them (even assuming plaintiff filed grievances against them); or (3) those defendants retaliated against plaintiff for filing grievances against defendant Parmer.[7] Sec. Am. Compl. (Dkt. No. 30) at 26. Stated simply, aside from the conclusory allegations, plaintiff's second amended complaint fails to alleges facts plausibly suggesting that defendants Schroyer, Koenigsmann, Powers, Smith, or Lashway refused plaintiff medical treatment as a result of his exercise of his First

_____

[7]     As another example of this type of vague allegation, despite his contention that all defendants knew of both plaintiff's elevated ALT blood levels and the DOCCS Hepatitis C Guidelines recommendation that patients with elevated ALT blood levels be afforded "'repeat liver biops[ies]," plaintiff alleges that all defendants "deliberately opted merely to test the plaintiff's ALT levels and to allow him to sustain 'liver cirrhosis' in reprisal for his having filed numerous medical related grievances from 2002 to 2012." Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 31-33. Indeed, there are no specific allegations as to who precisely decided to only monitory plaintiff's liver, how that decision was made, or which particular defendants were involved.

Amendment right to file grievances. *See Reed v. Doe*, No. 11-CV-0250, 2012 WL 4486086, at *6 (N.D.N.Y. July 26, 2012) (Peebles, M.J.), *report and recommendation adopted*, 2012 WL 4486085, (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.), (recommending that, where plaintiff's complaint lacked factual allegations that would establish a nexus between visiting a prison infirmary (protected activity) and the defendant's issuance of a misbehavior report (adverse action), the defendant's motion to dismiss should be granted).[8]

As it relates to defendant Parmer, although plaintiff's second

---

[8]    While plaintiff's second amended complaint alleges, in conclusory fashion, that defendant Koenigsmann's refusal to approve antiviral treatment was motivated by the filing of grievances, Sec. Am. Compl. (Dkt. No. 30) at ¶ 49, it also references a medical note authored by that defendant on March 7, 2012, in which he stated that

> [t]his [patient] has an ANC [absolute neutrophil count] below the recommended [treatment] level of 1000, in addition he has a low [platelet] count in the face of stage 4 [disease] this likely represents early decompensation of his cirrhosis . . . he is non compliant with medical care. I would regard this as too many contraindications to [treatment] and cannot approve [treatment].

Sec. Am. Compl. (Dkt. No. 30) at ¶ 45. This note suggests that defendant Koenigsmann denied the recommended course of treatment for medically based reasons, which could be enough to avoid liability for any alleged retaliatory conduct. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) ("[Defendant] DOC[C]S may evade liability if it demonstrates that it would have [engaged in the adverse conduct] even in the absence of the protected conduct." (internal quotation marks omitted)); *accord*, *Murray v. Hulihan*, No. 08-CV-0912, 2010 WL 1235615, at *3 (N.D.N.Y. Mar. 17, 2010) (Baxter, M.J.), *report and recommendation adopted by* 2010 WL 1260140 (N.D.N.Y. Mar. 31, 2010) (Mordue, J.).

amended complaint alleges that plaintiff filed specific grievances against defendant Parmer, there are no other allegations to plausibly suggest a causal connection between any of those grievances and defendant Parmer's alleged denial of medical treatment. While it is true that close temporal proximity can be a factor that gives rise to a causal connection, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009), plaintiff's second amended complaint fails to allege that defendant Parmer's alleged refusal to adequately treat plaintiff arose shortly after plaintiff filed a grievance against him. Moreover, while it is alleged that defendant Parmer treated plaintiff between 2008 and 2012, at least some of plaintiff's allegations in support of his retaliation claim vaguely suggest that defendant Parmer refused medical treatment based on grievances filed by plaintiff prior to 2008. *See* Sec. Am. Compl. (Dkt. No. 3) at ¶ 33 ("[T]he defendants[, including defendant Parmer,] . . . deliberately opted merely to test the plaintiff's ALT levels . . . in reprisal for his having filed numerous medical grievances from 2002 to 2012."). It is unclear from the allegations why defendant Parmer might be motivated by plaintiff's past grievances against Upstate medical staff to retaliate against him. *See Edwards v. Horn*, No. 10-CV-6194 , 2012 WL 760172, at *17 (S.D.N.Y. Mar. 8, 2012)

27

("[The plaintiff]'s reliance on temporal proximity does not make his claims plausible, as he fails to differentiate between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate any nexus between a specific grievance and a specific adverse action.").

I am mindful of the Second Circuit's admonition that claims of retaliation should be scrutinized with particular care because "virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001). "Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims 'with skepticism and particular care.'" *Brobston v. Schult*, No. 10-CV-0242, 2011 WL 5325715, at *9 (N.D.N.Y. Sept. 28, 2011) (Treece, M.J.), *report and recommendation adopted by* 2011 WL 5325778 (N.D.N.Y Nov. 3, 2011) (Sharpe, J.), (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). In this case, the allegations contained in plaintiff's second amended complaint merely allege that plaintiff filed grievances against defendant Parmer and that, as a result, defendant Parmer neglected to provide adequate medical treatment to plaintiff. Such

conclusory allegations, without more, are insufficient to satisfy the causal connection element necessary to state a claim for retaliation.

To fill this void, plaintiff alleges that an OMH employee, John Marinelli, told plaintiff that he heard defendants Parmer and Schroyer (and three other Upstate medical employees) "vehemently discussing grievances filed by . . . [plaintiff]." Sec. Am. Compl. (Dkt. No. 30) at ¶ 47. This allegation, which the court must credit at this procedural juncture, nonetheless fails to enhance the plausibility of plaintiff's retaliation claim. The fact that defendants Parmer and Schroyer discussed plaintiff's grievances does not, alone, provide a basis for the court to infer a causal connection between the grievances and the alleged inadequate treatment. Indeed, there could be any number of reasons why the two defendants were discussing the grievances that would not lead to a conclusion that defendant Parmer denied plaintiff treatment as a result the filing grievances against him. Without more, plaintiff is not entitled to the benefit of an inference that there is a causal link between plaintiff's grievances and defendant Parmer's alleged inadequate medical care.

For all of these reasons, I recommend that defendants' motion to dismiss plaintiff's retaliation claim asserted against all defendants be

granted.

## 2. Conspiracy to Retaliate

Plaintiff asserts a claim of conspiracy in violation of 42 U.S.C. § 1983 against defendants Parmer, Smith, Powers, Lashway, and Schroyer.[9] Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 42-44. Defendants argue, however, that this claim is not legally cognizable, based upon the intra-agency conspiracy doctrine, which precludes such claims against officers, agents, or employees of a single corporate entity. Defs.' Memo of Law (Dkt. No. 32-1) at 5.

To sustain a conspiracy claim under section 1983, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Benitez v. Ham*, No. 04-CV-1159, 2009 WL

---

[9] That section provides, in relevant part, that

> [e]very person who . . . causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress

42 U.S.C. § 1983.

3486379, at *18, (N.D.N.Y. Oct. 21, 2009) (Mordue, J., *adopting report and recommendation* by Lowe, M.J.). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.1983).

In this case, because I have already recommended that plaintiff's conspiracy claim be dismissed for failure to state a cognizable claim, I similarly recommend that his conspiracy to retaliate claim be dismissed. *See O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 426 (S.D.N.Y. 2004) ("In the absence of any claim establishing a violation of civil rights, the court must also dismiss claims of conspiracy[.]"); *Singer v. Fulton Cnty. Sheriff's Dep't*, No. 92-CV-1561, 1994 WL 549741, at *5 (N.D.N.Y. Oct. 4, 1994) (Hurd, M.J.), *aff'd* 63 F.3d 110 (2d Cir. 1995) ("Without a [constitutional] violation, there can be no actionable conspiracy."). Accordingly, I recommend dismissal of this conspiracy claim asserted against defendants Parmer, Smith, Powers, Lashway, and Schroyer, and find it unnecessary to address defendants' argument that the intracorporate conspiracy doctrine applies in this case.

D.     Eighth Amendment Claim of Medical Indifference

At the heart of plaintiff's second amended complaint in this action are his allegations that defendants violated his Eighth Amendment rights when they denied him the medical treatment that he requested for his Hepatitis C condition. The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (internal citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones*." Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

32

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (internal citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical

condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of

mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *accord*, *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

Plaintiff's second amended complaint in this action asserts a deliberate medical indifference claim against all eight named defendants. I have analyzed the sufficiency of plaintiff's deliberate indifference allegations only as they relate to defendants Parmer and Koenigsmann.[10]

---

[10]     As was discussed above, I have recommended dismissal of this claim to the extent it is asserted against defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock for lack of personal involvement. *See* Part III.B.1., *ante*.

### 1. Objective Element

After carefully considering the matter, I find that plaintiff's second amended complaint alleges sufficient facts to satisfy the objective element of the analysis. Plaintiff's allegations plausibly suggest that defendants Parmer and Koenigsmann failed to take even "'reasonable measures' in response to a medical condition." *Salahuddin*, 467 F.3d at 280. It is alleged, for example, that in 2002, plaintiff's blood tests indicated that he might have Hepatitis B and C, but the diagnosis could not be confirmed without a liver biopsy. Sec. Am. Compl. (Dkt. No. 30) at ¶ 16. Despite repeated requests for a biopsy in September 2002, one was not performed until July 23, 2003. *Id.* at ¶ 23. On August 20, 2003, the then-DOCCS Chief Medical Officer, who is not a party to this action, denied a recommendation from plaintiff's doctor that plaintiff begin antiviral therapy. *Id.* at ¶ 25. Plaintiff alleges that from that point until September 2011, he was not treated for Hepatitis C. *Id.* at ¶ 27. Defendant Parmer acted as plaintiff's primary medical provider from 2008 until 2012. *Id.* at ¶ 26. Between 2002 and 2011, plaintiff filed several grievances alerting all defendants of the inadequacy of his care, including one alleging that defendant Parmer failed to recommend that Benitez be afforded antiviral

treatment or a liver biopsy. *Id.* at ¶¶ 26, 28, 34. Defendant Parmer finally recommended antiviral treatment in September 2011, but treatment was ultimately postponed until after another liver biopsy was performed. *Id.* at ¶ 38-39. Following that biopsy in November 2011, the results of which evinced "cirrhosis consistent with Hepatatis C, grade 3/4, stage 4/4," defendant Koenigsmann denied a recommendation that plaintiff be considered for Hepatitis C therapy. *Id.* at ¶ 44-45. It was determined by Upstate's "treatment team" that plaintiff's condition was too advanced to justify treatment. *Id.* at ¶ 46. Considered together, these allegations plausibly suggest that defendant Parmer, who treated plaintiff, and defendant Koenigsmann, who had been alerted to plaintiff's condition, reviewed plaintiff's case, and ultimately denied recommended treatment, thereby failing to reasonably treat plaintiff's Hepatitis C for at least a period of three-and-a-half years.

In addition, I find that the alleged inadequate treatment was "sufficiently serious" to satisfy the objective element of a medical indifference claim. As was discussed above, plaintiff's second amended complaint alleges that, as a result of the failure of defendants Parmer and Koenigsmann to treat his Hepatitis C, the illness progressed so far that, by

2011, treatment was no longer appropriate. Sec. Am. Compl. (Dkt. No. 30) at ¶ 46. In addition, plaintiff alleges that he has suffered fatigue, prolonged abdominal pain, nausea, vomiting, dizziness, and psychological distress as a result of defendants' inadequate treatment. *Id.* at ¶¶ 34, 50. Plaintiff also remains at "risk for developing many potentially fatal complications." *Id.* at ¶ 51. These allegations are enough to satisfy the "sufficiently serious" prong of the objective inquiry. *See Salahuddin*, 467 F.3d at 281 (finding that a five-month delay in performing a liver biopsy on the plaintiff who had Hepatitis C "caused sufficiently serious harm" because the plaintiff alleged that he "suffered pain" during those five months); *but see Motta v. Wright*, No. 06-CV-1047, 2009 WL 1437589, at *16 (N.D.N.Y. May 20, 2009) (Mordue, J., *adopting report and recommendation by* DiBianco, M.J.) (finding, on a motion for summary judgment, that a three-and-a-half year delay between biopsies of a plaintiff with Hepatitis C was not sufficiently serious where the defendants produced evidence that the virus progresses so slowly that three years was unremarkable); *compare Dabney v. Maddock*, No. 10-CV-0519, 2011 WL 7479164. at *8 (N.D.N.Y. Nov. 29, 2011) (Peebles, M.J.), *report and recommendation adopted by* 2012 WL 760748 (N.D.N.Y. Mar. 7, 2012) (Suddaby, J.) (granting

defendants' motion to dismiss where the plaintiff merely alleged that the defendant failed to respond to a request for treatment of his Hepatitis C); *Melendez v. Wright*, No. 05-CV-1614, 2008 WL 4757360, at *4-5 (N.D.N.Y. Oct. 29, 2008) (Mordue, J. *adopting report and recommendation by* Treece, M.J.) (finding, on a motion for summary judgment, that the plaintiff had failed to establish that the defendant's alleged inadequate treatment was sufficiently serious where the Hepatitis C was at stage zero fibrosis and the plaintiff failed to demonstrate how the defendants' conduct affected him).

## 2. Subjective Element

As for the second, subjective requirement for stating an Eighth Amendment medical indifference claim, I find that the allegations in plaintiff's second amended complaint are similarly satisfactory. To satisfy the subjective element, a plaintiff's complaint must allege facts that plausibly suggest the defendant knew of or disregarded an excessive risk to inmate health or safety. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted). Although it is true, as defendants argue, that a plaintiff must do more than allege that he disagrees with the treatment provided by medical providers to satisfy this

element, *Chance*, 143 F.3d at 703, in this case, plaintiff's second amended complaint does exactly that. Plaintiff alleges, for example, that defendant Parmer was plaintiff's medical provider from 2008 until March 2012. Sec. Am. Compl. (Dkt. No. 3) at ¶ 27. He also asserts that defendants Parmer and Koenigsmann reviewed his blood tests results from 2008 until 2011, revealing that his ALT levels remained elevated. *Id.* at 32. All defendants allegedly were aware of the treatment recommended in the DOCCS Hepatitis C Guidelines, and the significance of elevated ALT levels. *Id.* at ¶¶ 29-31. It is also alleged that defendants Parmer and Koenigsmann ignored the results of plaintiff's blood tests and neglected to follow the recommended Hepatitis C treatment because plaintiff filed grievances against Upstate medical providers for their treatment of plaintiff's Hepatitis C illness. *Id.* at ¶ 33. As a result, plaintiff allegedly suffered serious medical consequences, including liver cirrhosis. *Id.* at 33-34.

Although it may become clear later in this litigation, based upon a more fully developed record, that plaintiff's medical indifference claim cannot be supported, I find that, at this juncture, when considered together, all of these allegations amount to more than mere negligence or

an inadvertent failure to provide adequate care. *Estelle*, 429 U.S. at 105-06. They also evince more than just plaintiff's disagreement with medical providers regarding treatment. *See Chance*, 143 F.3d at 703 (finding that, in certain instances, a medical provider may demonstrate deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan). Instead, plaintiff's allegations are adequate to satisfy the subjective element of the deliberate medical indifference analysis because they plausibly suggest defendants Parmer and Koenigsmann knowingly, and out of a motivation to retaliate against plaintiff for filing grievances against Upstate medical staff, denied plaintiff the treatment recommended in the DOCCS Hepatitis C Guidelines, and ignored blood test results in the face of a serious risk to plaintiff's health and safety.

Because I find that plaintiff's second amended complaint has alleged sufficient facts to satisfy both elements of an Eighth Amendment medical indifference claim against defendants Parmer and Koenigsmann, I recommend that defendant's motion to dismiss be denied as it relates to that claim. *See Muniz v. Goord*, No. 04-CV-0479, 2007 WL 2027912, at *9 (N.D.N.Y. July 11, 2007) (McAvoy, J*., adopting report and recommendation by* Lowe, M.J.) (denying the defendants' motion to

dismiss where the plaintiff alleged, *inter alia*, that the defendants had denied treatment for Hepatitis C, as well as testing for the progress of the disease).

     E.    Eleventh Amendment Immunity

Plaintiff's second amended complaint asserts causes of action against defendants Rock, Otis, and Koenigsmann in both their individual and official capacities. Sec. Am. Compl. (Dkt. No. 30) at ¶¶ 10-12. In support of their motion to dismiss, defendants argue that a damage claim asserted against any defendant in their official capacity is precluded by the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 32-1) at 15-16.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from

the state as the real party in interest.[11] *See, e.g., Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of New York App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing, *inter alia*, *Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."[12] *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

---

[11]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham Cnty.*, 547 U.S. 189, 193 (2006).

[12]    By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991).

Plaintiff's damage claims in this action asserted against defendants Otis, Rock, and Koenigsmann in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that, to the extent that any of the damage claims contained within plaintiff's second amended complaint are asserted against any these defendants in their official capacities, those claims be dismissed with prejudice.

F.    Subject Matter Jurisdiction Over State Law Claims

In their motion, defendants argue that the court lacks subject matter jurisdiction over plaintiff's state law claims. Defs.' Memo. of Law (Dkt. No. 32-1) at 18. Their motion, however, fails to identify any state law claims allegedly asserted by the plaintiff in his second amended complaint. *See id.* Similarly, my careful review of plaintiff's second amended complaint, including its preamble and request for relief, fails to reveal the existence of any state common law or statutory claims. Accordingly, I will not address this argument.

G.    Timeliness

The final issue raised by defendants in their motion is an argument that plaintiff's Eighth Amendment medical indifference claim is barred by the governing statute of limitations. Defs.' Suppl. Memo. of Law (Dkt. No. 32-5).

The applicable limitations period for a section 1983 action is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Accordingly, in New York, the statute of limitations for a section 1983 action is three years. N.Y. C.P.L.R. § 214(5); *see also Connolly v. McCall*, 254 F.3d 36, 40-41 (2d Cir. 2001) ("[The plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions[.]"); *accord*, *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1138, 1156 (2d Cir. 1995). A claim arising under section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly*, 254 F.3d at 41 (internal quotation marks omitted).

In certain circumstances, the continuing violation doctrine has been applied to toll the statute of limitations in the context of section 1983

claims. *See Shomo v. City of N.Y.*, 579 F.3d 176, 182 (2d Cir. 2009) (finding the continuing violation doctrine can apply "when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs"); *see also Matthews v. Conn. Dep't of Pub. Safety*, No. 10-CV-0325, 2010 WL 3984645, at *6 (D. Conn. Oct. 8, 2010) (applying the doctrine to a section 1983 First Amendment retaliation claim). "To assert a continuing violation for statute of limitations purposes [in actions where the plaintiff has asserted an Eighth Amendment deliberate medical indifference claim], the plaintiff must allege both the existence of an ongoing policy of deliberate indifference to his . . . serious medical needs and some non-time-barred acts taken in furtherance of that policy." *Shomo*, 579 F.3d at 182 (internal quotation marks and original alterations omitted).

Plaintiff's original complaint in this action is dated March 6, 2012.[13] Compl. (Dkt. No. 1). Accordingly, without consideration of the continuing violation doctrine, any claims accruing prior to March 6, 2009 would be

_____

[13]    Under the prison mailbox rule, a *pro se* inmate's papers are deemed filed as of the date they are given to prison officials. *Tracy v. Freshwater*, No. 01-CV-0500, 2008 WL 850594, at *1 (N.D.N.Y. Mar. 28, 2008) (McCurn, J.). For purposes of the pending motion, I have assumed that plaintiff conveyed his complaint to prison officials on the date it was signed.

untimely. Although it is true that plaintiff's allegations regarding his medical treatment date back to 2002, when considered as a whole, the allegations contained in the second amended complaint describe a continuing pattern of denying treatment recommended by plaintiff's medical providers, as well as a continuing pattern of ignoring consistent blood test results showing elevated ALT levels, from 2002 through 2012. Sec. Am. Compl. (Dkt. No. 30) at ¶ 25, 31-33, 39, 44. This is precisely the type of circumstances that can give rise to an application of the continuing violation doctrine. *See Shomo*, 579 F.3d at 182 (affirming district court's application of the doctrine where the plaintiff's complaint "allege[d] a policy of doctors and prison staff disregarding treatment recommendations") (citing *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) ("[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians.")). Accordingly, I recommend denial of defendants' motion to dismiss plaintiff's claims as untimely.

H.     Whether to Grant Leave to Amend

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where the court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). In this instance, given the procedural history of this action, the court must determine whether plaintiff is entitled to the benefit of this general rule.

After carefully considering the matter, I find that defendants would be unfairly prejudiced if plaintiff is permitted to file a third amended complaint in this action. After filing his original complaint in March 2012, plaintiff filed a first amended complaint as of right on April 10, 2012. Dkt. No. 3. Plaintiff then sought, and was granted, leave to file a second amended complaint. Dkt. Nos. 24, 29. In lieu of filing an answer, defendants timely filed the pending motion to dismiss in response to

plaintiff's first and second amended complaints. Dkt. Nos. 32, 44. Plaintiff has responded appropriately in opposition to the pending motion. Dkt. No. 42. Were the court to grant plaintiff leave to further amend, significant delay would be occasioned in this action, which is already fifteen months old and has not yet reached discovery.

I also note that, as District Judge Glenn T. Suddaby observed in his initial review of plaintiff's amended complaint, although plaintiff proceeds *pro se* in this action, he may no longer be afforded the benefit of the special solicitude *pro se* litigants normally receive in this circuit due to his demonstrated proficiency at drafting complaints. *See* Memorandum-Decision and Order (Dkt. No. 9) at 3-4 (finding that plaintiff has filed "some 33 other *pro se* prisoner civil rights action in district courts within the Second Circuit," and that "as far as the Court can tell, none of those actions has been dismissed for failure to state a claim" (citing *Tracy v. Freshwater*, 623 F.3d 90, 103 (2d Cir. 2010)). In light of plaintiff's experience as a *pro se* litigant, the fact that he has now filed two amended complaints in this action, and the age of the case, I recommend that plaintiff not be granted leave to file a third amended complaint.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's second amended complaint fails to allege sufficient facts to plausibly suggest that defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock were personally involved in the constitutional violations asserted against them. Accordingly, I recommend that those defendants be dismissed from the action.

As it relates to defendants Parmer and Koenigsmann, although plaintiff's second amended complaint fails to allege sufficient facts to state a claim against those defendants for retaliation, in violation of the First Amendment, it does state a cognizable claim against those two defendants for medical indifference, in violation of the Eighth Amendment. In addition, plaintiff's Eighth Amendment claim cannot be dismissed on the basis of the governing statute of limitations at this juncture, in light of the potential applicability of the continuing violation doctrine.

Finally, in light of plaintiff's demonstrated competency at drafting complaints as a *pro se* litigant, the fact that he has already filed two amended complaints, and the length of time this action has been pending, I recommend that plaintiff not be granted leave to file a third amended complaint.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 32) be GRANTED, in part, and that plaintiff's claims asserted against defendants Smith, Lashway, Powers, Schroyer, Otis, and Rock be dismissed, and that plaintiff's retaliation and conspiracy to retaliate claims be dismissed from the action, with prejudice; and it is further

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 32) otherwise be DENIED, and that plaintiff's Eighth Amendment deliberate medical indifference claim asserted against all defendants, except defendants Otis and Rock, survive.

NOTICE: Pursuant to 28 U.S.C. 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with clerk of court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d at 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    July 8, 2013
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

March 29, 2011.
Joseph Parks, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Aaron M. Baldwin, Esq., of Counsel, Albany, NY, for Defendants.

### *REPORT–RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Joseph Parks alleges that Defendants violated his right to exercise his religion when they disciplined him for attempting to mail a photograph of himself with his hands in what he characterizes as a prayer pose and Defendants characterize as a gang sign. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 51.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant times an inmate at Shawangunk Correctional Facility ("Shawangunk"), was raised as a Jehovah's Witness, but did not fully accept the religion until 2000 or 2001. (Dkt. No. 51–8 at 6:11.[FN1]) Thereafter, Plaintiff prayed five or six times per day. *Id.* at 22:6–11. Each time he prayed, Plaintiff placed his hands in a meditative hand position. *Id.*

at 17:17–18:5.) He assumed this hand position so that he could "make sure [he] went before [his] Father clean. Not just physically but mentally." *Id.* at 22:16–21. The hand position is not mandated for all Jehovah's Witnesses, but Plaintiff's own research and study led him to believe that he, personally, is required to use the hand position "[b]ecause where I am spiritually and what I know pertaining to the Bible as well as research. What you know holds you accountable." *Id.* at 24:11–17; 25:7–26:6. Plaintiff believes that he cannot pray without using the hand position. *Id.* at 12:13–13:13, 31:3–18.

> FN1. Page numbers refer to the page number assigned by the Court's electronic filing system.

On February 27, 2007, Plaintiff attempted to mail a letter and photograph to a personal ad service. (Dkt. No. 51–4 at 2 ¶ 6.) The photograph depicted Plaintiff, clad in a shirt and red pants, sitting on a chair. (Dkt. No. 51–6; Dkt. No. 51–8 at 16:14–18.) Plaintiff's feet were placed wide apart and his elbows were resting on his thighs. (Dkt. No. 51–6.) His hands were pressed together with his fingertips pointed downward and his thumbs meeting at the top to form a heart or diamond shape. *Id.* At his deposition, Plaintiff testified that he was not praying or meditating when the picture was taken. (Dkt. No. 51–8 at 28:14–16.) Rather, he "was just trying to relax and in the course of just trying to relax," he made the hand sign. *Id.* at 28:14–23. In the letter that accompanied the photograph, Plaintiff indicated that he wanted "to begin a good friendship" with "someone special" and hoped to "find my ideal woman who can complete me ... as I complete her." (Dkt. No. 51–5 at 7.) In the letter, Plaintiff referred to himself several times as a "spiritual" person, but did not mention that he is a Jehovah's Witness. (*Id.;* Dkt. No. 51–8 at 36:3–7.) At his deposition, Plaintiff testified that he included the photograph with the letter to "have a resemblance of me.... [t]o show what I looked like." (Dkt. No. 51–8 at 16:19–23.) In a declaration submitted in opposition to Defendants' motion for summary judgment, Plaintiff states that he "included the photo, not only to show what I look like but to attract someone who practices the same religion I do." (Dkt. No. 55 at 36.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

**\*2** The photograph was taken in the gym at Shawangunk, and DOCS personnel screened it before allowing Plaintiff to leave the gym with it. (Dkt. No. 51–8 at 15:4–23.) However, when Defendant Corrections Officer Kim Skwera, who was assigned to review outgoing inmate mail on February 27, 2007, saw the photograph, she "suspected that the photograph depicted [Plaintiff] making a gang sign with both his hands." (Dkt. No. 51–4 at 2 ¶¶ 6–7.) Based on this suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco, who had training in these matters and was one of the staff members who regularly reviewed incoming media and other materials to ensure that they do not contain any unauthorized gang material." *Id.* ¶ 8.

There is no written DOCS policy, procedure, or directive governing specifically how to identify gang insignia or materials. (Dkt. No. 51–3 at 3 ¶ 12.) Rather, staff members such as Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit. *Id.* ¶ 13. During this training, staff hear oral instruction and see examples of gang signs and symbols. *Id.* ¶ 15. The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS ." *Id.* at 4 ¶ 16. Staff learn that "The Bloods original color is RED ... Members' display of hand signs varies depending on the Set they belong to. The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers." *Id.* ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign. *Id.* at 5 ¶ 22. He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture. *Id.* at ¶¶ 23–24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia,* violating DOCS

Rule 105.12. (Dkt. No. 51–4 at 2 ¶ 10.) That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007. (Dkt. No. 51–5 at 3, 13.) Defendant Lt. G. Gardner served as the hearing officer. *Id.* at 3. Plaintiff alleges that Defendant Gardner "created a hostile environment, using intimidation tactics of taunting and facial gestures." (Dkt. No. 1 at 8 ¶ 16.)

**\*3** Plaintiff called Defendants Skwera and Franco as witnesses. (Dkt. No. 51–5 at 3.) Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign. *Id.* at 6. Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly ... an unauthorized hand sign." *Id.* at 9. Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them. *Id.* at 9–10. Defendant Franco testified that the "only religious ... group that comes close to that type of hand sign ... would be the Rastafarians.... [T]hat's the only one I'm familiar with. I am not familiar with ... meditation ... at all." *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation ... I reacted when trying to get calm for the picture ." *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge. *Id.* at 16. He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision. *Id.* at 17. He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges. *Id.* He stated that the reason for his decision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited." *Id.*

Plaintiff appealed Defendant Gardner's decision. (Dkt. No. 51–5 at 18.) In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant to my religious beliefs ... so to find me guilty is to infringe on my Constitutional rights that guarantee[ ] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40. Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007. *Id.* at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion. (Dkt. No 1 at 9 ¶ 21.) Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." *Id.* When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith. *Id.* ¶ 22. When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director. *Id.* at 9–10 ¶ 23. Plaintiff did not receive a response. *Id.* at 10 ¶ 24.]

**\*4** Plaintiff filed the complaint in this action on June 4, 2008. (Dkt. No. 1.) Plaintiff's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[ ] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a tier hearing consistent with his

constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11–12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56–2.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Id.; accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

**A. RLUIPA**

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

**\*6** [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN3] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

> FN3. An "institution" is, *inter alia,* "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1)(B)(ii) (2003).

42 U.S.C. § 2000cc–1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages. (Dkt. No. 51–10 at 6–13.)

1. *Whether Plaintiff Was Engaged in a Religious Exercise*

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise." (Dkt. No. 51–10 at 8–9.) I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51–10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice. At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture." (Dkt. No. 51–5 at 12, 14.) Plaintiff testified at his deposition that he "fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51–8 at 29:7–11.) Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA. Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice. (Dkt. No. 51–10 at 8–9.)

**\*7** Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise. *See, e.g., Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007). Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere. As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations...." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis. As the Supreme Court has noted:

Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

624 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose. As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is insincere and that he was, in fact, making a gang sign. But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax. But as a matter of law, I cannot credit one interpretation over the other. The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit ... protection." Thomas, 450 U.S. at 714. Further, "[c]ourts should not undertake to dissect religious beliefs because the ... [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." Id. at 715.

**8** Finally, I note that Farid v. Smith, 850 F.2d 917 (2d Cir.1988), cited by Defendants, is distinguishable. In that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards ..." Farid, 850 F.2d at 926. Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

2. *Substantial burden*

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise. 42 U.S.C. § 2000cc–1(a). Defendants argue that even if Plaintiff was

disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff. (Dkt. No. 51–10 at 9–11.) I find that Plaintiff has raised a triable issue of fact on this issue.

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use ... meditation poses ... while praying ...." (Dkt. No. 51–10 at 10.) Defendants cite Defendant Franco's declaration as support for the latter assertion. In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying ..., *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* ...." (Dkt. No. 51–3 at 6 ¶ 33, emphasis added.) In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007. I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs. A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this pressure was not substantial. Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

3. *Least Restrictive Means of Furthering a Compelling Governmental Interest*

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). The burden of proving this element is on Defendants. Redd v. Wright, 597 F.3d 532,

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

536 (2d Cir.2010) ("[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest.").

**\*9** Defendants argue that they were motivated by the compelling governmental interest of preventing gang activity and that their "zero tolerance" policy is the least restrictive means of furthering that interest. (Dkt. No. 51–10 at 11.) Defendant Franco's declaration discusses, at length, the security problems posed by gang activity within the DOCS system. Defendant Franco declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled the Department to take steps to slow the growth of these groups and monitor them closely." (Dkt. No. 51–3 at 2 ¶ 5.) Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying themselves and communicating with other members both within and outside correctional facilities. These include the use of code words, slang, hidden messages (sometimes contained in letters or newspaper classified advertisements), and signs, symbols, and insignia which can range from anything [from] wearing certain color clothing or jewelry, to tattoos, and the use of hand signs, symbols and gestures, whether in person or in photographs.

> *Id.* ¶ 6.

"Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007). Courts must be sensitive to these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). This, however, does not end the inquiry.

In *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009), the Second Circuit noted with approval that "[o]ther circuits have ... recognized that the state may not merely reference an interest in security ... in order to justify its actions...." Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id.* at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). The Second Circuit also noted with approval that "[o]ther circuits ... have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " *Id.* (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir.2005)). As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices. *Forde v. Baird,* 720 F.Supp.2d 170, 180 (D.Conn.2010).

**\*10** Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities." (Dkt. No. 51–3 at 3 ¶ 9.) Otherwise, he states:

> it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous. Without a zero tolerance policy, the prohibitions could also be applied ... inconsistently from one situation to another.

> *Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods. If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment. However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate. (Dkt. No. 51–3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

5. *Availability of Money Damages*

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief. (Dkt. No. 51–10 at 13.) Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The United States Courts of Appeals are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (money damages not available) *with Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir.2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted* —— U.S. ——, 130 S.Ct. 3319, 176 L.Ed.2d 1218 (2010) (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon,* I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

**B. Free Exercise Clause Claim**

**\*11** Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51–10 at 6–13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN4] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

FN4. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

**C. Retaliation**

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See* *Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See* *Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims

of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See* *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

**\*12** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51–10 at 11–12.) As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph. Therefore, I find Defendants' argument regarding the first prong to be without merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action ..." (Dkt. No. 51–10 at 11.)

Regarding the third prong:

[t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Vega v. Artus,* 610 F.Supp.2d 185, 207 (N.D.N.Y.2009) (citations and punctuation omitted) (Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants were substantially motivated by Plaintiff's religion. Defendants Franco and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion until they heard him testify at the disciplinary hearing. (Dkt. No. 51–3 at 5–6 ¶¶ 27–30; Dkt. No. 51–4 at 4–5 ¶¶ 21–25.) Although Defendant Gardner was aware of Plaintiff's faith when he found Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was substantially motivated by Plaintiff's religion to punish Plaintiff. Although the complaint characterizes Defendant Gardener's conduct at the hearing as "hostile" and "intimidating" (Dkt. No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything derogatory about Jehovah's Witnesses or people who use hand poses to pray. As for the other defendants, Plaintiff asserts that they must have known about his religion because, when he became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion. (Dkt. No. 51–8 at 6:2–20.) However, there is no evidence that any of the named defendants were aware of that form. Accordingly, I find that Plaintiff has not raised a triable

issue of fact that there was a causal connection between his protected conduct and the adverse action. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

**D. Personal Involvement**

*13 Defendants argue that, even if Plaintiff had raised a triable issue as to any of his substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement. (Dkt. No. 51–10 at 18–22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN5]

FN5. In *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

1. *Claims Against Defendant Smith*

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19–20); (2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9–10 ¶¶ 22–23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all. Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at *2–3 (W.D.N.Y. Dec.7, 2009).[FN6] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2–3. Here, there is no evidence that

Defendant Smith proactively participated in the review.

FN6. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN7. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

*14 A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement. *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Thus, Defendant Smith's alleged failure to respond to Plaintiff's grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked, unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally involved in any alleged constitutional violations.

2. *Claims Against Defendant Maly*

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary conviction. (Dkt. No 1 at 9 ¶¶ 19–20.) As discussed above, such a claim is insufficient to establish personal involvement unless there is evidence that the defendant was proactively involved in the appeal. Here, there is no such evidence regarding Defendant Maly. Therefore, Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any alleged constitutional violations.

3. *Claims Against Defendants Krom and Egan*

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance. (Dkt. No. 1 at 9–10 ¶¶ 22–24.) As discussed above regarding Defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Smith, this is insufficient to establish personal involvement. Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be *GRANTED.*

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

Sept. 12, 2011.
Joseph Parks, Wallkill, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. INTRODUCTION**
      **\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. George H. Lowe, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his March 29, 2011 Report–Recommendation, Magistrate Judge Lowe recommended that Defendants' motion for summary judgment (Dkt. No. 51) be granted. Plaintiff has filed objections to this recommendation.
**II. STANDARD OF REVIEW**

      When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009).[FN1] After reviewing the Report–Recommendation,

the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).
      FN1. The Southern District wrote in *Frankel:*

      The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. *See Pearson–Fraser v. Bell Atl.,* No. 01 Civ. 2343, 2003 W L 43367, at \*1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992). Similarly, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review." *Vega v. Artuz,* No. 97 Civ. 3775, 2002 W L 31174466, at \*1 (S.D.N.Y. Sept.30, 2002).

      2009 W L 465645, at \*2.

**III. DISCUSSION**

      Having reviewed *de novo* those portions of the Report–Recommendation that Plaintiff has lodged objections to, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Lowe's thorough report.
**IV. CONCLUSION**

      Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Lowe in their entirety. Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))

**GRANTED** and the remaining claims in this action are **DISMISSED.** The Clerk is instructed to enter judgment and close the file in this matter.

    **IT IS SO ORDERED.**

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.) [FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name. [FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Com pl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63.)

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

## DISCUSSION

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

## II. *The Temporary Release Program*

### A. *Conspiracy Claims*

**\*5** As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

### B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

**\*6** It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, Correction Law § 851 *et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 *et seq.,* contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

Correction Law § 855(9). Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 *et seq.* In addition, courts that have considered whether inmates in

New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

**7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to

engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995

Greenwaldt v. Coughlin

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3111684 (N.D.N.Y.)

(Cite as: 2009 WL 3111684 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James R. MERCER, Jr., Plaintiff,
v.
T. BENSON, Correctional Officer, Wende Correctional
Facility; T. Hunter, Correctional Officer, Wende
Correctional Facility; R.N. P. Smith, Correctional
Sergeant, Wende Correctional Facility; Richard Roy,
Inspector General, New York State Department of
Correctional Services; Dale Artus, Superintendent,
Clinton Correctional Facility; Linda Turner, Deputy
Superintendent for Program Services, Clinton
Correctional Facility; Vonda Johnson, Director of
Facility Health Services, Clinton Correctional Facility;
Brian Lecuyer, Nurse Administrator, Clinton
Correctional Facility; S. Miller, Nurse Practitioner,
Clinton Correctional Facility; and T. Brousseau, Inmate
Grievance Program Supervisor, Clinton Correctional
Facility, Defendants.
No. 08–CV–537 (DNH/DRH).

Aug. 14, 2009.
James R. Mercer, Jr., Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Christina L. Roberts–Ryba, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Michael G. Mccartin, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER**[FN1]

> **FN1.** This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se James R. Mercer, Jr. ("Mercer"),
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brings
this action pursuant to (1) 42 U.S.C. § 1983 alleging that
defendants, ten DOCS employees, violated his
constitutional rights under the First, Eighth, and
Fourteenth Amendments; and (2) Title II of the Americans
with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.,
alleging that defendants Artus, Turner, and Miller violated
his rights under that statute. Compl. (Docket No. 1).
Presently pending is defendants' motion for judgment on
the pleadings [FN2] as to defendants Turner, Artus, and Roy
and as to the ADA claims against Miller pursuant to
Fed.R.Civ.P. 12(c).[FN3] Docket No. 49.[FN4] Mercer opposes
the motion. Docket No. 70. For the following reasons, it
is recommended that defendants' motion be granted.

> **FN2.** Defendants' Notice of Motion and
> Memorandum of Law describe their motion as
> one to dismiss but refer to Rule 12(c) as
> authority for their motion. see Docket Nos. 49–1
> at 1, 49–3 at 3. Rule 12(c) authorizes motions for
> judgement on the pleadings "[a]fter the pleadings
> are closed." As the pleadings in this case are now
> closed, see Docket Nos. 1, 21), and as plaintiffs
> cite Rule 12(c) rather than Rule 12(b) as the
> authority for their motion, the motion will be
> treated as one for judgment on the pleadings. See
> subsection II(A) infra.

> **FN3.** Also pending are defendants' motion for
> reconsideration of a discovery order and
> Mercer's motion to compel discovery. Docket
> Nos. 60, 72. Those motions will be addressed in
> a separate order.

> **FN4.** In his response papers, Mercer concedes
> that the ADA claims should be dismissed against
> Artus, Turner, and Miller. Docket No. 70 ¶ 4.
> Additionally, he agrees that this concession
> dismisses Turner from the action entirely. Id.
> Therefore, defendants' motion as to those

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3111684 (N.D.N.Y.)

(Cite as: 2009 WL 3111684 (N.D.N.Y.))

defendants and claims should be granted without objection.

### I. Background

The facts are related herein in the light most favorable to Mercer as the non-moving party. *See* subsection II(A) *infra.*

On November 30, 2006, Mercer was involved in an altercation at Wende Correctional Facility with defendants Benson, Hunter, and Smith, all corrections officers. Compl. ¶¶ 19–33. As a result of the altercation, Mercer was issued a misbehavior report and on December 5, 2006, was found guilty and sentenced to six months in the Special Housing Unit ("SHU").[FN5] *Id.* ¶¶ 34, 37. On December 20, 2006 and January 12, 2007, Mercer sent letters to defendant Roy, the DOCS Inspector General, seeking to press criminal charges against the corrections officers involved in the altercation. *Id.* ¶ 38. Mercer received no response from Roy. *Id.*

> [FN5.] SHUs generally "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Mercer's mother began corresponding with various state agencies and legislators about the November 30 incident. Compl. ¶ 39. In response, Roy called Mercer's mother and "advised ... that because of the report ... and the finding of guilt towards [Mercer] thereto, transfer to a facility in the Western New York area was not feasible." *Id.* Mercer's mother continued attempts to have criminal charges brought against the three corrections officers by filing felony complaints with the town court. *Id.* ¶¶ 40–43. These complaints were forwarded back to Roy, who still failed to act on of them. *Id.* ¶ 43.

Similarly, Mercer sent multiple complaints and grievances to defendant Artus, the Superintendent at Clinton Correctional Facility, regarding his medical problems resulting from low back pain and related conditions. Compl. ¶¶ 67, 76, 83, 116, 118–19. In response, Artus sent him memoranda indicating that the complaints were received and forwarded to the appropriate individuals for investigation and resolution of Mercer's complaints. *Id.* ¶¶ 68, 77. Defendant Turner, the Deputy Superintendent for Program Services at Clinton, provided Mercer with DOCS Request for Reasonable Accommodations forms on two occasions. *Id.* ¶¶ 103, 109. She also signed the request forms when they were properly completed and received by her for further consideration by the medical department and administration. *Id.* ¶¶ 104, 110. After medical review was complete, Turner twice denied Mercer's requests for accommodations "because 'Medical staff have determined no medical need to substantiate request.' " *Id.* ¶¶ 107, 112. This action followed.

### II. Discussion

#### 1. Legal Standard[FN6]

> [FN6.] Mercer has attached documents to his opposition which are considered on this motion. *Falso v. Ablest Staffing Servs.,* ——F.3d ——, 2009 WL 1762206, at *1 (2d Cir. June 23, 2009) ("In deciding a motion to dismiss, a court should consider only those facts alleged in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.").

**\*2** "The standard for granting a Rule 12(c) motion ... is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted). Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04–CV–1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y. Sept. 30, 2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the nonmoving party cannot prove

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3111684 (N.D.N.Y.)

(Cite as: 2009 WL 3111684 (N.D.N.Y.))

a set of facts which would support his or her claim or entitle him or her to relief. *See* *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of N.Y.,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See* *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also* *Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

**B. Personal Involvement**

Defendants contend that Mercer has failed to allege the personal involvement of defendants Roy, Turner, or Artus. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*3** (1)[T]he defendant participated directly in the

alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

**1. Roy**

A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *Wright,* 21 F.3d at 501. Therefore, Roy's position as the DOCS Inspector General alone is insufficient to establish personal involvement. Moreover, the receipt of letters complaining of alleged constitutional violations will not suffice to establish personal involvement. *See Sealey,* 116 F.3d at 51. At best, Mercer's allegations against Roy establish no moe than this. Roy's actions in speaking with Mercer's mother constituted no more.

Further, the fact that an official failed to investigate the contents of a letter alleging a constitutional violation is likewise insufficient to establish personal involvement. *Westbrook v. City Univ. of N.Y.,* 591 F.Supp.2d 207, 225 (E.D.N.Y.2008). Thus, Mercer's contentions alleging that an investigation should have been ordered for a criminal prosecution are insufficient to allege personal involvement.[FN7] Moreover, there exists no allegations that Roy created an unconstitutional policy or custom or was grossly negligent in supervising others.

> FN7. Additionally, there exists no constitutionally protected right to file criminal charges against another. *See* *Langworthy v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3111684 (N.D.N.Y.)

(Cite as: 2009 WL 3111684 (N.D.N.Y.))

*Dean,* 37 F.Supp.2d 417, 422 (D.Md.1999) ("[A] right to compel the prosecution of criminal activity does not exist."). Defendants are thus entitled to judgment on this claim. Moreover, inmates do not possess a constitutional right to placement in a correctional facility of their choosing. *See generally, Montayne v. Haynes,* 427 U.S. 236, 242–43 (1976)

Accordingly, defendants' motion as to Roy on this ground should be granted.

### 2. Artus

The mere receipt of a complaint is insufficient to establish personal involvement. *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation). "The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation." *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (citing *Ortiz–Rodriquez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)).

Mercer's contentions do not allege that Artus knew, or was personally involved with the investigation of his complaints or grievances in which Mercer received memoranda from Artus. Rather, Mercer contends that Artus was apprised of these alleged violations in Mercer's letters and grievances. Thus, Artus should have known of Mercer's complaints. This asserted knowledge, without more, is also insufficient to establish personal involvement as there exists no allegation that Artus took any action. *See Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint). Moreover, there exists no allegation that Artus created an unconstitutional policy or custom or was grossly negligent in supervising.

*4 Accordingly, defendants' motion on this ground as to Artus should be granted.

### 3. Turner

Mercer alleges that Turner's principal involvement was her provision of ADA applications to him and her ultimate denials of his applications. "[T]he denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement." *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). There are no allegations that Turner did anything more than rely on the conclusions provided by the medical department in signing the denials of Mercer's requests for accommodations for his claimed medical condition. *See Bodie,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004); *see also Keyes v. Strack,* No. 95–CV–2367, 1997 WL 187368, at *3 ("It is well established that supervisory officials are generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinions of medical staff concerning the proper course of treatment.") (*citing inter alia White v. Farrier,* 849 F.2d 322, 327 (8th Cir.1988) (holding defendant immune from liability where he "justifiably relied on the opinion of [a physician] that no medical need existed.")). Moreover, there exists no allegation that Turner created an unconstitutional policy or custom or was grossly negligent in supervising others.

Accordingly, defendants' motion as to Turner on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for judgment on the pleadings (Docket No.49) be **GRANTED** and that judgment be entered in favor of defendants Roy, Turner, and Artus on all claims against them and that the ADA claims be **DISMISSED** against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

*DECISION and ORDER*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3111684 (N.D.N.Y.)

(Cite as: 2009 WL 3111684 (N.D.N.Y.))

DAVID N. HURD, District Judge.

Plaintiff, James R. Mercer, Jr., brought this civil rights action in March 2008, pursuant to 42 U.S.C. § 1983. By Report–Recommendation dated August 14, 2009, the Honorable David R. Homer, United States Magistrate Judge, recommended that defendants' motion for judgment on the pleadings (Docket No. 49) be granted and that judgment be entered in favor of defendants Roy, Turner, and Artus, on all claims against them, and that the ADA claims be dismissed against all defendants. No objections to the Report–Recommendation were filed by the plaintiff.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Homer, the Report–Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b) (1).

**\*5** Accordingly, it is

ORDERED that

1. The defendants' motion for judgment on the pleadings is GRANTED as to defendants Richard Roy, Dale Artus, and Linda Turner, on all claims against them;

2. The plaintiff's ADA claims are DISMISSED against all defendants;

3. The Clerk is directed to enter judgment in favor of the defendants Roy, Artus, and Turner, dismissing the complaint as against them;

5. The above action is referred to the Honorable Victor Bianchini, Recalled United States Magistrate Judge, for the purposes of mediation. Any further proceedings are stayed pending the completion of mediation.

IT IS SO ORDERED.

N.D.N.Y.,2009.

Mercer v. Benson
Not Reported in F.Supp.2d, 2009 WL 3111684 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E. Duckett, Corrections Officer; Alfred J. Deluca, Corrections Officer; Donald L. Broekema, Sergeant; and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.
Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Timothy P. Mulvey, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.
**\*1** Currently before the Court, in this prisoner civil rights action filed by Jonathan Henry ("Plaintiff") against the five above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), is Defendants' motion for partial summary judgment. (Dkt. No. 24.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that, between approximately January 29, 2009, and January 31, 2009, at Ulster Correctional Facility in Napanoch, New York, Defendants violated Plaintiff's following rights in the following manner: (1) Defendants Nurse Jean Norton, Corrections Officer James F. Dinelle, Corrections Officer Russell E. Duckett and Corrections Officer Alfred J. DeLuca violated Plaintiff's rights under the First Amendment by filing retaliatory false misbehavior reports against him, and subsequently providing false testimony against him at administrative disciplinary hearings, which resulted in his spending time in the Special Housing Unit ("SHU"); (2) Defendant Dinelle violated Plaintiff's rights under the Eighth Amendment by assaulting him on two occasions, and Defendants DeLuca and Duckett violated Plaintiff's rights under the Eighth Amendment by assaulting him once; (3) Defendant Sergeant Donald L. Broekema violated Plaintiff's rights under the Eighth Amendment by failing to intervene to prevent one of these assaults from occurring; (4) Defendant Norton violated Plaintiff's rights under the Eighth Amendment by harassing him almost immediately before he was subjected to the above-described assaults; and (5) Defendants Norton, Dinelle, Duckett and DeLuca violated Plaintiff's rights under the Fourteenth Amendment by performing the aforementioned acts, which constituted atypical and significant hardships in relation to the ordinary incidents of prison life. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff was an inmate and Defendants were employees of the New York State Department of Corrections and Community Supervision at Ulster Correctional Facility. On January 30, 2009, Defendant Dinelle took Plaintiff to the medical ward, because Plaintiff was experiencing a foul odor and oozing from a wound on his leg. After Defendant Norton treated Plaintiff, she filed an inmate misbehavior report against Plaintiff based on (1) Plaintiff's harassing behavior toward Defendant Norton and Defendant Dinelle, and (2) Plaintiff's disobedience of a direct order to be quiet. The misbehavior report was signed by Defendant Dinelle as an employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> FN1. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> FN2. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which

(again) is intended primarily for review by the parties. (*Id.*)

**C. Defendants' Motion**

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].). [FN3]

> FN3. In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> FN4. Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).

**2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene**

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene

on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at \*8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at \*8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at \*8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

**3. Fourteenth Amendment Substantive Due Process Claims**

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

## 4. Qualified Immunity Defenses

*6 The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> FN6. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN7. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN8. *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

should be recognized.

*Malley,* 475 U.S. at 341.[FN9]

> FN9. *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

## A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> FN10. Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

> FN11. *See Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at \*6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

> FN12. The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at \*4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at \*3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at \*15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at \*3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at \*6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. FN14 Furthermore, those convictions were never subsequently reversed on administrative appeal. FN15 As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011)* (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See* *O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also* *Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

## C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See* *Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are ***DISMISSED*** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
I. *Introduction* [FN2]

> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred[FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged deprivation of rights. *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).* Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Jan. 24, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, was initially
referred to Magistrate Judge George H. Lowe for Report
and Recommendation by the Honorable Norman A.
Mordue, United States District Judge, pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon
Magistrate Judge Lowe's retirement on February 9, 2012,
the case was reassigned to me. Plaintiff Phillip
Jean–Laurent ("Jean–Laurent") has brought this action
against Defendants Correctional Officers Patrick Lane
("Lane"), Allen Briggs ("Briggs"), and Seth Tyndall
("Tyndall"); Correctional Sergeants Matthew Beard
("Beard") and David Pawlin ("Pawlin") (sued incorrectly
as "Sgt. Pauline"); Correctional Lieutenant Norman Jones
("Jones"); Deputy Superintendent Security Brian
McAuliffe ("McAuliffe"); Superintendents Warren

Barkley ("Barkley") and William Hulihan ("Hulihan");
Appeal Review Officer Norman Bezio ("Bezio"); Deputy
Commissioner Christopher Lindquist ("Lindquist") (sued
incorrectly as "Dep. Comm. Linquist"); Dr. Charles
Moehs ("Moehs") (sued incorrectly as "Dr. Mays"); John
Does # 1 and # 2; Dr. John Doe; and Jane Doe. (Dkt. Nos.
1, ¶¶ 9–16, and 6–17.[FN1])

> FN1. Page numbers in citations to filed
> documents refer to the page numbers assigned by
> the Court's electronic filing system rather than to
> the page number in the original document.

Defendants, with the exception of the four Doe
Defendants who have not yet been identified and served,
now move to dismiss Plaintiff's Complaint for failure to
state a claim under Federal Rule of Civil Procedure
12(b)(6).[FN2] (Dkt. No. 23.) For the reasons set forth
below, the Court recommends that Defendants' motion be
**GRANTED** in part and **DENIED** in part.

> FN2. Because the Doe Defendants have been
> excluded from the motion, this Report and
> Recommendation does not address the legal
> sufficiency of the claims asserted against them in
> the Complaint.

### I. BACKGROUND[FN3]

> FN3. The background facts set forth herein are
> taken from Plaintiff's Complaint.

### A. Facts Concerning Plaintiff's Claims Arising Out of his Storage of Draft Bags and the Destruction of His Legal Documents

Plaintiff is a former prisoner of the New York State
Department of Correctional and Community Supervision
("DOCCS"). (Dkt. No. 1, ¶ 8.) In January of 2008,
Plaintiff was transferred from Elmira Correctional Facility
("Elmira") to Cape Vincent Correctional Facility ("Cape
Vincent"). *Id.* at ¶ 17. Eight draft bags containing
Plaintiff's personal property were sent from Elmira to
Cape Vincent at the time of the transfer. *Id.* Plaintiff's

personal belongings did not all fit into the storage lockers provided for his use at Cape Vincent, so he stored personal legal documents and materials and books in two draft bags placed neatly under his bunk. *Id.* at ¶ 18.

Defendant Lane, who was the steady housing unit officer at the time, advised Plaintiff that he could not store belongings in draft bags and would have to purchase storage containers from the commissary for his excess belongings. *Id.* at ¶ 19. When Plaintiff informed Lane that he had no funds to purchase the containers because of his transfer and assured him that he would purchase the containers when his funds arrived from Elmira, Lane agreed to allow him to use the draft bags until he was able to comply with the storage policy. *Id.* at ¶ 20. The funds transferred from Elmira were collected by Cape Vincent, so Lane allowed Plaintiff to use the draft bags for another two weeks. *Id .* at ¶ 21. Lane agreed to continued use of the bags when funds Plaintiff subsequently received from home were also collected by Cape Vincent. *Id.*

**\*2** Lane subsequently learned that Plaintiff was litigating an action against correctional officers and issued Plaintiff a misbehavior report for possessing the two draft bags in his living quarters the same day. *Id.* at ¶ 22. Defendant Pawlin, who was the hearing officer on the claimed rule violations, directed Plaintiff to discard several hundred pages of legal materials and documents essential to pending litigations. *Id.*

After the hearing, Plaintiff learned of a state-wide policy directive that he believed permitted him to retain two draft bags to store personal belongings in his cell.[FN4] *Id.* at ¶ 23. When he informed Defendant Lane of the directive, Lane "outburst his disregards for the policy directive." *Id.* Plaintiff sought redress through the administrative grievance procedure. When Lane learned of Plaintiff's grievance, he contacted Defendant Beard, a Corrections Sergeant at Cape Vincent, and during phone conversations with Beard, Lane repeatedly referenced departmental directives, facility policy manuals, and the inmate's misbehavior handbook. *Id.* at ¶ 24. Lane directed Plaintiff to turn over the draft bags and moments later Defendants Beard and Lane, along with other corrections officers, manacled Plaintiff and took him to the Special Housing Unit ("SITU"). *Id.* Plaintiff's Complaint does not state the length of time during which he remained in the

SITU.

FN4. Plaintiff is presumably referring to Section III of DOCCS Directive # 4917 which provides in part:

Personal property possessed by an inmate assigned to double cell housing shall be limited to the amount of property that will fit in three standard draft bags (including legal materials). Inmates will be responsible for proper storage of property and the neat and orderly appearance of their cells.

A. *Storage of Property.* An inmate assigned to double occupancy cell housing will be allowed to possess in his or her cell two draft bags provided by the Department for storage of property. Any property beyond what can be stored in the individual locker may be stored in these bags.

Defendants Briggs and Tyndall subsequently packed Plaintiff's belongings, and while doing so, deliberately emptied a container of melted ice into a bag filled with legal documents, destroying several items and a significant portion of legal materials and documents essential to Plaintiff's appeal in an unidentified case pending in the Second Circuit Court of Appeals. *Id.* at ¶ 25. According to Plaintiff, the Second Circuit had granted him an enlargement of time to file a petition for a hearing or rehearing *en banc.* Because the documents were destroyed, Plaintiff was unable to file the petition within the enlargement period. *Id.*

Plaintiff thereafter had a disciplinary hearing on possession of the two draft bags and allegedly fabricated rule violations.[FN5] *Id.* at ¶ 26. Defendant Jones, the hearing officer, found Plaintiff not guilty of the fabricated rule violations. However, he found Plaintiff guilty of possessing the two draft bags, despite what Plaintiff believes to have been a clear departmental directive evidencing that no rule violation had occurred. *Id.* Plaintiff was punitively sanctioned for the draft bag violation. *Id.*

FN5. Plaintiff has not identified the nature of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegedly fabricated rule violations in his Complaint. (*See* Dkt. No. 1.) Although Plaintiff's Complaint does not specifically identify the person(s) responsible for filing the misbehavior report that led to the hearing, it can be inferred from other allegations that Defendants Lane and Beard were behind the report.

## B. Plaintiff's Claims of Cruel and Inhuman Treatment and Deliberate Indifference to his Serious Medical Needs Against Defendants Pawlin, Moehs, McAuliffe, and Bezio

Prior to Plaintiff's SHU confinement, he had been scheduled for oral surgery and medical treatment for chronic low back pain. *Id.* at ¶ 27. Plaintiff was not allowed to keep his appointments because he was punitively confined in the SHU and was left to endure "unbearable toothaches, extreme eating and hygienical discomfort, as well as excruciating lower back pain during and after his SHU confinement." *Id.* Once Plaintiff was released from SHU confinement, he was required to start anew the lengthy and time consuming procedure of scheduling dental and medical appointments. *Id.* According to Plaintiff, Defendants McAuliffe and Barkley were cognizant of the routine practice of denying prisoners confined in the SHU reasonable and adequate dental and medical care and/or knowingly implemented or allowed the practice. *Id.*

**\*3** When Plaintiff was released from the SITU, he was required to carry his belongings, including at least eight draft bags weighing eighty or more pounds, to an assigned housing unit over four-hundred yards away in snowy frigid weather and was not allowed to use an available pushcart or have another inmate assist him, despite informing Defendant John Doe # 1 of his medical condition and level of pain. *Id.* at ¶ 28. Plaintiff strained his lower back as a result and endured tremendous pain for at least two weeks. *Id.* According to Plaintiff, Defendant Pawlin thereafter subjected Plaintiff to a pattern of harassing inter-facility movements that required Plaintiff to move his belongings to different housing units. *Id.*

Plaintiff was punitively confined in the SITU in April of 2008 as a result of sanctions imposed by Defendant Jones.[FN6] *Id.* at ¶ 29. Plaintiff was not permitted to keep his rescheduled dental and medical appointments because of

the confinement. *Id.* at ¶ 29. When he left the SITU after serving several weeks, Plaintiff was, for a second time, required to carry all of his personal belongings without assistance or a pushcart despite informing Defendant John Doe # 2 of his medical condition and pain. *Id.* Plaintiff hurt his back transporting his belongings. *Id.* When he reported to sick call, Defendant Jane Doe told him that she was not going to do anything for him, and she would not give him a medical excuse from carrying the rest of his personal belongings to his housing unit. *Id.*

> [FN6.](#) It is not entirely clear from the Complaint whether Plaintiff was confined in the SITU by Defendant Jones as a result of Jones' finding that Plaintiff was guilty of possessing two draft bags or for some other reason. *See* Dkt. No. 1 at ¶ 26.

Approximately four months later, after filing a grievance and personally seeking redress from DOCCS' Chief Medical Officer, Plaintiff was examined by Dr. Rosner and finally had one of two troubling wisdom teeth extracted and received a few physical therapy sessions, *Id.* at ¶ 30. Upon completion of the initial therapy sessions, the therapist concluded that the course of treatment had been effective and that Plaintiff was in need of further therapy. *Id.* at ¶ 31. The therapist also recommended that Plaintiff be given a TENS unit for self-administered therapy. *Id.* However, at a follow-up appointment with Defendant Moehs, who had replaced Dr. Rosner as Plaintiff's health care provider, Moehs informed Plaintiff that he would not continue with the recommended course of treatment or provide the TENS unit and told Plaintiff to live with the pain. *Id.*

## C. Plaintiff's Claim that he was Denied a Fair and Impartial Hearing by Defendant McAuliffe

In preparation for an August 2008 disciplinary hearing, Plaintiff attempted to obtain documentary evidence he believed was relevant and necessary to his defense. *Id.* at ¶ 32. Plaintiff's request was denied by Defendant McAuliffe, who presided over the disciplinary hearing and allegedly made false representations to Plaintiff to induce him to enter into an involuntary and unintelligent plea agreement. *Id.* McAuliffe is alleged to have unfairly and unilaterally penalized Plaintiff for an altercation with another prisoner and sanctioned Plaintiff

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

to punitive segregation for six months at Mid–State Correctional Facility ("Mid–State"), with a concomitant loss of privileges and recommended loss of good time, which extended Plaintiff's term of imprisonment to the maximum. *Id.* at ¶ 33. The other prisoner was not sanctioned at all. *Id.*

**\*4** Plaintiff appealed McAuliffe's determination to Defendant Bezio on the grounds that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he had been denied due process and equal protection of the law as supported by documentary evidence. *Id.* at ¶ 34. Defendant Bezio affirmed McAuliffe's determination. *Id.*

### D. Alleged Indifference to Plaintiff's Serious Medical and Dental Needs While in the SHU at Mid–State

During the period of his confinement in the SHU at Mid–State, Plaintiff continued to experience excruciating back pain and toothaches. *Id.* He requested and was denied treatment by Defendant Dr. John Doe based upon Moehs' medical entry, without any physical examination. *Id.* Plaintiff received dental care to the extent of having dental x-rays taken after grieving the matter to Defendant Hulihan. *Id.* However, his painful wisdom tooth was not extracted. *Id.* Despite making articulate, detailed complaints of being deprived necessary and adequate medical and dental care to Defendants Barkley, Hulihan, and Lindquist, Plaintiff's complaint was denied as unsubstantiated and no significant steps were taken to ensure that Plaintiff received necessary and adequate medical and dental care prior to his transfer from Mid–State to Downstate Correctional Facility. *Id.*

### II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on February 17, 2011. (Dkt. No. 1.) Plaintiff's application to proceed *in forma pauperis* was granted by Judge Mordue in a June 1, 2011 Decision and Order (Dkt. No. 2) in which the District Court dismissed Plaintiff's claim for destruction of property against Defendants Briggs and Tyndall, with prejudice, and his equal protection claim against Defendants McAuliffe and Bezio, without prejudice, under 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case any time if the court determines that ... (B) the action ... (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). *Id.* at pp. 6–8. Judge Mordue otherwise accepted the Plaintiff's complaint for filing, specifically noting that in doing so, the District Court was expressing no opinion as to whether Plaintiff's remaining claims could withstand a properly made motion to dismiss or for summary judgment. *Id.* at p. 9. The District Court also ordered Plaintiff to take reasonable steps to ascertain the identities of the "John Doe" and "Jane Doe" defendants and cautioned him that failure to serve the unnamed defendants in a timely manner may result in the action being dismissed against them. *Id.* at pp. 8–9.

### III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

**\*5** A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of a complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678. (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

(internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See* Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994); *see also* Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g.,* Donhauser v. Goord, 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also* Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).[FN7]

> FN7. Defendants have submitted DOCS Directive # 4913, entitled "Inmate Personal Property Limits" in support of their motion to dismiss. (Dkt. No. 23–2 at pp. 2–9.) Plaintiff has also relied upon the Directive in his opposition

papers as support for his argument that state-wide policy allowed him to store his excess personal belongings in the two draft bags under his bunk. (Dkt. No. 27 at p. 12.) Since the Directive is integral to the Plaintiff's Complaint, the Court can consider it on Defendants' Rule 12(b)(6) motion without converting the motion to one for summary judgment. However, because the Directive, on its face, can be construed to offer some support for both Plaintiff and Defendants' position, it is of little value in determining the motion before the Court.

> The Declaration of Sandra Prusak, also submitted in support of Defendants' motion to dismiss, references a disciplinary packet that was supposed to be attached to the Declaration. (Dkt. No. 23–3 at p. 2.) Inasmuch as the Disciplinary Packet is not attached to the Declaration as filed, the Court need not consider whether it, or Prusak's reference to its contents, can be considered on a Rule 12(b)(6) motion.

**\*6** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants

Defendants have moved for dismissal of Plaintiff's official capacity claims for money damages under 42 U.S.C. ¶ 1983. (Dkt. No. 1 at ¶¶ 9–10, 12–16.; Dkt. No. 23–1 at pp. 19–20.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

effectively arms of the state ( *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that the Plaintiff's § 1983 claims brought against the moving Defendants in their official capacities be dismissed without leave to amend.

**C. Claim Against Defendants Briggs and Tyndall for Denial of Access to Court on a Matter Before the Second Circuit Court of Appeals**

Plaintiff claims that documents essential to an appeal he had pending in the Second Circuit Court of Appeals were destroyed when Defendants Briggs and Tyndall deliberately emptied a container of melted ice into Plaintiff's bag. As a result, Plaintiff was unable to file a petition for a hearing or rehearing *en banc* in the case before the filing deadline. (Dkt. No. 1 at ¶ 25.) Plaintiff has not identified the action, nor has he described the nature of the action or the appeal on which he was seeking an *en banc* hearing or rehearing.

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to court under § 1983, Plaintiff must assert non-conclusory allegations demonstrating that Defendants Briggs and Tyndall's alleged conduct in destroying his legal documents was deliberate and malicious. *See Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011)

(Baxter, M.J.). Plaintiff's Complaint, liberally construed, satisfies that requirement.

**\*7** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348–349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Arar v. Ashcroft,* 532 F.3d 157, 188–89 (2d Cir.2008), *cert. denied,* —— U.S. ——, 130 S.Ct. 3409, 177 L.Ed.2d 349 (2010) (following *Christopher* in requiring that the complaint include a description of the "nonfrivolous," "arguable" claim that the plaintiff has lost). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

Plaintiff has provided no information whatsoever concerning the matter in the Second Circuit and has thus failed to state a claim for denial of his First Amendment right of access to court against Defendants Briggs and Tyndall. [FN8] For that reason, I recommend that Plaintiff's claim for denial of access to court against Defendants Briggs and Tyndall be dismissed. Inasmuch as it is possible that Plaintiff may be able to remedy the defect in his Complaint by including specific information regarding his underlying claim, I also recommend that he be granted leave to amend.

> **FN8.** The fact that Plaintiff was seeking a hearing or rehearing *en banc* raises the inference that he had been unsuccessful on an appeal to the Second Circuit.

**D. Retaliation Claims Against Defendants Lane, Pawlin, Beard, Briggs, Tyndall, and Moehs**

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

**\*8** To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary

record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Co-op. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

*1. Retaliation Claim Against Defendant Lane*

According to Plaintiff, Defendant Lane, who had been allowing him to keep two draft bags of personal items under his bunk, issued a misbehavior report against Plaintiff for possessing the two bags right after learning that Plaintiff was litigating a civil action against correctional officers. (Dkt. No. 1 at ¶¶ 20–22.) When Lane learned later that Plaintiff had filed a grievance in reliance upon a state-wide directive Plaintiff believed allowed him to possess two draft bags for temporary storage of his personal belongings [FN9], Lane ordered Plaintiff to turn over the draft bags and had him manacled and taken to SITU. *Id.* at ¶¶ 23–24.

FN9. *See* Dkt. No. 23–2 at p. 7.

Plaintiff claims that he was charged with a violation for possessing the two draft bags and other fabricated rule violations. (Dkt. No. 1 at ¶ 26.) The Court has inferred that Lane was involved in Plaintiff being charged with allegedly fabricated rule violations for which he was found not guilty following a disciplinary hearing. Plaintiff was found guilty of possessing the two draft bags and punitively sanctioned. *Id.*

The filing of lawsuits and administrative grievances is constitutionally protected activity for retaliation purposes. *See Colon,* 58 F.3d at 872 ("Prisoners ... have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right of prisoners to file administrative grievances is a constitutionally protected activity for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

retaliation purposes). Plaintiff's retaliation claim against Lane can be construed to include retaliation for his lawsuit and the grievance he filed, both constitutionally protected activity. Therefore, the Complaint satisfies the first prong of a retaliation claim for pleading purposes.

**\*9** Liberally construing Plaintiff's Complaint, it appears that Plaintiff has set forth a facially plausible claim of adverse action satisfying the second prong. Plaintiff contends that the "motivating factor" behind Lane's initial rule violation charge against him with regard to the draft bags was finding out about Plaintiff's lawsuit. (Dkt. No. 27 at p. 4.) The filing of the charge led to Plaintiff being ordered to discard documents and legal materials by hearing officer Pawlin. *Id.* Destruction of a prisoner's legal papers and personal property has been found substantial enough to qualify as an adverse action for retaliation purposes. *See Smith v. City of New York,* No. 03 Civ. 7576(NRB), 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (S.D.N.Y. May 3, 2005) (Buchwald, J.) Because Plaintiff did have the two draft bags under his bunk, Lane's initial rule violation charge was arguably not a false misbehavior report. However, since Plaintiff claims that the bags were under the bunk with Lane's consent at the time he charged Plaintiff with the rule violation, the violation charge can be viewed as an adverse action for pleading purposes.

Placing Plaintiff in the SHU and filing false misbehavior claims against him after learning that he had filed a grievance based upon the directive also constitute adverse action sufficient to satisfy the second prong of a retaliation claim. *See Hamilton v. Fisher,* No. 9:10–CV1066(MAD/RFT), 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*41 (N.D.N.Y. Feb.29, 2012) (Treece, M.J.) (alleged transfer to SHU in retaliation for complaints could be considered adverse action); *Smith v. Hash,* No. 904–CV–0074 LEK/DRH, 2006 WL 2806464, at \*6, 2006 U.S. Dist. LEXIS 70362 (N.D.N.Y. Sept.28, 2006) (Kahn D.J., Homer, M.J.) (same); *Kotler v. Daby,* No. 10–CV–136 (TJM/DRH), 2011 WL 915312, \*5, 2011 U.S. Dist. LEXIS 26173, at \*14 (N.D.N.Y. Feb.10, 2011) (Homer, M.J.) (both filing false misbehavior report and sending plaintiff to SHU for filing grievances and lawsuits constitute adverse actions); *Mateo v. Fischer,* 682 F.Supp.2d 423, 433

(S.D.N.Y.2010) (filing false misbehavior report against plaintiff constituted an adverse action for purposes of retaliation claim).

Plaintiff's Complaint also satisfies the third prong of the retaliation analysis—a causal connection between Plaintiff's lawsuit and grievance and the adverse actions by Lane. Although Lane was not himself the subject of Plaintiff's lawsuit, the temporal proximity between Lane's learning of the lawsuit against other correctional officers and charging Plaintiff with a rule violation makes a facially plausible showing of causation. Further, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SITU and having an allegedly false misbehavior report filed against him supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. In addition, Plaintiff was found not guilty with respect to the allegedly false misbehavior reports. *Id.*

**\*10** For the foregoing reasons, I recommend that Defendant Lane's motion to dismiss Plaintiff's retaliation claim against him be denied.

2. *Retaliation Claim Against Defendant Pawlin*

Plaintiff has also asserted a retaliation claim against Defendant Pawlin, the hearing officer who directed him to discard documents and legal materials. (Dkt. No. 27, at p. 4.) Plaintiff's Complaint does not adequately state a claim for retaliation against Defendant Pawlin. Plaintiff has not alleged that Pawlin was aware of the lawsuit Plaintiff had filed against correctional officers, nor is there any allegation that Pawlin was a defendant in that lawsuit. As a result, Plaintiff has failed to allege plausibly that the lawsuit was causally connected to Pawlin's allegedly adverse action. *See Wilson v. Kelly,* No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 121293, at \*24 (Aug. 27, 2012) (D'Agostino, D.J., Treece, M.J.) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity). Therefore, I recommend that Plaintiff's retaliation claim against Defendant Pawlin be dismissed with leave to amend.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

3. *Retaliation Claim Against Defendant Beard*

The Complaint does not allege that Defendant Beard was aware of the lawsuit that Plaintiff had filed against correctional officers. However, Plaintiff has alleged that when Defendant Lane learned that Plaintiff had filed a grievance with regard to storage of the draft bags in his cell, he began phoning Defendant Beard "and reporting to him the situation." (Dkt. No. 1 at ¶ 23.) The Court can reasonably infer from that allegation that Beard was aware that the grievance had been filed when he subsequently joined Lane in escorting the manacled Plaintiff out of his housing unit and taking him to SHU. *Id.* at ¶ 24. Placing Plaintiff in SHU constitutes an adverse action for purposes of the retaliation analysis. *See Hamilton,* 2012 WL 987374, at *14, 2012 U.S. Dist. LEXIS 39116, at *14 (putting Plaintiff in SHU for filing a grievance constitutes an adverse action). Furthermore, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SHU supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. Therefore, I recommend that Defendant Beard's motion to dismiss the Plaintiff's retaliation claim against him be denied.

4. *Retaliation Claim Against Defendants Briggs and Tyndall*

Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis. *See Smith v. City of New York,* 2005 WL 1026551, *3, 2005 U.S. Dist. LEXIS 7903, at *10 (destruction of prisoner's legal papers and personal property qualifies as an adverse action for retaliation purposes). However, Plaintiff has not alleged that either Briggs or Tyndall was involved in or even aware of Plaintiff's lawsuit or grievance at the time they are alleged to have emptied a container of melted ice into a bag filled with legal documents. Therefore, the Complaint does not make a facially plausible showing of causation against Briggs and Tyndall, and for that reason I recommend that Plaintiff's retaliation claim against those defendants be dismissed. Because Plaintiff may be able to correct the deficiency in an amended complaint, I recommend that he be granted leave to amend.

5. *Retaliation Claim Against Defendant Moehs*

**\*11** The only factual allegations in Plaintiff's Complaint regarding Defendant Moehs are that he replaced Dr. Rosner as Plaintiff's health care provider, informed Plaintiff that he would not continue with the recommended course of treatment necessary to improve Plaintiff's medical condition or provide him with the recommended TENS unit, and told Plaintiff to live with the pain. (Dkt. No. 1 at ¶ 31.) In his opposition to Defendants' motion to dismiss, Plaintiff has asked the Court to infer that Defendant Moehs substituted himself for Dr. Rosner in order to disapprove the recommended course of treatment because Plaintiff had complained to the Chief Medical Officer about not receiving adequate medical care. (Dkt. No. 27 at p. 5.)

The Court finds that the allegations in Plaintiff's Complaint do not permit the inference Plaintiff has asked it to make. *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (retaliation claim must be "supported by specific and detailed factual allegations" and "not stated in wholly conclusory terms.") (citation and internal quotation marks omitted).

Plaintiff has failed to allege that Moehs had any knowledge of his complaint to the Chief Medical Officer when he denied Plaintiff the treatment recommended by the therapist, thus failing to satisfy the causal relationship prong of the retaliation analysis. *See Wilson,* 2012 WL 3704996, at *9, 2012 U.S. Dist. LEXIS 12193, at *24. Plaintiff filed the grievance and made complaints to the Chief Medical Officer prior to his examination by Dr. Rosner and to the initial therapy sessions. *See Id.* at ¶¶ 30–31. There are no allegations in the Complaint suggesting that Moehs was the subject of the grievance or complaints or that he would otherwise have any reason to retaliate against Plaintiff by denying him necessary medical care.

In light of Plaintiff's failure to make a facially plausible showing of causal connection, I recommend that his retaliation claim against Defendant Moehs be dismissed. However, because Plaintiff's grievance and complaints to the Chief Medical Officer constitute constitutionally protected activity, and the denial of necessary medical treatment in retaliation for the filing of a grievance or making a complaint is sufficient to satisfy the adverse action requirement of the retaliation claim

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

analysis, I recommend that Plaintiff be granted leave to amend should he be able to plead specific facts supporting causation.[FN10]

> FN10. *See* *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10–11, 2003 U.S. Dist. LEXIS 16442, at ——33–34 (S.D.N.Y. Sept.18, 2003) (McKenna, J) (allegation that prison doctor revoked plaintiff's necessary medical treatment because he filed a grievance is sufficient for second prong of retaliation claim analysis).

**E. Claims of Cruel and Inhuman Treatment and/or Medical Indifference Against Defendants Pawlin, Moehs, McAuliffe, Barkley, Hulihan, and Lindquist**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted).

**\*12** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement. Under the objective requirement, "the deprivation alleged must be objectively sufficiently serious [;] ... a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted). Under the subjective requirement, a plaintiff must demonstrate that a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* In *Farmer,* the Supreme court found it "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* at 837.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care. "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer,* 511 U.S. at 825; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–6.

**\*13** Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith,* 316 F.3d at 185. Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

### 1. *Claim of Cruel and Inhuman Treatment By Defendant Pawlin*

Plaintiff has alleged that he suffered from lower back strain after being required to carry his personal belongings from SHU to his assigned housing unit. (Dkt. No. 1 at ¶ 28.) According to Plaintiff, Defendant Pawlin thereafter subjected him "to a pattern of harassing inter-facility movements ... which required him to move his belongings to different housing units." (Dkt. No. 1 at ¶ 28.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Even if requiring Plaintiff to move his personal belongings to different housing units when he was suffering from lower back strain could pass as an "unnecessary and wanton infliction of pain ... incompatible with the evolving standards of decency that mark the progress of a maturing

society," *Estelle,* 429 U.S. at 102, Plaintiff has not alleged facts showing that Pawlin was aware of Plaintiff's back strain at the time he directed the moves, that Plaintiff complained to Pawlin about any impact the moves had on his back, or that Plaintiff suffered any further harm to his back as a result of the moves to different housing units. Therefore, Plaintiff has failed to plead a facially plausible claim of deliberate indifference to Plaintiff's health or safety, and the Court recommends that Plaintiff's Eighth Amendment claim against Defendant Pawlin for cruel and inhuman treatment be dismissed, and that Plaintiff be given leave to amend.

### 2. *Claim of Medical Indifference Against Defendant Moehs*

Plaintiff claims that the physical therapist who had worked with him had recommended that Plaintiff be given additional physical therapy sessions and a TENS unit for his lower back pain, and that Defendant Moehs refused to authorize both when he took over as Plaintiff's physician. (Dkt. No. 1 at ¶ 31.) An inmate's "mere disagreement over the proper treatment does not create a constitutional claim ... [s]o long as the treatment given is adequate." *Chance,* 143 F.3d at 703. Construing Plaintiff's complaint liberally, as is required in light of his *pro se* status, and accepting the allegations as true, Plaintiff claims that Moehs not only rejected the treatment recommended by the therapist, but that he declined to provide any treatment at all to address Plaintiff's excruciating back pain, telling him instead to learn to live with the pain. (Dkt. No. 1 at ¶ 31.)

**\*14** Plaintiff has described himself as having "excruciating lower back pain" over an extended period of time. (Dkt. No. 1 at ¶¶ 27, 35–36.) Severe back pain, especially if it lasts for an extended period of time, as Plaintiff claims, can constitute a "serious medical need" under the Eighth Amendment, there by satisfying the first element of a medical indifference claim.[FN11] *See Guarneri v. Hazzard,* No. 9:06–CV–0985, 2008 WL 552872, at *6, 2008 U.S. Dist. LEXIS 14809 (Feb. 27, 2008) (Mordue, C.J., Homer, M.J.) (citing *Nelson v. Rodas,* No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at *14, 2002 U.S. Dist. LEXIS 17359, at *50 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.) (collecting cases)). Given Plaintiff's alleged level of back pain and the length of time over which it lasted, Moehs' refusal to allow him to follow through with the recommended therapy and allow Plaintiff a TENS unit,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

compounded by his alleged failure to prescribe any treatment whatsoever to address Plaintiff's back condition and pain, constitutes a facially sufficient claim of deliberate indifference for purposes of Plaintiff's 12(b)(6) motion. [FN12] Therefore, the Court recommends that Defendant Moehs' motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against him be denied.

> FN11. Dental conditions left untreated for a significant period of time can also constitute a serious medical need under the Eighth Amendment. *See, e.g., Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity which will degenerate with increasingly serious implications if neglected over sufficient time presents a serious medical need); *Chance,* 143 F.3d at 702 (untreated dental problems resulting in chronic tooth pain for six months resulting in tooth degeneration constitute serious medical needs); *see also Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir.1984) (claim based on plaintiff's inability to eat properly due to dental problems).

> FN12. If it turns out that Defendant Moehs did provide Plaintiff with some course of treatment for his back, albeit not the treatment recommended by the therapist or the treatment Plaintiff would have chosen for himself, and did not merely tell Plaintiff to live with the pain as alleged, Plaintiff's medical indifference claim is unlikely to survive a motion for summary judgment.

### 3. *Claim of Medical Indifference Against Defendants McAuliffe and Bezio Regarding Medical and Dental Care to Inmates in SHU*

Plaintiff has alleged that on two separate occasions when he in SHU he was not allowed to attend scheduled dental and medical appointments because of a routine practice denying inmates in SHU reasonable adequate dental and medical care. (Dkt. No. 1 at ¶¶ 27 and 29.) The basis for Plaintiff's Eighth Amendment medical indifference claim against Defendants McAuliffe and

Bezio is that they "were cognizant of this routine practice, and/or have knowingly implemented or allowed the implementation of the practice of denying prisoners confined in the SHU reasonable adequate dental and medical care." *Id.* at ¶ 27. The dental appointment Plaintiff missed was for "troubling wisdom teeth," which were painful and one of which was ultimately extracted after Plaintiff filed a grievance. *Id.* at ¶ 30. The medical appointment was for Plaintiff's chronic lower back problem that left him with excruciating pain. *Id.* at ¶ 27.

In a § 1983 action against a defendant in his or her individual capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. at 166. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) ("*[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions; holding a position in a hierarchical chain of command is insufficient by itself to support personal involvement").

**\*15** However, the Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal,[FN13] (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[FN14]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN13. There are no allegations in the Complaint that McAuliffe and Bezio had direct knowledge that Plaintiff had a serious medical need while he was in SHU and nonetheless refused to allow him to keep his dentist and medical appointments. *See Farmer,* 511 U.S. at 825, 837 (deliberate indifference requires defendant's awareness of facts from which he or she could draw an inference that plaintiff had a serious medical need, that inference was actually made, and that defendant consciously and intentionally disregarded or ignored the need).

FN14. The Supreme Court's decision in *Ashcroft,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

Under *Colon,* if McAuliffe and Bezio, acting in a supervisory capacity, either created a policy resulting in violation of an inmate's Eighth Amendment rights, or allowed the continuation of such a policy, they could be subject to liability under 42 U.S.C. § 1983. In this case, however, under even the most liberal reading of Plaintiff's Complaint, he has not alleged any facts to support such a claim. The Complaint is devoid of any factual enhancement of his conclusory assertion that McAuliffe and Bezio were aware of the allegedly routine practice, were involved in implementing it, or that they had authority to stop the practice of denying SHU prisoners "reasonable adequate dental and medical care" and allowed it to continue. *Id.* at ¶ 30. *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement [do] not suffice" to state a claim) (internal quotation marks omitted). Therefore, the Court recommends that Defendants McAuliffe and Bezio's motion to dismiss Plaintiff's Eight Amendment medical indifference claim against them be granted with leave granted Plaintiff to amend.

4. *Claim of Indifference to Serious Medical Needs Against Defendants Barkley, Hulihan, and Lindquist*

Plaintiff identifies Defendants Barkley and Hulihan as superintendents of correctional facilities and Defendant Lindquist as a grievance appeal officer. (Dkt. No. 1 at ¶¶ 14 and 16.) Plaintiff has alleged that while he was in SHU at Mid–State, he continued to experience excruciating back pains and a painful wisdom tooth and requested and was denied treatment by Defendant Dr. John Doe based upon Defendant Moehs' medical notation entry. *Id.* at ¶ 35. According to Plaintiff, the only dental or medical care he received while in SHU at Mid–State was dental x-rays. *Id.* Plaintiff has alleged in conclusory fashion that he made detailed and articulate complaints to Defendants Barkley, Hulihan, and Lindquist about being deprived of necessary and adequate medical and dental care at Mid–State, that the complaints were denied as unsubstantiated, and that no significant steps were taken to ensure that care was given during the time period he was at Mid–State prior to his transfer to Downstate. (Dkt. No. 1 at ¶ 36.)

**\*16** Supervisory personnel may be held liable under § 1983 for "fail[ure] to remedy a violation after learning of it through a report or appeal." *Colon,* 58 F.3d at 873. However, mere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (claim that official ignored prisoner's letter of protest not enough to hold official liable); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at \*12, 2002 U.S. Dist. LEXIS 7067, at \*43 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose *respondeat superior* liability.").

"On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at \*13,

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint.").

Allegations of awareness on the part of a correctional facility superintendent of an ongoing failure by prison officials to provide a plaintiff with medical treatment for injuries, coupled with failure to remedy the wrong after learning of it through a grievance procedure have been found to be sufficient to survive a Rule 12(b)(6) motion. *See Cicio v. Graham,* No. 9:08–CV–534, 2009 WL 537534, at *7, 2009 U.S. Dist. LEXIS 16675 (N.D.N.Y. Mar.3, 2009) (Mordue, C.J.) (Peebles, M.J.). However, the naked assertion in Plaintiff's Complaint that he complained to Defendants Barkley, Hulihan, and Lindquist that he was being deprived of reasonable and adequate dental care, and that his complaints were found unsubstantiated is simply too lacking in factual detail to show that Plaintiff is entitled to relief. *See Iqbal,* 556 U.S. at 678 (Rule 8(a)(2) "demands more than an unadorned, the defendant-harmed-me accusation.") Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints. Therefore, I recommend that Defendants Barkley, Hulihan, and Lindquist's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against them be granted and that Plaintiff be granted leave to amend.

**G. Claims for Denial of Due Process Against Defendants Lane, Beard, Jones, McAuliffe, and Bezio**

**\*17** To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d

223, 225 (2d Cir.2001) (internal quotation marks omitted). As to the first prong, an inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandlin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As to the second prong, the minimal due process requirements include: "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ...." *Wolff v. McDonald,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

*1. Due Process Claim Arising Out of Misbehavior Reports Involving Plaintiff's Draft Bags*

Plaintiff has asserted a claim for denial of his due process rights under the Fourteenth Amendment against Defendants Lane, Beard, McAuliffe[FN15] and Jones arising out of the institution, execution, and enforcement of a disciplinary proceeding against him based upon fabricated allegations and in violation of the state-wide directive allowing inmates to store two draft bags of personal possessions in their cells on a temporary basis. (Dkt. No. 1 at ¶¶ 47–48.) Construing Plaintiff's Complaint liberally, Defendants Lane and Beard are accused of filing fabricated charges and a draft bag possession charge against him. Defendant Jones was the hearing officer on the charges and ruled in favor of Plaintiff on the allegedly fabricated charges but found him guilty on the draft bags possession charge in violation of the state-wide directive. *Id.* at ¶ 28.

> FN15. Although Plaintiff has asserted a due process claim against Defendant McAuliffe in connection with the misbehavior report filed by Lane and Beard that resulted in the imposition of punitive sanctions by Defendant Jones, there are no factual allegations in the Complaint connecting Defendant McAuliffe to that claim.

The Court's initial inquiry is whether Plaintiff has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

pleaded facts supporting a facially plausible claim that a liberty interest was infringed by the false charges and hearing determination since Plaintiff had no right to due process unless a liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). In his Complaint, Plaintiff has alleged he was punitively confined to SITU by Jones.[FN16] (Dkt. No. 1 at ¶ 29.) Plaintiff claims that he was in SITU for a few weeks. *Id.* While he was unable to attend dental and medical appointments while he was in SITU, Plaintiff has described it as a routine practice rather than an atypical occurrence. *Id.* at ¶ 27. *See Palmer,* 364 F.3d at 64 (both duration and conditions are considered in determining whether SHU confinement rises to the level of "atypical and severe hardship"). The alleged violation of the state-wide DOCCS storage directive by Defendants Lane, Beard, and Jones help Plaintiff because failure to follow a DOCCS directive does not give rise to a Section 1983 claim. *See Cabassa v. Gummerson,* No. 9:01–CV–1039, 2008 WL 4416411, *6, n. 24, 2008 U.S. Dist. LEXIS 72975, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, D.J.) (violation of a DOCCS directive does not give plaintiff a claim under 42 U.S.C. ¶ 1983).

> **FN16.** The Court has inferred that the SHU sanction was imposed by Jones as a result of the guilty determination on the draft bag possession charge.

**\*18** Because the Plaintiff has failed to allege a liberty interest, it is not necessary to reach the issue of whether he was provided sufficient process in the hearing on the allegedly fabricated charges.[FN17] Therefore, the Court recommends that Defendants Lane, Beard, and Jones' motion to dismiss Plaintiff's Fourteenth Amendment due process claim be granted with leave to Plaintiff to amend.

> **FN17.** The Court has recommended that Defendants Lane and Beard's motion to dismiss Plaintiff's retaliation claim arising out of the allegedly false misbehavior report be denied. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (filing of a false misbehavior report may be actionable when made in retaliation for the exercise of constitutional rights).

*2. Due Process Claim Against McAuliffe and Bezio Arising Out of Plaintiff's Alleged Denial of a Fair and Impartial Hearing*

Plaintiff has also asserted a due process claim against Defendants McAuliffe and Bezio in connection with his disciplinary hearing in front of McAuliffe. Plaintiff's due process claim against McAuliffe arises out of his denial of Plaintiff's request for access to documentary evidence needed to defend himself in a disciplinary hearing, his deliberate and purposeful misrepresentation to Plaintiff, and his denial of a fair and impartial disciplinary hearing. His claim against Bezio arises out of Bezio's affirmance of McAuliffe's determination of guilt. (Dkt. No. 1 *at* ¶ 49.) Plaintiff was placed in SHU for six months, with a concomitant loss of all privileges and good time credit, which extended his sentence to the maximum, as a result of the guilty finding. *Id.* at ¶ 33.

The Supreme Court ruled in *Sandlin* that the Constitution did not require that restrictive confinement be preceded by a hearing providing procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Second Circuit considers the duration of SHU confinement as well as the severity of the conditions. *See Palmer,* 364 F.3d at 65. Although no bright-line rule establishes a period of SHU confinement beyond which a due process right is implicated, *id.* at 64, the Second Circuit has held that a 101 day confinement does not alone meet the *Sandlin* standard of atypicality. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004), *cert. denied,* 543 U.S. 1187, 125 S.Ct. 1398, 161 L.Ed.2d 190 (2005) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). A liberty interest has, on the other hand, been found to be infringed by a confinement of 305 days. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

SHU confinement of less than 101 days can constitute atypical and significant hardships if the conditions were more severe than normal SHU conditions or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz,* 323 F.3d at 195 & n. 1 and *Colon,* 215 F.3d at 232 & n. 1) In *Palmer,* the Second Circuit explained "[w]here the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest has been infringed]." 364 F.3d at 64–65.

**\*19** Plaintiff's allegations of a 180 day confinement in SITU with no medical care for an excruciatingly painful back and painful wisdom tooth is sufficient to satisfy the atypical conditions requirement for a liberty interest for pleading purposes. Plaintiff has also asserted facts adequate to satisfy the pleading requirements for a denial of due process in his disciplinary hearing. "Chief among the due process minima outlined in *Wolff* [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Plaintiff has alleged that McAuliffe twice denied his request for documents relevant to his defense.

Prisoners also have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). Plaintiff claims that McAuliffe made false representations to him to induce him to enter into an involuntary plea. While Plaintiff's due process claim against McAuliffe may not survive a motion for summary judgment, the allegations in the Complaint are adequate to assert a facially plausible claim of denial of due process.

Plaintiff has also alleged facts adequate to state a claim against Defendant Bezio for denial of due process in affirming the hearing determination. According to Plaintiff, in his appeal, he informed Bezio that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he was denied due process and equal protection. (Dkt. No. 1 at ¶ 34.) It appears from the Complaint that Bezio affirmed the hearing determination while Plaintiff was still in SHU, and that as a result of the affirmance, Plaintiff ended up serving the full 180 day SITU confinement and the maximum of his original sentence. *Id.* Personal involvement of a supervisory official may be shown by evidence that after learning of the violation of a prisoner's

rights through an appeal, he failed to remedy the wrong. *Colon,* 58 F.3d at 873.

The consequences of McAuliffe's alleged violation of Plaintiff's due process rights—Plaintiff's confinement in SHU and loss of good time—were ongoing at the time Bezio affirmed the hearing determination. *Id.* at 34. Bezio therefore had the opportunity to remedy the violation at least to some degree and failed to do so, thereby leaving him potentially subject to personal liability. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where superintendent denied appeal from hearing that allegedly violated plaintiff's rights); *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 WL 1842294, at \*8, 2011 U.S. Dist. LEXIS 51917, at \*25–26 (S.D.N.Y. May 9, 2011) (Swain, D.J.) (denying motion to dismiss claim against official who heard appeal from disciplinary hearing); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because prisoner alleged he had been denied the opportunity to call a witness at disciplinary hearing); *Moore v. Scully,* No. 90 Civ 3817(MEL), 1993 WL 22129, at \*3, 1993 U.S. Dist. LEXIS 841, at \*10–11 (S.D.N.Y. Jan. 26, 1993) Laker, D.J.) (denying summary judgment where superintendent denied affirmed disciplinary hearing result where plaintiff alleged that hearing denied due process).

**\*20** Based upon the foregoing, the Court recommends that Defendant Bezio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim be denied.

**H. Plaintiff's Pendent State Claims**

Plaintiff has asserted three distinct claims for relief under New York State law against Defendants for acts or omissions within the scope of their employment. (Dkt. No. 1 at ¶¶ 51–55.) They are: (1) *respondeat superior* claims against Defendants Lindquist, Barkley, and Hulihan for negligence in performing their administrative duty to supervise their subordinates' work performance as it related to Plaintiff's care and treatment, *Id.* at ¶ 51; (2) claims against Defendants Lane, Beard, Jones, McAuliffe, and Bezio for wrongful confinement and deprivation of Plaintiff's liberty interest by denying him the right to offer relevant documentary evidence for the preparation and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

presentation of his defense in a disciplinary proceeding in violation of New York State Rules and Regulations and DOCCS policy directives, *Id.* at ¶¶ 52–53; and (3) negligence and malfeasance in providing Plaintiff medical and dental care. Defendants argue that Plaintiff's state law claims should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 23–1 at pp. 20–22.) Defendants are correct. Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The statutory bar is intended to permit correction officers to perform the task of maintaining safety and security in correctional facilities "undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*21** In 2009, the United States Supreme Court held Correction Law § 24 unconstitutional to the extent it

precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb.28, 2012) (Homer, M.J.); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S. Dist. LEXIS 104641, at \*15–16 (N.D.N.Y. Sept.30, 2010) (Scullin, S.D.J.); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at \*16, 2010 U.S. Dist. LEXIS 124737, at \*47–48 (N.D.N.Y. Sept.29, 2010) (Lowe, M.J.); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at \*18, 2010 U.S. Dist. LEXIS 10799, at \*61 (N.D.N.Y. Feb.8, 2010) (Kahn, D.J., Peebles, M.J.). For the reasons set forth in those decisions, I recommend that Defendants' motion to dismiss Plaintiff's pendent state law claims in this case be granted, without leave to amend.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 23) be *GRANTED IN PART AND DENIED IN PART.* Specifically, the Court recommends that Defendants' motion be *GRANTED* as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against the moving Defendants in their official capacities, without leave to amend;

2. Dismissal of all of Plaintiff's state law claims against Defendants Lindquist, Barkley, Hulihan, Lane, Beard, Jones, Moehs, McAuliffe, and Bezio (Dkt. No. 1, Counts XV–XIX), without leave to amend; and

3. Dismissal of the following claims, with leave to amend: (a) First Amendment claim against Defendants Briggs and Tyndall for denial of access to courts; (b) First Amendment retaliation claims against Defendants Pawlin,

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

Briggs, Tyndall, and Moehs; (c) Eighth Amendment claim of cruel and inhuman treatment against Defendant Pawlin; (d) Eighth Amendment claim for indifference to serious medical needs against McAuliffe, Bezio, Barkley, Hulihan, and Lindquist; and (e) Fourteenth Amendment denial of due process claims against Defendants Lane, Beard, and Jones; and it is further

**RECOMMENDED** that Defendants' motion be ***DENIED*** as to the following: (a) Plaintiff's claim for retaliation against Defendants Lane and Beard; (b) Plaintiff's Eighth Amendment medical indifference claim against Defendant Moehs; and (c) Plaintiff's Fourteenth Amendment violation of due process claim against Defendants McAuliffe and Bezio; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Complaint that relate to the claims on which dismissal is denied and those which relate to the Doe Defendants.

**\*22** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 600213 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 599893 (N.D.N.Y.)

(Cite as: 2013 WL 599893 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Feb. 15, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### *ORDER*

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a
Report–Recommendation by Magistrate Judge Therese
Wiley Dancks, duly filed on the 24th day of January 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's ReportRecommendation,
and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in
its entirety.

2. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned
to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 599893 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Benji D. REED, Plaintiff,
v.
John DOE No. 1; John Doe No 2; and M. Soto,
Defendants.
Civil Action No. 9:11–CV–0250 (TJM/DEP).

July 26, 2012.
Benji D. Reed, Elmira, NY, pro se.FN1

> FN1. The court's records list the plaintiff as
> being confined in the Southport Correctional
> Facility "Southport", based upon a change of
> address notice filed by Reed on February 22,
> 2012. *See* Dkt. No. 20. According to publicly
> available information, however, Reed is now
> being held in the Elmira Correctional Facility.
> *See* http://nysdoccslookup.doccs.ny.gov.
> GCA00P00/WINQ130 (screenshot attached.
> Plaintiff is reminded of his obligation under the
> court's rules to notify the court and defendants'
> counsel of any further address changes in order
> to facilitate communications with him. *See*
> N.Y.N.D.L.R. 10.1(c)(2).

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, James Seaman, Esq., Assistant Attorney
General, Albany, NY, for Defendant Soto.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.
   **\*1** Plaintiff Benji D. Reed, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. § 1983
against various prison officials, alleging deprivation of his
civil rights. While the scope of his complaint has been
winnowed, and it now raises only claims of cruel and

unusual punishment and unlawful retaliation against one
named and two unidentified "Doe" defendants, as
originally filed that pleading asserted an array of claims
stemming from incidents occurring at two separate
correctional facilities.

   In response to plaintiff's complaint the sole remaining
named defendant has moved for dismissal of all claims
against him for failure to state a plausible cause of action
upon which relief may be granted. The plaintiff, in turn,
has applied for leave to amend his complaint, and for
appointment of counsel to represent him *pro bono.* For the
reasons set forth below, I recommend that defendant's
motion to dismiss be granted, and will deny plaintiff's
application for leave to amend, on the basis of futility in
light of my recommendation regarding the legal
sufficiency of his existing claims, as well as his request for
assignment of counsel.

*I. BACKGROUND*FN2

> FN2. The following recitation is drawn
> principally from plaintiff's amended complaint,
> the contents of which have been accepted as true
> for purposes of the pending motion. *See Erickson
> v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200
> (2007) (citing *Bell Atl. Corp. v. Twombly,* 550
> U.S. 544, 555–56, 127 S.Ct. 1955, 1965 (2007));
> *see also Cooper v. Pate,* 378 U.S. 546, 546, 84
> S.Ct. 1733, 1734 (1964). In light of the
> severance and transfer of plaintiff's claims arising
> out of his confinement at the Southport
> Correctional Facility to the Western District of
> New York, I have included only the facts
> relevant to his remaining claims, all of which
> involve events at the Eastern Correctional
> Facility ("Eastern").

   Plaintiff is a prison inmate entrusted to the custody of
the New York State Department of Corrections and
Community Supervision ("DOCCS"). *See generally*
Complaint (Dkt. No. 1). At the times relevant to the claims
remaining in the action, he was designated to Eastern,
located in Napanoch, New York. *Id.* at ¶ 3.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

The events giving rise to plaintiff's claims were set in motion on September 14, 2010, when Reed developed an illness he attributed to food consumed in the mess hall at Eastern. Complaint (Dkt. No. 1) ¶¶ 32–37. Plaintiff maintains that the food causing his intestinal issues was known by defendant John Doe No. 1 to have been contaminated, and should have been inspected by defendant John Doe No. 2 prior to being served to the inmates. Complaint (Dkt. No. 1) ¶¶ 41–42.

Plaintiff was initially treated on the following day at the facility's medical clinic, along with several other affected inmates, and given "dymotabs" to address the condition. Complaint (Dkt. No. 1) ¶ 38. The medication was subsequently discontinued on that same day, however, and plaintiff was confined to his cell and placed on a water diet for one day. *Id.* at ¶¶ 39–40.

While at Eastern, plaintiff was designated to undergo alcohol and substance abuse treatment in a program ("ASAT") overseen by defendant M. Soto, a counselor at the facility. *See* Complaint (Dkt. No. 1) ¶¶ 6, 31. Based apparently upon his absence from ASAT treatment while confined to his cell due to illness, plaintiff received a misbehavior report authored by defendant M. Soto accusing him of lying regarding his location on September 15, 2010, after being asked why he did not appear for ASAT treatment, and for failing to follow facility rules regarding attendance in the program. Complaint (Dkt. No. 1) ¶ ¶ 46–47. At a subsequent disciplinary hearing conducted to address the accusations set forth in the misbehavior report, however, the charges were dismissed. *Id.* at ¶ 49.

**\*2** Following plaintiff's return to the ASAT program he was called into defendant Soto's office and, after a conversation during which Reed refused to discuss the conviction that led to his incarceration, he was forced by Soto to sign a refusal to participate in ASAT training. *Id.* at ¶¶ 50–56. Plaintiff was then removed from the ASAT program and escorted to his cell, where he remained in keeplock pending a hearing stemming from the issuance of a new misbehavior report alleging his refusal to participate in the ASAT program.[FN3] *Id.* at ¶¶ 57–61. At a subsequent hearing, conducted on October 12, 2010, Reed was

exonerated of all charges and was permitted to return to the ASAT program. *Id. at* ¶¶ 64–65. As a result of issuance of the two misbehavior reports, while at Eastern plaintiff was keeplock-confined for a total of fourteen days.[FN4] *See* Plaintiff's Memorandum (Dkt. No. 18) p. 6 of 18.

> FN3. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving the inmate of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v.. Greene,* No. 95–CV–1765, 1997 WL 160124, at \*2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)) (Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.). Inmate conditions while keeplocked are substantially the same as in the general population, the primary exception being that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

> FN4. Plaintiff's opposition memorandum also intimates that he lost good time credits as a result of the relevant events. *See* Plaintiff's Memorandum (Dkt. No. 18) at p. 6 of 18. There is no factual support for this statement, however, in either plaintiff's complaint or the attached exhibits.

Plaintiff was subsequently transferred out of Eastern and into the Southport Correctional Facility, located in Pine City, New York, in December 2010. Complaint (Dkt. No. 1) ¶ 71.

II. *PROCEDURAL HISTORY*

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

Plaintiff commenced this action on March 8, 2011. Complaint (Dkt. No. 1). Plaintiff's complaint named the two Doe defendants, M. Soto, and seven corrections employees assigned to Southport as defendants, and asserted claims under the Eighth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. § 12,101 *et seq.,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, additionally setting forth a pendent claim of negligence. By order issued on August 2, 2011, based upon an initial review of plaintiff's complaint and accompanying *in forma pauperis* application, Senior District Judge McAvoy ordered all claims arising from events occurring at Southport severed, and directed that those claims be transferred to the Western District of New York. Dkt. No. 4.

In lieu of answering plaintiff's complaint defendant Soto, the sole remaining named defendant in this action, moved on October 17, 2011 for dismissal of plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In his motion defendant argues that plaintiff's complaint fails to allege a plausible claim upon which relief may be granted, and that in any event he is entitled to qualified immunity from suit. *Id.* Plaintiff has since submitted a response in opposition to defendant's motion. Dkt. No. 18.

Following the filing of defendant's dismissal motion, plaintiff moved on December 7, 2011 for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Dkt. No. 14. In his motion Reed asserts that amendment is sought to permit elimination of the claims and references to the defendants affected by the transfer to the Western District of New York, and to clarify and expand upon facts set forth in his original complaint relating to events at Eastern. *See* Motion for Leave to Amend (Dkt. No. 14) ¶¶ 1–2. Plaintiff has also requested appointment of counsel to represent him in the action, *pro bono.* Dkt. No. 15. Defendant Soto has since responded in opposition to those motions, by letter dated January 6, 2011 from his counsel, Megan A. Brown, Esq., arguing that the motion for leave to amend should be denied as futile for the same reasons as set forth in his dismissal motion, and taking no position with regard to plaintiff's request for appointment of counsel. Dkt. No. 17.

**\*3** Defendant's dismissal motion, which is now ripe

for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Rule 72.3(c). *See* Fed.R.Civ.P. 72(b). The remaining two motions brought by the plaintiff fall within my non-consensual jurisdiction, and therefore will be addressed in the form of an order from this court.

III. *DISCUSSION*

A. *Standard of Review*

Defendant's motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U .S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims." *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations and quotations omitted)).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

B. *Plaintiff's Retaliation Claim*

Plaintiff alleges that defendant Soto, motivated by Reed's use of the medical facilities at Eastern, issued two false misbehavior reports to him in September 2010. In response, Soto argues that plaintiff's vague and conclusory allegations offered in support of this retaliation claim are insufficient to survive a motion to dismiss.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the provisions of the Eighth Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.2008). Claims by inmates that adverse actions taken by prison workers are, of course, easily incanted, and inmates often attribute

adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis,* 320 F.3d at 352 (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff succeeds in carrying this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*5** Affording plaintiff the deference which he is due as a *pro se* litigant and broadly construing his complaint, it appears that plaintiff is claiming the September misbehavior reports were issued in retaliation for his having sought medical treatment due to a sudden illness.[FN5] As defendant correctly argues, the mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to level of constitutional significance. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). The further assertion that the false misbehavior report was prompted by the accused inmate having engaged in protected activity, however, can suffice

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

to support a cognizable claim of unlawful retaliation. *Franco,* 854 F.2d at 589.

> FN5. In his motion defendant Soto has assumed, for the sake of argument, that plaintiff's resort to seeking medical treatment within the facility constituted protected activity sufficient to trigger the First Amendment's protection against retaliation, and I will do likewise.

Having assumed plaintiff's ability to establish that he engaged in protected activity, the court's focus turns next to the question of whether he has sufficiently alleged that he experienced adverse action at the hands of the defendant. In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493; *see also Davis,* 320 F.3d at 353. The adverse action inquiry is a contextual one. *Davis,* 320 F.3d at 353. Courts should bear in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

The adverse action alleged by the plaintiff in support of his retaliation claim consists of the issuance of two false misbehavior reports. The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). The false misbehavior reports at issue led to plaintiff's keeplock cell confinement for a period of fourteen days. At this early procedural juncture, I am unable to conclude that this allegation is insufficient to support a plausible finding of adverse action. *See Edwards v. Horn,* No.2012 WL 76012, at * 16 (S.D.N.Y. Mar. 8, 2012) (citing *Gill,* 389 F.3d at 384) (false misbehavior report and placement in keeplock constitutes adverse action)).

The third requirement for pleading a cognizable retaliation claim involves linking the protected activity and adverse action alleged. It is in connection with this element that plaintiff's retaliation claim fails. In cases involving claims of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in

establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). When evaluating whether a misbehavior report is the product of retaliatory animus, an analysis most typically undertaken on a motion for summary judgment, courts generally look to several factors as bearing upon any potential nexus between the protected conduct and the misbehavior report, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

**\*6** In this instance, plaintiff's complaint is lacking in any factual allegations that would establish the requisite nexus between his visit to the prison infirmary and defendant Soto's issuance of misbehavior reports. Indeed, in his complaint Reed hypothesizes that Soto disbelieved his explanation concerning his whereabouts at the time of his absence from the ASAT program, prompting him to issue the misbehavior reports. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 54, 65. This allegation by the plaintiff suggests a non-retaliatory motivation for defendant's issuance of the misbehavior reports at issue.

In light of the plaintiff's failure to state facts sufficient to satisfy this critical element of a retaliation claim, I recommend that the defendant's motion be granted, and that plaintiff's retaliation cause of action under the First Amendment be dismissed.

C. *Verbal Harassment/False Misbehavior Report Claims*

Liberally construed, plaintiff's complaint could be interpreted as also asserting a claim, independent of retaliation, under the Eighth Amendment for harassment and for issuance of false misbehavior reports.

As was previously observed, the mere issuance of a false misbehavior report, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise on behalf of a prison inmate; a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). As

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

such, plaintiff's claim related to the filing of a false misbehavior report, independent of his First Amendment retaliation cause of action, is subject to dismissal.

Defendant also interprets plaintiff's complaint as alleging that he was generally harassed by Soto, and that Soto stated to other inmates that Reed was a monster with whom they should not associate. These allegations appear to be calculated to state a violation of his Eighth Amendment's right to be free from cruel and unusual punishment. Reed's complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection. As a general matter, mere verbal harassment, including that accompanied by the use of profanity, without any corresponding physical injury does not support a cognizable claim under section 1983, however boorish and unprofessional the alleged conduct may be. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Because plaintiff's complaint lacks allegations that would plausibly support an Eighth Amendment violation claim, I recommend dismissal of that cause of action, to the extent that his complaint may properly be construed as raising such a claim.

### D. *Leave to Amend*

**\*7** Following the filing of plaintiff's dismissal motion, plaintiff sought leave to amend his complaint to flesh out certain factual allegations in support of his claims. *See* Dkt. No. 14. At this juncture the court must determine whether to permit the amendment now sought, and additionally whether the amendment should be granted leave to amend in any event in an effort to cure the deficiencies perceived with regard to his existing claims against defendant Soto.

### 1. *Leave to Amend Generally*

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted-under circumstances not applicable here-a party may amend its pleading "only with

the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962); *Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98–CIV.–662, 2000 WL 297197, at *3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances that may entitle the pleader to relief, then futility is not a proper basis on which to deny the right to amend. *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

The court has reviewed plaintiff's proposed amended complaint, and finds that it suffers from the same deficiencies as are noted above with respect to his initial complaint. Accordingly, plaintiff's motion for leave to file the proposed amended complaint accompanying his motion will be denied on basis of futility.[FN6] *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *accord Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sep. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted).

[FN6.] In his proposed amended complaint plaintiff seeks to add a claim for denial of equal protection, alleging that because he was issued a

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

misbehavior report for exercising his right to seek medical care while another inmate was permitted to attend the medical clinic, his right to equal protection was denied. *See* Proposed Amended Complaint (Dkt. No. 14–1) ¶ 60.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

While plaintiff's complaint alleges that he was treated differently than another inmate, conspicuously absent from his proposed amended complaint is the allegation of any fact plausibly suggesting that the difference in treatment was the result of an intentional or purposeful discrimination directed at an identifiable or suspect class. For this reason, I find that the proposed amended complaint does not state a plausible equal protection claim.

### 2. *Leave to Amend to Cure Perceived Deficiencies*

**\*8** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon,* 875 F.Supp. at 1003 (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

I am unable to conclude that if given the opportunity plaintiff nonetheless would be unable to set forth allegations sufficient to avoid dismissal of his claims at this early stage in the litigation. If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at \*24–25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### E. *Appointment of Counsel*

In addition to seeking leave to amend, plaintiff has applied to the court for appointment of counsel. As a threshold matter, prior to requesting appointment of *pro bono* counsel, a party must first demonstrate that he or she

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

has been unable to obtain counsel through the private sector or public interest firms. *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 173–74 (2d Cir.1989) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). Given that plaintiff has not provided the court with information regarding any efforts by him to obtain counsel, his request is subject to denial on this basis alone.

Turning to the merits of his application, I find that Reed has not demonstrated entitlement to appointment of counsel under the applicable statute. 28 U.S.C. § 1915(e)(1) affords district courts broad—though not limitless—discretion in determining whether to appoint counsel to represent indigent civil litigants. *Hodge,* 802 F.2d at 60. In *Hodge,* the Second Circuit noted that when exercising that discretion the court

> **\*9** should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for crossexamination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61–62; *see also Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (citing Hodge). As can be seen, of the criteria enunciated by the Second Circuit to be considered when determining whether assignment of pro bono counsel is appropriate, the most important is the merits—that is, "whether the indigent's position [is] likely to be of substance." *Cooper,* 877 F.2d at 172 (citations and internal quotations omitted). Where a plaintiff does not provide a court with evidence, as opposed to mere allegations, relating to his or her claims, that party does not meet this threshold requirement. *See Herman v. Runyon,* No. 96 CIV. 6080, 1997 WL 118379, at \*1 (S.D.N.Y. Mar. 17, 1997).

Each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, J.) (citing *Hodge,* 802 F.2d at 61). Although the Constitution guarantees indigent litigants "meaningful access" to the courts, it does not

entitle all such parties to receive the benefit of *pro bono* representation. *Hodge,* 802 F.2d at 60. While, as was previously indicated, the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised the court is required to call upon attorneys to donate their time *pro bono* to the benefit of indigent litigants and the court. Accordingly, in deference to the limited resources available to the court to serve the interests of the many indigent litigants who pursue claims before it, and recognizing the "thankless burden" associated with such assignments, *Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir.1961), *cert. denied,* 370 U.S. 964, 82 S.Ct. 1592 (1962), courts should not grant such applications indiscriminately, but instead must exercise good judgment and restraint in doing so. *Cooper,* 877 F.2d at 172.

In this instance, plaintiff has failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation. Plaintiff's application for appointment of counsel will therefore be denied, without prejudice to renewal.[FN7]

> FN7. In accordance with the customary practice of this court, once a case passes through the discovery and motion phases and becomes trial ready, *pro bono* counsel is usually appointed for an indigent *pro se* inmate litigant to assist in preparation for and during the trial, either as attorney of record or as standby counsel.

### IV. *SUMMARY AND RECOMMENDATION*

The claims now remaining before this court, following severance and transfer of a portion of plaintiff's original complaint to the Western District of New York, include causes of action against two John Doe defendants arising from plaintiff's alleged investigation of contaminated food, as well as claims of retaliation, harassment, and cruel and unusual punishment against defendant M. Soto. Because the Doe defendants in this case have not yet been identified and thus have not yet appeared in the action, the court has not been called upon to gauge the sufficiency of plaintiff's claims against those defendants.[FN8] Turning to plaintiff's claims against defendant Soto, based upon a review of the allegations set

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)

(Cite as: 2012 WL 4486086 (N.D.N.Y.))

forth in plaintiff's complaint, I recommend that all claims against defendant Soto be dismissed, with leave to replead, and find it unnecessary to address his alternative argument, to the effect that he is entitled to qualified immunity from suit.

FN8. Because only "persons" may act under color of state law, a complaint seeking money damages pursuant to § 1983 must name one or more individuals as defendants. *See Walker v. State of Connecticut,* No. 3:06CV165, 2006 WL 1981783, *2 (D.Conn.2006); *Connor v. Hurley,* No. 00Civ.8354LTSAJP, 2004 WL 885828, at *3 (S.D.N.Y.2004).* It is not uncommon for a *pro se* plaintiff to include a "John Doe" or other unknown defendants, together with named defendants in a complaint. Generally, in such cases the complaint is served upon the named defendants, and the plaintiff is directed to pursue discovery to identify the John Doe(s) and to thereafter seek leave to amend the complaint to name them as defendants. In the event the plaintiff chooses to abandon his claims against defendant Soto, leaving only the two "Doe" defendants in the case, I recommend the court allow plaintiff to name the superintendent of Eastern as a defendant—even though there is no suggestion of his or her personal involvement in the alleged constitutional violations—solely for the purpose of effecting service and so that issue may be joined. In that event, once issue is joined, plaintiff may seek through discovery the identity of the John Doe defendant(s). *See Peralta v. Doe,* No. 04–CV–6559P, 2005 WL 357358, at *2 (W.D.N.Y. Jan. 24, 2005)* (citing *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997))* (district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *Harvey v. Corrections Officer,* 9:09–CV–0517 (N.D.N.Y.) (LEK/GHL) (order filed 6/1/09 permitting plaintiff to name superintendent as a defendant for purposes of service and discovery).

**\*10** Turning to plaintiff's pending motions, I conclude

that his motion for leave to amend should be denied, based upon futility, but that he nonetheless should be afforded an opportunity to further amend his complaint in an effort to cure the deficiencies cited in this report and recommendation in connection with his allegations against defendant Soto. I further find, however, that he has failed to establish a basis for appointment of counsel to represent him, *pro bono,* at this early procedural juncture in this litigation.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed above within thirty days from the date of the filing a decision and order acting upon my recommendation of dismissal; and it is further

ORDERED, that plaintiff's motions for leave to amend (Dkt. No. 14) and for appointment of counsel (Dkt. No. 15) be DENIED in all respects, without prejudice to renewal.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2012.

Reed v. Doe No. 1
Not Reported in F.Supp.2d, 2012 WL 4486086 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486085 (N.D.N.Y.)

(Cite as: 2012 WL 4486085 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Benji D. REED, Plaintiff,
v.
John DOE NO. 1; John Doe No 2; and M. Soto,
Defendants.
No. 9:11–CV–0250 (TJM/DEP).

Sept. 27, 2012.

Benji D. Reed, Elmira, NY, pro se.

James Seaman, New York State Attorney General,
Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. INTRODUCTION**
   *1 This pro se action brought pursuant to 42 U.S.C.
§ 1983 was referred by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule N.D.N.Y. 72.3(c). In his July 26, 2012
Report–Recommendation and Order, Magistrate Judge
Peebles recommended that "the motion of defendant M.
Soto to dismiss plaintiff's claims against him in this action
(Dkt. No. 11) be GRANTED, and that all claims against
that defendant be DISMISSED, with leave to file an
amended complaint as directed [in the
ReportRecommendation and Order] within thirty days
from the date of the filing of a decision and order acting
upon my recommendation of dismissal." Rep. Rec., p. 28
[dkt. # 22].

   In the Report–Recommendation and Order,
Magistrate Judge Peebles also addressed Plaintiff's
motions (1) for leave to file an amended complaint [Dkt.
No. 14], and (2) to appoint counsel [Dkt. No. 15].
Magistrate Judge Peebles denied Plaintiff's motion for
leave to amend because the proposed amended complaint

submitted with the motion did not contain allegations
setting forth plausible claims. See July 26, 2012
Report–Recommendation and Order, pp. 18–20.
Magistrate Judge Peebles denied Plaintiff's motion for
appointment of counsel [Dkt. No. 15], without prejudice
to renewal, because Plaintiff "failed to make a sufficient
showing to warrant appointment of counsel to represent
him at this early stage in the litigation." Id. p. 25; see also
id. pp. 22–25.

   Defendant Soto objects to the recommendation to the
extent that it recommends that Plaintiff be granted leave to
file an amended complaint, arguing that Plaintiff already
had ample opportunity to do so but failed to state a claim
upon which relief can be granted. Def. Obj. [dkt. # 24].
Plaintiff objects by asserting that the complaint does
contain sufficient factual allegations to set forth a
plausible claim of retaliation, or, in the alternative, he
should be granted leave to file an amended complaint to
assert a retaliation claim. Pl. Obj. [dkt. # 26]. He also
argues that he should be appointed counsel "for the sole
purpose of ascertaining the names of the two John Doe
defendants." Id.

**II. STANDARD OF REVIEW**

   When objections to a magistrate judge's report and
recommendation are lodged, the district court makes a "de
novo determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." See 28 U.S.C. § 636(b)(1)(C); see also
United States v. Male Juvenile, 121 F.3d 34, 38 (2d
Cir.1997) (The Court must make a de novo determination
to the extent that a party makes specific objections to a
magistrate's findings.). "[E]ven a pro se party's objections
to a Report and Recommendation must be specific and
clearly aimed at particular findings in the magistrate's
proposal, such that no party be allowed a second bite at
the apple by simply relitigating a prior argument."
Machicote v. Ercole, 2011 WL 3809920, at *2 (S.D.N.Y.,
Aug.25, 2011) (citations and interior quotation marks
omitted); DiPilato v. 7–Eleven, Inc., 662 F.Supp.2d 333,
340 (S.D.N.Y.2009) (same). By the same reasoning, a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486085 (N.D.N.Y.)

(Cite as: 2012 WL 4486085 (N.D.N.Y.))

party may not advance new theories that were not presented to the magistrate judge in an attempt to obtain this second bite at the apple. *See Calderon v. Wheeler,* 2009 WL 2252241, at \*1, n. 1 (N.D.N.Y. July 28, 2009); *Green v. City of New York,* 2010 WL 148128, at \* 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

**\*2** General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

### III. DISCUSSION

With this standard in mind, and after having reviewed Defendant's and Plaintiff's objections, the Court determines to adopt the recommendation for the reasons stated in Magistrate Judge Peebles's thorough report.

Plaintiff's attempts to reargue the positions he took before Magistrate Judge Peebles are insufficient. The Court finds no error in Magistrate Judge Peebles's analysis or determinations. Moreover, Plaintiff is granted leave to re-plead his claims, so he suffers no prejudice by dismissal. Should he elect to do so, Plaintiff should take care to re-plead his retaliation claim with more particularity as to (1) what he asserts was the retaliatory conduct, and (2) what he believes was the motivation for this conduct. *See* Rep. Rec. at p. 21. [FN1]

FN1. As Magistrate Judge Peebles stated:

If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."

*Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at \*24–25, 1995 WL 316935 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint [must] also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Inasmuch as the re-pled claims must be accordance with the parameters set forth contained in the Report–Recommendation and Order, *see* fn. 1, *supra,* the Court rejects Defendant's objection to this portion of the recommendation. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ( "It is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citations omitted), *cert den.,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Hughes v. Anderson,* 2011 WL 5829658, at \* 1 (2d Cir. Nov.21, 2011) ("As a general matter (excepting clearly frivolous cases), it is improper for a district court to dismiss a complaint with prejudice for failure to state a claim without giving the plaintiff notice and an opportunity to be heard and to offer an amended pleading.") (summary order) (citing *Perez v. Ortiz,* 849 F.2d 793, 797 (2d Cir.1988)).

To the extent that Plaintiff's objections challenge Magistrate Judge Peebles's determinations to deny (1)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4486085 (N.D.N.Y.)

(Cite as: 2012 WL 4486085 (N.D.N.Y.))

leave to file the previously proposed amended complaint, and (2) appointment of counsel, the objections are in the nature of an appeal. A district court judge reviewing a magistrate judge's non-dispositive pretrial order may not modify or set aside any part of that order unless it is clearly erroneous or contrary to law. *Labarge v. Chase Manhattan Bank, N.A.,* 1997 WL 583122, at * 1 (N.D.N.Y. Sept.3, 1997) (citing 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); N.D.N.Y. LOCAL RULE 72.1(b)); *Mathias v. Jacobs,* 167 F.Supp.2d 606, 621–23 (S.D.N.Y.2001). Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error. *Lanzo v. City of New York,* 1999 WL 1007346, *2–3 (E.D.N.Y. Sept.21, 1999). This standard imposes a heavy burden on the objecting party, and only permits reversal where the district court determines that the magistrate judge "abused his broad discretion over resolution of discovery matters." *Labarge,* 1997 WL 583122, at * 1; *see Mathias,* 167 F.Supp.2d at 621–23; *Lanzo,* 1999 WL 1007346, *3.

**\*3** The Court finds no error or abuse of discretion by Magistrate Judge Peebles and, therefore, affirms Magistrate Judge Peebles's decisions in these regards for the reason set forth in the Report–Recommendation and Order at pages 18–20 and 22–25.

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Peebles's July 26, 2012 Report–Recommendation and Order in its entirety. Therefore, Defendant M. Soto's motion to dismiss Plaintiff's claims against him in this action (Dkt. No. 11) is GRANTED, and all claims against Defendant Soto are DISMISSED. Plaintiff is granted leave to file an amended complaint. An amended complaint, if one is filed, must be in accordance with the directions contained in the Report–Recommendation and Order, and must be filed within thirty (30) days from the date of the filing of this Decision and Order.

To the extent that Plaintiff's objections can be construed as appeals from Magistrate Judge Peebles's determinations to deny Plaintiff's motions to amend the complaint [Dkt. No. 14], and to appoint counsel [Dkt. No. 15], Magistrate Judge Peebles's determinations are

AFFIRMED.

**IT IS SO ORDERED.**

N.D.N.Y.,2012.

Reed v. Doe No. 1
Not Reported in F.Supp.2d, 2012 WL 4486085 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Joel MURRAY,
v.
William F. HULIHAN, Superintendent, Mid-State Correctional Facility; M. Debraccio, Correction Counselor, Mid-State Correctional Facility; R. Ferraro, Correction Counselor, Mid-State Correctional Facility; W. Koagle, Correction Counselor, Mid-State Correctional Facility; S. Moore, Correctional Counselor, Mid-State Correctional Facility; B. Simons, Senior Correction Counselor, Mid-State Correctional Facility; C. Cheyne, Social Worker, Mid-State Correctional Facility; M. Strumlofler, Mid-State Correctional Facility, Defendants.
No. 9:08-CV-912 (NAM/ATB).

March 17, 2010.

Joel Murray, pro se.

Brian J. O'donnell, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

   **\*1** This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Upon Magistrate Judge Di Bianco's retirement, the case was reassigned to me on January 4, 2010 by Norman A. Mordue, Chief United States District Judge. (Dkt. No. 33).

   Plaintiff filed his complaint [FN1] pursuant to 42 U.S.C. §§ 1983 & 1985 while plaintiff was an inmate in the custody of the Department of Correctional Services ("DOCS") at Mid-State Correctional Facility

("Mid-State"). (Compl.¶ 5).[FN2] Plaintiff's complaint lists eight causes of action. The first and second causes of action allege conspiracy and retaliation, relating to defendants Debraccio, Ferraro, Koagle, Moore, Simons, and Strumlofler. The third and fourth causes of action allege "deliberate indifference" and relate to defendant Hulihan. The fifth and sixth causes of action allege conspiracy and retaliation against defendant Cheyne. The seventh and eighth causes of action relate to all defendants and allege cruel and unusual punishment and denial of due process. (Compl.¶¶ 23-30). Plaintiff seeks declaratory and injunctive relief. (Compl.¶ 32).

   FN1. Although plaintiff has labeled his document "Amended Complaint," it is clear that there is only one complaint in this action. (Dkt. No. 1).

   FN2. Plaintiff numbered the paragraphs in his complaint sequentially up until his "Prayer for Relief" on page 14, where he starts the numbers over. For clarity, citations to paragraph numbers will refer to paragraphs located on pages 1-14. Citations to material located after page 14 in the complaint will be by page number alone.

   Presently before this court are two motions: plaintiff's motion for a preliminary injunction (Dkt. No. 22), and defendants' cross motion for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 24). Defendants' motion also responds to plaintiff's motion for a preliminary injunction, and plaintiff has responded in opposition to defendants' motion. (Dkt. No. 27). For the following reasons, this court recommends denying plaintiff's motion for a preliminary injunction and granting defendants' cross motion for judgment on the pleadings.

**DISCUSSION**

**I. Facts**

   Plaintiff's causes of action arise from a period of time when he was enrolled in a residential treatment program at Mid-State, known as the Alcohol and Substance Abuse Treatment ("ASAT") program. (Def.'s Mem. of Law 1). In

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

January of 2008, plaintiff had recently restarted the ASAT program when he was called into a correctional officer's ("CO") office by defendants Ferraro and Debraccio. (Compl.¶ 14). Ferraro and Debraccio brought to plaintiff's attention some "pull-ups" [FN3] and a "refuse to do a detail" order. *Id.* Plaintiff responded that he was not "orientated" and had not signed a contract. *Id.* On January 8, 2008, plaintiff alleges that defendant Koagle deliberately moved plaintiff's bed so that plaintiff's shoes would not be lined up and then gave plaintiff a pull-up for failing inspection. (Compl.¶ 15). Plaintiff filed a grievance for receiving this pull-up. *Id.* The next day, plaintiff received another pull-up for having his typewriter on his bed and after objecting to that pull-up, received another pull-up for a "negative attitude." (Compl. Ex. B-2 at 4).[FN4]

> [FN3.] Pull-ups are apparently a system by which ASAT participants receive notice of a rule violation from both ASAT counselors and other ASAT participants. (*See* Compl. Ex. B-2 at 24 ("inmates in ASAT are encouraged to accept pull-ups given by both staff and peer inmates ... this process of acceptance allows participants to develop the skills necessary to learn from their short comings [sic] ).

> [FN4.] Plaintiff has not paginated the lengthy attachment to his complaint entitled "Exhibit B2." For clarity, the court will reference pages in this document as "Compl. Ex. B-2" and give the page number, with the cover sheet as pg. 1.

Defendant Strumlofler conducted the Inmate Grievance Committee hearing on February 14, 2008, regarding the grievance plaintiff filed after defendant Koagle's January 9, 2008 pull-up. (Compl.¶ 16). Plaintiff states that defendant Strumlofler didn't want to call plaintiff's witnesses, read plaintiff's grievance on the record, or have plaintiff's representative present. *Id.* Plaintiff then alleges that, "As a result, the [plaintiff] became argumentative with [Strumlofler] and [Strumlofler] throw [sic] the [plaintiff] out of the hearing." (Compl.¶ 24).

**\*2** After leaving the grievance office, plaintiff was called by defendant Moore to go to an interview with the ASAT committee. (Compl.¶ 17). The committee was comprised of defendants Simons, Ferraro, Debraccio and Strumlofler. *Id.* Plaintiff alleges that the committee "started threating [sic] to remove me from [the] ASAT program if I write any more grievances and that this will be my last chance." *Id.* Plaintiff submitted another grievance, "disregarding this threat." *Id.*

Later that same day, defendant Moore was teaching members of the ASAT program and gave them a five-minute break. (Compl.¶ 18). When plaintiff returned from the break, defendant Moore told him that he was late, to which plaintiff replied that he knew Moore was "acting actively in cohoots [sic] with Mr. Simons, Mr. Ferraro, and Ms. Debraccio, to throw [plaintiff] out of ASAT." *Id.* Defendant Moore then placed plaintiff on a "contract." [FN5] *Id.*

> [FN5.] Apparently, contracts are more serious disciplinary measures than pull-ups.

Two weeks later, around February 28, 2008, after plaintiff had been removed from the ASAT program and was awaiting placement to another housing unit, he was called in to the corrections officer's office by defendant Debraccio. (Compl.¶ 19). Plaintiff alleges that the corrections officer raised his voice and approached plaintiff in a threatening manner. *Id.* Plaintiff "stood-up [sic] and defended [himself]." *Id.* Plaintiff was then given a misbehavior report. *Id.* Plaintiff was found guilty after a hearing, and as a result, he lost package, commissary, phone and recreation privileges for 30 days to "impress upon [inmate] that this type of behavior will not be tolerated." (Compl. Ex. B-2 at 41-42).

One week later, on March 10, 2008, plaintiff met with defendant Cheyne on a mental health callout. (Compl.¶ 20). Plaintiff alleges that he told defendant Cheyne about his concern that the ASAT staff members "during [sic] something to me when I walk down the walkway," and he requested a transfer to Marcy Correctional Facility. *Id.* Plaintiff attached a copy of a memorandum written by defendant Cheyne to his complaint. (Comp. Ex. B-2 at 38). The memorandum states that when defendant Cheyne refused plaintiff's request to be transferred to Marcy Correctional Facility and refused to grant him other mental health services, he responded, "What if one day something

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

just sets me off and I lose it[?] I see all the civilians walking up and down that road. There are no [corrections officers] around. By the time you pressed the button and someone got to you, who knows what could happen[?]" (Comp. Ex. B-2 at 38).

As a result of defendant Cheyne's memorandum, plaintiff received a Tier III [FN6] disciplinary hearing on March 19, 2008, after which he lost commissary, phone, and package privileges for two months and was placed on "keeplock" for two months. (*Id.* at 43). However, these punishments were suspended for one month and deferred for six months. *Id.* This hearing was reviewed and reversed by the director of the Special Housing/Inmate Disciplinary Program on May 5, 2008. (Compl. Ex. B-2 at 47).

> FN6. DOCS regulations provide for three tiers of disciplinary hearings, depending upon the seriousness of the misconduct charged. *See Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (explaining the levels of disciplinary hearing, together with the possible dispositions). Tier III hearings are for the most severe disciplinary infractions and may result in the highest penalties. *Id.*

**\*3** Plaintiff received a memorandum dated May 22, 2008, which apparently was in response to a letter written by plaintiff to defendant Simons. (Compl. Ex. B-2 at 36). The memorandum informed plaintiff that his name had been added back to the ASAT programs need list, but due to plaintiff's "previous past two unsatisfactory removals from ASAT, (10/29/07 and 3/2/08), your name was placed on the bottom of ASAT programs [sic] needs list." *Id.*

Plaintiff has now been transferred to Marcy Correctional Facility and is apparently in an ASAT Dorm. (Pl.'s Decl. of Service at Dkt. No. 27; Defs.' Mot. Ex. 1).

## II. Judgment on the Pleadings

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983)

(citations omitted). *See* Fed.R.Civ.P. 12(b), 12(c) and 12(h)(2). The motion for judgment on the pleadings is then treated according to the same standard as a motion to dismiss under Rule 12(b)(6). *Id.*

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93-94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). In this case, plaintiff has attached a myriad of documents to his complaint. (Pl.Ex.B-2) (Dkt. No. 1-1). These documents consist mainly of plaintiff's grievances and disciplinary records relating to this action. This court has considered these documents in making its determination.

## III. Retaliation

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 378, 380 (2d Cir.2004) (citation omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id .* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

**\*4** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb.10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

Here, it appears plaintiff argues that the constitutionally protected conduct is his right to file grievances, as protected by the First Amendment. Plaintiff argues that the defendants conspired to remove him from the ASAT program "as a direct result of [plaintiff] filing inmate grievances." (Compl.¶ 24). Plaintiff's claims of a causal connection between his grievances and the conduct of the defendants, however, are conclusory. Moreover, as plaintiff's own complaint indicates, what he characterizes as retaliatory actions by the defendants were, in fact, remedial and didactic measures integral to the ASAT program:

[O]nce in [the] ASAT program, you are required to have your shoes lined together, nothing on your lockers or beds, beds made with hospital corners ... any one of these violations can get you removed from the program. When [an] ASAT counselor give [sic] you a pull-up or

contract, you are prohibited from protesting or contesting any pull-ups or contracts, regardless if you're wrong or right. The inmates in New York State Department of Correctional Facilities/Services in ASAT program [sic] encounter this type of abuse from ASAT staff members on a daily situations [sic] and circumstances, which only foster [sic] hate and resentment towards those in authority.[FN7]

> FN7. Plaintiff also claims that the ASAT staff "demeanor towards inmates teaches [n]egative consequences comes [sic] before recover [sic]." *Id.*

(¶ 3). Although plaintiff refers to these rules as "abuse," the fact that one's shoes must be in line or that one's bed must be made in a particular way cannot be plausibly characterized as "abuse," regardless of plaintiff's disagreement with these requirements. Plaintiff's main issue seems to be with the ASAT program itself and with rules that he finds unnecessary, annoying, or detrimental to his recovery. In his "Prayer for Relief" that comprises pages 14 through 18 of his complaint, plaintiff delineates what seem to be his own proposed standards for how the ASAT program should be run. (Compl.pgs.14-18).

Plaintiff concedes that he violated the rules and became argumentative with the staff. However, he blames the staff for his inappropriate reactions. He states, for example, that one of the officers moved plaintiff's bed so that his shoes would be out of line. (Compl.¶ 15). Plaintiff alleges that he became argumentative with defendant Strumlofler when he refused to read plaintiff's grievance into the record. (Compl.¶ 24). On February 28, 2008, plaintiff states that a "CO" took off his glasses and "raised his voice," and approached plaintiff "in a threatening manner," causing plaintiff to stand up and defend himself. (Compl.¶ 19). Plaintiff appears to be surprised that he received a misbehavior report for that conduct. *Id.* Plaintiff's argumentative behavior at the grievance hearing on February 14, 2008, was the reason he was "kicked out" of the hearing.

**\*5** From the ASAT standards plaintiff himself includes in his complaint, is it clear that the defendants would have acted similarly even if plaintiff had not filed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

grievances. Argumentative behavior, having one's shoes out of line, and putting items on one's bed all appear, from plaintiff's own description of the ASAT program, to be valid reasons for remedial action.

Plaintiff's description of his subsequent meeting with defendants Debraccio, Ferraro, Simons, and Stromlofler is at odds with the grievance documents that plaintiff has submitted as exhibits to the complaint. (Compl. Ex. B-2 at 33). Plaintiff states that after he was "kicked out" of the grievance committee hearing, he was "threatened" by defendants Debraccio, Ferraro, Simons, and Strumlofler, who told him that he would be removed from ASAT if he filed any more **grievances.** (Compl.¶ 17). Plaintiff's own grievance states that "[o]n 02-14-08, ... I was told by [the ASAT] committee that one more **contract** and I was done with ASAT." (Compl. Ex. B-2 at 5). The Superintendent's response to one of plaintiff's grievances states that plaintiff was told that he would be removed from the program if he did not sign the ASAT "contract." (Compl. Ex. B-2 at 33).

The Superintendent's response further states that at the meeting where plaintiff claims he was "threatened," the defendants actually gave him "another opportunity at improving his involvement in ASAT. *Id.* In fact, when plaintiff's original behavioral "contract" was rescinded because the officers could not find the "signed orientation sheet," plaintiff was given another "orientation" for the program, and given another chance to adjust. *Id.* It is clear, from plaintiff's own pleading and the attachments, that it was not plaintiff's grievances, but his inability to abide by the rules of the ASAT program that motivated the actions of the defendants.

On the same day, February 14, 2008, plaintiff concedes that he had an argument with Mrs. Moore about whether plaintiff returned late from a "break." (Compl.¶ 18). Plaintiff states that he told Mrs. Moore that he knew that she was in "cohoots [sic]" with defendants Simons, Ferraro, and Debraccio to throw plaintiff out of the program. *Id.* Arguing with a teacher is a valid reason for disciplinary action. Plaintiff's inappropriate reaction to discipline is evident in the language he used in the grievance he filed after he was removed from the ASAT program (following the argument he had with defendant Moore):

Ms. Moore who views me as a *Pimp* [sic] actively acted [sic] in Cohoots [sic] with the ASAT Board Members who wanted to throw me out of ASAT; Ms. Moore as [sic] a former Crack head [sic] addict and prostitute hate [sic] Pimps [sic] and as a result claims that I was late for groups [sic] after a Five [sic] minutes [sic] break ...

(Compl. Ex. B-2 at 5). The apparent basis for the defendants' discipline of plaintiff is his bad behavior, triggered by what he views as "harassment" inherent in the ASAT program, not some conspiracy to expel him from ASAT because he filed grievances.

**\*6** Plaintiff's conclusory allegations of retaliation by defendant Cheyne likewise fails to state a claim. Plaintiff alleges that defendant Cheyne was retaliating against plaintiff "for ASAT staff members and her Mental Health co-worker Doctor menlendez [sic], who I am suing in the Federal Court." (Compl.¶ 27). In the same paragraph, plaintiff alleges that defendant Cheyne "made these unfounded statements was to make it appear as though I was a problem for DOCS...." *Id.* Plaintiff's allegations of retaliation by defendant Cheyne relative the ASAT program do not make sense because he had already been removed from the ASAT program by the time that he met with defendant Cheyne; and she was not involved in the ASAT program. Plaintiff makes no plausible allegation that would indicate why defendant Cheyne would retaliate against plaintiff for filing grievances against counselors in the ASAT program.

Plaintiff's claim of retaliation by Cheyne relating to the doctor apparently refer to a civil rights action he filed in the Northern District of New York on October 17, 2003, against numerous defendants, including Dr. Melendez. *Murray v. Pataki,* 9:07-CV-1263 (N.D.N.Y.). The district court granted defendants' motion for summary judgment and dismissed plaintiff's claims against Dr. Melendez because plaintiff had failed to effect service of process over the five years the lawsuit had been pending.[FN8] The case is currently on appeal to the Second Circuit. (Dkt. Nos. 154-57 in 9:03-CV1263). It is unclear how defendant Cheyne, a social worker at Mid-State in 2008, would have been aware of a lawsuit against Dr. Melendez, allegedly a doctor at Clinton Correctional

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

Facility who cared for plaintiff in 2002.[FN9]

> FN8. On March 3, 2009, Magistrate Judge Treece recommended dismissing the action *inter alia* for the failure to serve Dr. Melendez, and on April 9, 2009, District Judge Suddaby adopted the recommendation. (Dkt. Nos. 149, 151 in 9:03-CV-1263).

> FN9. *See Murray v. Pataki, et al.,* 9:03-CV-1263 (N.D.N.Y) (Dkt. No. 10 "Second Amended Complaint" at ¶¶ 9, 22, 38).

Plaintiff has failed to state claims of retaliation because he has presented nothing but his conclusory allegations, that essentially all of the actions taken by the defendants were motivated by his grievances. He has, therefore, failed to plead a plausible causal connection between defendants' actions and plaintiff's grievances. While there is some temporal proximity between defendant's actions and plaintiff's grievances, that proximity is only a result of the number of grievances plaintiff filed in the period of time covered by his allegations. The grievances, together with the associated decisions, attached to plaintiff's complaint support the court's findings. Accordingly, this court recommends that plaintiff's claims of retaliation against all the defendants be dismissed.

**IV. Other Claims**

As to plaintiff's claims of conspiracy, his allegations are merely conclusory and implausible claims, unsupported by any additional documents filed with his complaint.[FN10] Plaintiff apparently views any disciplinary action taken by anyone as evidence of a conspiracy among those meting out the discipline, regardless of whether they are associated or not. The only apparent connection between all of the defendants is the plaintiff, which does not, by itself, establish a causal connection. Conclusory allegations are insufficient to establish a cause of action under the civil rights statutes and may be dismissed on the pleadings alone. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d. Cir.1987). *See also Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987); *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983). Plaintiff has not alleged any facts sufficient to render plausible his claim that defendants conspired against him to violate his constitutional rights. Accordingly, this court recommends that plaintiff's claims of conspiracy be dismissed.

> FN10. Plaintiff includes 42 U.S.C. § 1985(3) as a basis for his conspiracy claims. (Compl.¶¶ 23, 27). To establish a claim under section 1985(3), plaintiff must establish a racial or class-based conspiracy to deprive a person or class of persons of equal protection of the laws." *Mian v. Donaldson, Lufkin & Jenrette Securities Corporation,* 7 F.3d 1085, 1087 (2d Cir.1993). Although near the end of his statement of facts, plaintiff states that "only black inmates with Conditional Release dates get removed from ASAT for the smallest thing." (Compl.¶ 21). The only other reference to "people of color" appears in the fourth cause of action, alleging deliberate indifference by defendant Hulihan alone, stating that he allows the ASAT staff to "single-out people of color." (Compl.¶ 26). There is no reference to any racially based conspiracy in either of plaintiff's causes of action alleging section 1985 conspiracy. (Compl.¶¶ 23, 27). In fact, in paragraph 23, plaintiff states that defendants "*for personal reasons* have conspire [sic] to violate the Plaintiff's First, and Fourteenth Amendment Rights ...." (emphasis added). In paragraph 27, plaintiff alleges that defendant Cheyne "conspire [sic]," but does not indicate with whom she conspired. Plaintiff fails to state a claim under section 1985.

> In one of plaintiff's causes of action, he makes a passing reference to 42 U.S.C. § 1986. (Compl.¶ 25). Plaintiff includes this reference in a paragraph alleging that defendant Hulihan was deliberately indifferent to "the consequences of his conduct." Section 1986 provides a cause of action against anyone having knowledge of a section 1985 conspiracy, who fails to prevent the violation if he or she has the power to do so. Clearly, plaintiff's citation to section 1986 was inappropriate and the complaint states no claim under this section.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

**\*7** Plaintiff adds a claim entitled "Cruel and Unusual Punishment." (Compl.¶ 29). The Eighth Amendment prohibits cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Whitley v. Albers,* 475 U.S. 312, 319-20, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). Neither the alleged removal of plaintiff from the ASAT program nor the imposition of 30-days in the Special Housing Unit are "punishments" that involve the unnecessary and wanton infliction of pain, and plaintiff has stated no deprivation of basic human needs. Accordingly, this court recommends that plaintiff's cause of action alleging cruel and unusual punishment be dismissed as to all defendants.

Plaintiff also suggests he has a due process claim. (Compl.¶ 30). To establish a claim based on a violation of procedural due process, a plaintiff must first establish a constitutionally protected liberty or property interest that a plaintiff was denied without the appropriate procedural safeguards. *See Perry v. McDonald,* 380 F.3d 159, 173 (2d Cir.2001) (citations omitted). Plaintiff alleges that his due process rights were violated because he was "prevented from completing his recommended program." (Compl.¶ 30).

Plaintiff associates the ASAT program with conditional release and believes that removal from the ASAT program "significantly affected his daily activities to participate in the required recommended program inorder [sic] to secure his release from imprisonment." (Compl.¶ 25). If plaintiff is claiming that his removal from the ASAT program was done without due process, his argument fails, because inmates have "no constitutional right to discretionary good time release, or to participation in prison programs which might expedite release." *Fifield v. Eaton,* 07-CV-6521L, 2009 U.S. Dist. LEXIS 96967, \*5-\*6, 2009 WL 3429791, (W.D.N.Y. October 20, 2009). Because plaintiff has failed to establish a liberty interest,

no due process violation occurred.[FN11] Accordingly, this court recommends that plaintiff's due process claim be dismissed.

> **FN11.** Plaintiff also alleges that defendants "neglected to follow their own rules." (Compl.¶ 30). However, the violation of state statutes, rules, and/or regulations does not automatically rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744-45 (S.D.N.Y.2002). *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

**V. Plaintiff's Motion for Preliminary Injunction**

Plaintiff has also moved for a preliminary injunction. (Dkt. No. 22). In this motion, he sought an order enjoining DOCS from transferring plaintiff to Marcy Correctional Facility. Plaintiff evidently thought the transfer would be "retaliatory" and was only being done in order to "MOOT Plaintiff's Declaratory Injunctive Relief." (Pl.'s Mot. for a Prelim. Inj. 2. (capitalization in the original)).

Plaintiff is correct in that his transfer renders his injunctive relief moot-but only the relief requested in his motion. Plaintiff did not request any injunctive relief in his complaint that was affected by his transfer to Marcy. Plaintiff has also failed to meet the requirements for a preliminary injunction because he has not established that he is likely to suffer irreparable injury, that he will likely succeed on the merits or that a balance of hardships tip decidedly in his favor. *See Moore v. Consolidated Edison* 409 F.3d 506-511 (2d Cir.2005).

**\*8 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for a preliminary injunction (Dkt. No. 22) be **DENIED,** and it is further

**RECOMMENDED,** that defendants' cross-motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) (Dkt. No. 24) be **Granted,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Murray v. Hulihan
Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Joel MURRAY,
v.
William F. HULIHAN, Superintendent, Mid-State Correctional Facility; M. Debraccio, Correction Counselor, Mid-State Correctional Facility; R. Ferraro, Correction Counselor, Mid-State Correctional Facility; W. Koagle, Correction Counselor, Mid-State Correctional Facility; S. Moore, Correctional Counselor, Mid-State Correctional Facility; B. Simons, Senior Correction Counselor, Mid-State Correctional Facility; C. Cheyne, Social Worker, Mid-State Correctional Facility; M. Strumlofler, Mid-State Correctional Facility, Defendants.
No. 9:08-CV-912 (NAM/ATB).

March 17, 2010.

Joel Murray, pro se.

Brian J. O'donnell, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.
    **\*1** This matter was referred to Magistrate Judge Gustave J. Di Bianco for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Upon Magistrate Judge Di Bianco's retirement, the case was reassigned to me on January 4, 2010 by Norman A. Mordue, Chief United States District Judge. (Dkt. No. 33).
    Plaintiff filed his complaint [FN1] pursuant to 42 U.S.C. §§ 1983 & 1985 while plaintiff was an inmate in the custody of the Department of Correctional Services ("DOCS") at Mid-State Correctional Facility

("Mid-State"). (Compl.¶ 5).[FN2] Plaintiff's complaint lists eight causes of action. The first and second causes of action allege conspiracy and retaliation, relating to defendants Debraccio, Ferraro, Koagle, Moore, Simons, and Strumlofler. The third and fourth causes of action allege "deliberate indifference" and relate to defendant Hulihan. The fifth and sixth causes of action allege conspiracy and retaliation against defendant Cheyne. The seventh and eighth causes of action relate to all defendants and allege cruel and unusual punishment and denial of due process. (Compl.¶¶ 23-30). Plaintiff seeks declaratory and injunctive relief. (Compl.¶ 32).

    FN1. Although plaintiff has labeled his document "Amended Complaint," it is clear that there is only one complaint in this action. (Dkt. No. 1).

    FN2. Plaintiff numbered the paragraphs in his complaint sequentially up until his "Prayer for Relief" on page 14, where he starts the numbers over. For clarity, citations to paragraph numbers will refer to paragraphs located on pages 1-14. Citations to material located after page 14 in the complaint will be by page number alone.

    Presently before this court are two motions: plaintiff's motion for a preliminary injunction (Dkt. No. 22), and defendants' cross motion for a judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 24). Defendants' motion also responds to plaintiff's motion for a preliminary injunction, and plaintiff has responded in opposition to defendants' motion. (Dkt. No. 27). For the following reasons, this court recommends denying plaintiff's motion for a preliminary injunction and granting defendants' cross motion for judgment on the pleadings.

**DISCUSSION**

**I. Facts**
    Plaintiff's causes of action arise from a period of time when he was enrolled in a residential treatment program at Mid-State, known as the Alcohol and Substance Abuse Treatment ("ASAT") program. (Def.'s Mem. of Law 1). In

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

January of 2008, plaintiff had recently restarted the ASAT program when he was called into a correctional officer's ("CO") office by defendants Ferraro and Debraccio. (Compl.¶ 14). Ferraro and Debraccio brought to plaintiff's attention some "pull-ups"[FN3] and a "refuse to do a detail" order. *Id.* Plaintiff responded that he was not "orientated" and had not signed a contract. *Id.* On January 8, 2008, plaintiff alleges that defendant Koagle deliberately moved plaintiff's bed so that plaintiff's shoes would not be lined up and then gave plaintiff a pull-up for failing inspection. (Compl.¶ 15). Plaintiff filed a grievance for receiving this pull-up. *Id.* The next day, plaintiff received another pull-up for having his typewriter on his bed and after objecting to that pull-up, received another pull-up for a "negative attitude." (Compl. Ex. B-2 at 4).[FN4]

> [FN3]. Pull-ups are apparently a system by which ASAT participants receive notice of a rule violation from both ASAT counselors and other ASAT participants. (*See* Compl. Ex. B-2 at 24 ("inmates in ASAT are encouraged to accept pull-ups given by both staff and peer inmates ... this process of acceptance allows participants to develop the skills necessary to learn from their short comings [sic] ).

> [FN4]. Plaintiff has not paginated the lengthy attachment to his complaint entitled "Exhibit B2." For clarity, the court will reference pages in this document as "Compl. Ex. B-2" and give the page number, with the cover sheet as pg. 1.

Defendant Strumlofler conducted the Inmate Grievance Committee hearing on February 14, 2008, regarding the grievance plaintiff filed after defendant Koagle's January 9, 2008 pull-up. (Compl.¶ 16). Plaintiff states that defendant Strumlofler didn't want to call plaintiff's witnesses, read plaintiff's grievance on the record, or have plaintiff's representative present. *Id.* Plaintiff then alleges that, "As a result, the [plaintiff] became argumentative with [Strumlofler] and [Strumlofler] throw [sic] the [plaintiff] out of the hearing." (Compl.¶ 24).

**\*2** After leaving the grievance office, plaintiff was called by defendant Moore to go to an interview with the ASAT committee. (Compl.¶ 17). The committee was comprised of defendants Simons, Ferraro, Debraccio and Strumlofler. *Id.* Plaintiff alleges that the committee "started threating [sic] to remove me from [the] ASAT program if I write any more grievances and that this will be my last chance." *Id.* Plaintiff submitted another grievance, "disregarding this threat." *Id.*

Later that same day, defendant Moore was teaching members of the ASAT program and gave them a five-minute break. (Compl.¶ 18). When plaintiff returned from the break, defendant Moore told him that he was late, to which plaintiff replied that he knew Moore was "acting actively in cohoots [sic] with Mr. Simons, Mr. Ferraro, and Ms. Debraccio, to throw [plaintiff] out of ASAT." *Id.* Defendant Moore then placed plaintiff on a "contract."[FN5] *Id.*

> [FN5]. Apparently, contracts are more serious disciplinary measures than pull-ups.

Two weeks later, around February 28, 2008, after plaintiff had been removed from the ASAT program and was awaiting placement to another housing unit, he was called in to the corrections officer's office by defendant Debraccio. (Compl.¶ 19). Plaintiff alleges that the corrections officer raised his voice and approached plaintiff in a threatening manner. *Id.* Plaintiff "stood-up [sic] and defended [himself]." *Id.* Plaintiff was then given a misbehavior report. *Id.* Plaintiff was found guilty after a hearing, and as a result, he lost package, commissary, phone and recreation privileges for 30 days to "impress upon [inmate] that this type of behavior will not be tolerated." (Compl. Ex. B-2 at 41-42).

One week later, on March 10, 2008, plaintiff met with defendant Cheyne on a mental health callout. (Compl.¶ 20). Plaintiff alleges that he told defendant Cheyne about his concern that the ASAT staff members "during [sic] something to me when I walk down the walkway," and he requested a transfer to Marcy Correctional Facility. *Id.* Plaintiff attached a copy of a memorandum written by defendant Cheyne to his complaint. (Comp. Ex. B-2 at 38). The memorandum states that when defendant Cheyne refused plaintiff's request to be transferred to Marcy Correctional Facility and refused to grant him other mental health services, he responded, "What if one day something

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

just sets me off and I lose it[?] I see all the civilians walking up and down that road. There are no [corrections officers] around. By the time you pressed the button and someone got to you, who knows what could happen[?]" (Comp. Ex. B-2 at 38).

As a result of defendant Cheyne's memorandum, plaintiff received a Tier III [FN6] disciplinary hearing on March 19, 2008, after which he lost commissary, phone, and package privileges for two months and was placed on "keeplock" for two months. (*Id.* at 43). However, these punishments were suspended for one month and deferred for six months. *Id.* This hearing was reviewed and reversed by the director of the Special Housing/Inmate Disciplinary Program on May 5, 2008. (Compl. Ex. B-2 at 47).

> FN6. DOCS regulations provide for three tiers of disciplinary hearings, depending upon the seriousness of the misconduct charged. *See Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (explaining the levels of disciplinary hearing, together with the possible dispositions). Tier III hearings are for the most severe disciplinary infractions and may result in the highest penalties. *Id.*

*3 Plaintiff received a memorandum dated May 22, 2008, which apparently was in response to a letter written by plaintiff to defendant Simons. (Compl. Ex. B-2 at 36). The memorandum informed plaintiff that his name had been added back to the ASAT programs need list, but due to plaintiff's "previous past two unsatisfactory removals from ASAT, (10/29/07 and 3/2/08), your name was placed on the bottom of ASAT programs [sic] needs list." *Id.*

Plaintiff has now been transferred to Marcy Correctional Facility and is apparently in an ASAT Dorm. (Pl.'s Decl. of Service at Dkt. No. 27; Defs.' Mot. Ex. 1).

## II. Judgment on the Pleadings

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983)

(citations omitted). *See* Fed.R.Civ.P. 12(b), 12(c) and 12(h)(2). The motion for judgment on the pleadings is then treated according to the same standard as a motion to dismiss under Rule 12(b)(6). *Id.*

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007)). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007)). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 93-94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). In this case, plaintiff has attached a myriad of documents to his complaint. (Pl.Ex.B-2) (Dkt. No. 1-1). These documents consist mainly of plaintiff's grievances and disciplinary records relating to this action. This court has considered these documents in making its determination.

## III. Retaliation

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 378, 380 (2d Cir.2004) (citation omitted). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id* . (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

**\*4** The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb.10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

Here, it appears plaintiff argues that the constitutionally protected conduct is his right to file grievances, as protected by the First Amendment. Plaintiff argues that the defendants conspired to remove him from the ASAT program "as a direct result of [plaintiff] filing inmate grievances." (Compl.¶ 24). Plaintiff's claims of a causal connection between his grievances and the conduct of the defendants, however, are conclusory. Moreover, as plaintiff's own complaint indicates, what he characterizes as retaliatory actions by the defendants were, in fact, remedial and didactic measures integral to the ASAT program:

> [O]nce in [the] ASAT program, you are required to have your shoes lined together, nothing on your lockers or beds, beds made with hospital corners ... any one of these violations can get you removed from the program. When [an] ASAT counselor give [sic] you a pull-up or

contract, you are prohibited from protesting or contesting any pull-ups or contracts, regardless if you're wrong or right. The inmates in New York State Department of Correctional Facilities/Services in ASAT program [sic] encounter this type of abuse from ASAT staff members on a daily situations [sic] and circumstances, which only foster [sic] hate and resentment towards those in authority.[FN7]

> FN7. Plaintiff also claims that the ASAT staff "demeanor towards inmates teaches [n]egative consequences comes [sic] before recover [sic]." *Id.*

(¶ 3). Although plaintiff refers to these rules as "abuse," the fact that one's shoes must be in line or that one's bed must be made in a particular way cannot be plausibly characterized as "abuse," regardless of plaintiff's disagreement with these requirements. Plaintiff's main issue seems to be with the ASAT program itself and with rules that he finds unnecessary, annoying, or detrimental to his recovery. In his "Prayer for Relief" that comprises pages 14 through 18 of his complaint, plaintiff delineates what seem to be his own proposed standards for how the ASAT program should be run. (Compl.pgs.14-18).

Plaintiff concedes that he violated the rules and became argumentative with the staff. However, he blames the staff for his inappropriate reactions. He states, for example, that one of the officers moved plaintiff's bed so that his shoes would be out of line. (Compl.¶ 15). Plaintiff alleges that he became argumentative with defendant Strumlofler when he refused to read plaintiff's grievance into the record. (Compl.¶ 24). On February 28, 2008, plaintiff states that a "CO" took off his glasses and "raised his voice," and approached plaintiff "in a threatening manner," causing plaintiff to stand up and defend himself. (Compl.¶ 19). Plaintiff appears to be surprised that he received a misbehavior report for that conduct. *Id.* Plaintiff's argumentative behavior at the grievance hearing on February 14, 2008, was the reason he was "kicked out" of the hearing.

**\*5** From the ASAT standards plaintiff himself includes in his complaint, is it clear that the defendants would have acted similarly even if plaintiff had not filed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

grievances. Argumentative behavior, having one's shoes out of line, and putting items on one's bed all appear, from plaintiff's own description of the ASAT program, to be valid reasons for remedial action.

Plaintiff's description of his subsequent meeting with defendants Debraccio, Ferraro, Simons, and Stromlofler is at odds with the grievance documents that plaintiff has submitted as exhibits to the complaint. (Compl. Ex. B-2 at 33). Plaintiff states that after he was "kicked out" of the grievance committee hearing, he was "threatened" by defendants Debraccio, Ferraro, Simons, and Strumlofler, who told him that he would be removed from ASAT if he filed any more **grievances.** (Compl.¶ 17). Plaintiff's own grievance states that "[o]n 02-14-08, ... I was told by [the ASAT] committee that one more **contract** and I was done with ASAT." (Compl. Ex. B-2 at 5). The Superintendent's response to one of plaintiff's grievances states that plaintiff was told that he would be removed from the program if he did not sign the ASAT "contract." (Compl. Ex. B-2 at 33).

The Superintendent's response further states that at the meeting where plaintiff claims he was "threatened," the defendants actually gave him "another opportunity at improving his involvement in ASAT. *Id.* In fact, when plaintiff's original behavioral "contract" was rescinded because the officers could not find the "signed orientation sheet," plaintiff was given another "orientation" for the program, and given another chance to adjust. *Id.* It is clear, from plaintiff's own pleading and the attachments, that it was not plaintiff's grievances, but his inability to abide by the rules of the ASAT program that motivated the actions of the defendants.

On the same day, February 14, 2008, plaintiff concedes that he had an argument with Mrs. Moore about whether plaintiff returned late from a "break." (Compl.¶ 18). Plaintiff states that he told Mrs. Moore that he knew that she was in "cohoots [sic]" with defendants Simons, Ferraro, and Debraccio to throw plaintiff out of the program. *Id.* Arguing with a teacher is a valid reason for disciplinary action. Plaintiff's inappropriate reaction to discipline is evident in the language he used in the grievance he filed after he was removed from the ASAT program (following the argument he had with defendant Moore):

Ms. Moore who views me as a *Pimp* [sic] actively acted [sic] in Cohoots [sic] with the ASAT Board Members who wanted to throw me out of ASAT; Ms. Moore as [sic] a former Crack head [sic] addict and prostitute hate [sic] Pimps [sic] and as a result claims that I was late for groups [sic] after a Five [sic] minutes [sic] break ...

(Compl. Ex. B-2 at 5). The apparent basis for the defendants' discipline of plaintiff is his bad behavior, triggered by what he views as "harassment" inherent in the ASAT program, not some conspiracy to expel him from ASAT because he filed grievances.

**\*6** Plaintiff's conclusory allegations of retaliation by defendant Cheyne likewise fails to state a claim. Plaintiff alleges that defendant Cheyne was retaliating against plaintiff "for ASAT staff members and her Mental Health co-worker Doctor menlendez [sic], who I am suing in the Federal Court." (Compl.¶ 27). In the same paragraph, plaintiff alleges that defendant Cheyne "made these unfounded statements was to make it appear as though I was a problem for DOCS...." *Id.* Plaintiff's allegations of retaliation by defendant Cheyne relative the ASAT program do not make sense because he had already been removed from the ASAT program by the time that he met with defendant Cheyne; and she was not involved in the ASAT program. Plaintiff makes no plausible allegation that would indicate why defendant Cheyne would retaliate against plaintiff for filing grievances against counselors in the ASAT program.

Plaintiff's claim of retaliation by Cheyne relating to the doctor apparently refer to a civil rights action he filed in the Northern District of New York on October 17, 2003, against numerous defendants, including Dr. Melendez. *Murray v. Pataki,* 9:07-CV-1263 (N.D.N.Y.). The district court granted defendants' motion for summary judgment and dismissed plaintiff's claims against Dr. Melendez because plaintiff had failed to effect service of process over the five years the lawsuit had been pending.[FN8] The case is currently on appeal to the Second Circuit. (Dkt. Nos. 154-57 in 9:03-CV1263). It is unclear how defendant Cheyne, a social worker at Mid-State in 2008, would have been aware of a lawsuit against Dr. Melendez, allegedly a doctor at Clinton Correctional

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

Facility who cared for plaintiff in 2002.[FN9]

> **FN8.** On March 3, 2009, Magistrate Judge Treece recommended dismissing the action *inter alia* for the failure to serve Dr. Melendez, and on April 9, 2009, District Judge Suddaby adopted the recommendation. (Dkt. Nos. 149, 151 in 9:03-CV-1263).

> **FN9.** *See Murray v. Pataki, et al.,* 9:03-CV-1263 (N.D.N.Y) (Dkt. No. 10 "Second Amended Complaint" at ¶¶ 9, 22, 38).

Plaintiff has failed to state claims of retaliation because he has presented nothing but his conclusory allegations, that essentially all of the actions taken by the defendants were motivated by his grievances. He has, therefore, failed to plead a plausible causal connection between defendants' actions and plaintiff's grievances. While there is some temporal proximity between defendant's actions and plaintiff's grievances, that proximity is only a result of the number of grievances plaintiff filed in the period of time covered by his allegations. The grievances, together with the associated decisions, attached to plaintiff's complaint support the court's findings. Accordingly, this court recommends that plaintiff's claims of retaliation against all the defendants be dismissed.

## IV. Other Claims

As to plaintiff's claims of conspiracy, his allegations are merely conclusory and implausible claims, unsupported by any additional documents filed with his complaint.[FN10] Plaintiff apparently views any disciplinary action taken by anyone as evidence of a conspiracy among those meting out the discipline, regardless of whether they are associated or not. The only apparent connection between all of the defendants is the plaintiff, which does not, by itself, establish a causal connection. Conclusory allegations are insufficient to establish a cause of action under the civil rights statutes and may be dismissed on the pleadings alone. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d. Cir.1987). *See also Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987); *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983).* Plaintiff has not alleged any facts sufficient to render plausible his claim that defendants

conspired against him to violate his constitutional rights. Accordingly, this court recommends that plaintiff's claims of conspiracy be dismissed.

> **FN10.** Plaintiff includes 42 U.S.C. § 1985(3) as a basis for his conspiracy claims. (Compl.¶¶ 23, 27). To establish a claim under section 1985(3), plaintiff must establish a racial or class-based conspiracy to deprive a person or class of persons of equal protection of the laws." *Mian v. Donaldson, Lufkin & Jenrette Securities Corporation,* 7 F.3d 1085, 1087 (2d Cir.1993). Although near the end of his statement of facts, plaintiff states that "only black inmates with Conditional Release dates get removed from ASAT for the smallest thing." (Compl.¶ 21). The only other reference to "people of color" appears in the fourth cause of action, alleging deliberate indifference by defendant Hulihan alone, stating that he allows the ASAT staff to "single-out people of color." (Compl.¶ 26). There is no reference to any racially based conspiracy in either of plaintiff's causes of action alleging section 1985 conspiracy. (Compl.¶¶ 23, 27). In fact, in paragraph 23, plaintiff states that defendants "*for personal reasons* have conspire [sic] to violate the Plaintiff's First, and Fourteenth Amendment Rights ...." (emphasis added). In paragraph 27, plaintiff alleges that defendant Cheyne "conspire [sic]," but does not indicate with whom she conspired. Plaintiff fails to state a claim under section 1985.

> In one of plaintiff's causes of action, he makes a passing reference to 42 U.S.C. § 1986. (Compl.¶ 25). Plaintiff includes this reference in a paragraph alleging that defendant Hulihan was deliberately indifferent to "the consequences of his conduct." Section 1986 provides a cause of action against anyone having knowledge of a section 1985 conspiracy, who fails to prevent the violation if he or she has the power to do so. Clearly, plaintiff's citation to section 1986 was inappropriate and the complaint states no claim under this section.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

**\*7** Plaintiff adds a claim entitled "Cruel and Unusual Punishment." (Compl.¶ 29). The Eighth Amendment prohibits cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Whitley v. Albers,* 475 U.S. 312, 319-20, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). Neither the alleged removal of plaintiff from the ASAT program nor the imposition of 30-days in the Special Housing Unit are "punishments" that involve the unnecessary and wanton infliction of pain, and plaintiff has stated no deprivation of basic human needs. Accordingly, this court recommends that plaintiff's cause of action alleging cruel and unusual punishment be dismissed as to all defendants.

Plaintiff also suggests he has a due process claim. (Compl.¶ 30). To establish a claim based on a violation of procedural due process, a plaintiff must first establish a constitutionally protected liberty or property interest that a plaintiff was denied without the appropriate procedural safeguards. *See Perry v. McDonald,* 380 F.3d 159, 173 (2d Cir.2001) (citations omitted). Plaintiff alleges that his due process rights were violated because he was "prevented from completing his recommended program." (Compl.¶ 30).

Plaintiff associates the ASAT program with conditional release and believes that removal from the ASAT program "significantly affected his daily activities to participate in the required recommended program in order [sic] to secure his release from imprisonment." (Compl.¶ 25). If plaintiff is claiming that his removal from the ASAT program was done without due process, his argument fails, because inmates have "no constitutional right to discretionary good time release, or to participation in prison programs which might expedite release." *Fifield v. Eaton,* 07-CV-6521L, 2009 U.S. Dist. LEXIS 96967, \*5-\*6, 2009 WL 3429791, (W.D.N.Y. October 20, 2009). Because plaintiff has failed to establish a liberty interest,

no due process violation occurred.[FN11] Accordingly, this court recommends that plaintiff's due process claim be dismissed.

> FN11. Plaintiff also alleges that defendants "neglected to follow their own rules." (Compl.¶ 30). However, the violation of state statutes, rules, and/or regulations does not automatically rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744-45 (S.D.N.Y.2002). *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

**V. Plaintiff's Motion for Preliminary Injunction**

Plaintiff has also moved for a preliminary injunction. (Dkt. No. 22). In this motion, he sought an order enjoining DOCS from transferring plaintiff to Marcy Correctional Facility. Plaintiff evidently thought the transfer would be "retaliatory" and was only being done in order to "MOOT Plaintiff's Declaratory Injunctive Relief." (Pl.'s Mot. for a Prelim. Inj. 2. (capitalization in the original)).

Plaintiff is correct in that his transfer renders his injunctive relief moot-but only the relief requested in his motion. Plaintiff did not request any injunctive relief in his complaint that was affected by his transfer to Marcy. Plaintiff has also failed to meet the requirements for a preliminary injunction because he has not established that he is likely to suffer irreparable injury, that he will likely succeed on the merits or that a balance of hardships tip decidedly in his favor. *See Moore v. Consolidated Edison* 409 F.3d 506-511 (2d Cir.2005).

**\*8 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for a preliminary injunction (Dkt. No. 22) be **DENIED,** and it is further

**RECOMMENDED,** that defendants' cross-motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) (Dkt. No. 24) be **Granted,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)

(Cite as: 2010 WL 1235615 (N.D.N.Y.))

written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Murray v. Hulihan
Not Reported in F.Supp.2d, 2010 WL 1235615 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
William EDWARDS, Plaintiff,
v.
Martin HORN, et al., Defendants.
No. 10 Civ. 6194(RJS)(JLC).

March 8, 2012.
*ORDER ADOPTING REPORT AND
RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

**\*1** *Pro se* Plaintiff William Edwards brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that at various times, Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at five different facilities on Rikers Island. By Order dated September 1, 2010, this matter was referred to the Honorable James L. Cott, Magistrate Judge. On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b) (6) of the Federal Rules of Civil Procedure. On March 3, 2011, Judge Cott set a deadline of March 4, 2011 for Plaintiff to submit an opposition to Defendants' motion. Although Judge Cott thrice extended this deadline—on May 18, 2011, June 8, 2011, and June 29, 2011—Plaintiff never submitted an opposition. Accordingly, Judge Cott properly considered Defendants' motion fully submitted.

On February 14, 2012, Judge Cott issued the attached forty-six page Report and Recommendation (the "Report"), recommending that the motion to dismiss be granted except as to Plaintiff's retaliatory termination claim against Defendant Rosa to the extent that Plaintiff seeks nominal or punitive damages. In the Report, Judge Cott advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the

time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After reviewing the record, the Court finds that Judge Cott's well-reasoned and careful Report is not facially erroneous. Accordingly, the Court adopts the Report in its entirety and, for the reasons set forth therein, grants Defendants' motion to dismiss as to all but one of Plaintiff's claims. The court denies the motion as to Plaintiff's retaliatory termination claim against Defendant Rosa, and only to the extent that Plaintiff seeks nominal or punitive damages against her. The Clerk of the Court is respectfully directed to terminate the motion located at Doc. No. 88.

SO ORDERED.

*REPORT & RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.
    **To The Honorable Richard J. Sullivan, United States District Judge:**
    Plaintiff William Edwards, proceeding pro se, brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 alleging that Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration in various facilities on Rikers Island. Edwards also alleges that he was discriminated against in violation of the Americans with Disabilities Act. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that the motion to dismiss be granted except as to Edwards' retaliatory termination claim against Defendant Rosa.

**I. BACKGROUND**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**A. Factual Background**

**\*2** The following facts are taken from the Complaint and are accepted as true for purposes of this motion. (*See* Complaint, dated June 23, 2010 ("Compl.") (Dkt. No. 2)). Edwards brings this suit pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.,* against 44 current and former New York City employees and two John Doe Defendants: Commissioner Martin Horn, Warden Bailey, Warden J. Davis, Warden E. Duffy, Warden Michael Hourihan, Warden Riordan, Warden Robert Shaw, Correctional Officer ("CO.") Dinolfo, CO. Grima, CO. Hernandez, CO. Holmes, CO. Lagos, CO. Lewis, CO. Maynard, CO. Morales, CO. Noon, CO. Reyes, CO. Richardson, CO. Rosa, CO. Smalls, CO. Smith, CO. Sumpter, Captain Alleyve, Captain Bethacourt, Captain Calle, Captain G. Davis, Captain Polak, Marybeth Campfield, Ms. Carrera, Mrs. M. Cattafesta, Mr. K. Guerrant, Cook Hannah, Deputy Hill, Florence Hunter, Ms. Jenkins, Ms. K. Johnson [FN1], Ms. G. Lee, Ms. P. Mimms, Mr. R. Mulvena, Ms. B. Musmacher, Ms. R. Padmore, Karen Powell, James Robinson, and Ms. Steven (together, "Defendants"). (*See* Compl. at 1–5).[FN2]

> **FN1.** In the case caption on the first page of the Complaint, Edwards mistakenly identifies Defendant Johnson as "Ms. K. Jonhson." (Compl. at 1).

> **FN2.** In Section I.b of the Complaint, Edwards lists 38 Defendants. Six additional Defendants—Carrera, Cattafesta, Duffy, Grima, Powell, and Steven—do not appear on this list, but are named in the case caption on the first page of the Complaint.

Edwards alleges that Defendants deprived him of his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at several facilities on Rikers Island: the Anna M. Kross Center ("AMKC"), the Eric M. Taylor Center ("EMTC"), the George Motchan Detention Center ("GMDC"), the George R. Vierno Center ("GRVC"), and the Robert N. Davoren Complex ("RNDC"). At the time he filed his Complaint, Edwards was an inmate at the Clinton Correctional Facility, and he is currently on parole. (*See* Letter, dated Dec. 11, 2011 (Dkt. No. 135)).

Throughout his roughly 100 paragraph, single-spaced, 25–page Complaint, Edwards does not present his allegations by cause of action, nor does he clearly articulate exactly what causes of action he is asserting, as many allegations appear to overlap and lack clarity.[FN3] Several of Edwards' allegations deal with Defendants' actions in relation to a separate lawsuit Edwards brought in the Northern District of New York, *Edwards v. Selsky,* No. 04 Civ. 493(FJS)(DRH), 2008 WL 190385 (N.D.N.Y. Jan. 22, 2008) ("*Selsky*" or the "NDNY action"), which was dismissed for failure to prosecute. The Court has made every effort to identify and address all possible claims asserted in the Complaint.[FN4] The Court is able to identify 12 potential causes of action spanning separate dates from July 25, 2007 to April 5, 2010. Specifically, Edwards asserts the following claims: (1) verbal harassment; (2) deprivation of access to free telephone calls; (3) deprivation of access to legal services; (4) mail tampering; (5) denial of required food portions; (6) unconstitutional strip search; (7) violation of due process rights within the prison's disciplinary and grievance system; (8) excessive force and denial of medical treatment; (9) deprivation of access to the prison's grievance system; (10) retaliation; (11) conspiracy; and (12) disability discrimination under the ADA. Edwards seeks $75,000,000 in damages, attorneys' fees, a reimbursement of penalties incurred due to two allegedly false infractions, injunctive relief in the form of expunging those false infractions, injunctive relief terminating Defendants from their positions in the New York City Department of Correction ("DOC") and permanently enjoining them from city, state, or federal employment, and a permanent restraining order to prevent Defendants from committing any future similar violations. (Compl. ¶ V). Edwards does not present these allegations in a narrative fashion, but instead describes dozens of grievance letters that he has submitted to DOC staff at the various Rikers Island facilities over the course of nearly three years. To avoid repetition, the Court will describe the factual background relating to Edwards' specific allegations in the context of the relevant legal discussion below.

> **FN3.** Accordingly, while Defendants do not argue as much, the Complaint could also be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

dismissed under Rule 8(a)(2), which requires a pleading to contain "a short and plain statement" of the claims.

FN4. Edwards has attached more than 300 pages of documents to his Complaint, consisting of grievance letters, notices of infraction, and inmate grievance committee decisions. These materials can be properly considered in deciding Defendants' motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). However, while the Court will consider these materials in support of the claims asserted in the Complaint—indeed, nearly every paragraph advises the reader to "see attached exhibit" but fails to cite to a specific page—the Court will not attempt to identify the potentially innumerable causes of action that could be construed from the hundreds of allegations contained solely in the attachments.

## B. Procedural Background

**\*3** Edwards filed the Complaint on August 18, 2010. (Dkt. No. 2). On October 29, 2010, the United States Marshals executed service of the Summons and Complaint on 32 of the 44 named defendants.FN5 Over the course of the next several months, with the assistance of the Office of Corporation Counsel, the United States Marshals, and the Court, Edwards has attempted to serve the remaining 12 named defendants. (*See* Dkt. Nos. 56, 62, 69, 70, 75, 119, 120, 129). To date, Edwards has successfully served nine additional Defendants and appears to have served a number of Defendants twice.FN6 Accordingly, there are three named Defendants who have not been served—Bethacourt, Davis, and Johnson-and two John Doe Defendants who have not been identified.FN7

FN5. This set of defendants consists of Sumpter (Dkt. No. 11), Horn (Dkt. No. 12), Cattafesta (Dkt. No. 13), Hunter (Dkt. No. 15), Guerrant (Dkt. No. 17), Lagos (Dkt. No. 18), Shaw (Dkt. No. 19), Campfield (Dkt. No. 20), Reyes (Dkt. No. 21), Davis (Dkt. No. 22), Hernandez (Dkt. No. 23), Holmes (Dkt. No. 24), Rosa (Dkt. No. 25), Smith (Dkt. No. 26), Mulvena (Dkt. No. 27), Polak (Dkt. No. 28), Noon (Dkt. No. 29),

Duffy (Dkt. No. 31), Dinolfo (Dkt. No. 32), Mimms (Dkt. No. 34), Bailey (Dkt. No. 35), Lewis (Dkt. No. 36), Alleyve (Dkt. No. 37), Calle (Dkt. No. 39), Hannah (Dkt. No. 41), Hourihan (Dkt. No. 43), Jenkins (Dkt. No. 44), Maynard (Dkt. No. 45), Padmore (Dkt. No. 48), Richardson (Dkt. No. 49), Riordan (Dkt. No. 50), and Smalls (Dkt. No. 51).

FN6. Since October 29, 2010, Edwards has served the following Defendants: Lee (service executed on Dec. 2, 2010 (Dkt. No. 61)); Powell (service executed on Mar. 29, 2011 (Dkt. No. 98)); Steven (service executed on Feb. 24, 2011 (Dkt. No. 110); service executed on Mar. 31, 2011 (Dkt. No. 99)); Grima (service executed on Mar. 2, 2011 (Dkt. No. 107); service executed on Mar. 14, 2011 (Dkt. No. 100)); Robinson (service executed on Mar. 29, 2011 (Dkt. No. 101)); Musmacher (service executed on Mar. 14, 2011 (Dkt. No. 102)); Hill (service executed on Feb. 24, 2011 (Dkt. No. 112); service executed on Mar. 14, 2011 (Dkt. No. 103)); Horn (service executed on Mar. 31, 2011 (Dkt. No. 97)); and Carrera (service executed on Oct. 6, 2011 (Dkt. No. 131)).

FN7. As to Defendant Bethacourt, the Office of Corporation Counsel advised the Court by letter dated June 8, 2011 that it is unable to locate records that would assist in identifying Bethacourt. Accordingly, as stated in the Court's Order dated June 9, 2011 (Dkt. No. 120), it does not appear that any further action can be taken to identify this Defendant. As to Defendant Davis, the Office of Corporation Counsel advised the Court by letter dated February 16, 2011 that the Legal Bureau of the DOC would accept service on his behalf. By Order dated September 1, 2011, the Court directed Edwards to serve Davis by September 26, 2011 (Dkt. No. 129), but the docket sheet does not reflect any attempt to effect service. Lastly, on October 31, 2011, Edwards attempted to serve Defendant Johnson but was unsuccessful because she was not located at the address provided by the Office of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Corporation Counsel. (*See* Order, dated Dec. 12, 2011 (Dkt. No. 134), at 1). Edwards was directed to again attempt to serve Johnson by January 27, 2012 (*Id* .), but no proof of service has been filed.

During the pendency of his lawsuit, Edwards has submitted several requests to the Court. By Order dated November 1, 2010, the Court denied Edwards' request for an order prohibiting certain employees at the Southport Correctional Facility, where Edwards was incarcerated at the time, from tampering with his legal and personal mail. (Dkt. No. 8). By Orders dated November 30, 2010 and April 14, 2011, the Court denied Edwards' motions for default judgment against certain Defendants (Dkt.Nos.56, 92), and Edwards' interlocutory appeal of the November 30 Order was denied by the Second Circuit on May 26, 2011. (Dkt. No. 118). By Orders dated February 9, 2011, I declined Edwards' request that I disqualify myself from this action and also denied his motion for the appointment of counsel. (Dkt.Nos.73–74). Lastly, on March 8, 2011, I denied Edwards' request for sanctions in connection with Corporation Counsel's providing Edwards with service addresses for Defendants. (Dkt. No. 81).

On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss, dated Apr. 4, 2011 ("Def.Mem.") (Dkt. No. 89)).[FN8] Defendants assert that Edwards has failed to state a claim as to his verbal harassment, deprivation of telephone access, unconstitutional strip search, mail tampering, denial of food, denial of legal services, due process, grievance processing and protocol, excessive force and medical treatment, conspiracy, and retaliation causes of action. (Def. Mem. at 16–45). In addition, Defendants argue that Edwards' claims against Defendants Bailey, Cattafesta, Davis, Hill, Horn, Hourihan, Powell, and Riordan fail for lack of personal involvement, all defendants are entitled to qualified immunity, and Edwards' claims are barred by the Prison Litigation Reform Act (the "PLRA")[FN9] (*Id.* at 14–16, 45–48). Pursuant to the Court's Order dated March 3, 2011, Edwards' deadline to submit an opposition to Defendants' motion was May 4, 2011. (Dkt. No. 80). However, despite receiving several extensions—first to

May 18 (Dkt. No. 90) then to June 8 (Dkt. No. 116) and June 29 (Dkt. No. 122)—Edwards has not submitted any opposition. Accordingly, the Court considers Defendants' motion fully submitted.

FN8. Although the motion to dismiss was not filed on behalf of any of the unserved Defendants (*see* Def. Mem. at 2–3 n. 2), Counsel has stated that the arguments raised apply equally to all Defendants. Accordingly, in light of my recommendation to dismiss all claims against all Defendants except the retaliatory termination claim against Defendant Rosa, *see infra* Section ILK, the Court should *sua sponte* dismiss the Complaint as to Defendants Bethacourt, Davis, John Doe # 1, John Doe # 2, and Johnson.

FN9. Defendants have not moved to dismiss any of Edwards' claims on the ground that he has failed to exhaust his administrative remedies, as he is required to have done under the PLRA. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). While exhaustion under Section 1997e(a) is mandatory, *see Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), non-exhaustion "is an affirmative defense that is waiveable." *Handberry v. Thompson,* 446 F.3d 335, 342 (2d Cir.2006) (citations, alterations, and quotation marks omitted); *see also Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Here, because Defendants have not argued that Edwards failed to exhaust his administrative remedies, the non-exhaustion defense has been waived. *See, e.g., Ortiz v. Dep't of Corr. of the City of N.Y.,* No. 08 Civ. 2195(RJS)(HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011) (defendant's failure to raise non-exhaustion constitutes waiver) (Report and Recommendation), *adopted,* 2011 WL 2638140

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

(S.D.N.Y. Jul.5, 2011); *Hobson v. Fischer,* No. 10 Civ. 5512(SAS), 2011 WL 891314, at *2 n. 22 (S.D.N.Y. Mar.14, 2011) (finding waiver even where grievance "appears not to have been fully exhausted" under PLRA).

## II. *DISCUSSION*

**A. Applicable Legal Standards**

**\*4** A plaintiff's failure to oppose a 12(b)(6) motion does not by itself merit dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Id.* Consequently, as with all Rule 12(b)(6) motions, in deciding an unopposed motion to dismiss, a court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" according to the principles below. *Id.* at 322.

A complaint will not survive a 12(b)(6) motion to dismiss if it "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Although "a complaint attacked by a 12(b) (6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks and citations omitted). "To survive a motion to dismiss, the complaint must set out only enough facts to state a claim to relief that is plausible on its face." *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 32 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950 (citation omitted). A complaint thus may only survive a 12(b) (6) motion to dismiss if it has "facial plausibility" and pleads enough facts to allow the court to "draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* at 1949.

Given that Edwards is proceeding *pro se,* the Court must "construe [his Amended Complaint] broadly and interpret it to raise the strongest arguments it suggests." *Sharpe v. Conole,* 386 F.3d 482, 484 (2d Cir.2004) (citation omitted). Furthermore, "when the plaintiff proceeds pro se ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (citation omitted). Nevertheless, "a *pro se* litigant [is] bound by the same rules of law ... as those [litigants] represented by counsel." *Fertig v. HRA Med. Assistance Program,* No. 10 Civ. 8191(RPP), 2011 WL 1795235, at *4 (S.D.N.Y. May 6, 2011) (quotation marks and citation omitted).

**B. Verbal Harassment**

Edwards asserts that several Defendants, in violation of Section 1983, used harassing, threatening, and profane language towards him on 17 separate occasions taking place between July 25, 2007 and September 1, 2008. (Compl.¶¶ III, 2, 6, 8, 17, 19, 22, 24, 30, 33, 37, 38, 53, 55, 61, 83, 91(b)). In separate allegations, he claims that Defendants Campfield, Dinolfo, Grima, Hannah, Hernandez, Holmes, Lewis, Maynard, Morales, Noon, Reyes, Richardson, Smalls, and Smith, called him a "snitch" in front of other inmates, mocked his disability, falsely informed him that he had a visitor when in fact he did not have a visitor, and directed racial slurs and profane language toward him. (*Id.*). These claims should be dismissed. The Eighth Amendment prohibits the imposition of cruel and unusual punishment, *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but its protection does not extend to verbal harassment of an inmate by correction officers without any resulting "appreciable injury." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 373 (S.D.N.Y.2011) (quoting *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)).

**\*5** Verbal harassment, by itself, is not a constitutional violation. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010) ("[v]erbal harassment itself does not rise to the level of a constitutional violation [,]" and "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

violations") (quotation marks and citation omitted); *Davidson v. Bartholome,* 460 F.Supp.2d 436, 446 (S.D.N.Y.2006) (no relief to inmate "simply because [an officer] made a hostile or derogatory comment"); *Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2005 WL 121720, at *11 (S.D.N.Y. Jan. 21, 2005) (no claim because merely "insulting" or "disrespectful" comments "do not give rise to a constitutional violation") (quotation marks and citations omitted) (Report and Recommendation), *adopted,* 2005 WL 433285 (S.D.N.Y. Feb.23, 2005). Absent any appreciable injury, courts routinely dismiss claims of verbal harassment brought under Section 1983. *See, e.g., Felder v. Filion,* 368 F. App'x 253, 256 (2d Cir.2010) (verbal harassment did not violate Eighth Amendment where plaintiff did not present evidence of resulting injury); *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a [Section] 1983 claim if no specific injury is alleged"). Because Edwards does not allege any injury whatsoever, let alone one that could be considered "appreciable," Defendants' alleged threats, verbal harassment, or profane language do not give rise to constitutional violations and should therefore be dismissed.

### C. Denial of Required Telephone Calls

Edwards alleges that since his incarceration began on January 23, 2008, he has not been provided with a free telephone call as required by the "DOC Telephone System." (Compl.¶ 46).[FN10] Edwards further alleges that he submitted a grievance on June 3, 2008 regarding his deprivation of free telephone calls. (*Id.*). However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (citing cases) (Report and Recommendation), *adopted,* 2011 WL 5006831 (S.D.N.Y. Oct.20, 2011). Because inmates "have no right to unlimited telephone calls[,]" *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1998) (citation omitted), Edwards must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights. *See, e.g., Paulino v. Menifee,* No. 00 Civ. 5719(RCC)(KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction

restoring phone privileges where inmate did not allege that alternate means of communication were inadequate). Edwards' claim regarding the denial of free telephone calls should therefore be dismissed.

FN10. In the context of his claim for the denial of free telephone calls, Edwards provides different dates for the start of his incarceration, stating January 23, 2008 in his Complaint and January 24, 2008 in an attached exhibit. (Compl. ¶ 46; Dkt. No. 2–3 at 4). These cited dates, however, appear to be inconsistent with the commencement of Edwards' incarceration, as his earliest allegation in this lawsuit takes place on July 25, 2007 while he was housed at the AMKC. (*Id.* ¶ III). In any event, regardless of whether Edwards has been denied free telephone calls since July 2007 or January 2008, his cause of action should be dismissed because he has failed to state an actionable claim.

### D. Deprivation of Access to Legal Services

**\*6** Edwards alleges numerous deprivations of access to legal services by Defendants Campfield, Musmacher, and Smalls. As to Campfield, Edwards alleges that in March 2008 she denied him a legal manila envelope, lost his legal documents pertaining to the NDNY action, and denied him legal services. (Compl. ¶¶ 31, 36). As to Musmacher, Edwards asserts that she denied him legal services for more than a month around August 2008 and discriminated against him by providing legal services to Latino detainees when Edwards was "next ... on line" to receive such services. (*Id.* ¶¶ 56–57). As to Smalls, Edwards claims that she denied him extra time in the prison facility's law library in August 2008. (*Id.* ¶ 61). Each of these claims should be dismissed.

The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Accordingly, for a defendant's conduct to provide a basis for an inmate to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

invoke his right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09 Civ. 3722(SHS)(DF), 2010 WL 5480756, at *21 (S.D .N.Y. Sept. 1, 2010) (citations and quotation marks omitted) (Report and Recommendation), *adopted,* 2011 WL 9398 (S.D.N.Y. Jan.3, 2011).

Here, Edwards does not state sufficient facts to constitute any injury or material prejudice. He does not claim any injury suffered because of Defendants' alleged denials of legal services, legal supplies, extra time in the law library, or alleged discrimination in favor of Latino detainees. While he asserts that Campfield's losing his legal documents in connection with the NDNY action prevented him from "prosecuting" that action (Compl.¶ 36), he fails to provide any specifics as to his purported inability to prosecute. He does not elaborate on, for example, what documents he believes were lost and what actions he was prevented from taking in his litigation, which is especially relevant since Edwards appears to have participated in the NDNY lawsuit in some capacity, but failed to keep the court apprised of his mailing address. *See Selsky,* 2008 WL 190385, at *1–3. Accordingly, because Edwards has not identified any injury or material prejudice as a result of his alleged deprivation of access to legal services, these claims should be dismissed.

**E. Mail Tampering**

Edwards' mail tampering claims are based on allegations of interference with his outgoing non-legal mail and his incoming and outgoing legal mail at the EMTC and AMKC. Specifically, Edwards first alleges that on November 1, 2007 he wrote a letter to Michael Caruso at the DOC that was never sent from the EMTC. (Compl.¶ 16). Second, Edwards alleges that his "legal mail" addressed to Caruso never left the EMTC and was returned to him on November 27, 2007. ( *Id. ¶ 27*). Next, Edwards submitted a grievance on September 8, 2008 alleging that his "personal and legal mail" addressed to a co-defendant never left the AMKC because it was returned for insufficient postage despite being marked with a postage stamp. ( *Id. ¶ 70*). Edwards' fourth claim of mail tampering relates to the NDNY action. He asserts that Defendant Davis failed to forward his incoming legal mail to the correct address, despite Edwards' instruction for him

to do so, and that as a result, his NDNY lawsuit was dismissed. ( *Id. ¶ 47*). Lastly, Edwards alludes to an allegation of tampering with his outgoing "legal and personal mail" against unnamed AMKC staff, which he documented in a November 18, 2008 grievance letter. ( *Id. ¶ 94*). None of these claims should withstand a motion to dismiss.

**\*7** Both legal and non-legal mail are protected by the First Amendment's "right to the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at *5 (S.D.N.Y. Mar.29, 2001) (citation omitted). In addition, "the Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

With these principles in mind, Edwards' allegations as to outgoing non-legal mail-non-legal mail being afforded less protection than legal mail, *Davis,* 320 F.3d at 351–fail to state a claim because he does not assert that Defendants actually tampered with his mail, only that his mail never left the facility. Moreover, instead of establishing plausible mail tampering claims for his outgoing non-legal mail, Edwards' alleged facts make mail tampering an unlikely possibility. For example, Edwards' allegation that his November 1, 2007 letter to Michael Caruso never left the EMTC is based solely on the fact that Caruso never answered the letter. (Compl.¶ 16). Caruso's failure to respond to Edwards' letter, of course, does not necessarily suggest that it was never sent by EMTC staff. Absent any allegations that Defendants opened the letter, withheld it from being sent, or otherwise took any adverse action to make it plausible that EMTC staff tampered with Edwards' outgoing mail, Edwards' claim is merely speculative. Similarly, Edwards' allegation in his September 8, 2008 grievance that a letter to a co-defendant was returned to him for insufficient postage despite having a postage stamp does not suggest mail tampering, but rather that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Edwards had failed to affix sufficient postage. ( *Id.* ¶ 70). In any event, an isolated failure to mail an inmate's letter does not state a constitutional violation. *See, e.g., Battice v. Phillip,* No. 04 Civ. 669(FB)(LB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) (defendant's failure to deliver plaintiff's mail, even if intentional, is "simply *de minimis* and therefore outside the ambit of constitutional protection") (citation and quotation marks omitted). Finally, Edwards' claim regarding mail tampering in November 2008 is devoid of any facts that could state a cause of action. (Compl.¶ 94).

As to Edwards' claims regarding interference with his incoming and outgoing legal mail, the Court notes that such interference "implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351. To survive a motion to dismiss, a plaintiff must allege that correction officers "regularly and unjustifiably" interfered with his mail, depriving him of his constitutional rights. *Shepherd v. Fisher,* No. 08 Civ. 9297(LTS)(RLE), 2011 WL 3278966, at *2 (S.D.N.Y. July 27, 2011) (citations and quotation marks omitted). To assert such a claim, a prisoner must allege that the defendant's actions (1) were "deliberate and malicious" and (2) "resulted in actual injury" to the plaintiff. *Cancel,* 2001 WL 303713, at *4 (quoted in *Davis,* 320 F.3d at 351). Actual injury exists where interference with legal mail results in "the dismissal of an otherwise meritorious legal claim." *Id.* However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* at 352 (citations and quotation marks omitted).

**\*8** None of Edwards' claims of interference with his legal mail—both those related to incoming and outgoing mail—sufficiently states an actual injury. Edwards fails to allege that he suffered any injury in connection with DOC staff's alleged failure to send his outgoing legal mail on November 27, 2007, September 8, 2008, or November 18, 2008, assuming that Edwards' "legal mail" is in fact legal mail. (Compl.¶¶ 27, 70, 94). For the same reason, Edwards' claim pertaining to incoming mail from the NDNY does not state a constitutional violation. This claim is based on Defendant Davis' alleged failure to adhere to

Edwards' request to have his mail sent to a forwarding address. For support, Edwards appears to rely on language in Judge Scullin's order that the magistrate judge's report and recommendation was returned to the Court marked "unable to forward." (Compl.¶ 47). The NDNY action, however, was not dismissed solely because certain documents were returned to the Court. Rather, the case was dismissed for Edwards' failure, for more than one year, to prosecute the action, which included his failure to keep the court and defendants apprised of his address, appear for a deposition, or pay a sanction, despite being aware of the pending litigation. *See Selsky,* 2008 WL 190385, at *1–3. Even if Davis had complied with Edwards' forwarding request, the court's decision to dismiss the complaint for Edwards' "repeated and ongoing failures to fulfill his obligations to notify the [c]ourt and counsel of his address and to cooperate in discovery" would likely have remained unchanged. *Id.* at *3. The alleged failure to forward did not, therefore, cause "the dismissal of an otherwise meritorious legal claim." *Cancel,* 2001 WL 303713, at *4 (citation omitted).

Moreover, Edwards does not plead that Defendants blocked his outgoing legal mail in connection with the NDNY action. Indeed, Edwards could not assert such an argument, since, as Judge Scullin noted, he had previously mailed documents to the court during the pendency of his lawsuit. *See Selsky,* 2008 WL 190385, at *1–2. Accordingly, Edwards cannot establish the requisite injury needed to state a cause of action for the deprivation of his constitutional right of access to the courts. Edwards' mail tampering claims should therefore be dismissed.

**F. Denial of Required Food Portions**

Edwards alleges that on several occasions Defendants Lagos, Lewis, and Richardson deprived him of required food portions, including "prescribed therapeutic diet 'soy milk' " on April 19, 2008 (Compl.¶ 38), a second chicken patty on or around May 2008 ( *Id.* ¶ 43), a "morning meal" on July 31, 2008 ( *Id.* ¶ 53), and an "afternoon meal" on or around October 2008. ( *Id.* ¶ 90). Each of these claims should be dismissed. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725

F.2d 12, 15 (2d Cir.1983) (per curiam) (quotation marks and citation omitted). Courts have found the Eighth Amendment to be implicated only where a prisoner's allegations involve a serious and continued deprivation of nutritionally adequate food. *See, e.g., Reeder v. Artus,* No. 09 Civ. 575(DNH)(DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (seven out of twelve days without meals constituted sufficient deprivation to survive motion to dismiss) (Report and Recommendation), *adopted,* 2010 WL 3636132 (N.D.N.Y. Sept.9, 2010).

**\*9** Edwards does not allege that the alleged denials of food placed his health and well being in any immediate danger. *See, e.g., Martinez v. Lape,* No. 09 Civ. 0665(TJM)(RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) (Report and Recommendation), *adopted,* 2011 WL 4528980 (N.D.N.Y. Sept.28, 2011) (no Eighth Amendment claim where inmate failed to allege how expired food and juice posed an immediate risk to health); *Bee v. Krupp,* No. 08 Civ. 10141(SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) ("visible globs of spit" in food did not violate Eighth Amendment). Nor do the allegations, which are alleged to have taken place on four separate dates over a span of six months, suggest that Edwards was in any danger. Accordingly, Edwards' claims regarding deprivation of meals should be dismissed.

### G. Unconstitutional Strip Search

Edwards alleges that an unspecified officer subjected him to an "institutional" strip search on an unspecified date in violation of the Fourth Amendment. (Compl.¶ 13). Edwards argues that this strip search was unconstitutional because he was convicted of a misdemeanor and not a felony. (*Id.*). While the Fourth Amendment prohibits "unreasonable searches," *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citation omitted), it is not unreasonable for prison officials to perform routine random strip searches on prison inmates. *See N.G. v. Connecticut,* 382 F.3d 225, 230–32 (2d Cir.2004). Edwards' reliance on the distinction between inmates convicted of misdemeanors and those convicted of felonies is misplaced, as that distinction is only relevant as to pre-trial detainees. *See Shain v. Ellison,* 356 F.3d 211, 214 (2d Cir.2004) ("clearly established Fourth Amendment precedent ... preclude[s] jails from strip

searching misdemeanor arrestees absent a reasonable suspicion that weapons or other contraband were concealed"); *Walsh v. Franco,* 849 F.2d 66, 70 (2d Cir.1988) ("indiscriminate strip-searching of misdemeanor arrestees is unconstitutional"). Here, Edwards admits that he was convicted at the time of his strip search. (Compl.¶ 13). *See, e.g., Castro–Sanchez v. NY. State Dep't of Corr. Servs.,* No. 10 Civ. 8314(DLC), 2011 6057837, at *8 (S.D.N.Y. Dec.6, 2011) (strip search claim dismissed because routine random searches of inmates are constitutional). Accordingly, Edwards' claim should be dismissed.

### H. Deprivation of Due Process Rights Within Prison's Disciplinary System

Edwards alleges that he was denied certain rights during two disciplinary proceedings heard by Defendant Davis on September 30, 2008, which can be broadly construed as a claim asserting a deprivation of procedural due process under the Fourteenth Amendment. (Compl.¶¶ 86, 87b, 89, 95, 97–99). The disciplinary hearings appear to relate to Edwards' alleged violations of "numerous [ ] rules within the inmate misbehavior rule book" on September 20, 2008 and September 24, 2008. (*Id.* ¶¶ 86, 87). Edwards takes issue with several aspects of the disciplinary hearings, including that: (1) Davis found him guilty of the infraction without conducting an investigation into Edwards' claim that he never received a copy of the rule book ( *Id.* ¶ 86); (2) Davis failed to provide him with certain documentary evidence that "could have help [ed]" Edwards defend himself, including Edwards' "orange detention card," his "injury report," and a video tape of the alleged infraction (*Id.* ¶¶ 86, 87b); (3) no witnesses to Edwards' violations "endor[s]e[d]" the infraction against him ( *Id.* ¶ 87); and (4) Edwards never received responses to notices of appeal and letters submitted to Horn, Hourihan, Hunter, and Robinson regarding his fine and punitive segregation. (*Id.* ¶¶ 86, 87b, 89, 94–99). In addition, Edwards appears to challenge his resulting discipline, which included a $25.00 "surcharge" and 30 days of punitive segregation. (*Id.* ¶¶ 87, 87b).

**\*10** Edwards' cause of action for deprivation of his procedural due process rights fails because he does not allege sufficient facts to state an actionable claim. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v.*

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

*McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation and quotation marks omitted). Prisoners subject to disciplinary proceedings can show a liberty interest only where "an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " *Luna v. Pico,* 356 F.3d 481, 487 n. 3 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In determining whether an inmate endured atypical and significant hardship during punitive segregation, the Second Circuit instructs courts to consider both the duration and conditions of the confinement. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("[f]actors relevant to determining" whether inmate endured atypical hardship include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement") (quotation marks and citation omitted).

The Second Circuit has expressly declined to provide a bright-line rule as to what length of time in punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. *See id.* Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000). By contrast, 305 days or more of confinement has been deemed an atypical and a significant hardship. *Id.* at 231–32. Even if an inmate is segregated for fewer than 101 days, a violation of his liberty interest may be implicated if "the conditions were more severe than the normal [punitive segregation] conditions ... or a more fully developed record showed that even relatively brief confinements under normal [punitive segregation] conditions were, in fact, atypical." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Palmer,* 364 F.3d at 65); *see also Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004). Indeed, " 'the conditions of confinement are a distinct and equally important consideration' in determining whether the prisoner has suffered a due process violation." *Sales v. Barizone,* No. 03 Civ. 6691(RJH), 2004 WL 2781752, at *6 (S.D.N.Y. Dec.2, 2004) (quoting *Palmer,* 364 F.3d at 64–65).

Here, Edwards claims that he was confined to punitive segregation for 30 days. Several courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin. See, e.g., Sandin,* 515 U.S. at 486 (30 days' disciplinary segregation not atypical and significant hardship); *Duncan v. Keane,* No. 95 Civ. 1090(SHS), 1997 WL 328070, at *2 (S.D.N.Y. June 13, 1997) (30 days in keeplock not atypical or significant hardship) (citation omitted); *Harris v. Keane,* 962 F.Supp. 397, 404 (S.D.N.Y.1997) (23 days in keeplock not atypical or significant hardship as "[t]he Second Circuit's post-*Sandin* decisions are unanimous that keeplock of 60 days or less in New York prisons is not an atypical hardship") (quotation marks and citations omitted); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1108 (S.D.N.Y.1995) (60 days in confinement does not implicate liberty interest). Given the duration of his segregation and Edwards' failure to allege that the conditions of his confinement were atypical and significant, Edwards' punishment does not implicate a liberty interest. Similarly, Edwards' $25.00 "surcharge" was not an atypical hardship. *See, e.g., Byrd v. Cornell Corr., Inc,* 60 F. App'x 191, 193–94 (10th Cir.2003) ( $50 fine and 30 days' segregation not atypical and significant hardship). Thus, neither Edwards' punitive segregation nor his $25 fine implicates the requisite liberty interest to state a due process claim.[FN11] Because of the absence of any protected liberty interest—and because Edwards' allegations cannot be construed to allege a protected property interest—any failures by the hearing officer to conduct a thorough investigation of Edwards' claims, including the provision of certain documentary evidence and witnesses, do not support a cause of action for the denial of due process. *See, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003) (inmate cannot claim due process violations at hearing where 12–day disciplinary confinement did not implicate protected liberty interest). Edwards' procedural due process claims should therefore be dismissed.

FN11. Edwards also alleges a claim for the deprivation of his procedural due process rights in connection with a September 24, 2008 disciplinary hearing. This claim fails because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Edwards cannot establish the requisite liberty interest, as he does not allege that he was subject to any discipline as a result of Davis' finding him guilty on September 24, 2008. (Compl.¶ 86).

Even if Edwards had alleged disciplinary confinement resulting from the September 28 hearing, and assuming that that confinement implicated a liberty interest under the Fourteenth Amendment, Edwards still cannot state a claim for deprivation of due process. Citing to the Notice of Disciplinary Disposition Form # 6500D attached to the Complaint (Dkt. No. 2–7 at 1), Edwards alleges that he was "never called down" for the hearing and that the hearing officer, Defendant Davis, was biased in favor of finding him guilty of the underlying infraction. (Compl.¶ 86). While an inmate "has a right to a fair and impartial hearing officer [,]" _Kalwasinski v. Morse,_ 201 F.3d 103, 108 (2d Cir.1999) (citation omitted), and one who "does not prejudge the evidence[,]" _Patterson v. Coughlin,_ 905 F.2d 564, 570 (2d Cir.1990), Edwards fails to plead any specific facts, beyond his conclusory allegation of bias, to suggest that Davis was predisposed to finding him guilty. Moreover, despite Edwards' claim that he was never called down for a disciplinary hearing, Edwards' signature appears next to a notation on the Form # 6500D that the hearing was adjourned by Edwards himself.

**I. Excessive Force and Denial of Required Medical Treatment**

**\*11** Edwards asserts two allegations of physical injury, which the Court construes as excessive force claims, and a related allegation that he was denied medical treatment. (Compl.¶¶ 91, 91b). Edwards asserts that on November 1, 2008, Defendant Grima hit him in the head with a "pushdraw" and then refused Edwards' request for medical treatment. (_Id._ ¶ 91). He also argues that Grima inflicted "personal physical harm" upon him after Grima pressed the "emergency personal alarm device." (_Id._ ¶ 91b). Neither of these claims should survive Defendants'

motion to dismiss.

The constitutional basis for Edwards' excessive force and deliberate indifference to medical needs claims is the Eighth Amendment's ban on cruel and unusual punishment. _See Graham v. Connor,_ 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); _Hemmings v. Gorczyk,_ 134 F.3d 104, 108 (2d Cir.1998) (per curiam). Any actionable claim under the Eighth Amendment consists of a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect. _See, e.g., Wright v. Goord,_ 554 F.3d 255, 268 (2d Cir.2009). The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness ..." _Id._ (citations and quotation marks omitted). In the excessive force context, this means "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." _Hudson v. McMillian,_ 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In the medical needs context, the defendant must act with a "sufficiently culpable state of mind[,]" _Wilson v. Seiter,_ 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), which means that he must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." _Farmer v. Brennan,_ 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment's objective component "focuses on the harm done, in light of contemporary standards of decency" and whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." _Wright,_ 554 F.3d at 268 (citations and quotation marks omitted). For deliberate indifference claims, "the alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." _Hathaway v. Coughlin,_ 99 F.3d 550, 553 (2d Cir.1996) (citations and quotation marks omitted).

Edwards' allegations of excessive force and denial of medical treatment fail to meet either the subjective or objective components under the Eighth Amendment. Both claims of excessive force are devoid of any specific information regarding the extent of a temporary or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

permanent injury, if any, and the level of pain that Edwards endured. The entirety of Edwards' first allegation of excessive force is that Grima "hit [him] in [the] head with the pushdraw that's part of the officers [sic] station" (Compl.¶ 91), which falls far short of what is needed to state a claim of excessive force. As to his second allegation, Edwards states only that Grima "caused [him] personal physical harm" after Grima pressed his "emergency personal alarm device[,]" but he fails to elaborate on what exactly Grima did, how and where it harmed Edwards, and what injury Edwards suffered. (*Id.* ¶ 91b). Edwards' medical treatment claims are similarly deficient, as he alleges only that Grima "said 'no' " after Edwards requested medical assistance and then sent Edwards away to pack up his belongings. (*Id.* ¶ 91). These allegations do not shed light on whether any injury that Edwards suffered was sufficiently serious to warrant medical attention, whether Grima knew of and disregarded an excessive risk to Edwards' health, or even whether there was any risk to Edwards' health. Accordingly, Edwards has failed to state claims for excessive force and denial of medical treatment, and those claims should be dismissed.

**J. Deprivation of Access to Prison Grievance System**

**\*12** Throughout the Complaint, Edwards claims that he submitted several grievance letters and complaints to numerous Defendants, who he alleges denied, ignored, never answered, and/or improperly processed his grievances on various dates from July 2007 through February 2009. (Compl.¶¶ 1–15, 17–20, 21–33, 36–39, 41–45, 48–51, 54–85, 88, 90, 91b, 92–94, 96). As one example, Edwards states that on September 18, 2007, he wrote a complaint letter to Defendant Horn about Defendant Rosa's use of her cellular phone while on duty, which caused a "security breach." (*Id.* ¶ 7). Edwards alleges that he was denied access to the grievance system because Defendant Mulvena failed to file that grievance (or any of his other grievances) and Defendant Horn did not follow up regarding the complaint. (*Id.*).

While a plaintiff has a right "to meaningful access to the court and to petition the government for the redress of grievances" under the First Amendment, *Shell v. Brzeziniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (citation omitted), the failure to process a grievance does not rise to the level of a constitutional violation. *See, e.g.,*

*id.* at 370 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable [Section] 1983 claim") (citation omitted); *Torres,* 246 F.Supp.2d at 342 ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.") (citations omitted); *Cancel,* 2001 WL 303713, at \*3–4 (violation of grievance procedures does not give rise to claim under First Amendment). Courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures. *See, e.g ., id.; Muhammad v. McMickens,* No. 86 Civ. 7376(SWK), 1988 WL 7789, at \*3 (S.D.N.Y. Jan.25, 1998). Accordingly, because Edwards' claims for alleged violations of the inmate grievance process have no constitutional basis, those claims should be dismissed.[FN12]

> **FN12.** Related to the allegations about the grievance system, Defendants also assert that Edwards' failure to allege personal involvement for Defendants Bailey (*Id.* ¶¶ 37, 41, 48, 52), Caruso (*Id.* ¶¶ 16, 27), Cattafesta ( *Id.* ¶ 80), Davis (*Id.* ¶¶ 13, 26, 47), Hill ( *Id.* ¶ 63), Horn (Compl.¶¶ 7, 9, 10, 12, 14–16, 21, 23, 25, 28, 29, 32–35, 39, 41–43, 45, 52, 59, 79, 97), Hourihan (*Id.* ¶¶ 50, 61, 66, 68, 77, 95, 98), Powell (*Id.* ¶¶ 57, 78), and Riordan ( *Id.* ¶ 6) provide an independent basis for dismissal. (Def. Mem. at 14–16). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation and quotation marks omitted). An official's failure to respond to a prisoner's letter of protest and request for an investigation, as Edwards is alleging in his Complaint, "is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citation and quotation marks omitted). Accordingly, Edwards' claims against these Defendants should be dismissed on this ground as well.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

## K. Retaliation

Edwards alleges that on 17 separate occasions between July 2007 and November 2008, Defendants Campfield, Grima, Hannah, Holmes, John Doe # 1, John Doe # 2, Lagos, Lee, Maynard, Polak, Richardson, Rosa, Shaw, Smalls, and Sumpter retaliated against him in response to his submitting, or informing Defendants that he intended to submit, grievance letters. Edwards' allegations of retaliation include the use of verbal threats or harassment, issuance of infractions, transfers between prison facilities, denials of meals, loss of legal documents, and termination from part-time employment he had while on Rikers Island.

To prove a First Amendment retaliation claim under Section 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). For a retaliation claim to survive a motion to dismiss, it must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (citation and quotation marks omitted). An "unsupported, speculative, and conclusory" allegation of retaliatory conduct may be dismissed on the pleadings. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citations and quotation marks omitted).

**\*13** In reviewing Edwards' retaliation claims, the Court is mindful that "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Indeed, while the "First Amendment protects prisoners from retaliation for filing grievances[,]" *Quezada v. Ercole,* No. 09 Civ. 2832(DLC), 2011 WL 3251811, at *5 (S.D.N.Y. Jul.29, 2011) (citations omitted), the Court recognizes "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 13). Moreover, courts should

carefully scrutinize an inmate's claims of retaliation because such allegations "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Hodges v. Wright,* No. 10 Civ. 0531(GLS)(GHL), 2011 WL 5554866, at *9 (N.D.N.Y. Sept. 29, 2011)* (quoting *Dawes,* 239 F.3d at 491) (citations omitted) (Report and Recommendation), *adopted,* 2011 WL 5554880 (N.D.N.Y. Nov.15, 2011). Therefore, courts reviewing an inmate's retaliation claims should do so "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted).

Edwards' allegations, in chronological order, are as follows: (1) in retaliation for submitting a grievance against Defendant Morales on July 25, 2007, Morales called Edwards' housing unit on August 1, 2007 and informed other officers that Edwards had a visitor, when in fact he did not, which caused him to wait in the inmate visitor process area for two hours (*Id.* ¶¶ 2, 4); (2) in retaliation for an incident where Defendant Hannah said she was made to apologize to Edwards for "making fun of [his] phsical [sic] disability/and deformity[,]" Hannah threatened Edwards on September 5, 2007 by saying "I'm going to get you back for that" ( *Id.* ¶ 6); (3) in retaliation for filing a grievance against Defendant Rosa on September 18, 2007, Rosa fired Edwards from his job as a Suicide Prevention Aide and issued an infraction against him on October 31, 2007 (*Id.* ¶¶ 14–16); (4) on or around November 1, 2007, after Edwards informed Defendant Holmes that he intended to submit a grievance against her, Holmes caused Edwards to be transferred to another housing facility ( *Id.* ¶ 17); (5) in retaliation for filing a grievance against Holmes on November 2, 2007, Holmes came to Edwards' housing unit and verbally abused him by "ridicul[ing] and mak[ing] fun of [his] physical disability and deformity" ( *Id.* ¶ 19); (6) on or around November 15, 2007, in retaliation for filing a grievance against Rosa, Rosa informed John Doe officers that Edwards "like[s] to utilize the grievance mechanism against staff [,]" subsequent to which Edwards was subjected to an unauthorized transfer from "6–Lower" to "7–Lower" in the EMTC ( *Id.* ¶ 20); (7) on or around November 25, 2007, in retaliation for Edwards' filing a grievance against Rosa, Defendants Hernandez and Smith retaliated against Edwards by informing another inmate that Edwards was a "snitch," which "cause[d] [Edwards] physical harm by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

other inmate's [sic] within [the] housing unit" (*Id.* ¶¶ 24, 26); (8) in retaliation for submitting a grievance against Defendants Campfield and Reyes on or around March 22, 2008, Defendant Shaw had Edwards transferred out of the GRVC on March 25, 2008 ( *Id.* ¶ 34); (9) on or around April 1, 2008, in retaliation for submitting a grievance against her, Campfield intentionally lost Edwards' legal documents relating to the NDNY action ( *Id.* ¶ 36); (10) after filing a grievance on June 27, 2008, Edwards was transferred out of the GMDC that same day, which he says was approved by Defendant Bailey (*Id.* ¶¶ 48, 52); (11) after Edwards informed Defendant Richardson that he planned to file a grievance against her because she refused to turn off the lights in his jail cell on July 30, 2008, Richardson retaliated by denying Edwards his "morning meal" on July 31, 2008 ( *Id.* ¶ 53); (12) in retaliation for filing a grievance against him, Richardson put a "hit out" by offering 20 boxes of Frosted Flakes cereal to any inmate that physically assaulted Edwards, for which Edwards filed a grievance on August 7, 2008 ( *Id.* ¶ 55); (13) on August 18, 2008, in retaliation for informing a supervisor that Defendant Smalls was "only providing certain detainees with options on the hour every hour" in the law library, Smalls verbally abused Edwards (*Id.* ¶ 61); (14) on or around August 25, 2008, in retaliation for Edwards' use of the grievance mechanism against her, Defendant Smalls retaliated against Edwards through verbal abuse, threatening to have Edwards transferred, and informing other inmates that Edwards uses the grievance process ( *Id.* ¶ 66); (15) on or around September 24, 2008, in retaliation for filing numerous grievances against them, Defendants Maynard and Musmacher conspired to retaliate against Edwards by threatening physical violence and issuing an infraction, which resulted in a disciplinary hearing on September 30, 2008 (*Id.* ¶¶ 83, 87, 87b); (16) after Edwards informed Defendant Lagos on October 17, 2008 that he planned to file a grievance against her because of alleged racial discrimination, Lagos retaliated by denying Edwards his "afternoon meal" on October 18, 2008 ( *Id.* ¶ 90); and (17) after Edwards informed Defendant Grima that he intended to submit a grievance about his alleged physical assault with a "pushdraw" on November 1, 2008, Grima retaliated by threatening physical harm, pressing his "emergency personal alarm device," issuing an infraction, and causing Edwards to be transferred to a new housing unit (*Id.* ¶¶ 91, 91b).

## 1. Protected Activity

**\*14** It is well-established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances" and is therefore actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citation omitted); *see, e.g., Mateo v. Fischer,* 682 F.Supp.2d 423, 433–34 (S.D.N.Y.2010) (filing of a grievance is a protected activity). However, expressing an intent to engage in a constitutionally protected activity—in this case, filing a grievance—is not protected activity. *See Henry v. Dinelle,* No. 09 Civ. 0456(GTS)(DEP), 2011 WL 5975027, at *7 n. 12 (citing cases) & n. 13 (N.D.N.Y. Nov. 29, 2011) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.") (citing *McKinnie v. Heisz,* No. 09 Civ. 0188(BBC), 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009)). In light of these principles, Edwards' allegations of retaliation in response to his submitting grievance letters constitute protected activities. However, Edwards' allegations of retaliatory conduct arising from his expressing an intent to file a grievance—those allegations occurring on or about November 1, 2007 (Compl.¶ 17), July 31, 2008 ( *Id.* ¶ 53), October 18, 2008 ( *Id.* ¶ 90), and November 1, 2008 (*Id.* ¶¶ 91, 91b)-are not protected activities and therefore cannot form the basis of a claim for retaliation.[FN13]

> FN13. Moreover, of the four allegations of retaliation that are not based on protected activities, two cannot be considered adverse actions-concerning Defendant Richardson on July 31, 2008 (Compl.¶ 53) and Defendant Lagos on October 18, 2008 ( *Id.* ¶ 90)-because both of these allege that these Defendants retaliated against Edwards by denying him a meal. The denial of meals on two occasions, separated by more than three months, is *de minimis* and not actionable. *See, e.g., Snyder v. McGinnis,* No. 03 Civ. 0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (denial of food to plaintiff two times would not chill First Amendment activity).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Adverse Actions**

Having determined that four of Edwards' allegations of retaliation fail because he was not engaged in a constitutionally protected activity, the Court now considers whether the remaining 13 allegations meet the adverse action requirement. "[I]n the prison context [the Second Circuit has] defined 'adverse action' objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations and quotation marks omitted). An inmate can meet this requirement by "alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation." *Smith v. Maypes–Rhynders,* No. 07 Civ. 11241(PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493 (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. In applying this objective test to determine whether conduct is *de minimis,* the Court must consider that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation and quotation marks omitted).

**a. Retaliatory Verbal Abuse**

**\*15** Several of Edwards' allegations of retaliation are based on verbal harassment, abuse, or threats. (*See* Compl. ¶¶ 2, 4, 6 ("I'm going to get you back for that."), 19, 24 (calling Edwards a "snitch"), 26, 55 (putting a "hit out" on Edwards to any inmate that "fucks Edwards up"), 61 (calling Edwards a "crackhead" and "one arm faggot"), 66). While "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action[,]" *Mateo,* 682 F.Supp.2d at 434 (citations omitted), "[n]on-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937(DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan.11, 2012). "[V]erbal threats may constitute adverse action, though whether they

constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Hofelich v. Ercole,* No. 06 Civ. 13697(PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr.8, 2010) (citation and quotation marks omitted).

Here, Edwards' claims of retaliatory verbal abuse do not include any allegations of harm, nor are they alleged with any specificity to suggest that they would deter others from exercising their constitutional rights. Several of his claims allege only that Edwards was forced to endure verbal abuse, but do not explain what was said and why that abuse was in any way adverse. And where Edwards has detailed the nature of the verbal abuse, his allegations are either *de minimis*—for example, in the case of being told he had a visitor when he in fact did not—amount to name-calling, or are insufficiently direct or specific to be adverse. *See, e.g., Dawes,* 239 F.3d at 492–93 (referring to plaintiff as an "informant" and "rat" in presence of other inmates not an adverse action); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (referring to transsexual inmate as "he/she" was "rudeness and name-calling" but not a constitutional violation); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (name-calling, without any appreciable injury, not a constitutional violation); *Kemp v. LeClaire,* No. 03 Civ. 844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar.12, 2007) (threats of "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions); *Battice,* 2006 WL 2190565, at *6–7 (defendant's making fun of plaintiff's disability does not constitute adverse action). Accordingly, Edwards' charges of retaliation that allege only retaliatory verbal abuse—on August 1, 2007 (Compl.¶¶ 2, 4), September 5, 2007 ( *Id.* ¶ 6), November 2, 2007 ( *Id.* ¶ 19), November 25, 2007 (*Id.* ¶¶ 24, 26), August 7, 2008 (*Id .* ¶ 55), August 18, 2008 ( *Id.* ¶ 61), and August 25, 2008 ( *Id.* ¶ 66)—should be dismissed.

**b. Retaliatory Loss of Legal Documents**

**\*16** Courts have held that theft, confiscation, or destruction of an inmate's legal documents may constitute an adverse action. *See, e .g., Smith,* 2009 WL 874439, at *5 (theft of legal papers is adverse action). However, "mere delays in the transfer of [an inmate's] legal papers, even if motivated by retaliation, is not the type of adverse

action required to support a retaliation claim." *Ford v. Fischer,* No. 09 Civ. 723(DNH)(ATB), 2011 WL 856416, at *8 (N.D.N.Y. Jan. 31, 2011); *see, e.g., Rivera v. Pataki,* No. 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb.7, 2005) (several temporary incidents of interference with plaintiff's legal documents not an adverse action. Here, because Edwards has pled an injury in connection with this allegation—Defendant Campfield's allegedly retaliatory loss of his legal documents prevented him from prosecuting the NDNY action (Compl.¶ 36), which was subsequently dismissed for failure to prosecute, *see Selsky,* 2008 WL 190385, at *1—it contains sufficient facts to constitute an adverse action.

**c. Retaliatory Filing of Infractions**

Edwards alleges that Defendants Maynard, Musmacher, and Rosa issued false infractions against him on or about October 31, 2007 (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18) and September 24, 2008 (*Id.* ¶¶ 83, 87, 87b) in retaliation for filing grievances. While an "inmate has no general constitutional right to be free from being falsely accused in a misbehavior report[,]" *Boddie,* 105 F.3d at 862, a misbehavior report issued in retaliation for an inmate's exercise of a protected activity may constitute an adverse action. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under [Section] 1983.") (citation omitted); *see, e. g., Gill,* 389 F.3d at 384 (false misbehavior report and placement in keeplock constitutes adverse action); *Mateo,* 682 F.Supp.2d at 434 (false misbehavior report constitutes adverse action). Accordingly, Edwards' allegations that these Defendants filed false retaliatory infractions against him are sufficient to plead an adverse action.

**d. Retaliatory Transfers**

Edwards' allegations that Defendants Bailey, Bethacourt, Hannah, John Doe # 1, John Doe # 2, Rosa, and Shaw transferred Edwards between prison facilities in retaliation for submitting grievances are also sufficient to establish an adverse action at the motion to dismiss stage. (*See* Compl. ¶¶ 20, 34, 48, 52). While a "prisoner has no liberty interest in remaining at a particular correctional facility ... prison authorities may not transfer [him] in retaliation for the exercise of constitutionally protected

rights." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted); *see, e.g., Soto v. Iacavino,* No. 01 Civ. 5850(JSM), 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (prison housing transfer is adverse action for retaliation claim).

**e. Retaliatory Termination**

**\*17** Finally, Edwards' allegation that Defendant Rosa fired him from his position as a Suicide Prevention Aide states sufficient facts to constitute an adverse action. (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18). "[A] claim for relief may be stated under [S]ection 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citation omitted). More specifically, an inmate can bring a claim under Section 1983 for termination of employment in retaliation for his exercise of constitutionally protected rights. *See, e.g., Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990). The termination of Edwards' job, if found to be retaliatory, could serve to "chill a person of ordinary firmness from continuing to engage" in a protected activity. *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (quoted in *Davis,* 320 F.3d at 353).

**3. Causal Connection**

Of his six allegations of retaliation that meet the adverse action requirement—those dated October 31, 2007, November 15, 2007, March 25, 2008, April 1, 2008, June 27, 2008, and September 24, 2008—all but one should be dismissed. Edwards has not alleged any facts, as he must, that his filing of grievances was a "substantial or motivating factor" for Defendants' actions. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). In addressing the causal connection requirement, a court may consider: (1) the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior disciplinary record, (3) vindication at a hearing on the matter, and (4) any statements by the defendants regarding their motives. *See Colon,* 58 F.3d at 872–73. However, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13.

With the exception of his claim arising on October 31, 2007, Edwards' allegations of retaliation are wholly conclusory. Edwards does not set forth any specific facts,

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

other than his repeated use of the word "retaliation," to support his suspicion of retaliation or to suggest that Defendants were motivated in any way by Edwards' filing grievance letters. On several occasions, Edwards appears to rely on the mere fact that the purported adverse actions took place after he filed a grievance. To infer causation from the very fact that one activity preceded another, however, is insufficient here to adequately plead retaliatory intent. Temporal proximity may serve as circumstantial evidence of retaliation, *see, e.g., Colon, 58 F.3d at 872,* and the Second Circuit has found that such proximity can establish causality. *See Espinal v. Goord, 558 F.3d 119, 129–30 (2d Cir.2009)* (causal connection present where six months passed between protected activity and retaliatory beating); but see *Sloane v. Mazzuca, No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006)* (temporal proximity insufficient by itself to prove causation) (citations omitted); *Nunez v. Goord, 172 F.Supp.2d 417, 431–32 (S.D.N.Y.2001)* (same). But in this case, Edwards' reliance on temporal proximity does not make his claims plausible, as he fails to differentiate between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate a nexus between a specific grievance and a specific adverse action. *See, e.g., Andino v. Fischer, 698 F.Supp.2d 362, 385 (S.D.N.Y.2010)* (proximity between complaints and adverse actions the result of large number of grievances in short period of time).

**\*18** In addition to Edwards' failure to plead any facts suggesting retaliation, the facts that Edwards chose to include in the Complaint suggest a relationship between protected activity and adverse action that is too attenuated to plausibly constitute causation. For example, Edwards theorizes that on November 15, 2007 he was transferred by Defendant John Doe # 2 in retaliation for filing a grievance against Rosa, after Rosa informed John Doe # 1, who then informed John Doe # 2, of Edwards' use of the grievance mechanism. (Compl.¶ 20). However, absent any additional information, such as corroborating statements from other officers or inmates, it is simply not plausible to impute a retaliatory motive to John Doe # 2 by way of John Doe # 1 and Rosa. Edwards' allegations of March 25, 2008 suffer the same deficiency, as he aims to pin a

retaliatory motive not on the target of his protected activity, but on an entirely different Defendant. ( *Id.* ¶ 34). Apart from any apparent temporal proximity, therefore, Edwards' allegations are wholly conclusory and should be dismissed. *See, e .g., Sioleski v. McGrain, No. 10 Civ. 0665S (WMS), 2012 WL 32423, at *4 (W.D.N.Y. Jan.5, 2012); Douglas v. Smith, No. 05 Civ. 1000(LEK)(DRH), 2008 WL 434605, at *15 (N.D.N.Y. Feb. 14, 2008).*

By contrast, Edwards is able to state an actionable claim of retaliatory termination against Rosa based on his allegations of October 31, 2007. Edwards states that on September 18, 2007, he submitted a grievance letter regarding Defendant Rosa's alleged use of her personal cell phone while on duty, which Edwards contends is a "security breach." (Compl.¶ 7). Then, on October 31, 2007, while he was working as a Suicide Prevention Aide, Edwards alleges that Rosa stated, "Watch your mouth boy before I write you. You like writing anyway." (Dkt. No. 2–6 at 18). Edwards asked another officer for a grievance form, intending to submit another grievance against Rosa, at which point Rosa stated: "What lies are you going to write on me now stupid nigger. The cellphone lie didn't work nigger. All you are is nigger is a snitch don't worry, you're going to get yours. I'm going to make sure you get fuck up nigger." (*Id.*). Moments later, Rosa returned and asked for Edwards' identification card, stating, "I'm writing you up nigger. Two can play that game and also nigger you're fired. Morales get this nigger out of here now." (*Id.*).

These statements clearly suggest a retaliatory animus. *See, e.g., Baskerville v. Blot, 224 F.Supp.2d 723, 732–33 (S.D.N.Y.2002)* (defendant's comments during assault point to retaliatory animus). In mentioning the "cellphone lie," which likely refers to Edwards' September 18 grievance about Rosa's use of her personal cell phone, Rosa's comments establish a clear causal link between Edwards' protected activity and Rosa's decision to terminate Edwards from his job and issue an infraction against him. *See, e.g., Headley v. Fisher, No. 06 Civ. 6331(PAC)(KNF), 2008 WL 1990771, at *18 (S.D.N.Y. May 7, 2008)* (causal connection exists where officer referred to protected activity during retaliatory assault). Accordingly, Edwards has stated a plausible claim of retaliatory termination against Rosa, and Defendants'

motion to dismiss that claim should be denied.

**L. Conspiracy**

**\*19** Edwards alleges four conspiracy claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, specifically that (1) on October 31 and November 1, 2007, Rosa and Polak conspired to fire Edwards from his job as a Suicide Prevention Aide and issue an infraction against him (Compl.¶¶ 14–16); (2) as described in a complaint letter dated July 10, 2008, Defendant Johnson conspired with "the security staff to violate Edwards" constitutional rights by not filing his grievances ( *Id.* ¶ 50); (3) as described in a complaint letter dated August 28, 2008, Defendants Johnson and Sumpter conspired to deny Edwards access to the prison's grievance system ( *Id.* ¶ 69); and (4) as described in a September 24, 2008 grievance letter, Defendants Maynard and Musmacher conspired to issue threats of physical violence and submit a false infraction against Edwards. (*Id.* ¶ 83).

**1. Conspiracy Under Section 1983**

To state a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between [two or more state actors or] a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[A] plaintiff must show that defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts." *Bussev v. Phillips,* 419 F.Supp.2d 569, 586–87 (S.D.N.Y.2006) (quotation marks and citations omitted). "[C]omplaints containing only conclusory, vague, or general allegations [of conspiracy] ... are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello,* 292 F.3d at 325 (citation and quotation marks omitted). Finally, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (citation omitted). If a plaintiff fails to show an underlying constitutional violation on which to base a Section 1983 conspiracy claim, the conspiracy claim fails as a matter of

law. *See, e.g., AK Tournament Play, Inc. v. Town of Wallkill,* No. 09 Civ. 10579(LAP), 2011 WL 197216, at *3–4 (S.D.N.Y. Jan.19, 2011), aff'd, 444 F. App'x 475 (2d Cir.2011).

Each of Edwards' conspiracy claims should be dismissed because he has failed to state any underlying constitutional violations, with the exception of his retaliatory termination claim against Rosa. Moreover, even if the Court were to find that Edwards could state plausible constitutional claims as a predicate for conspiracy, he fails to state any non-conclusory allegations pertaining to the existence of a conspiracy, a meeting of the minds to support a conspiracy claim, or any overt acts which would suggest the existence of a conspiracy. Edwards' statements that certain Defendants "conspired" with others is not, by itself, sufficient to state an actionable claim for conspiracy. *See Nealy v. Berger,* No. 08 Civ. 1322(JFB)(AKT), 2009 WL 704804, at *5 (E.D.N.Y. Mar. 16, 2009) ("The mere use of the term 'conspiracy' ... is clearly insufficient to satisfy Rule 12(b)(6) in connection with a Section 1983 conspiracy claim.") (citation omitted). The only claim for which Edwards alleges any facts is that Rosa and Polak conspired to retaliate against him. However, the statements that he attributes to Polak—"my girl said you conspired" and "you are not getting your job back" (Compl.¶ 15)—do not suggest any understanding, agreement, or meeting of the minds between these two Defendants. Polak's reinforcement of Rosa's decision to fire Edwards, at best, suggests only that Polak sided with Rosa's decision, but it is not sufficient to state a conspiracy claim. Absent any actionable allegations of a conspiratorial understanding between Polak and Rosa, Edwards' conspiracy claims fail.

**2. Conspiracy Under Section 1985**

**\*20** 42 U.S.C. § 1985(2) and (3) also provide relief for claims of conspiracy. To plead a claim under Section 1985(2), a plaintiff must show "(1) a conspiracy (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of New York,* No. 05 Civ.

10682(PKC) (FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008) (citing 42 U .S.C. § 1985(2)). The elements of a claim under Section 1985(3) are: " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States.' " *Id.* (quoting *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000)).

As with Section 1983 conspiracy claims, Section 1985 claims require a showing of an underlying constitutional violation. *See, e.g., Okoh v. Sullivan,* No. 10 Civ. 2547(SAS), 2011 WL 672420, at *4 (S.D.N.Y. Feb.24, 2011), *aff'd,* 441 F. App'x 813 (2d Cir.2011); *Bishop v. Best Buy, Co.,* No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *13 (S.D.N.Y. Oct.13, 2010). Because Edwards has not set forth sufficient facts to state any constitutional violations, with the exception of his retaliatory termination claim against Rosa, his Section 1985 claims should be dismissed as well. Even if the Court were to find any underlying constitutional violations, including the surviving retaliation claim, the Section 1985 claims should be dismissed because Edwards has failed to allege any facts, as he must, that Defendants' conspiracies were motivated not by any personal malice of the conspirators toward him, but rather by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' animus.' " *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (citation omitted); *accord Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam); *Okoh,* 2011 WL 672420, at *6.

### 3. Conspiracy Under Section 1986

To state a claim under Section 1986, a plaintiff must state a valid claim under Section 1985. "Section 1986 imposes liability on individuals who have knowledge of a conspiracy under [Section] 1985, but fail to take action to prevent them." *Jenkins v. N.Y. City Dep't of Educ.,* No. 10 Civ. 6159(BSJ)(THK), 2011 WL 5451711, at *5 (S.D.N.Y. Nov. 9, 2011) (citing 42 U.S.C. § 1986). A Section 1986 claim "must be predicated upon a valid [Section] 1985 claim." *Brown,* 221 F.3d at 341 (citation and quotation marks omitted). Because Edwards fails to

state a claim under Section 1985 and otherwise fails to make any allegations that certain Defendants had knowledge of a conspiracy but failed to prevent it, the Court should also dismiss his Section 1986 claim.

### M. Disability Discrimination Claim

*21 Edwards asserts that on five occasions he was discriminated against on the basis of an alleged disability in violation of Title II of the ADA. (Compl. ¶¶ 6, 17, 19, 30, 61). To state a claim under Title II, which applies to inmates in state prisons, *see United States v. Georgia* 546 U.S. 151, 153, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a prisoner must show: (1) "he is a 'qualified individual' with a disability"; (2) "he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity"; and (3) "such exclusion or discrimination was due to his disability." *Phelan v. Thomas,* 439 F. App'x 48, 50 (2d Cir.2011) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)); *see* 42 U.S.C. § 12132.

Although Defendants have moved to dismiss the Complaint in its "entirety" (Def. Mem. at 49), they have failed to offer any specific arguments to dismiss Edwards' ADA claims. (*See* Def. Mem. at 3). Nevertheless, these claims should be dismissed. It appears from the Complaint that Edwards' alleged disability is that one of his arms is significantly shorter than the other, and his discrimination claims arise from Defendants' comments allegedly mocking this deformity. Leaving aside the question of whether Edwards' deformity falls under the ADA's definition of disability, Edwards fails to state that Defendants excluded him from participating in, or denied him the benefit of, any particular activity as a result of his alleged disability. Edwards' allegations of objectionable language are not sufficient to state a claim under the ADA.

### N. Edwards' Potential Recovery Is Limited to Nominal or Punitive Damages From Rosa

In his Complaint, Edwards seeks both money damages and injunctive relief. (Compl.¶ V). However, because of qualified immunity, Edwards can only obtain monetary damages from Defendant Rosa and, because of the PLRA, that recovery is limited to nominal or punitive damages. In addition, Edwards' request for injunctive relief is moot because he is no longer in prison.

### 1. Qualified Immunity Precludes Money Damages,

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**Except From Rosa**

Qualified immunity provides a basis to preclude monetary damages, but not injunctive relief. *See Morse v. Frederick,* 551 U.S. 393, 432, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (citation omitted). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ––– U.S. –––, –––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A state actor is afforded qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (citations and quotation marks omitted). Because Edwards has failed to plead facts showing that Defendants violated any constitutional right, with the exception of his claim for retaliatory termination against Rosa, Defendants are entitled to qualified immunity for each of Edwards' claims.

**\*22** However, as to Edwards' surviving retaliation claim, Defendant Rosa is not entitled to qualified immunity. Courts have long recognized, well before the time of Edwards' allegations, that inmates have a constitutional right to seek redress of grievances without suffering retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see, e.g., Baskerville,* 224 F.Supp.2d at 737–38 (no qualified immunity for retaliation claim because right to file grievances without retaliation is well-established); *Wells v. Wade,* 36 F.Supp.2d 154, 160 (S.D.N.Y.1999) (same). Here, Edwards has alleged intentional conduct by Rosa in response to a protected activity, adequately stating a cause of action for retaliation. Moreover, Defendants have offered no argument that Rosa's conduct was objectively reasonable. Accordingly, at the pleading stage, Rosa is not entitled to qualified immunity from monetary damages on Edwards' retaliatory termination claim against her.

**2. Any Money Damages from Rosa Are Limited to Nominal or Punitive Damages**

In light of the qualified immunity finding above,

Edwards' recovery of monetary damages, if any, is limited to Rosa. Because of the PLRA's physical injury requirement, however, that recovery from Rosa cannot include compensatory damages. Defendants argue that all of Edwards' claims are barred by the PLRA because he does not allege that he has suffered any physical injury. (Def. Mem. at 46–48). Section 1997e(e) of the PLRA provides that " '[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' " *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting 42 U.S.C. § 1997e(e)). The term "physical injury" is not statutorily defined; however, the injury complained of must be more than *de minimis* to meet the requirements of § 1997e(e). *See Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). Therefore, in the absence of a showing of physical injury, a prisoner cannot recover compensatory damages for mental or emotional injury. *Thompson,* 284 F.3d at 417. To recover punitive or nominal damages, however, a prisoner need not allege that he has sustained a physical injury. *Id.,* at 418; *see also Abreu v. Nicholls,* No. 04 Civ. 7778(DAB)(GWG), 2011 WL 1044373, at \*4 (S.D.N.Y. Mar. 22, 2011) (Report and Recommendation); *Walker v. Shaw,* No. 08 Civ. 10043(CM), 2010 WL 2541711, at \*15 (S.D.N.Y. June 23, 2010) (citing *Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998)).

Edwards does not allege that he has suffered any physical injury as a result of his alleged constitutional violations, including his allegation of excessive force, which does not mention any temporary or permanent physical injury as a result of Defendants' actions. *See supra* Section ILL The only injuries that Edwards complains about are the "loss of amenity" and "limited liberty" as a result of his segregated confinement, and emotional distress arising from the "embarrass[ment]" caused by Defendants' ridiculing his physical deformity. (Compl.¶ V). Neither of these injuries constitutes a physical injury under the PLRA. *See, e.g., Henry,* 2011 WL 3295986, at \*4 (no physical injury where inmate complained of embarrassment); *Wilson v. Phoenix House,* No. 10 Civ. 7364(DLC), 2011 WL 3273179, at \*3 (S.D.N.Y. Aug.1, 2011) (confinement not enough, by itself, to fulfill physical injury requirement). Accordingly, in the absence of any allegations of physical injury,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

Edwards' claims against Defendants (including his surviving retaliation claim against Rosa) should be dismissed insofar as he seeks compensatory damages, and he should be limited to seeking nominal or punitive damages from Rosa. *See, e.g., Brummell v. Stewart,* No. 09 Civ. 10326(PAC)(FM), 2011 WL 1306170, at *4 (S.D.N.Y. Mar. 24, 2011) (Report and Recommendation) (claims seeking compensatory damages dismissed because no allegation of physical injury suffered); *Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *10 (S.D.N.Y. Jan.18, 2011) (request for compensatory damages for emotional injuries stricken from complaint).

**3. Edwards' Request for Injunctive Relief Is Moot**

*23 By letter dated December 11, 2011, Edwards informed the Court that he has been released from prison. (Dkt. No. 135). This factual development renders moot Edwards' request for injunctive relief. "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under that principle, an inmate's request for injunctive and declaratory relief against correctional staff at a particular correctional institution becomes moot when the inmate is discharged. *See Muhammad v. City of NY. Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997); *see, e.g., Khalil v. Laird,* 353 F. App'x 620, 621 (2d Cir.2009) (injunctive and declaratory relief moot because inmate released from prison); *Sheppard v. Lee,* No. 10 Civ. 6696(GBD)(JLC), 2011 WL 5314450, at *4 n. 6 (S.D.N.Y. Nov. 7, 2011) (declaratory and injunctive relief claims moot because inmate no longer incarcerated) (Report and Recommendation), *adopted,* 2011 WL 6399516 (S.D.N.Y. Dec.20, 2011). Accordingly, because Edwards has been released from prison, his claims for injunctive relief should be dismissed.[FN14]

FN14. In addition, Edwards cannot establish a likelihood of success on the merits or the possibility of irreparable injury as required for any injunctive relief. Even assuming he could however, and to the extent Edwards' claims for injunctive relief are not moot, the PLRA extends prospective relief "no further than necessary to correct the violation of the Federal right of a particular plaintiff[,]" 18 U.S.C. § 3626(a)(1)(A), and the relief Edwards seeks—terminating Defendants from their positions and enjoining them from future government employment—is not "narrowly drawn." *Id.; see also Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y.2011) (proposed order directing installation of security cameras beyond narrow scope permitted by PLRA); *Easter v. CDC,* 694 F.Supp.2d 1177, 1188–90 (S.D.Cal.2010) (inmate not entitled to injunctive relief preventing officials from future supervision or control over him when inmate no longer in facility where attack took place, and no indication of imminent injury).

## III. *CONCLUSION*

For the foregoing reasons, I recommend that Defendants' motion to dismiss be granted as to Edwards' claims for verbal harassment, deprivation of access to free telephone calls, deprivation of access to legal services, mail tampering, denial of required food portions, unconstitutional strip search, violation of due process rights within the prison's disciplinary and grievance system, excessive force and denial of medical treatment, deprivation of access to the prison's grievance system, retaliation (against all Defendants except Rosa for Edwards' termination), conspiracy, and disability discrimination under the ADA. I further recommend that the motion to dismiss be denied only as to Edwards' retaliatory termination claim against Defendant Rosa to the extent Edwards seeks nominal or punitive damages against her.

### *PROCEDURE FOR FILING OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. **FAILURE TO FILE OBJECTIONS WITHIN**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

(Cite as: 2012 WL 760172 (S.D.N.Y.))

**FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. If Plaintiff does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Defendants' counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

S.D.N.Y.,2012.

Edwards v. Horn

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Kenneth BROBSTON, Plaintiff,
v.
Deborah SCHULT, Warden, FCI Ray Brook; Ms. Halladay, Special Investigation Serv., FCI Ray Brook; Mr. Helms, Lt., Former S.I.S., FCI Ray Brook; Hensley, Supervisor of Industry; Mr. Peterson, Factory Manager of Unicor, FCI Ray Brook; Mr. Duckett, Correctional Officer, FCI Ray Brook; Ms. Darrah, Unit Manager (Mohawk–B), FCI Ray Brook; Mr. Lucas, Case Manager (Mohawk–B), FCI Ray Brook; and Ms. Sepaneck,[FN1] Unit Counselor (Mohawk–B), FCI Ray Brook, Defendants.

> FN1. According to the Declaration submitted in support of Defendants' Motion to Dismiss or in the alternative for Summary Judgment, the correct spelling of this Defendant's name is "Sepanek" and the Court shall refer to her accordingly.

Civ. No. 9:10–CV–242 (GLS/RFT).

Sept. 28, 2011.
Kenneth Brobston, Three Rivers, TX, pro se.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Charles E. Roberts, Asst. United States Attorney, of Counsel, Syracuse, NY, for Defendants.[FN2]

> FN2. The United States Attorney has appeared on behalf of all named Defendants, except for Ms. Darrah, upon whom service had not been accomplished primarily because she is no longer employed at FCI Ray Brook. Dkt. No. 18. Upon information and belief, Ms. Darrah has retired. Dkt. No. 29, Notice of Mot., dated Dec. 15, 2010, at p. 1, n. 1; see also infra Part II.G.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Kenneth Brobston filed this civil rights action, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ("Bivens"), against the Defendants claiming his constitutional rights were violated when he was incarcerated at Federal Correctional Institution in Ray Brook ("FCI Ray Brook"). Dkt. No. 1, Compl. On December 15, 2010, Defendants filed a Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative a Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. Dkt. Nos. 29 & 32. Plaintiff opposes the Motion. Dkt. No. 34. For the reasons that follow, this Court recommends that Defendants' Motion be **granted** and this entire action be **dismissed.**

I. BACKGROUND

Unless otherwise indicated, the following facts are well-supported and not reasonably controverted. *Pro se* Plaintiff Kenneth Brobston is a federal inmate, originally sentenced in the United States District Court for the Central District of Illinois for violating 21 U.S.C. §§ 846, 841(a)(1), & (b)(1)(A) (Conspiracy to Manufacture Methamphetamine). Dkt. No. 29–5, Robin VanWeelden Decl., dated Nov. 19, 2010, at ¶ 4 & Ex. A (docketed as Dkt. No. 29–6) at pp. 1–4.[FN3]

> FN3. Regarding page number citations to Defendants' Exhibits attached to various Declarations, the Court refers to those numbers automatically assigned by the Court's Case Management Electronic Case Files system.

On July 6, 2009, while incarcerated at FCI Ray Brook, Plaintiff submitted an Inmate Request to Staff (also known as a "cop out"), complaining about a new prison policy that went into effect on that date and prevented him from leaving the UNICOR factory, where he worked, to go to his dorm during the lunch break. Dkt. No. 29–8, Jon

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

Hensley Decl., dated Nov. 9, 2010, at ¶¶ 5 & 7; Ex. A. Plaintiff complained that because he could not return to his dorm, he was forced to share the bathroom with three hundred other people and that there was a shortage of toilet paper. *Id.* He also complained that because he could not freely return to his cell, he had no access to hot water, microwaves, the telephone, or his counselor. *Id.* The policy in issue, implemented *via* Memorandum Notice on June 22, 2009, did not, *per se,* prevent the inmates from returning to their cells during their forty-five minute lunch break, but, for security reasons, if while in their cells the inmates were confined to their housing units because of it being locked down, such inmates could no longer obtain special release from the housing unit in order to return to the UNICOR factory. Hensley Decl. at ¶ 6 & Ex. C.

Defendant Jon Hensley, Ray Brook Superintendent of Industries and Education, responded to Plaintiff's July 6th Complaint, noting that, notwithstanding the new policy, Plaintiff still had access to UNICOR and Recreation toilets and that his other concerns, such as meeting with his counselor or using the telephone, could be met outside his UNICOR working hours. *Id.* at ¶ 7 & Ex. A. IN fact, UNICOR has three inmate restrooms, each with multiple toilets and urinals. *Id.* at ¶ 8.

**\*2** On July 13, 2009, Plaintiff submitted a second Request to Staff complaining that on two separate dates, July 6th and 9th, there was a shortage of toilet paper at UNICOR. *Id.* at ¶¶ 5 & 9; Ex. B. This complaint was made specifically against Defendants Hensley and CO Duckett for their alleged refusal to give Plaintiff the toilet paper he requested. Hensley Decl., Ex. B. According to Plaintiff's written complaint, Plaintiff alerted Defendant Duckett about the shortage of toilet paper on July 6th, but he refused to give Plaintiff any toilet paper; instead, Plaintiff received a roll from another inmate who overheard the conversation. *Id.* Then, on July 9th, Plaintiff informed Defendants Duckett and Hensley that there was no toilet paper and that he needed to use the bathroom stressing that it was an emergency. Plaintiff was denied toilet paper from 7:30 a.m. until 9:00 a.m., and because there was no move scheduled during that time, he could not return to his cell. *Id.* Shortly after 9:00 a.m., Defendant Hensley provided Plaintiff with a roll of toilet paper, but en route to use the bathroom, Plaintiff soiled himself. *Id.*

Plaintiff further expressed concern in the "cop-out" that Defendants Hensley and Duckett may be annoyed with him and may be motivated to retaliate against him. *Id.* According to his verified Complaint, after showering and changing his soiled clothes, Plaintiff informed Mr. Lucas, his Case Manager, and Ms. Sepanek, his Unit Counselor, about what transpired and requested that his complaints be placed on the record. Compl. at ¶ 8.

Defendant Hensley responded to Plaintiff's complaint, indicating that sufficient toilet paper was issued for the week of July 6–10; specifically, in addition to the normal weekly supply, upon being informed of the shortage of toilet paper, the factory issued another week's supply. Hensley Decl., Ex. B.

At some point while at Ray Brook, Plaintiff had inquired whether he could be transferred to another facility in Kentucky so that he could participate in a vocational welding program and be closer to home. Dkt. No. 29–9, Jackii Sepanek Decl., dated Nov. 19, 2010, at ¶ 5. As a result of Plaintiff's inquiry, Case Manager Lucas and the Supervisor of Education consulted with personnel at FCI Ashland in Kentucky and confirmed that Plaintiff met all the criteria for enrollment in their welding program. *Id.* On July 14, 2009, a Request for Transfer was completed and signed off by Defendant Lucas, Defendant Barbara Darrah, Plaintiff's Unit Manager, and Defendant Deborah Schult, FCI Ray Brook Warden. *Id., Ex. B.

Plaintiff claims that on July 13, 14, and 15, 2009, Defendants Lucas, Darrah, and Sepanek denied Plaintiff's requests for "BP. 8" forms so that Plaintiff could file a complaint about Defendants Hensley, Duckett, and Peterson, who was the factory manager for UNICOR.[FN4] Compl. at ¶¶ 13–18. He further claims that on July 14th, Defendant Lucas told Brobston that he's been receiving complaints about him because of what happened in UNICOR on July 6th and 9th and that he was holding up Plaintiff's transfer papers. *Id.* at ¶ 15.

> FN4. In his Complaint, Plaintiff stated that on July 15th, he received the BP.8 form from another inmate and began to type it up. Compl. at ¶ 18. He does not what the substance of his written complaint concerned nor whether he

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

submitted his form for filing.

**\*3** On July 27, 2009, Plaintiff was issued an Incident Report, authored by Defendant Peterson, charging Plaintiff with possessing a narcotic in violation of the prison code. VanWeelden Decl., Ex. F (docketed as Dkt. No. 29–6) at p. 17. According to that Report, on July 27th, at approximately 1:15 p.m., Defendant Peterson and David Kirby [FN5] conducted a visual search of Brobston while he was on the UNICOR loading dock. *Id.* During this search, Brobston "attempted to stuff a cellphone wad in the floor drain." *Id.* At Kirby's direction, Brobston handed over the item, which was taken to the Lieutenant Degon [FN6]. *Id.* at pp. 17 & 19. Reportedly, Brobston was asked what the item was and he responded, "it[']s weed." *Id.* Lieutenant Degon confirmed that the packets he received contained a green leafy substance and tested positive for marijuana. *Id.* Peterson's Incident Report was entered on the Bureau of Prison's ("BOP") computerized system with the notation "SUSPENDED PENDING REFERRAL TO AUSA." VanWeelden Decl. at ¶ 7 & Ex. G (docketed as Dkt. No. 29–6) at pp. 28–29. On July 27th, in accordance with BOP policy, Plaintiff was placed in administrative detention within the special housing unit ("SHU") "pending an investigation of a violation of Bureau regulations." *Id,* Exs. H (docketed as Dkt. No. 29–7) at p. 8 & Ex. I (docketed as Dkt. No. 29–7) at p. 15. According to the Administrative Detention Order, written by Defendant Halladay, Plaintiff received a copy of the notice of administrative detention, as witnessed by S. Degon. *Id.,* Ex. I at p. 15. However, in accordance with BOP policy, because the BOP investigation into Defendant Peterson's Incident Report was suspended pending criminal prosecution, there was no requirement that Plaintiff be provided a copy of the subject Incident Report. *Id.,* Ex. H at pp. 4–5. Also in accordance with BOP policy, during his time in SHU, Plaintiff was subjected to periodic urinalysis testing. *Id.* at ¶ 11 & Ex. J (docketed as Dkt. No. 29–7) at pp. 16–20.

> **FN5.** David Kirby is the UNICOR Production Foreman and is not named as a defendant in this matter.

> **FN6.** Lieutenant Degon is not named as a defendant in this matter.

On July 28, 2009, a "Referral of an Inmate Criminal Matter for Investigation" was completed by Defendant Helms, who is a member of the Special Investigations Section ("SIS") Department, and the matter was referred to the United States Attorney's Office. *Id.,* Ex. F at p. 21. On February 10, 2010, a grand jury in the Northern District of New York issued an Indictment charging Plaintiff with violating 18 U.S.C. §§ 1791(a)(2) and (b)(3), for knowingly possessing "a prohibited object; to wit, marijuana, a schedule I controlled substance." *Id.,* Ex. B (docketed as Dkt. No. 29–6) at p. 6; *see also United States of Am. v. Brobston,* Case No. 8:10–CR–73 (FJS) (N.D.N.Y.). On March 4, 2010, a Writ of *Habeas Corpus Ad Prosequendum* was issued, and on March 16, 2010, Plaintiff was released from Ray Brook to the United States Marshals Service for prosecution of this criminal charge. VanWeelden Decl., Ex. C & D (docketed as Dkt. No. 29–6) at pp. 7–10. Plaintiff thereafter appeared before the undersigned for his Initial Appearance and Arraignment, where, after being advised of his rights, he pled not guilty and waived his right to a detention hearing. *See United States of Am. v. Brobston,* Case No. 8:10–CR–73, Min. Entry, dated Mar. 17, 2010. Plaintiff was remanded to the custody of the U.S. Marshals and was held at the Albany County Correctional Facility. *Id.,* Dkt. No. 3. On July 8, 2010, Plaintiff pled guilty to the one count Indictment with no plea agreement in place. *Id.,* Dkt. No. 19 (Change of Plea Hr'g Tr.). On December 1, 2010, Plaintiff was sentenced to be imprisoned for a term of four months to run consecutively with the current sentence, with three years supervised release to follow. *Id.,* Dkt. No. 15. Plaintiff filed a Notice of Appeal of that Judgment, but subsequently withdrew such appeal. *Id.,* Dkt. Nos. 16 & 20.

**\*4** In the interim, on February 8, 2010, Plaintiff filed a Petition for a Writ of *Habeas Corpus* in this District challenging his administrative SHU detention.[FN7] *See Brobston v. Schult,* 9:10–CV–145 (N.D.N.Y.) (JKS), Dkt. No. 1, Pet. On March 3, 2011, the Honorable James K. Singleton, Visiting United States District Judge, issued a Dismissal Order noting first that Plaintiff's Petition complaining about the conditions of his confinement should have been brought as a action pursuant to 42 U.S.C. § 1983 and that such an action had already been

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

brought by Plaintiff in this District. *Id.,* Dkt. No. 20 at pp. 3–4 (referring to the current case). Judge Singleton further found that to the extent the case is properly brought as a *Habeas* Petition, the Petition should be denied because Brobston failed to exhaust his administrative remedies and failed to show good cause for such failure. *Id.* at p. 5. He further found that the Petition was moot because the relief sought in that action was Brobston's release from administrative SHU confinement at FCI Ray Brook, which had been accomplished during the pendency of the Petition when Brobston was transferred from Ray Brook to Albany County Jail pending the criminal prosecution. *Id.* at pp. 5–6; *see also supra* note 7. For all these reasons, the Petition was dismissed without prejudice to Brobston continuing his civil rights action. *Id.* at p. 6.

FN7. The instant civil rights action was filed on March 3, 2010, while Plaintiff was still at FCI Ray Brook. As noted above, on March 16, 2010, by Writ, Plaintiff was transferred from Ray Brook to U.S. Marshal custody for purposes of the criminal prosecution. On March 17, 2010, the day after appearing before the undersigned regarding this criminal prosecution, Brobston submitted a Notice of Change of Address in his *Habeas* case, noting that his updated address was at Albany County Jail. *Brobston v. Schult,* 9:10–CV–145 (N.D.N.Y.) (JKS), Dkt. No. 5.

## II. DISCUSSION

### A. Standard of Review—Rule 56(b)

The Defendants have moved for conversion of the Complaint pursuant to FED. R. CIV. P. 12(b)(6), and in the alternative have moved for summary judgment, pursuant to FED. R. CIV. P. 56. Dkt. No. 18–1. In moving for summary judgment, the Defendants submitted various documents outside the pleadings, which have been considered by the Court. It is within a court's discretion to convert a motion filed under Rule 12(b) and (c) into a motion seeking summary judgment when matters outside of the pleadings have been presented and accepted by the court. *Baum v. Northern Dutchess Hosp.,* 764 F.Supp.2d 410, 416 (N.D.N.Y. Jan.24, 2011) (citing *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566 (2d Cir.2005)) (citations omitted). In light of this additional proof, and because Plaintiff also had notice and an opportunity to submit his own evidence, this Court has decided to proceed under the summary judgment standard of review.

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. Rule 56(a). The moving party bears the initial burden through the production of admissible evidence to establish that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This Court must view the evidence in the light most favorable to the party opposing the motion. *Id.* at p. 323.

If the moving party meets this initial burden, the nonmoving party must then set forth evidence demonstrating that there is a genuine issue of material fact. *Id.* at p. 324; *see also Salahuddin v. Goord,* 467 F.3d 263, 273 (2d. Cir.2006). "Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must do more than simply show that there is some metaphysical doubt as to the material facts." *Hooks v. Howard,* 2010 WL 1235236, at *2 (N.D.N.Y. Mar.30, 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Bald assertions, completely unsupported by evidence, will not satisfy the non-movant's burden. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). In order to defeat a motion for summary judgment, the nonmoving party must properly address the movant's assertion of fact, and cannot rest "merely on allegations or denials" of the facts submitted by the movant. Fed.R.Civ.P. 56(e); *see Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."). Rather, the opposing party must produce "specific facts" that influence "a reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "This is true even when the issue is exhaustion." *White v. Ercole,* 2009 WL 602890, at *5 (S.D.N.Y. Mar.3, 2009).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

**\*5** When considering a motion for summary judgment, the trial court's duty "is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, a court will grant summary judgment "only when reasonable minds could not differ as to the import of evidence." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991).

### B. *Bivens* Cause of Action

"*Bivens* established that the victims of a constitutional violation by a federal agent [acting under color of federal authority] have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green,* 446 U.S. 14, 18, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *see also Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006).

The Second Circuit has recognized that "*Bivens* actions are not significantly dissimilar to claims brought under §§ 1981 and 1983 in terms of the interests being protected, the relief which may be granted, and the defenses which may be asserted." *Taverez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995) (citation omitted). Thus it has been held that 42 U.S.C. § 1983 law is applicable to *Bivens* actions "[b]ecause the two actions share the same practicalities of litigation." *Id.* at 110 (internal quotation marks and citation omitted). Furthermore, "[b]ecause the doctrine of *respondeat superior* does not apply in *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation." *Thomas v. Ashcroft,* 470 F.3d at 496 (citation omitted) (emphasis in original).

### C. Exhaustion of Administrative Remedies

In seeking dismissal of this action, Defendants assert the affirmative defense that Plaintiff has not exhausted his available administrative remedies prior to bringing this action. Dkt. No. 29–1, Defs.' Mem. of Law, at pp. 10–18. Plaintiff maintains that on numerous occasions, his attempts to fully exhaust his administrative remedies were thwarted by all of the Defendants at different points in time. Compl. at ¶¶ 13–18 & 20–21; Dkt. No. 34, Pl.'s

Aff./Mot., at ¶ 8.

The Supreme Court held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). Prisoners must exhaust all available "administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process." *Woodford v. Ngo,* 548 U.S. 81, 85, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Booth v. Churner,* 532 U.S. 731, 734, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)).

The Administrative Remedy Program is comprised of a four-step procedure set forth by the BOP. Inmates are required to use the Administrative Remedy program "in good faith and in an honest and straightforward manner." 28 C.F.R. § 542.11(b). First, the inmate must submit the issue of concern informally to staff, and staff must take measures to informally resolve the issue. *Id.* at § 542.13(a). Second, if the issue cannot be resolved informally, the inmate must submit a formal written Administrative Remedy Request, on a designated form, within twenty days of the event giving rise to the complaint. [FN8] *Id.* at § 542.14(a). If the inmate believes the issue is sensitive such that his/her safety or well-being would be placed in danger, the inmate may circumvent the initial filing at the institution by submitting the request directly to the appropriate Regional Director.[FN9] *Id.* at § 542.14(d)(1). Third, if the formal written request is denied, an unsatisfied inmate may submit an Appeal, on a designated form, to the appropriate Regional Director within twenty calendar days of the date the Warden signed the response. *Id.* at § 542.15(a). Fourth, an inmate may appeal a negative decision from the Regional Director to the General Counsel within thirty days of the date the Regional Director signed the response. *Id.* Appeal to the General Counsel is the last administrative appeal and once exhausted, legal action may commence.

> FN8. The inmate must obtain the grievance form from his/her correction counselor. *See* 28 C.F.R. § 542.13(c)(1).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

FN9. The inmate must clearly write "sensitive" on the request, and further explain the reason for not submitting the request at his/her institution. *See* 28 C.F.R. § 542.14(d)(1). "If the Regional Administrative Remedy Coordinator agrees that the [r]equest is sensitive, the [r]equest shall be accepted. Otherwise, the [r]equest will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the [r]equest." *Id.*

**\*6** The Second Circuit recognized that while PLRA's exhaustion requirements are mandatory, certain caveats may apply. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citation omitted). "[A] three-part inquiry is appropriate where a prisoner plaintiff seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA[.]" *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). First, depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether such procedures were actually "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d at 667. Second, "[t]he court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own action inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill v. New York,* 380 F.3d at 686 (citing *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004) & *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004)). Third, the Second Circuit has found that "there are certain 'special circumstances' in which ... the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004). "The effect of such justification is that, though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.*

Recently, the Second Circuit ruled that a prisoner is not entitled to a jury trial when there is a factual dispute regarding administrative exhaustion. *Messa v. Goord,* 652 F.3d 305, 2011 WL 3086827 (2d Cir. July 26, 2011)

(joining five other Circuit Courts in holding that the Seventh Amendment guarantee to a jury trial does not extend to the "threshold issue[s] that *courts* must address to determine whether litigation is being conducted in the right forum at the right time" (emphasis and alterations in original) (quoting *Dillon v. Rogers,* 596 F.3d 260, 272 (5th Cir.2010)).

As in the *Messa* case, currently before us are issues of fact and matters of credibility with regard to Plaintiff's compliance with the PLRA's exhaustion mandate. Plaintiff asserts that while in administrative detention, he requested that he be provided with his legal work, but was denied. Compl. at ¶ 20 & Ex. 7. Four months later, he was finally furnished with his legal work. *Id.* at ¶ 21. According to Plaintiff, by the time he was able to submit the correct forms, they were denied as untimely. *Id.* at ¶ 28. Plaintiff asserts that his subsequent requests for grievance forms were also denied by various Defendants and that some of the complaints he filed were not answered in a timely fashion. *Id.* at ¶¶ 31–35, 47, & 52–53, 652 F.3d 305. Defendants categorically deny, under oath, that they ever denied Plaintiff the proper forms or otherwise impeded his efforts to properly exhaust his administrative remedies. They further suggest that Plaintiff could have sought the proper forms from any number of staff members who made regular rounds in SHU. *See* Van Weelden Decl. at ¶¶ 39–40; Sepanek Decl. at ¶ 9. Under such circumstances, we would be required to hold a fact-finding hearing prior to submitting any of Plaintiff's substantive claims to a jury. However, as explained more fully below, because Plaintiff's claims clearly lack merit, there is no need for this Court to exert further judicial resources in holding a hearing to determine whether Plaintiff's admitted failure to fully exhaust his administrative remedies should be excused.

### D. Eighth Amendment

**\*7** In his Complaint, Plaintiff asserts that on July 6th and 9th, his requests for toilet paper were denied by Defendants Duckett and Hensley. The shortage of toilet paper was resolved on July 6th after another inmate provided Plaintiff with a spare roll to use. On July 9th, Plaintiff did not have access to toilet paper for approximately an hour and a half, and ended up soiling

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

himself. Much of Brobston's Complaint focuses on perceived retaliation and his alleged attempts to file multiple grievances, and thus, it is unclear whether Plaintiff raises an Eighth Amendment claim with regard to the deprivation of toilet paper. For example, in the Causes of Action portion of his Complaint, he does not cite this incident as an Eighth Amendment violation, and in this vein, the Complaint can be read as raising this issue solely as a means of providing background for his many retaliation claims. But, we are mindful that within the Complaint, he includes a paragraph that seems to implicate the Eighth Amendment. Compl. at ¶ 11. Thus, after liberally construing Plaintiff's Complaint, we find that a discussion of the Eighth Amendment is apropos.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)).

In *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling [v. McKinney],* 509 U.S. [25,] 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 [ ( 1993) ] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency. *Id.* at 35–36; *Rhodes [v. Chapman],* 452 U.S. 337[,] 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 [ ( 1981) ].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer [v. Brennan],* 511 U.S. [825,] 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 [ (1994) ].

**\*8** *Phelps v. Kapnolas,* 308 F.3d at 185–86.

"Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). In determining whether a condition of confinement was objectively serious, courts consider the length of the deprivation and the potential for harm.

Under certain circumstances, the deprivation of toiletries, like toilet paper, can rise to the level of unconstitutional conditions of confinement. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (quoted in *Reeder v. Hogan,* 2010 WL 3909050, at \*7 (N.D.N.Y. Sept.30, 2010)). Yet, courts in this Circuit have consistently held that an *occasional* or *temporary* deprivation of toilet use does not constitute an extreme deprivation of a basic human need or necessity of life. *Jones v. Marshall,* 2010 WL 234990, at \*3 (S.D.N.Y. Jan.19, 2010) (citing cases in support of the finding that the denial of the right to use the bathroom for ninety minutes did not "establish the existence of an objective injury for purposes of an Eighth Amendment claim"); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 488–89 (N.D.N.Y.2009) (citing cases for the proposition that a "mere denial of the toilet paper and soap on several occasions for a few days is, while dismaying and unprofessional, not a denial of 'the minimal civilized measure of life's necessities,' as required by *Farmer [v. Brennan],* 511 U.S. at 834"); *Kee v. Hasty,* 2004 WL 807071, at \*26 n. 24 (S.D.N.Y. Apr.14, 2004) (citing *McNatt v. Unit Mgr. Parker,* 2000 WL 307000, at \*4

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

(D.Conn. Jan.18, 2000)). In rendering these assessments, courts consider whether the deprivation of toilet use, or toilet paper, resulted in unsanitary conditions that posed a significant risk to an inmate's health. *See Whitted v. Lazerson,* 1998 WL 259929, at *1 & 2 (S.D.N.Y. May 21, 1998) (finding no Eighth Amendment violation where inmate was deprived of the use of toilet for approximately ninety minutes requiring him to "hold his bowel movement at painful levels, and at time partially urinate[ ] and defecate[ ] in his clothing"); *Gill v. Riddick,* 2005 WL 755745, at *16 (N.D.N.Y. Mar.31, 2005) (finding no Eighth Amendment violation when inmate urinated on himself as a result of the denial of the use of the bathroom during a trip to another prison).

In the circumstances before us, the lack of available toilet paper on July 6th and the temporary denial of toilet paper on July 9th do not objectively rise to the level of a constitutional violation. But, even if we were to find that, objectively, the denial of toilet paper was sufficiently serious, in light of the uncontested facts, it is clear that Defendants did not act with the requisite state of mind. Instead, by all accounts, Defendants took affirmative action to cure the toilet paper deficiency. Furthermore, there is no indication that Plaintiff was forced to stay in the soiled clothes, since, by his own account, he was able to shower and change his clothes immediately. Thus, to the extent stated in the Complaint, we recommend **granting** Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment claim.

### E. Retaliation

**\*9** The true crux of Plaintiff's Complaint revolves around the notion that after he complained about the lack of toilet paper in UNICOR, and possibly because he complained about the BOP change in policy regarding prisoner movement during and after UNICOR lunch breaks, various Defendants retaliated against him. Such examples of retaliation include 1) Defendant Peterson's search while Plaintiff was on the UNICOR loading dock; 2) Defendant Helms's subsequent investigation; 3) forcing Plaintiff to submit to urine testing while in administrative detention; and 4) the hindrances imposed by all Defendants in blocking or delaying Plaintiff's attempts to file formal complaints while in SHU.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)

To state a First Amendment claim for retaliation, an inmate must demonstrate that (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

Here, Plaintiff satisfies the first prong because he engaged in constitutionally protected activity *vis a vis* filing grievances about the lack of toilet paper in UNICOR and complaining about the BOP change in policy. However, it is not entirely clear whether Plaintiff has satisfied the second and third prongs regarding adverse action taken against him and causal connection. It is worth noting that during the time Plaintiff alleges that various

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

Defendants were retaliating against him, these same staff/team members were working on his behalf to have him transferred to a facility closer to his home. It was only after the July 27th incident that such effort was terminated. *See* Sepanek Decl. at ¶ 5 & Ex. B. It seems that Plaintiff seeks to label the search, and possibly the subsequent administrative confinement, urine testing, and criminal prosecution, as adverse action, but he fails to make a clear connection between his written complaints about the lack of toilet papers and these acts. Conspicuously absent from his Complaint are the facts surrounding the search. In his Complaint, Plaintiff would have us believe that for no reason, he was singled out and searched and then put into administrative detention without cause. At no point in his Complaint does he mention that marijuana was found on his person during that search. Yet, after reviewing the Defendants' moving papers, we learn that Plaintiff had been suspected of possessing or dealing drugs, which was the basis for the search,[FN10] and during such search, Plaintiff was observed attempting to force a cellophane wad down the drain. After determining that the substance in the cellophane was marijuana, the incident was referred to the United States Attorney's Office for prosecution. At no time does Plaintiff claim that the drugs found that day were not his nor that they were planted there by the Defendants. Indeed, he would be foreclosed in making such argument in light of his guilty plea to the crime of possession during his criminal prosecution.

[FN10.] In his Declaration, Defendant Jon Hensley, Superintendent of Industries and Education, indicated that on July 27, 2009, he became aware that Plaintiff was selling drugs out of the factory restroom. Dkt. No. 29–8, Jon Hensley Decl., dated Nov. 9, 2010, at ¶ 11. He does not share with the Court how he came to possess such information. Hensley says that he informed Defendant Peterson of this and asked him to look into the allegation, which resulted in the visual search. *Id.*

**\*10** Furthermore, it is clear from the Defendants' submissions that even if a retaliatory animus were present, based on their suspicion and because of the items discovered during the search, they would have taken the same steps, *i.e.,* administrative confinement and referral

for prosecution. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), for the proposition that in situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at \*6 (N.D.N.Y. Oct.15,1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" (internal quotation marks and citations omitted)).

The undisputed facts show that on July 27th, the search of Brobston, and subsequent lab testing, revealed he possessed marijuana. While a BOP Incident Report was written by Defendant Peterson that same day, the BOP investigation into this matter was suspended pending referral to the United States Attorney's Office. Van Weelden Decl. at ¶ 7 & Exs. F & G. In accordance with BOP policy, because of the pending investigation, Brobston was not furnished with a copy of the Incident Report. *Id.* at ¶ 10 & Ex. H. Also in accordance with BOP policy, Plaintiff was placed in administrative detention pending the criminal investigation and was subjected to periodic urinalysis. *Id.* at ¶¶ 8 & 11, Exs. H, I, & K. The following date, the matter was referred for investigation, thus, the timeline of such prosecution was no longer with any member of the BOP, but rather with the United States Attorney's Office. As we know, eventually, Plaintiff was indicted and pled guilty to the charge of Knowingly Possessing a Prohibited Object. Thus, it is clear from the undisputed evidence that even if a retaliatory motive existed, and we do not find that to be the case, the search, investigation, administrative detention, and urine testing were legitimate and in accordance with BOP policy. Thus, we recommend that these claims of retaliation be **dismissed.**

Lastly, with regard to Plaintiff's claim that all nine Defendants retaliated against him by interfering with his ability to file administrative grievances, we note that such claim lacks the vital causal connection. The

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

constitutionally protected activity at issue is the complaints Plaintiff filed with regard to the shortage of toilet paper in UNICOR. Those complaints were immediately addressed by UNICOR staff in the form of providing additional toilet paper and by Defendant Hensley, who issued a written response to Plaintiff's complaint indicating that he had fully investigated the matter and was assured that for the dates in question, UNICOR staff ensured that there was an adequate supply of toilet paper. It is not clear why Plaintiff believes that his complaints upset any of the nine Defendants that they would engage in acts of retaliation spanning over seven months. By all accounts, the complaints were resolved amicably. And, as noted above, prior to July 27th, these same staff members were working on Plaintiff's behalf to grant his request for a transfer. Having failed to assert a causal connection between the alleged retaliatory acts and his complaints about the lack of toilet paper, we recommend that this claim be **dismissed.**

### F. Qualified Immunity

**\*11** In light of the above analysis wherein this Court has assessed that no constitutional violations occurred, it is unnecessary for us to consider this affirmative defense put forth by Defendants. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, should there be any doubt as to the above recommendations, it is clear based upon the undisputed evidence and Declarations that the each Defendant would be entitled to qualified immunity for each of the above claims because "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable for the defendant[s] to believe that [t]he[y] w[ere] acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

### G. Service

Under FED. R. CIV. P. 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m).[FN11] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative after notice to the plaintiff, to dismiss the case without prejudice as to that defendant. *Id.*

> FN11. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

Defendant Darrah has not been properly served in this matter. Apparently, at the time service was attempted, Ms. Darrah had already retired from the BOP. Dkt. Nos. 18 & 29. Nevertheless, as noted above, Plaintiff's claims regarding the shortage of toilet paper and various forms of retaliation should be dismissed against the Defendants, including Defendant Darrah, because he has not asserted a cognizable claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss/for Summary Judgment (Dkt. No. 29) should be **GRANTED** and this entire action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

N.D.N.Y.,2011.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325715 (N.D.N.Y.)

(Cite as: 2011 WL 5325715 (N.D.N.Y.))

Brobston v. Schult
Not Reported in F.Supp.2d, 2011 WL 5325715
(N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325778 (N.D.N.Y.)

(Cite as: 2011 WL 5325778 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Kenneth BROBSTON, Plaintiff,
v.
Deborah SCHULT et al., Defendants.
No. 9:10–cv–242 (GLS/RFT).

Nov. 3, 2011.
Kenneth Brobston, Three Rivers, TX, pro se.

Hon. Richard S. Hartunian, United States Attorney, Office of the United States Attorney, Charles E. Roberts, Assistant United States Attorney, of Counsel, Syracuse, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, District Judge.

#### I. *Introduction*

**\*1** Plaintiff *pro se* Kenneth Brobston brings this action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging his constitutional rights were violated while he was incarcerated at Federal Correctional Institution in Ray Brook. (*See* Compl., Dkt. No. 1.) In a Report–Recommendation and Order (R & R) filed September 28, 2011, Magistrate Judge Randolph F. Treece recommended that the defendants' motion be granted and Brobston's Complaint be dismissed.[FN1] (*See generally* R & R, Dkt. No. 42.) Pending are Brobston's objections to the R & R. (Dkt. No. 43.) For the reasons that follow, the R & R is adopted in its entirety.

> FN1. The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

#### II. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.*

#### III. *Discussion*

To the extent specific objections to the R & R can be gleaned from Brobston's objections, they are that: (1) Judge Treece erred when he found Brobston exhausted administrative remedies; (2) he stated a cognizable Eighth Amendment claim; and (3) defendants' violated institutional policies with respect to his criminal conviction for possession of a prohibited object. (*See generally* Dkt. No. 43.) However, as discussed below, these objections are irrelevant and thus, will be construed as general objections.

Brobston's first and third objections, regarding the exhaustion of administrative remedies and the circumstances surrounding his criminal conviction, are immaterial to Judge Treece's dismissal recommendation. (*See* R & R at 13, 18–20; Dkt. No. 42.) Although Judge Treece—in the interest of thoroughness—discussed the unresolved questions of fact with respect to the exhaustion of administrative remedies, and the interplay between Brobston's criminal case and the instant case, his recommendation for dismissal was based on Brobston's failure to state cognizable Eighth Amendment and retaliation claims. (*See id.* at 10–20.)

Similarly, Brobston's second objection, which appears to challenge the objective reasonableness of preventing him from using the bathroom for an hour and a half, is also misdirected. (*See* Dkt. No. 43 at 3.) Notwithstanding Brobston's contention, Judge Treece concluded that Brobston's Eighth Amendment cause of action failed because "it is clear that Defendants did not act with the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 5325778 (N.D.N.Y.)

(Cite as: 2011 WL 5325778 (N.D.N.Y.))

requisite state of mind." (R & R at 16; Dkt. No. 42); *see, e.g., Phelps v. Kapnolas, 308 F.3d 180, 185–86 (2d Cir.2002).*

**\*2** Because Brobston objected to only extraneous matters, *i.e.,* non-dispositive grounds, the court concludes that a *de novo* review of Brobston's Eighth Amendment and retaliation claims is unnecessary.

### IV. *Conclusion*

Having found no clear error in the R & R, the court accepts and adopts Judge Treece's R & R in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Randolph F. Treece's September 28, 2011 Report–Recommendation and Order (Dkt. No. 42) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion (Dkt. No. 29) is **GRANTED** and all Brobston's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties by mail and certified mail.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Brobston v. Schult
Not Reported in F.Supp.2d, 2011 WL 5325778 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Henry BENITEZ, Plaintiff,

v.

HAM, et al., Defendant.

No. 9:04-CV-1159.

Oct. 21, 2009.

Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

### *ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

*REPORT-RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

**\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [FN1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left

wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

> FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.

Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at \*1, 2008 WL 1787692, at \*9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on." [FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

*4 On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant

Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

> FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [FN5] (Dkt. No. 1 ¶ 23.)

> FN5. The medical records produced by Defendants in support of their motion for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's

note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was

over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at \* 20-21, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [FN13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

> FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN14] or (2) a challenge to the legal cognizability 14 of the claim. [FN15]

> FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> FN15. *See* Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 379 F.Supp.2d 348, 370 (S.D.N.Y.2005)* ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth., 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); Tangorre v. Mako's, Inc.,* No.01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made under a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see*

*also Swierkiewicz, 534 U.S. at 512* (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)* (citation omitted).

FN17. *Swierkiewicz, 534 U.S. at 514* (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir.1995)* ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988)* ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y.1996)* (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp., 335 F.3d 152, 156 (2d Cir.2003)* (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the

strongest arguments that they suggest." [FN22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN25]

> FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before

dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed), [FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation

marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005)

(acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

### 1. *Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was

actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

FN31. Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

### 3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

> FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

> FN34. 42 U.S.C. § 1997e.

> FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

> FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17,

2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] *Id.*

> FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595

(S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

### 2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

### 3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright,

Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

*1. Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

### 2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine. [FN47] (Dkt. No. 92-10 at 31-32.)

FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I

have not addressed Defendants' argument regarding class-based animus.

### a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

### b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999).* "This doctrine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

> FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y.

March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also* *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996)* ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use

excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> FN49. Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)
a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding

that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

procedural due process claim at issue in *Freeman." Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.*

The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

> FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114

(N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.) "An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I

recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

> FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based

on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

### D. Disciplinary Hearing/Sentence

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

### 1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [FN53] (Dkt. No. 1 ¶ 35.)

FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.[FN54]

FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal

the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a

contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

> FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kuhlman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body

itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be ***GRANTED IN PART AND DENIED IN PART;*** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be

dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham
Slip Copy, 2009 WL 3486379 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)

(Cite as: 1994 WL 549741 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel S. SINGER, Plaintiff,
v.
FULTON COUNTY SHERIFF'S DEPARTMENT, its
Agents and Employees; Fulton County Sheriff; Stewart's
Ice Cream Company, Inc.; Its Agents and Employs
Raymond Shuler, Individually; Andrea Nicollela,
Individually; The Village of Northville, County of
Fulton, its Agents and Employs; Sheldon Ginter,
Individually and as Mayor of Village of Northville;
James Groff, Individually, as a Deputy Sheriff and as
Village of Northville, Village Board Member; James
Hillman, Individually and as Deputy Sheriff; Deputy
Hillier, Individually and as Deputy Sheriff; Martin
Kested, Individually and as Deputy Sheriff, Defendants.
No. 92–CV–1561.

Oct. 4, 1994.

Martin J. Kehoe, III, Albany, NY, for Plaintiff.

Robert A. Murphy, Jr., Albany, NY (James E. Conway, of
counsel), for defendants FCSD, Fulton County Sheriff,
Hillman, Hillier and Kested.

Dreyer, Boyajian & Tuttle, Albany, NY (Damon J.
Stewart, of counsel), for defendants, Village of Northville,
Ginter and Groff.

Office of Belinda Wagner, Albany, NY, for defendants
Stewart's Ice Cream Co., Inc., Shuler and Nicollela.

*MEMORANDUM–DECISION AND ORDER*

HURD, United States Magistrate Judge.
I. *Introduction.*

**\*1** This action was initiated by the plaintiff, Daniel
Singer, pursuant to 42 U.S.C. § 1983, alleging violations
of his civil rights. There are three federal civil rights
claims. These are (1) false arrest; (2) malicious

prosecution; and (3) conspiracy. In addition, there is also
a pendent state claim for damages based upon the common
law tort of malicious prosecution.

The "Fulton County defendants" are the Fulton
County Sheriff's Department, Fulton County Sheriff,
Deputy Sheriff James Hillman, Deputy Sheriff Hillier, and
Deputy Sheriff Martin Kested. The "Northville
defendants" are the Village of Northville, Sheldon Ginter
(Mayor), and James Groff (Board Member). The "Stewart
defendants" are Stewart's Ice Cream Company, Inc., and
its employees Raymond Shuler and Andrea Nicollela.

The plaintiff alleges that the defendants conspired to
intimidate, discriminate, and harass him which ultimately
resulted in his false arrest, false imprisonment, and
malicious prosecution on the charge of petit larceny. This
conspiracy was allegedly an attempt to quiet the plaintiff
because he focused public attention on the way some of
the defendants were doing their jobs through the use of a
newsletter published by him. The plaintiff's claims are
based on alleged violations of his civil rights under the
First, Fourth and Fourteenth Amendments to the United
States Constitution.

There are presently five motions before the court. The
Fulton County defendants and the Northville defendants
have moved for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure. The Northville
defendants have also moved for sanctions against the
plaintiff. The plaintiff has cross-moved for summary
judgment, and has also moved for sanctions against the
Village of Northville defendants.

II. *Summary Judgment.*

A motion for summary judgment must be granted
when the pleadings, depositions, answers to
interrogatories, admissions and affidavits show that there
is no genuine issue as to any material fact, and that the
moving party is entitled to summary judgment as a matter
of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 247 (1986); *Lang v. Retirement Living Pub.
Co.,* 949 F.2d 576, 580 (2d Cir.1991). The moving party

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)

(Cite as: 1994 WL 549741 (N.D.N.Y.))

carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., 475 U.S. at 586.* At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

### III. *Facts.*

**\*2** On October 20, 1991, at approximately 2:15 p.m., plaintiff, in the discharge of his duties as a State Forest Ranger, entered the Northville Stewart's Shop to gather provisions for an ongoing search and rescue. Plaintiff advised the store clerk, Ray Shuler ("Shuler") (whom he knew on a first name basis) of his intentions to pay for the goods at a future date, left an itemized list of the goods and their prices with Shuler, and left the store.

At approximately 3:00 p.m. the clerk contacted his manager, Andrea Nicollela ("Nicollela"), who came to the store. She waited several more hours for Deputy Sheriff Martin Kested ("Kested") to arrive. It is not clear who called the police. When Kested arrived at the Stewart's Shop, Nicollela, Shuler, and Kested went to the back room of the store and remained there for some length of time. Between 6:05 and 6:16 p.m., Shuler completed and signed an information and supporting deposition charging plaintiff with petit larceny of the items with a value of $11.55. By that time, the plaintiff had returned home from the search and rescue. Kested went to plaintiff's home to make the arrest. Upon seeing a deputy at the door, plaintiff

got up from the supper table believing Kested had come to inform him of another emergency. Instead Kested read him the Miranda warnings and arrested him at 6:45 p.m. for petit larceny despite plaintiff's explanation regarding the search and rescue. Plaintiff was arraigned in Northamptom Town Court and released on his own recognizance.

By order of Fulton County Judge Michael Mazzone, dated August 12, 1992, the matter was transferred to the Gloversville City Court. On November 19, 1992, the charge of petit larceny was dismissed by City Court Judge Mario Papa "in the interests of justice."

### IV. *Discussion.*

### A. *Termination of the petit larceny charge.*

One of the essential elements of a prosecution for false arrest, false imprisonment, and/or malicious prosecution is that the prior criminal action complained of must be terminated in plaintiff's favor, or he may not maintain an action pursuant to § 1983. Thus, the plaintiff "must allege and prove that the prosecution terminated in some manner indicating that the person was not guilty of the offense charged." *Singleton v. City of New York,* 632 F.2d 185, 195 (2d Cir.1980). In defining a favorable termination, the Court stated that "[p]roceedings are terminated in favor of the accused only when the final disposition is such as to indicate that [the] accused is not guilty." *Id.* at 193.

In the instant case, prosecution of plaintiff's case was dismissed, in the interest of justice, as opposed to an adjournment in contemplation of dismissal. Thus, the underlying rationale for prohibiting a § 1983 malicious prosecution and false arrest claim remains. Under New York law, a dismissal in the interest of justice leaves the question of guilt or innocence unanswered. *Rounseville v. Zahl,* 819 F.Supp. 1148, 1161 (N.D.N.Y.1993) (citing *Ryan v. New York Tel Co.,* 62 N.Y.S.2d 494, 504–505, 478 N.Y.S.2d 823, ——— (1984)). Specifically, the Second Circuit has held that a case dismissed in the interest of justice does not satisfy the favorable termination requirement for a § 1983 claim. *Hygh v. Jacobs,* 961 F.2d 359, 367–368 (2d Cir.1992). Therefore, where a plaintiff's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)

(Cite as: 1994 WL 549741 (N.D.N.Y.))

claims for false arrest and/or malicious prosecution is lacking the favorable termination element, the claims are prohibited.

**\*3** In order to determine whether or not the petit larceny charge was terminated in plaintiff's favor with an indication that he was not guilty, a close reading of the proceedings before Judge Papa on November 19, 1992, must be reviewed. The pertinent portion of those proceedings are as follows:

THE COURT: Okay. Then I'm going to dismiss this. And *I'm going to dismiss this action in the interests of justice and on the basis that the District Attorney is not able to produce a witness at trial.*

MR. SISE: I would state, your Honor, just for the record, that it is our position in this case that the witness, who we are doubtful that would appear, was the reason why the defendant was arrested by the Fulton County Sheriff's Department in that that witness supplied the Sheriff's Department with probable cause that a person left the Stewart's Store with items from the Stewart's without permission, without adequate permission, and that is why the petit larceny charge was filed by the Fulton County Sheriff's Department, but we understand the Court's position and the reason for the dismissal in that we cannot give the Court assurance because we have not been able to contact that witness and to assure this Court and our office that the witness will appear.

THE COURT: And for the record, the conference we had in my office was that we were going to make a decision today whether we were going to go forward or not. *In light of the fact that there is no witness able to be produced* on behalf of the People, I think that *in the interests of everybody involved here,* and even potentially the tremendous expense of obtaining that witness if he's over in Europe, *I'm going to dismiss. Okay, Mr. Singer?*

DEFENDANT SINGER: *Yes, sir.*

THE COURT: You're free to go home.

MR. KEHOE: *Your Honor, thank you.*

THE COURT: You're welcome. (emphasis added).

Because the record is clear that the termination was made without any indication that the plaintiff was innocent of the charge of petit larceny, there is no need for a hearing on this issue. The charge was terminated because the key prosecution witness (Shuler) was not available. More important, the plaintiff did not protest, and in fact, agreed to such a termination. Judge Papa specifically asked him whether or not he agreed with the disposition "in the interest of justice," and he replied, "Yes, sir." He was represented by counsel at that time. Counsel also indicated his approval of the disposition by stating, "Your Honor, thank you."

A further indication that the charge was not dismissed on the merits stems from the conference held shortly thereafter before Magistrate Judge Ralph W. Smith on December 2, 1992. At that time, an attorney for the Stewart defendants indicated that the Fulton County District Attorney was contemplating renewal of the charge if the testimony of Shuler was taken in this case. The plaintiff's attorney was present and made no statement to the contrary. In fact, he seemed to agree that the charge of petit larceny could be reinstated. This point bears mention because if the charge was dismissed on the merits in City Court, it could not be reinstated because of the rule against double jeopardy. No one considered the dismissal by Judge Papa to be with prejudice on the merits, or with any indication that the plaintiff was innocent of the petit larceny charge.

**\*4** Therefore, since an essential element of the plaintiff's claims for false arrest, false imprisonment, and malicious prosecution can never be proven, those claims must be dismissed.

B. *False Arrest.*

The existence of probable cause for the arrest of plaintiff further supports this finding. No cause of action exists for an alleged violation of civil rights where an arrest is supported by probable cause. *O'Neill v. Babylon, 986 F.2d 646, 649 (2d Cir.1993).* "Probable cause is a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)

(Cite as: 1994 WL 549741 (N.D.N.Y.))

fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232 (1983). "There is probable cause when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.' " *O'Neill,* 986 F.2d at 650 (quoting *Calamia v. City of New York,* 879 F.2d 1025, 1032 (2d Cir.1989)). The court looks only to the information that the arresting officer had at the time of the arrest. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

In this case, Kested was advised by Shuler as a clerk in the Stewart's Ice Cream Shop, and his supervisor, Nicollela, that plaintiff had taken items with a value of $11.55 from the store without paying for same. Shuler signed a supporting deposition to this effect. As a matter of law, under the circumstances, Kested had probable cause to arrest the plaintiff for petit larceny.

In addition, Kested would be entitled to qualified immunity as a matter of law, so long as "no reasonable jury, looking at the evidence in the light most favorable to and drawing, all inferences most favorable to, the plaintiffs could conclude that it was objectively unreasonable for the defendant to believe he was acting in a fashion that did not clearly violate an established federal protected right." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (quoting *Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986)). Deputy Kested's belief that he had probable cause to arrest the plaintiff was reasonable, and was grounded in the facts. *Wachtler v. County of Herkimer,* —— F.3d ——, No. 93–9135, 1994 WL 498622 at *—— (2d Cir. Sept. 9, 1994) ("An arresting officer is entitled to qualified immunity from a claim for unlawful arrest if 'either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " (quoting *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991)) (citing *Malley v. Briggs,* 475 U.S. 335, 341 (1986)), *cert. denied,* 112 S.Ct. 3032 (1992))). Because it was objectively reasonable for Kested to arrest plaintiff based upon statements given to him by Shuler and Nicollela and Shuler's signed deposition, Kested is entitled

to qualified immunity. *Id.* This is not a subjective test. Kested's bad judgment or negligence is not material. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Burns v. Reed,* 500 U.S. 478, ——, 111 S.Ct. 1934, 1944 (1991) (The defense of qualified immunity "provides ample support to all but the plainly incompetent or those who knowingly violate the law." (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986))).

C. *Malicious Prosecution.*

**\*5** In addition to the fact that an essential element of the malicious prosecution claim cannot be met by the plaintiff, a majority of Justices in the Supreme Court recently adopted a very negative view of attempts to bring malicious prosecution claims under § 1983. *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807 (1994). The First Circuit expounded upon this view in *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994), stating, "*Albright* would appear virtually to foreclose reliance on substantive due process as the basis for a viable malicious prosecution claim under § 1983." Therefore, if the persuasive reasoning of the First Circuit in *Perez–Ruiz* were followed, the plaintiff's attempt to bring a federal malicious prosecution claim against the defendants would be foreclosed under *Albright* as well.

D. *Conspiracy.*

The same reasoning as was applied in Section A above, applies to the conspiracy claims. The plaintiff cannot sustain his § 1983 claim based on conspiracy since he cannot show that his rights were violated by his arrest/imprisonment or prosecution because he cannot demonstrate a favorable termination. In order to prove a conspiracy, plaintiff's constitutional rights must be violated. *See Duff v. Coughlin,* 794 F.Supp. 521, 525 (S.D.N.Y.1992); *see also Spear v. Town of West Hartford,* 771 F.Supp. 521, 529 (D.Conn.1991), *aff'd* 954 F.2d 63 (2d Cir.1992), *cert. denied* 113 S.Ct. 66 (1992); *and Bergman v. Stein,* 404 F.Supp. 287 (S.D.N.Y.1975). Without a violation, there can be no actionable conspiracy.

Further "... complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed." *Dukes*

Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)

(Cite as: 1994 WL 549741 (N.D.N.Y.))

*v. New York,* 743 F.Supp. 1037, 1043 (S.D.N.Y.1990) (citing *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977)); *see also Estes–El v. New York,* 552 F.Supp. 885 (S.D.N.Y.1982). The complaint in this case falls squarely within the above definition. Specific allegations are difficult, if not impossible to find.

### E. *Stewart Ice Cream defendants.*

The Stewart Ice Cream defendants have not moved for summary judgment. However, the Federal claims against them must also be dismissed *sua sponte* for the above reasons.

### F. *Pendent State Claim.*

"It is well settled that 'if the federal claims are dismissed before trial ... the state claims should be dismissed as well.' " *West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990) (citations omitted) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966)). This decision is in keeping with the principle that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Robison,* 821 F.2d at 925.

Having determined that plaintiff's federal claims must be dismissed, and there being no diversity of citizenship between the parties, the court declines to take jurisdiction of the state law claim. In addition, the state common law claim of malicious prosecution would be barred for the same failure to prove the essential element of favorable termination on the merits of the underlying criminal charge. *Colon v. City of New York,* 60 N.Y.2d 78, 82 (1983).

### G. *Sanctions and Attorneys Fees.*

**\*6** No sanctions will be made against any party. Although the plaintiff's claims are dismissed, the court must comment that Kested showed an extraordinary lack of common sense in making this arrest, even though he did have "probable cause." It was equally irresponsible for Shuler to make a complaint and sign a deposition. The time, money, and effort that has been expended in this matter is a direct result of the incredibly poor judgment of a number of individuals. If only some common sense had

prevailed, this could all have been avoided. In fact, the day following the arrest, October 21, 1991, Nicollela signed a deposition indicating she was willing to drop the charges. This was not done. Instead, there were years of criminal and civil litigation involving at least four judges, and a half a dozen lawyers.

The inappropriate motive of the plaintiff in bringing the action against the Northville defendants is clear from his statements made before the Village Board on January 18, 1994, and in his newsletter of January 1994. The atmosphere which prevails, and the animosity between plaintiff and the members of the Fulton County Sheriff's Department, the Village of Northville officials, and the Stewart Ice Cream Co., Inc. employees has led to this unfortunate series of events from arrest to dismissal, and from lawsuit to dismissal. All sides share the blame, and it is for this reason that no sanctions will be assessed in favor of any side.

In addition, although the defendants are the "prevailing parties," any claim for attorney's fees is denied. *See Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir.1994) (Plaintiff's claim must have been frivolous, unreasonable, or groundless. Section 1988 attorney fees will rarely be awarded to prevailing defendants due in part to "the potential chilling effect of such an award on Section 1983 plaintiffs.") This entire case must be brought to an end.

Therefore, it is

ORDERED that

1. The motion by the defendants Village of Northville, Sheldon Ginter, and James Groff for summary judgment is granted;

2. The motion by the defendants Fulton County Sheriff's Department, Fulton County Sheriff, James Hillman, Deputy Hillier, and Deputy Martin Kested for summary judgment is granted;

3. The motion by the defendants Village of Northville, Sheldon Ginter, and James Groff for sanctions is denied;

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)

(Cite as: 1994 WL 549741 (N.D.N.Y.))

4. The cross-motion by the plaintiff for summary judgment is denied;

5. The motion by the plaintiff for sanctions is denied;

6. The complaint is dismissed as against the defendants Stewart Ice Cream Company, Inc., Raymond Shuler, and Andrea Nicollela *sua sponte;* and

7. Attorney's fees are denied.

The Clerk is directed to enter judgment dismissing the complaint in its entirety.

IT IS SO ORDERED.

N.D.N.Y.,1994.

Singer v. Fulton County Sheriff's Dept.
Not Reported in F.Supp., 1994 WL 549741 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Steven MOTTA, Plaintiff,
v.
Dr. Lester WRIGHT, Deputy Commissioner of Health
Services, NYS Docs; Dr. Syed Haider Shah, Marcy
Correctional Facility, Defendants.
**No. 9:06-CV-1047.**

May 20, 2009.

West KeySummary
**Prisons 310** 📧 **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In General. Most Cited Cases

**Prisons 310** 📧 **194**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k194 k. Psychological Conditions and
Treatment. Most Cited Cases

**Sentencing and Punishment 350H** 📧 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.

Most Cited Cases

**Sentencing and Punishment 350H** 📧 **1547**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1547 k. Psychological and Psychiatric
Treatment. Most Cited Cases
In his § 1983 action, prisoner failed to state Eighth
Amendment claim against prison doctor who was
allegedly deliberately indifferent to prisoner's serious
medical needs because the doctor delayed prisoner's
hepatitis treatment from October of 2002 until June of
2006. There was no evidence that the delay was
substantially serious. Moreover, the doctor's explanation
for the delay in providing prisoner with the hepatitis
treatment was based upon the lack of a psychiatric
clearance between October 2002 and October 2005. The
hepatitis protocol clearly required a psychiatric clearance
for individuals who have a history of major depression or
other major psychiatric illness. U.S.C.A. Const.Amend. 8;
42 U.S.C.A. § 1983.

Steven Motta, Dannemora, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Office of the Attorney General, Charles J.
Quackenbush, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants Haider Shah and
Wright.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Gustave J.
DiBianco, duly filed on the 29th day of April 2009.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The defendants' motion for summary judgment (Dkt. No. 29) is granted, and the complaint is dismissed in its entirety.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**REPORT-RECOMMENDATION**

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendants denied him constitutionally adequate medical care from October 10, 2002 until June 1, 2006, while plaintiff was an inmate in the custody of the Department of Correctional Services (DOCS) at Marcy Correctional Facility (Marcy). Complaint (Dkt. No. 1). In the jurisdictional section of the complaint, in addition to 42 U.S.C. § 1983, plaintiff cites the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.; the

Rehabilitation Act (RA), 29 U.S.C. § 794; and 42 U.S.C. §§ 1985, 1988. Compl. ¶ 8. In the body of the complaint plaintiff also quotes the text of the ADA, RA, and sections 1985 and 1988.[FN1] Compl. ¶¶ 67, 68-69. Plaintiff's Causes of Action, however, do not mention these statutes. The complaint contains seven causes of action and all of them state that they are violations of the "Eighth and Fourteenth Amendments." Compl. ¶¶ 73-88. The complaint seeks declaratory and substantial monetary relief.[FN2] Compl. at 28.

> FN1. The jurisdictional section also mentions unspecified state law claims. Compl. ¶ 8.

> FN2. The complaint also requests "costs and disbursements," including "reasonable attorneys fees" and asks for permission to "be placed before District Court Judge David N. Hurd, who presides over the recently certified class action suit in *Hinton v. Wright,"* ...." Plaintiff is referring to *Hilton v. Wright,* 235 F.R.D. 40 (N.D.N.Y.2006). The court would point out that a *pro se* litigant is not entitled to attorneys fees under 42 U.S.C. § 1988. *See SEC v. Price Waterhouse,* 41 F.3d 805, 808 (2d Cir.1994). This would be true even it the *pro se* plaintiff were an attorney. *See Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). Thus, plaintiff would not be entitled to attorneys fees even if he were successful in the action. The court will discuss plaintiff's request regarding the class action later in this report.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt. No. 29). Plaintiff has responded in opposition to the motion. (Dkt. No. 33). Although the docket sheet indicates that defendants have filed a "Reply," the document filed is simply "dated copies of signature pages from the Declarations of Dr. Haider Shah and Dr. Wright" that were originally filed in support of defendants' motion for summary judgment.[FN3] (Dkt. No. 34). For the following reasons, this court agrees with defendants and will recommend dismissing plaintiff's complaint.

> FN3. Plaintiff's first argument in opposition to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

the defendants' motion was that the defendants' Declarations were unsigned and undated and, thus, not admissible in support of the motion. Plaintiff's Memorandum of Law at 2. (Dkt. No. 33). Defendants corrected their error by submitting copies of the appropriate signed and dated pages, together with a certificate of service on plaintiff, but this correction is docked as a "Reply." (Dkt. No. 34).

## DISCUSSION

### 1. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*2 In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The

second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted). Plaintiff in this case has responded to defendants' motion, however, the court will still carefully review the entire record in making its determination.

### 2. *Facts and Contentions*

In his complaint, plaintiff states that he has been in the custody of DOCS since 1982, and has Hepatitis-C (HCV).FN4 Plaintiff's medical records show that he was diagnosed with HCV in December of 1995. Haider Shah Decl. ¶ 9 & Ex. A FN5 at 503. The first several paragraphs of plaintiff's complaint are entitled "INTRODUCTION" and discuss plaintiff's allegations generally. Compl. ¶¶ 1-7. The complaint then contains a section entitled "ALLEGATIONS," containing a more specific statement of facts and chronology of plaintiff's claims. Compl. ¶¶ 25-63.

> FN4. Plaintiff disputes when he contracted the illness. Plaintiff states that he contracted the virus *after* he was incarcerated, and defendants state that plaintiff became infected sometime *prior* to his incarceration in 1982. This dispute is not relevant to the court's analysis since it is undisputed that he was not diagnosed with HCV until December of 1995.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

FN5. Defendant Haider Shah has submitted a declaration in support of defendants' motion for summary judgment. Exhibit A are plaintiff's medical records including his Ambulatory Health Record (AHR) and other relevant medical records. An inmate's AHR contains entries referring to medical visits on particular days, however, multiple visits are recorded on each day, with up to three visits from three dates recorded on one page. Exhibit A has been paginated, and the page numbers appear at the bottom. Thus, the court will cite to the page number of Exhibit A with further citation to the date of a particular entry of the AHR if necessary.

Plaintiff alleges that after he arrived at Marcy on October 10, 2002, defendant Dr. Haider Shah failed to monitor plaintiff's elevated liver function tests (LFT's) for nineteen months, in violation of the HCV "protocol" FN6 and failed to refer plaintiff to a liver specialist. Compl. ¶ 1. Plaintiff claims that defendant Haider Shah refused to give plaintiff HCV treatment "on a number of occasions" for improper reasons, including that plaintiff was too close to being paroled; needed psychiatric clearance; or "needed outside clearance." Compl. ¶ 2. Plaintiff states that defendant Haider Shah failed to order the prescribed liver biopsy on October 20, 2005 and failed to seek psychiatric clearance for plaintiff until October 20, 2005. *Id.* Plaintiff claims that once defendant Haider Shah obtained the psychiatric clearance in October of 2005, he delayed giving plaintiff the HCV treatment for another nine months. *Id.*

FN6. Plaintiff is referring to the DOCS Division of Health Services "protocol" entitled "Hepatitis C Primary Care Practice Guidelines ." (DOCS Guidelines). Defendants have submitted various revisions of the DOCS Guidelines, dated January 17, 2000; July 20, 2004; and October 13, 2005. Wright Decl. Ex. A-1-A-3

**\*3** Plaintiff states that he filed two grievances regarding his medical care. Compl. ¶¶ 3-4. Plaintiff claims that defendant Haider Shah did not order a genotype blood test until February 14, 2006, after plaintiff's second grievance

was filed, and "after nineteen straight months of no blood tests at all." Compl. ¶ 4. Plaintiff states that only after he filed his second grievance, did defendant Haider Shah begin to check plaintiff's liver function. On June 1, 2006, plaintiff claims that he vomited in front of a nurse, and that on the same day, plaintiff was examined by defendant Haider Shah, who had plaintiff sign a "Contract for Specialty Care" appointment, and requested medication for plaintiff from defendant Wright. Compl. ¶ 6. Plaintiff states that if it had not been for the vomiting incident, defendant Haider Shah never would have ordered the medication that eventually was started on June 9, 2006. Compl. ¶ 7.

In the complaint, plaintiff has listed a number of medical terms that are associated with HCV. Compl. ¶¶ 12-24. Plaintiff has filed a substantial number of documents in support of his complaint, including numerous medical records and other references concerning HCV. Compl. App. A-C. Plaintiff begins the "Allegations" portion of the complaint by outlining the facts surrounding the diagnosis and care of his condition since October 10, 1990, when a laboratory report of blood tests taken at Elmira Correctional Facility, showed that plaintiff tested positive for Hepatitis A FN7 (HAV) and B(HBV). Compl. ¶ 26 & App. B at 3-5.

FN7. Plaintiff states that the tests were positive for both A and B, but the pages he cites only show that the tests were positive for Hepatitis B. Compl. App. B at 3-5.

Plaintiff was diagnosed with HCV on December 12, 1995, while he was in Clinton Correctional Facility. Compl. ¶ 28. Plaintiff states that the tests showed an "out of control chronic Hepatitis C virus," and that although plaintiff complained of liver pain, dizziness, and nausea, he was not scheduled to see a "liver specialist." *Id.* The complaint discusses 1995 through 2002, stating that at various times, plaintiff complained about symptoms that he was experiencing. Compl. ¶¶ 29-34.

Plaintiff states that in June of 1999, he was incarcerated at Riverview Correctional Facility and experienced dizzy spells. Compl. ¶ 33. Plaintiff states that on June 15, 1999, Dr. R. Hentschel noted that plaintiff was positive for HCV

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

and recommended a follow-up with a private physician, "Rx medication for hepatitis C, [and] lab monitoring." FN8 Compl. ¶ 33 (citing App. B at 40-45). Plaintiff states that when he was at Franklin Correctional Facility in April of 2002, he requested medication for HCV and signed consent forms. Compl. ¶ 34. Plaintiff's Ambulatory Health Record (AHR) indicates that he was interested in HCV treatment, and he signed consent forms in April of 2002. Pl.App. at 65 (AHR entries of 4/8 and 4/11/02).

> FN8. The court must point out that in the pages of the medical records cited by plaintiff there is no reference to "medication." Pl.App. B at 41. It is unclear what Dr. Hentschel wrote. The notation appears to be "Needs f/u private physician Rx of Hepatitis C. Lab monitoring." Pl.App. at 41.

Plaintiff was transferred to Marcy in October of 2002, and plaintiff states that on October 17, 2002, he requested HCV treatment again, and that defendant Haider Shah told plaintiff that he would review the policy and record to see if plaintiff met the criteria for medication. Compl. ¶ 35 (citing App. B at 71 AHR entry of 10/17/02). Plaintiff then states that on October 23, 2002, he requested HCV treatment and a "Nurse" told plaintiff that he needed psychiatric clearance. FN9 Id. Plaintiff states that after the October 17, 2002 "examination," defendant Haider Shah failed to administer a course of treatment; send plaintiff to a private physician; and monitor his liver function every six months as ordered by Dr. Hentschel in 1999. Compl. ¶ 37.

> FN9. Plaintiff is again mistaken regarding his citation to the record. Pages 70 and 71 of plaintiff's appendix are copies of the same page. The **October 17, 2002** entry is written by Nurse K. Dooley. App. B at 70, 71. Nurse Dooley states that plaintiff is requesting treatment for HCV, and Nurse Dooley stated that she would consult P. Perrotta about reviewing the record to determine whether plaintiff met the criteria. The entry dated October 23, 2002 contains the notation of a variety of requests made by plaintiff, including vaccine for Hepatitis A and B; a lead-level test because of a gunshot wound; a memory test; and HCV treatment. Pl.App. B at

70, 71. The entry ends with the notation "Psych Clearance for Possible Hep C Rx." *Id.* Defendant Haider Shah states in his declaration that **he** met with plaintiff on October 23, 2002. Haider Shah Decl. ¶ 11.

**\*4** Plaintiff states that he was examined by defendant Haider Shah on August 7, 2003 and told that he was not ready for medication because he was "too close to going home." Compl. ¶ 39. Plaintiff then cites various laboratory test results, showing that he had a high HCV viral load in 2003. Compl. ¶¶ 40-41. Plaintiff states that consistent with the high viral count, he went to sick call on August 13, 2003, January 7, 2004, and March 31, 2004. Compl. ¶ 42. Plaintiff claims that although he had serious symptoms, no medical action was taken. *Id.* Plaintiff then cites additional dates on which he was tested. Compl. ¶¶ 43-47.

Plaintiff states that on January 9, 2004, he had a liver function test, and the notation on the report stated that plaintiff "needs to be seen." Compl. ¶ 43. On October 20, 2004, defendant Haider Shah sent plaintiff for a CAT Scan of his abdomen to rule out a bile duct obstruction. Compl. ¶ 45. The CAT Scan was performed on November 5, 2004. *Id.* (citing App. B at 83). Plaintiff states that on October 13, 2005, defendant Lester Wright sent a memorandum, rescinding the DOCS policy that would prevent an inmate from having HCV treatment if he had not participated in the Alcohol and Substance Abuse Treatment (ASAT)/Residential and Substance Abuse Treatment (RSAT) programs. Compl. ¶ 48. At the same time, defendant Wright rescinded that policy prohibiting approval for HCV treatment if the inmate were going to be released prior to the completion of the treatment. *Id.* (citing Pl.App. A-HCV Guidelines dated 2/10/06).

Plaintiff states that on October 20, 2005, he asked again for the HCV treatment and discovered that he had not received psychiatric clearance. Compl. ¶ 49. Plaintiff states that the sick call nurse cited to the AHR dated 10/20/04, 6/25/04, 10/23/02 after she noted that there was no psychiatric clearance in the medical records. Compl. ¶ 49. Plaintiff claims that the main reason that he did not obtain his treatment was that he did not have psychiatric clearance, but maintains that no request had ever been made for the clearance. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Plaintiff states that he the request was finally made on October 20, 2005, and he obtained the psychiatric clearance on the same day, using the same form upon which the request was written. Compl. ¶ 50 & App. B at 90. Plaintiff claims that on January 4, 2006, he complained to defendant Haider Shah about some of the symptoms plaintiff had been having. Compl. ¶ 52. Plaintiff alleges that during the examination, defendant Haider Shah was going through the medical records and "deliberately lied" about not receiving a reply from the Mental Health Department, when in fact the clearance had been sent on October 20, 2005. *Id.*

Plaintiff states that he wrote a grievance on January 14, 2006 that was consolidated with a prior grievance dated November 15, 2002. Compl. ¶ 53. Plaintiff states that he had an Inmate Grievance Resolution Committee (IGRC) hearing, but that the IGRC could not override a medical decision. *Id.* Plaintiff states that the Superintendent denied his grievance on January 30, 2006, in part because the medical department was waiting for the psychiatric clearance, and that when that clearance was obtained, the medical department would pursue the next step. Compl. ¶ 54. Plaintiff appealed the grievance, stating that he had already received the clearance, but that in any event, he had met the criteria "for years." Compl. ¶ 55.

**\*5** In the meantime, on February 15, 2006, defendant Haider Shah made a request for plaintiff to have a liver biopsy which was completed on March 27, 2006. Compl. ¶¶ 57-58. Plaintiff claims that on June 1, 2006, he reported for sick call and vomited in front of the nurse. Compl. ¶ 59. Plaintiff states that the nurse wrote in the AHR that plaintiff was seeking HCV treatment. *Id.* Plaintiff states that he was examined by defendant Haider Shah on the same day and that plaintiff signed the "Contract for a Specialty Care Appointment." Compl. ¶ 60. Plaintiff states that his HCV treatment began on June 9, 2006, however, if it had not been for the incident in which plaintiff vomited in front of the nurse, "Defendant Haider Shah would never have ordered the medication...." Compl. ¶ 61.

Finally, plaintiff states that on July 5, 2006, defendant Haider Shah informed plaintiff that the high "iron readings" on his liver function tests were the "number one **'killer,'** for him." Compl. ¶ 62 (emphasis in original). Plaintiff stated that his iron levels had always been high

and asked defendant Haider Shah whether there was any medication that could bring plaintiff's iron levels down. *Id.* Plaintiff states that defendant Haider Shah told plaintiff that such medication existed, but that he did not believe that plaintiff needed it at the time. *Id.*

Essentially, plaintiff claims that the delay in his treatment caused him serious physical and emotional injury since plaintiff now has fibrosis of the liver that cannot be cured "except by way of liver transplant...." Compl. ¶ 63. Plaintiff alleges that defendant Wright may be held liable for failure to train and supervise his medical employees in the care of inmates such as plaintiff, who have been identified by their treating physicians as being in need of treatment for HCV. Compl. ¶ 70. Plaintiff also seeks to hold defendant Wright liable for establishing an unconstitutional policy and custom of refusing to administer treatment because inmates are too close to going home or because plaintiff did not complete a substance abuse program. Compl. ¶ 71.

The complaint contains seven causes of action, each referring **only** to the Eighth and Fourteenth Amendments and not to any statutory basis for relief. [FN10]

FN10. In any event, the court would point out that while the defendants must be sued in their individual capacities for purposes of section 1983, defendants may **not** be sued in their "individual" capacities for violations of the ADA or the RA. *Garcia v. S.U.N.Y. Health Science Center of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Thus, any suit for statutory relief would be against the defendants in their "official" capacities. Without discussing whether the Eleventh Amendment in this case would bar damage relief against the State (defendants in their "official" capacities), the court would merely note that plaintiff does not state a claim under the ADA or the RA. *See e.g. Carrion v. Wilkinson,* 309 F.Supp.2d 1007 (D.Ohio 2004).

In *Carrion,* the court specifically stated that the ADA and RA "afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not provide

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

them with a general federal cause of action for challenging the medical treatment of their underlying disabilities." *Id.* (quoting *Galvin v. Cook,* CV-00-29, 2000 U.S. Dist. LEXIS 15181, *19-20, 2000 WL 1520231 at *6 (D.Ore. Oct. 3, 2000)). Plaintiff in this case is only challenging the medical treatment of his underlying medical condition, thus, he could not proceed under either the ADA or the RA, even if this court were to interpret his complaint to raise those claims. The court will analyze this case under the Eighth and Fourteenth Amendment claims that plaintiff includes in his "Causes of Action." Compl. ¶¶ 73-88.

(1) Defendant Haider Shah violated plaintiff's Eighth and Fourteenth Amendment rights when he delayed plaintiff's HCV treatment from October 17, 2002 until June 1, 2006.

(2) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he delayed plaintiff's HCV treatments until June 1, 2006, even after he received the psychiatric clearance on October 20, 2005.

(3) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he departed from the "new" HCV Primary Care Guidelines from October 20, 2005 until June 1, 2006.

(4) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he failed to administer liver function tests every eight to twelve weeks.

**\*6** (5) Defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs when he ignored "numerous 'red flags' " regarding plaintiff's condition that indicated that plaintiff was in need of immediate treatment.

(6) Defendant Wright is responsible for the delay

between October 23, 2002 and October 13, 2005, when he changed the HCV policy.

(7) Defendants Wright and Haider Shah were deliberately indifferent to plaintiff's serious medical needs when defendant Haider Shah refused to administer HCV treatment on August 7, 2003 because plaintiff was "too close to going home."

Compl. ¶¶ 73-88.

Both defendants have submitted declarations in support of their motion for summary judgment. (Dkt.Nos.29-15, 29-16). Defendants have also submitted the declaration of John B. Rogers, M.D., whose primary area of practice is Gastroenterology. Rogers Decl. (Dkt. No. 29-21). Dr. Rogers has examined a copy of plaintiff's medical records, dating back to 1995. Rogers Decl. ¶¶ 4, 7 & Ex. B.

Defendant Haider Shah states that he is a clinical care physician with the Medical Department at Marcy, and he has been providing medical services to plaintiff since his arrival at Marcy in 2002 and during the time period relevant to this case. Haider Shah Decl. ¶¶ 2, 4. Defendant Haider Shah has also submitted copies of plaintiff's medical records as Exhibit A.<sup>FN11</sup> In his declaration, defendant Haider Shah gives a short description of HCV in general, stating that, while it is a serious infection, is progression is variable and generally slow. Haider Shah Decl. ¶ 10. Defendant Haider Shah states that HCV may go undetected for a number of years without physical signs or symptoms. *Id.* ¶ 7.

FN11. The medical records have been "traditionally filed" and are not part of the electronic docket. The court notes the medical records submitted by plaintiff are also contained in the defendants' exhibits, except for those records from prior to 1995 that plaintiff has submitted in his appendices. Defendants medical records are more extensive than those submitted by plaintiff.

Dr. Rogers states that HCV has the potential of producing

cirrhosis of the liver and/or liver cancer. Rogers Decl. ¶ 10. HCV is the leading cause of liver cancer in the United States, and thus, it is important to treat the disease "when possible." *Id.* Dr. Rogers states that advances in treatment during the past *six* years have been "particularly helpful," but notwithstanding these advancements, it is not yet possible to cure all individuals who are infected with HCV. *Id.*

The current drug treatment for HCV is a combination of two drugs, pegylated interferon and ribavarin. Rogers Decl. ¶ 11. Dr. Rogers states that treatment is often difficult for the patient because these drugs have many serious side effects, some of which can be considered life-threatening. *Id.* Thus, before starting this treatment, patients must be carefully evaluated to determine if they will have a good chance of tolerating the treatment itself. *Id.* Dr. Rogers states that it is also important to check patients for "coinfections" with Hepatitis B (HBV) or human immune deficiency virus (HIV) because the treatment "is very likely to fail" if the patient has either one of those viruses in addition to HCV. *Id.*

Because of all the above variables regarding whether the existing drug treatment is appropriate, and because of the great number of inmates infected with HCV, DOCS has developed a "protocol" to make certain that all of the necessary information is considered regarding each patient with HCV before starting the drug treatment. Rogers Decl. ¶ 11; Wright Decl. ¶¶ 4-7. Defendant Wright states that DOCS develops and regularly updates "Clinical Practice Guidelines" for various diseases in an effort to maintain the consistency of care and stay current with scientific advances. Wright Decl. ¶ 5. The "Hepatitis C Primary Care Practice Guideline" (the Guidelines) used by DOCS was initially approved on March 31, 1999 and revised December 17, 1999, December 13, 2000, July 20, 2004, and October 13, 2005. Wright Decl. ¶ 6. Copies of these Guidelines are included as Exhibits A-1 to A-3, attached to defendant Wright's declaration.

**\*7** Defendant Wright states that the Guidelines were developed by a task force of physicians and other health professionals, including DOCS practitioners, and experts from medical colleges and hospitals. Wright Decl. ¶ 5. The Guidelines are based upon many sources of information and research regarding HCV, including

publications of the National Institutes of Health (NIH); the United States Centers for Disease Control; the New York State Department of Heath Bureau of Communicable Disease Control; the New England Journal of Medicine; and the Federal Bureau of Prisons Treatment Guidelines for Viral Hepatitis. Wright Decl. ¶¶ 7-8.

Dr. Rogers states that it is now possible to achieve a "cure" in almost fifty percent of the HCV cases after 24 to 48 weeks of treatment, "depending upon the genotype of the virus." Rogers Decl. ¶ 12. Dr. Rogers states that it is "well worth the risks and costs of therapy to prevent the development of cirrhosis of the liver and/or liver cancer which often develops in patients with untreated HCV." Rogers Decl. ¶ 12. If the patient's viral levels remain undetectable six months after completion of the drug therapy, it is considered a "sustained viral response" and the patient may be considered "cured," however, relapses have been reported. Rogers Decl. ¶ 13. The likelihood of a relapse depends upon "individualized" factors, including the virus genotype, the patient's ethnicity, gender, age, the duration of the disease, and alcohol use. *Id.*

The "current" treatment with pegylated interferon and ribavirin was approved by the United States Food and Drug Administration (FDA) in 2001. Wright Decl. ¶ 12. However, there are patients that do not achieve sustained suppression of the virus even after treatment, and they are referred to as "nonresponders." Wright Aff. ¶ 13. Defendant Wright states that at this time, there is no alternative treatment for these individuals. *Id.* There are also patients called "relapsers," who initially respond to the treatment, but experience a re-emergence of the virus. *Id.* In the case of a "relapser," it may be appropriate to explore re-treatment with variations on the duration of therapy and/or the dosage of the drugs. *Id.*

Defendant Haider Shah states that plaintiff was diagnosed with HCV in December of 1995, but was not transferred to Marcy until October of 2002. Haider Shah Decl. ¶¶ 8-9. In 1992, it had been determined that plaintiff had also been exposed to Hepatitis A and B, but had acquired immunity to those viruses. *Id.* ¶ 9. By the time that he was transferred to Marcy, plaintiff's HCV had already progressed to the "chronic" stage. *Id.* Defendant Haider Shah had no responsibility for plaintiff's care until he was transferred to Marcy in 2002.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Defendant Haider Shah states that he met with plaintiff on October 23, 2002. [FN12] The medical records confirm that October 23, 2002 was the first time that defendant Haider Shah met with plaintiff at Marcy. Haider Shah Decl. Ex. A at 331. On October 17, 2002, plaintiff met with **Nurse Dooley,** and he told the nurse that he wanted a lead level test because he had metal fragments in his abdomen; [FN13] wanted a treatment plan for his HCV; wanted "injections" for his HAV and HBV; and had some concerns about his memory. *Id.*

> FN12. Although as stated above, plaintiff states that the October 17, 2002 AHR entry was based on an examination by defendant Haider Shah, it is clear that the October 17th entry was written by Nurse Dooley, and that defendant Haider Shah's entry is dated October 23rd. Haider Shah Decl. Ex. A at 331.

> FN13. These fragments were apparently the residue of a gunshot wound. Haider Shah Decl. Ex. A at 331.

**\*8** Nurse Dooley advised plaintiff of the "policy" regarding reviewing the record and determining whether plaintiff met the criteria for treatment. *Id.* Nurse Dooley also stated that there would be a follow up with Nurse Perrotta to "review for need." *Id.* Nurse Dooley also questioned the need for "injections" because the medical records indicated "immunity" for HAV and HBV. *Id.* Finally, Nurse Dooley wrote in the AHR entry that plaintiff had an "md" appointment on October 23, 2002. *Id.*

Dr. Haider Shah states that when he met with plaintiff on October 23, they discussed various medical issues. Haider Shah Decl. ¶ 11 & Ex. A at 331. Defendant Haider Shah told plaintiff that the vaccinations for HAV and HBV were not necessary [FN14] and the lead level testing was not necessary. *Id.* Defendant Haider Shah also noted that plaintiff was requesting treatment for HCV, and states in his declaration that he "made a notation on [plaintiff's] AHR requesting a psychiatric consultation ... this was the first of a series of such requests." Haider Shah Decl. ¶ 12 & Ex. A at 311.

> FN14. The reason that vaccinations were not necessary was that although plaintiff had been exposed to both HAV and HBV, the tests showed that his body had already developed an immunity to both. *See* Pl.App. C at 29 ("medical conditions").

Defendant Haider Shah states that some of the risks involved in the HCV treatment include suppression of the bone marrow; damage to the thyroid gland; damage to the heart and kidneys; and depression that can lead to suicide. Haider Shah Decl. ¶ 16. Dr. Haider Shah states that due to the risks, the slow rate of the disease's progression, and the moderate success of the current treatment, "very often it is most reasonable to refrain from drug therapy entirely and await the next innovation in treatment." Haider Shah Decl. ¶ 17.

Defendant Haider Shah states that when an inmate/patient has a history of depression or other serious mental disorder, he must be examined by a psychiatrist and issued a clearance to proceed with the drug therapy for HCV. *Id.* ¶ 21. The drugs may sometimes trigger depression even in those who have no prior psychiatric history, but those who do have such a history are "particularly susceptible." *Id.* Thus, before a DOCS treating physician will submit an HCV treatment request to Albany, [FN15] a psychiatric clearance must be obtained for the inmate. *Id.* A psychiatric clearance is obtained by the DOCS physician submitting a referral/consultation request to the Office of Mental Health (OMH), which oversees the provision of mental hygiene services to DOCS inmates. Haider Shah Decl. ¶ 22. Defendant Haider Shah states that OMH processes and fulfills the request "in due course." *Id* .

> FN15. Before an inmate may be treated for HCV, the treating physician must submit a request for treatment to defendant Wright, the Chief Medical Officer of DOCS. Haider Shah Decl. ¶ 20.

Defendant Haider Shah states that prior to 2002 and during the following years, plaintiff had a "significant history" of clinical depression, was seen by a psychiatrist,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and was prescribed medication on a number of occasions. Haider Shah Decl. ¶ 23. Defendant Haider Shah states that "we submitted multiple requests for psychiatric evaluations between October of 2002 and October of 2005, when the clearance was finally obtained. *Id.* ¶ 24 (citing Ex. A at 331 (10/23/02 request); 261 (10/29/04 request); 245-47 (8/5/05 request); and 239 (10/20/05 request)); Pl.App. B at 89-92. Defendant Haider Shah speculates that "it may well be" that the psychiatrists did not clear plaintiff for treatment earlier because between 2002 and 2005, plaintiff was reporting symptoms of depression and was receiving medication off and on for the condition. *Id.* ¶ 25 (citing Ex. A at 293-94 (4/8/04 consult/treatment for depression)).

**\*9** On October 30, 2002, plaintiff had laboratory tests related to his HCV diagnosis. Haider Shah Decl. Ex. A at 325-27. Between 2002 and 2005, testing was done in August of 2003; in January of 2004; February of 2004; in April of 2004; in June of 2004; in July of 2004; in August of 2004; and in May of 2005. Haider Shah Decl, Ex. A at 312-15; FN16 Pl.App. B at 77; Haider Shah Decl. Ex. A at 305-309; 290; 284-85; 278; 273-74; and 250. Plaintiff had laboratory testing in February of 2006 FN17 and twice in March of 2006. Haider Shah Decl. Ex. A at 220-23; 207-208. After plaintiff started his treatments in June of 2006, he was receiving regular laboratory testing to monitor his blood levels. Ex. A at 226 (chart of lab testing). *See also* Pl.App. B at 109 (AHR of June 22, 2006-HCV tracking note regarding the frequency of lab testing).

> FN16. Plaintiff's August 13, 2003 AHR entry has a "Lab" notation, and the following AHR entry for what appears to be February 2004 states "Last Labs 8/03." Pl.Ex. B at 75.

> FN17. The record indicates that on February 11 and 15, 2006. plaintiff did not show up for his laboratory testing, and the tests had to be rescheduled. Haider Shah Decl. Ex. A at 227.

It appears from the medical records that as of January 4, 2006, defendant Haider Shah did not know that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 235 (AHR dated January 4, 2006).

However, by February 15, 2006, defendant Haider Shah had requested a referral to a gastroenterologist to approve the HCV treatment and for a liver biopsy, noting that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 190 (Referral dated February 15, 2006). On March 20, 2006, plaintiff's history and physical were done in anticipation of his liver biopsy. Haider Shah Decl. Ex. A at 210. Plaintiff had the biopsy on March 27, 2006. *Id.* Ex. A at 195 (surgical pathology report of biopsy) FN18 The biopsy report indicated that plaintiff's diagnosis was "chronic hepatitis with stage 3 fibrosis." Haider Shah Decl. ¶ 33 & Ex. A at 195. Defendant Haider Shah states that they then obtained additional blood chemistry tests, including a thyroid hormone analysis. *Id.* & Ex. A at 186. On June 1, 2006, defendant Haider Shah requested a repeat CT Scan based on the plaintiff's complaints of nausea and pain in the area of the lesion. Haider Shah Decl. Ex. A at 180. Defendant Haider Shah states that after considering all the available information, including the biopsy result, he determined that it was appropriate to proceed with the drug therapy requested by plaintiff. Haider Shah Decl. ¶ 33. Final approval was requested from DOCS, and plaintiff obtained his first of a twenty four week dose of HCV medication on June 6, 2006. *Id.*

> FN18. Page 197 of Ex. A is a copy of the biopsy report.

After plaintiff began his drug treatment, the medical records show constant monitoring. In July of 2006, plaintiff complained of abdominal pain, and another CT Scan was performed on July 21, 2006. Haider Shah Decl. Ex. A at 160. On August 3, 2006, plaintiff was noted to be continuing his treatment without complaints. *Id.* at 157. However, on August 6, 2006, plaintiff was "agitated" and wanted to be referred to the mental health department. *Id.* at 155-56. Plaintiff was crying and wringing his hands, but denied thoughts of self-harm or harm to others. *Id.*

**\*10** There are approximately eight entries in plaintiff's medical records in August 2006 alone. *Id.* at 142-53. Plaintiff had laboratory tests and was examined for complaints of headaches. *Id* . The monitoring continued through September and October. *Id.* at 122-42. In November of 2006, plaintiff had an abnormal thyroid and platelet count. *Id.* at 112-16. Plaintiff completed his HCV treatment on December 11, 2006 after 24 weeks. *Id.* at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

105. Defendant Haider Shah states that upon completion of the treatment, plaintiff's virus had dropped to undetectable levels. Haider Shah Decl. ¶ 34. However, the virus has re-emerged. *Id.* Both defendant Haider Shah and Dr. Rogers state that the timing of the treatment was not related to the re-emergence of the virus, and that it was unlikely that drug therapy in 2002 would have been any more successful. Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14. Defendant Haider Shah states that the viral response to the drug therapy depended upon the effect of the drugs upon plaintiff's particular virus and not upon the timing of the drugs. *Id.* ¶ 34.

Plaintiff filed this action on August 29, 2006, during the time that he was receiving his drug treatment. (Dkt. No. 1). Defendants have submitted a great deal of medical records relating to plaintiff's medical care, even after he filed this complaint. A CT Scan performed on January 3, 2007 showed that the lesion in plaintiff's liver had increased in size from 8 by 13 millimeters to 13 by 15 millimeters. Haider Shah Decl. Ex. A at 91. His monitoring continued, however, most of the AHR entries for January and part of February of 2007 are unrelated to plaintiff's HCV. *Id* . at 84-88. Plaintiff was transferred to Elmira Correctional Facility (Elmira) on February 15, 2007. *Id.* at 79-84.

Although plaintiff received laboratory tests while at Elmira, most of the AHR entries are unrelated to plaintiff's HCV. *Id.* at 61-76. Plaintiff was transferred to Clinton Correctional Facility in June of 2007. *Id.* at 58-61. On March 4, 2008, while still at Clinton, plaintiff was examined by an endocrinologist for abnormal thyroid function. *Id.* at 20. The consultant stated that plaintiff's abnormal thyroid readings were likely due to the HCV, however, the consultant stated that plaintiff "[d]oes not need treatment as Interferon is known to be able to cause ... abnormalities in thyroid function...." *Id.* The doctor suggested another test in six to eight months. *Id.* at 9, 20.

### 3. *Personal Involvement*

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted);

*Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

**\*11** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

In this case, it is clear that defendant Wright, who is the Chief Medical Officer of DOCS, was not involved in plaintiff's day-to-day medical care and was in no way involved in plaintiff's case. Wright Decl. ¶ 3. The only "involvement" by defendant Wright would have been when defendant Haider Shah made the request for the approval of plaintiff's treatment and ordered the medications. Haider Shah Decl. Ex. A at 179, 181. Plaintiff is claiming that the delay in treating him for HCV was the unconstitutional conduct. To the extent that defendant Wright had any actual involvement at all, it was **after** the allegedly unconstitutional delay had occurred.

Plaintiff claims that he can establish personal responsibility either because defendant Wright created an unconstitutional policy or because he failed to properly train physicians such as defendant Haider Shah in the proper care of inmates with HCV. Compl. ¶¶ 70, 71. Plaintiff attempts to hold defendant Wright liable for the allegedly unconstitutional policy of denying inmates HCV treatment if they are within fifteen months of parole, or the policy of denying inmates HCV treatment if they have not participated in a drug treatment program.

The court would first point out that prior to 2005, the HCV Guidelines contained a provision stating that the

inmate's "anticipated incarceration" had to be adequate to complete the evaluation and treatment. Wright Decl. Ex. A-2, June 20, 2004 Guidelines at p. 4 (Criteria for Treatment No. 13). The length of anticipated incarceration required was different for different genotypes of the virus: nine months for genotypes 2 and 3 and fifteen months for genotypes 1 and 4, from the time of referral, including the 24-48 week treatment course. *Id.* This section provided that inmates who would not be able to complete a course of treatment due to their time of incarceration would receive a baseline evaluation and be referred for medical follow-up and treatment upon release. *Id.* Additionally, inmates who had a substance abuse history were required to successfully complete or be enrolled in a substance abuse program. *Id.* (Criteria for Treatment No. 11).

In October 2005, the Guidelines were revised, and the above requirements were amended. Wright Decl. Ex. A-1 at p. 2. Instead of requiring the substance abuse program, the new Guidelines "strongly encouraged" inmates with a history of substance abuse to complete the program "since dealing with alcohol or substance use issues is an essential part of their Hepatitis C/liver treatment and protection program." *Id.* (Criteria for Treatment No. 11). Finally, if the inmate does not have an anticipated incarceration adequate to complete the evaluation and treatment, the new Guidelines provide that he could begin the treatment, and he would be followed *after release* through the "Continuity Program," as long as the inmate agreed to the conditions of the program. *Id.* (Criteria for Treatment No. 13).

**\*12** While defendant Wright might be responsible for helping to create these guidelines, plaintiff in this case was *never* denied treatment *because of* the failure to take the substance abuse program since he completed the program in 2000, long before he requested the treatment that became available in *2002. See* Haider Shah Decl. Ex. A at 350. Thus, even if defendant Wright were responsible for the "policy," plaintiff was never denied treatment based on this policy.

Plaintiff somehow claims that he also may have been denied the HCV treatment because of the pre-2005 policy limiting treatment based on an inmate's anticipated length of incarceration. There are some notations in the record, indicating that he was going to be paroled in the near future. On August 7, 2003, a nurse noted on plaintiff's AHR that plaintiff "goes home in 30-60 days." *See* Haider Shah Decl. Ex. A at 321. On August 5, 2005, Nurse Perrotta wrote in the AHR that plaintiff "states [sic] is paroling soon-needs psych eval." *Id.* at 247. Based upon plaintiff's August 5, 2005 statement, on the same day, Nurse Perrotta completed a "Request and Report of Consultation Form," with a similar notation that plaintiff "states [sic] paroling soon-mandatory psy. eval. needed." *Id.* at 245.

Neither of these notations indicates that plaintiff was being denied HCV treatment because he was not going to be incarcerated long enough.[FN19] In any event, by October 13, 2005, DOCS had removed the anticipated length of incarceration requirement from the Guidelines. Although plaintiff states that on August 7, 2003, defendant Haider Shah told plaintiff that "he was too close to going home, '30-60 days', 'not ready for medication,' " plaintiff cites the AHR entry written by Nurse Dooley, *not* by defendant Haider Shah. *See* Haider Shah Decl. Ex. A at 321; Pl.Ex. B at 72. In any event, plaintiff was clearly *not* being released within 30-60 days of August 7, 2003, nor was "paroling soon" in 2005 when the note was written by Nurse Perrotta. Thus, plaintiff was not subjected to either "policy" that he claims was unconstitutional.

> FN19. In fact, the court notes that the only time that plaintiff's length of incarceration was mentioned in conjunction with HCV treatment was in April of 2002, while plaintiff was still at Franklin, and a Hepatitis Consult Request was completed. Haider Shah Decl. Ex. A at 350. At that time, the older guidelines required at least 15 months, and the individual completing the form stated that plaintiff *met the criteria. Id.*

The court notes that in *Hilton v. Vasquez,* 235 F.R.D. 40 (N.D.N.Y.2006), District Judge David N. Hurd certified a class of inmates who had been denied HCV treatment based upon their failure to complete a DOCS-sponsored substance abuse program. *Id.* at 50-54. By memorandum, defendant Wright had voluntarily rescinded the requirement, however, the court was concerned that the plaintiff class would not be assured of the appropriate relief. *Id.* at 46-50. The parties entered into an interim settlement agreement in July of 2007, and on January 2,

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

2008, Judge Hurd approved the interim agreement as a final settlement agreement. *Hilton v. Vasquez, 9:05-CV1038, 2008 U.S. Dist. LEXIS 461, 2008 WL 53670 (N.D.N.Y. Jan. 2, 2008)*. The settlement required DOCS to reevaluate any prisoner who was denied treatment for HCV ***"because of"*** the ASAT program. *Id.* at *3.

**\*13** Plaintiff was not, and clearly is not a class member in *Hilton*. Plaintiff in this case has obtained his treatment, and thus, only has a claim for damages. Plaintiff was ***never*** denied treatment because he failed to participate in a substance abuse program. Nor does the record support that he was ever denied treatment because he was being paroled "soon." [FN20] Thus, plaintiff cannot show that he was denied treatment due to any "policy" that was created or condoned by defendant Wright.

> FN20. The court notes that the amended complaint in *Hilton* also alleged that it was difficult to enroll in the programs due to the number of inmates who took the programs. (Dkt. No. 11 at ¶ 4) (*Hilton* ). The amended complaint further alleged that even if an inmate finally had the opportunity to enroll in the substance abuse program, he would be denied participation in the program if the inmate were going to be released on parole before finishing the program. *Id.* ¶ 5. There was no challenge, however, to the requirement that an inmate had to have enough time remaining on their sentence before they were allowed to get treatment. There were various ***other*** issues related to the requirement that inmates participate in the substance abuse programs, and one of the important allegations was that the DOCS policy did not allow for individualized assessments of an inmate's drug history or medical condition prior to imposing this requirement. *Id.* ¶ 3.

Plaintiff's HCV drug treatment was delayed because of the requirement that an individual with a prior psychiatric history must be cleared by a psychologist or a psychiatrist prior to beginning the treatment. Although this requirement is one of the criteria for treatment [FN21] and is, thus, part of the DOCS "policy," plaintiff is not challenging the "policy" or the requirement. Plaintiff is

claiming that defendant Haider Shah "failed to seek the psychiatric clearance until October 20, 2005," and "failed to acknowledge" that plaintiff was cleared for treatment for six months after he was cleared, causing an unconstitutional delay in treatment. Compl. ¶ 2.

> FN21. *See* Hepatitis C Primary Care Guidelines dated October 13, 2005, Criteria for Treatment No. 10. Wright Decl. Ex. A-1 at p. 6.

Plaintiff claims that defendant Wright may be held liable because he failed to train and supervise employees such as defendant Haider Shah in the care of inmates who are identified by their treating physicians as being in need of HCV treatment. Compl. ¶ 70. Defendant Wright is the Chief Medical Officer of DOCS and is not located at any particular correctional facility. Because the allegedly unconstitutional policies plaintiff has cited as created by defendant Wright were not applied to plaintiff, plaintiff would now have to show that defendant Wright was "grossly negligent" in supervising defendant Haider Shah. *Colon,* 58 F.3d at 873.

Plaintiff does not claim that defendant Wright had notice of the alleged improper delay in plaintiff's case. Thus, it is unclear how defendant Wright would be "grossly negligent" in supervising defendant Haider Shah, given that the adequacy of the general policy of requiring psychiatric clearances for HCV treatment is ***not in dispute.*** Thus, plaintiff has failed to show that defendant Wright was personally involved in plaintiff's alleged denial of constitutionally adequate medical care, and any claim for damages may be dismissed as against defendant Wright. The court may proceed to consider plaintiff's medical care claims as against defendant Haider Shah.

### 4. *Medical Care*

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

## A. Objective Element

**\*14** In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the *inadequacy* in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

## B. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk, however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin,* that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

**\*15** Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**C. Application**

In this case, plaintiff essentially claims that defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs because the doctor delayed plaintiff's HCV treatment from October of 2002 until June of 2006 for a series of improper reasons. Plaintiff's other claims, alleging that defendant Haider Shah also failed to "monitor plaintiff's elevated liver functions tests (LFT's), for nineteen straight months, when the HCV protocol called for monitoring every 8-12 weeks; failed to refer plaintiff to a liver specialist; and failed to order a "prescribed" liver biopsy are related to the delay.

No one disputes that HCV is a "serious medical condition." However, since a review of the plaintiff's medical records in this action show that plaintiff received **substantial** medical care for his illness, this court must analyze the Eighth Amendment claim with reference to whether the "delay" was sufficiently serious. The Second Circuit opinion in *Salahuddin* is instructive in this regard. The plaintiff in *Salahuddin* also had HCV, and the defendant doctor cancelled plaintiff's liver biopsy, postponing the procedure for a period of five months. 467 F.3d at 281. The court stated that it could not determine as a matter of law that it was "reasonable" for a prison official to postpone the plaintiff's course of treatment for HCV "because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole." *Id.* The court then assumed that the five-month delay was "objectively serious" because the defendants

did not address the issue on appeal.[FN22]

**FN22.** The Second Circuit pointed out that the defendants incorrectly believed that the objective prong turned upon the severity of plaintiff's HCV, rather than the severity of the delay. *Salahuddin,* 467 F.3d at 281 n. 7. The court relied on the defendants' forfeiture of the argument.

**\*16** The delay in this case was approximately three and one half years, according to plaintiff.[FN23] The court first finds that plaintiff has not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis. There is no evidence that the delay was "substantially serious." It is clear that on October 23, 2002, defendant Haider Shah's entry in plaintiff's AHR "ordered" a psychiatric clearance. In *Salahuddin,* the defendants did not present any evidence regarding the "seriousness" of the harm caused by the five month delay. 467 F.3d at 281. Unlike defendants in *Salahuddin,* the defendants in this case have presented evidence that the delay was not "substantially serious." Both defendants and Dr. Rogers state in their declarations that because HCV progresses so slowly, the three year delay was "unremarkable." Wright Decl. ¶ 35; Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14.[FN24] Dr. Rogers states that "it is unlikely that drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006." Rogers Decl. ¶ 14. Thus, plaintiff has not raised a genuine issue regarding the objective prong of the test. In any event, assuming that the delay were substantially serious, the court will proceed to analyze the subjective prong of the test.

**FN23.** As stated above, plaintiff complains about the delay between October of 2002 and June 1, 2006, whereas defendants interpret the "delay" as beginning in October 2002, but ending on October 30, 2005, when plaintiff's psychiatric clearance was obtained.

**FN24.** Dr. Rogers actually states that "four years is not a particularly long period in the course of a Hepatitis C progression." Rogers Decl. ¶ 14.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

Again, reference is made to the analysis in *Salahuddin.* Notwithstanding the question of fact regarding the reasonableness of the defendant's actions in *Salahuddin,* the court granted summary judgment for the defendant doctor based upon the subjective element of the analysis. *Id.* at 281-82. The court found that the doctor had written a letter expressing his belief that because "Hepatitis C leads to cirrhosis only over 20 to 30 years, Salahuddin 'is in no immediate danger' and that '[fro]m a medical standpoint [,] there is no urgency for [the cancelled liver biopsy].' " *Id.* at 282 (alteration in original). The court stated that while the assumption could have been "unsound" absent an investigation into the progression of the plaintiff's HCV, the doctor's letter was "direct evidence that he was not aware of a substantial risk that postponing the liver biopsy would cause serious harm." *Id.*

The court in *Salahuddin* stated that there was no circumstantial evidence to contradict the doctor's conclusion, distinguishing the court's own decision in *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005). *See Salahuddin,* 467 F.3d at 282. In *Johnson,* another HCV case, the Second Circuit denied summary judgment because there was evidence raising a genuine issue of material fact surrounding the defendant's decision to administer one drug over another, based upon other treating physicians' recommendations of the rejected medication. *Id.* The court stated that *Johnson* involved a case of "willful blindness," and the idea of "willful blindness" would have required that someone arouse the defendant's suspicion that postponing Salahuddin's biopsy would be seriously harmful. *Id.* (distinguishing *Johnson,* 412 F.3d at 404-05).

**\*17** In this case, defendant Haider Shah's explanation for the delay in providing plaintiff with the HCV treatment is based upon the lack of a psychiatric "clearance" between October 2002 and October 2005. The HCV protocol clearly requires a psychiatric clearance for individuals who have a history of "major depression" or other major psychiatric illness." Wright Decl. Ex. A-1, Criteria for Treatment No. 10. The requirement itself is a medical judgment that is not in dispute in this case. In any event, there appears to be no question that one of the side effects of the HCV treatment is "depression with associated suicidal feelings," making the requirement of psychiatric clearance reasonable. *See* Rogers Decl. ¶ 18. Dr. Rogers states that some inmates who receive the HCV treatment

"will need to be followed by psychiatry and treated with mood altering drugs." *Id.* ¶ 20.

Defendant Haider Shah states that "multiple requests" were submitted for psychiatric evaluations of plaintiff. Haider Shah Decl. ¶ 24. Plaintiff's October 23, 2002 AHR shows that defendant Haider Shah noted the need for a psychiatric clearance for "possible" HCV treatment. Haider Shah Decl. Ex. A at 331. In his declaration, defendant Haider Shah cites this notation in the AHR as one of the multiple "requests" that were "submitted" for "psychiatric evaluations" between October 2002 and October of 2005. Haider Shah Decl. ¶ 24. The other dates cited by defendant Haider Shah are October 29, 2004; August 5, 2005; and October 20, 2005, the date that clearance was finally obtained. *Id.* (citing Ex. A at 262; 245-47; 239).

A review of the above "requests" shows that the first is a "notation" in the AHR. The second request is a "Mental Health Referral" form, dated October 29, 2004. Haider Shah Decl. Ex. A at 261. The form states that plaintiff was requesting to resume the psychiatric medications that he had refused two months before because of increased "frustration, anxiety, and sleeplessness." *Id.* The AHR contains a nurse's entry, dated October 29, 2004 stating that plaintiff was requesting to resume his Paxil and Vistaril. *Id.* at 263.

The third request consists of an AHR entry and a "Request and Report of Consultation," dated August 5, 2005. Haider Shah Decl. Ex. A at 245, 247. This entry on the AHR is made by a nurse and follows the notation that plaintiff "states" he is paroling soon. *Id.* at 245. The top of the "Request and Report of Consultation" form is also completed by the nurse and states that plaintiff told the nurse that he was paroling soon, and the nurse wrote that plaintiff needed a mandatory psychiatric evaluation. *Id* . at 247. The bottom of the form is blank, indicating that the evaluation was never performed.[FN25] *Id.*

> FN25. It is possible that the evaluation was never performed because plaintiff was ***not*** paroling soon. It appears from other portions of the plaintiff's medical records that psychiatric evaluations may be required for parole purposes.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

*See* Haider Shah Decl. Ex. A at 383-84 (Mental Health Status Report for Division of Parole, dated August 20, 2001).

The final request is the October 20, 2005 "Request and Report of Consultation," and the AHR entry dated the same day, referencing the HCV treatment as the reason for the request. *Id.* at 239, 240. The bottom of the form was completed on the same day, stating that plaintiff was only treated briefly for "a few months for depression" after the death of a family member and stating that there was no contraindication for the treatment. *Id.* at 239. The AHR entry states that on October 30, 2005, plaintiff was "asking" about the HCV treatment, and defendant Haider Shah referred to all the requests for psychiatric consultation listed above and stated that there had been "no psych. clearance." *Id.* at 240.

*18 In the October 30, 2005 AHR entry, defendant Haider Shah refers to another prior request, dated June 25, 2004. *Id.* A review of the June 25, 2004 AHR entry shows that one of defendant Haider Shah's "orders" on that date was a "note to tracking nurse" to check for the "Hep C tx." *Id.* at 286. The entry also states "Ret if not written." *Id.* On October 30, 2005, defendant Haider Shah ordered "Psych. Clearance" and "GI Consult." *Id.* There is a notation by the nurse indicating that she "so noted" the ordered section of the entry.[FN26] *Id.* The October 29, 2004 and August 5, 2005 requests, however, do not reference HCV or HCV treatment as the reason for the referral.

FN26. This notation also appears on the October 23, 2002 entry. Haider Shah Decl. Ex. A at 331.

Interestingly, the record contains various versions of the October 30, 2005 request for psychiatric clearance. Plaintiff himself has submitted four such versions. Pl.App. B at 88-92. One of these versions is simply the referral form with only the top portion (the request) completed. *Id.* at 91. The second has the top portion and the bottom portion (the clearance) completed. *Id.* at 88, 90 (two copies). The third document contains a notation at the bottom, written by defendant Haider Shah, which appears to be dated June 1, 2006, but the notation is very difficult to read. *Id.* at 92. It appears to state "How did it get ... without ... us ... seeing." *Id.* Defendants' exhibit contains

the same notation. Haider Shah Decl. Ex. A at 239.

Finally and most interestingly, ***plaintiff's appendix*** contains a version of the document with what appears to be a note copied onto the top left corner of the document, written by Dr. L. Kalias, the doctor who signed the clearance at the bottom. Pl.App. B at 89. The note states "Sorry this took so long-Also FYI-Gave MH approval for Hep C tx today." *Id.* It is unclear why Dr. Kalias would be apologizing for taking "so long," when the form request and the clearance are dated the same day, unless, there had in fact been prior requests that had gone unanswered. This version does not appear in the defendants' exhibits.

It thus appears that although plaintiff seeks to blame defendant Haider Shah for the delay, it may not be completely attributable to this defendant. Defendant Haider Shah also states in his declaration that plaintiff may not have been cleared sooner because between 2002 and 2005, he was reporting symptoms of depression and was receiving medication for the condition. Haider Shah Decl. ¶ 25. The records ***do*** show that plaintiff had periods of psychiatric treatment. Plaintiff had signs of depression as early as January 1995, while he was incarcerated at Collins Correctional Facility. Haider Shah Decl. Ex. A at 534. However, in 1999, plaintiff was psychiatrically evaluated by Dr. David Goldman at Riverview Correctional Facility for the Parole Board, and there were "no current psychiatric problems." *Id.* at 420-23. Dr. Goldman had the same opinion in 2001 when he performed another psychiatric review for the Parole Board.[FN27] *Id.* at 383-85.

FN27. It is clear from these documents that each time an inmate is considered for parole, there is a mandatory psychiatric examination.

*19 On February 25, 2002, plaintiff was again examined by Dr. Goldman, who wrote a report, changing plaintiff's OMH level to Level III [FN28] and prescribing Zyprexa. *Id.* at 372. Dr. Goldman wrote a second report the next day, February 26, 2002, continuing plaintiff's OMH level as III. *Id.* at 368-69. Plaintiff was still taking the psychiatric medication when he was transferred to Franklin on March 15, 2002. *Id.* at 365, 368. The medications were discontinued by plaintiff's own request on March 30,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

2002. *Id* . at 358-59. His OMH Level was changed to 6 on September 13, 2002. *Id.* at 335.

> FN28. Mental Health Service Level 3 indicates that the inmate needs short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders. Haider Shah Ex. A at 444. (listing of levels). Level 6 is an inmate who does not need Mental Health Services. *Id.* The medical providers use roman numerals and arabic numbers interchangeably to refer to these levels.

Although there was no discussion of plaintiff's mental status in the 2003 medical records, in plaintiff's April 8, 2004 AHR entry, there is a notation that plaintiff was complaining of being depressed, that a relative was dying, and that he wanted to resume his psychiatric medication. Haider Shah Decl. Ex. A at 294. An urgent mental health referral was made. *Id.* at 293. Plaintiff was prescribed his Paxil and Vistaril on April 12, 2004. *Id.* at 291. Although plaintiff stopped taking this medication in June of 2004, he resumed the medication in October of 2004. *Id.* at 261, 263, 283. The court notes that plaintiff did experience some psychiatric problems on August 6, 2006, during the course of his HCV treatment. *Id.* at 155-56.

Defendant Haider Shah also states that aside from plaintiff's psychiatric history, there were physical conditions to consider prior to beginning the HCV treatment. Haider Shah Decl. ¶ 27. The medical personnel were concerned about the risk to plaintiff's thyroid and the scarring of plaintiff's internal organs due to a gunshot wound. *Id.* Defendant Haider Shah points out that plaintiff did experience some thyroid problems as a result of the treatment. *See* Haider Shah Decl. ¶ 27 & Ex. A at 9, 17, 20, 23-24. Plaintiff was referred to a specialist for evaluation. Ex. A at 20.

Although plaintiff in this case complains about the "delay" between October of 2005 and June of 2006 when he began his treatment, there is no evidence of "delay." Dr. Rogers and defendant Wright state that even after the psychiatric clearance was obtained, further evaluation was required, and "significant medical steps" had to be taken before the administration of the treatment. Rogers Decl. ¶ 22; Wright

Decl. ¶ 34. Beginning in January of 2004, plaintiff had laboratory tests more frequently.[FN29] After the psychiatric clearance was obtained in October 2005, plaintiff was referred to a gastroenterologist, and had a liver biopsy prior to beginning his treatment in June of 2006. Haider Shah Decl. Ex. A at 192-93 (biopsy report). Plaintiff's extensive medical care continued throughout his HCV treatment and afterward.

> FN29. Plaintiff had laboratory testing for liver function done twice in January 2004; July; and October of 2004. Haider Shah Decl. Ex. A at 306, 308-09, 278-81, 268. On October 20, 2004, defendant Haider Shah made a request for a CT scan of plaintiff's abdomen to rule out a possible obstruction of plaintiff's bile duct because plaintiff was complaining of vomiting and weight loss. *Id.* at 260, 269. The CT scan was performed on November 5, 2004. Plaintiff had laboratory tests again on May 25, 2005; February 14, 2006; March 7, 2006; March 16, 2006; and April 4, 2006. *Id.* at 250, 220-23, 217, 211-12, 186.

Defendant Haider Shah states that upon completion of the HCV therapy, plaintiff's viral levels had become almost undetectable, however, the virus reemerged. Haider Shah Decl. ¶ 34. Defendant Haider Shah states that this reemergence was not related to the delay in treatment, but rather due to the effectiveness of the drugs on plaintiff's particular virus. *Id.* Defendant Wright states that by the time that plaintiff had his liver biopsy on March 27, 2006, the fibrosis in his liver had progressed to Stage 3, a severe degeneration, falling short of cirrhosis. Wright Decl. ¶ 27.

**\*20** There is no evidence in this case that defendant Haider Shah was "deliberately indifferent" to plaintiff's condition. At worst the failure of defendant Haider Shah to follow up on the request for psychiatric clearance was inadvertence or negligence,[FN30] and it is unclear whether the delay was attributable to defendant Haider Shah since the notation on plaintiff's exhibit from Dr. Kalias contains an apology that the clearance "took so long." The delay appears to have been due to a possible misunderstanding regarding the request for psychiatric clearance.

> FN30. The court in no way states this as a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1437589 (N.D.N.Y.)
(Cite as: 2009 WL 1437589 (N.D.N.Y.))

"finding."

According to Dr. Rogers, the delay was based on a "combination of legitimate factors." Rogers Decl. ¶ 30. These factors were based on medical reasons, and any delay between obtaining the psychiatric clearance in October of 2005 and the eventual commencement of the treatment in June of 2006 was due to plaintiff undergoing the required tests prior to the administration of the drugs, including plaintiff's biopsy in March of 2006. Rogers Decl. ¶ 31. As in *Salahuddin,* since all of the doctors in this case have indicated that it is their medical judgment that the disease progresses so slowly that even a four year delay would not affect the efficacy of plaintiff's treatment,[FN31] there is no evidence to show that defendant Haider Shah was deliberately indifferent to a serious risk to plaintiff.

> FN31. As stated above, although plaintiff initially responded to the treatment, the virus has reemerged. All the doctors state, however, that the re-emergence of the virus is not due to any delay in treatment, but rather due to the type of virus. The doctors state that because plaintiff is a "relapser," the virus would have re-emerged whether he had the treatment in 2002 or 2006. Haider Shah Decl. ¶ 34; Wright Decl. ¶ 27. *See also* Rogers Decl. ¶ 28 ("the likelihood of a different response to the same drugs is not high").

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2009.
Motta v. Wright
Slip Copy, 2009 WL 1437589 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bartram Yihni DABNEY,[FN1] Plaintiff,
[FN1.] In both the caption and body of his complaint, which was apparently typed with the assistance of fellow inmates working in the prison law library at the Clinton Correctional Facility, plaintiff's name is spelled as "Dadney". *See* Complaint (Dkt. No. 1) pp. 1, 2. From the signature page of that complaint as well as publicly available records from the New York State Department of Corrections and Community Supervision ("DOCCS"), however, it appears that plaintiff's name is correctly spelled as "Dabney".

v.

Dr. Raymond MADDOCK, Physician, Great Meadow Correctional Facility, and M. Stormer, Corrections Officer, Great Meadow Correctional Facility, Defendants.
Civil Action No. 9:10–CV–0519 (GTS/DEP).

Nov. 29, 2011.
Bartram Yihni Dabney, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney General, William J. McCarthy, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.
**\*1** *Pro se* plaintiff Bartram Yihni Dabney, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging that he has suffered several constitutional deprivations arising out of his incarceration. [FN2] Plaintiff's complaint names eighteen separate defendants in varying positions, all employed at the prison facility at which he was confined at the relevant times, and asserts an amalgamation of claims against those defendants ranging from alleged deprivation of his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution to violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1 *et seq.*

[FN2.] In his complaint, which is sworn to under penalty of perjury, Dabney claims not to have previously brought any other lawsuit in federal court relating to his imprisonment. *See* Complaint (Dkt. No. 1) p. 2. Despite this sworn representation, the court's records reveal that this is the fifth civil rights action filed by Dabney in this court since 1994. *Dabney v. Ricks, et al.,* No. 94–CV–1058, *Dabney v. Coombe, et al.,* No. 95–CV–1633, *Dabney v. Eagen, et al.,* 03–CV–184, *Dabney v. Goord, et al.,* 04–CV–944, and *Dabney v. Fischer, et al.,* 10–CV–1109.

Plaintiff's claims in this action were significantly narrowed as a result of a decision rendered by the court upon initial review of Dabney's *in forma pauperis* application and accompanying complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, prior to service and appearances on behalf of the defendants. As a result of that review and the court's initial filing order, the sole surviving claims include a First Amendment retaliation claim against Corrections Officer Stormer and a deliberate medical indifference cause of action against Raymond Maddock, a physician employed at the prison in which plaintiff was housed at the relevant times. Those defendants, who have since been served, now seek dismissal of the remaining claims for failure to state a cause of action upon which relief may be granted. For the reasons set forth below, I am unable to say at this early procedural juncture that plaintiff has not stated a plausible retaliation claim against defendant Stormer, but I do find that his claim against defendant Maddock lacks palpable facial merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

I. *BACKGROUND*[FN3,FN4]

> **FN3.** In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)*); *see also Cooper v. Pate, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964).* In addition, when evaluating defendants' motion I have also considered the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 27, to the extent they are consistent with the allegations set forth in his complaint. *See Donhauser v. Goord, 314 F.Supp.2d 119, 121 (N.D.N.Y.2004)* (Hurd, J.).

> **FN4.** While plaintiff's complaint, as originally constituted, was wide-ranging and concerned a number of events, both related and unrelated, in the following background section I have included only those salient facts relating to the two claims that survived the court's initial review.

Plaintiff is a prison inmate entrusted to the custody and care of the DOCCS (formerly known as the New York State Department of Correctional Services, or "DOCS"); while he is currently designated elsewhere, plaintiff was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York, at the times relevant to his claims in the action. *See generally* Complaint (Dkt. No. 1).

In his complaint plaintiff alleges that Corrections Officer Stormer unlawfully retaliated against him, in violation of his rights under the First Amendment, in return for Dabney having filed one or more grievances against that defendant as well as other prison workers alleged to be his friends. Complaint (Dkt. No. 1) ¶¶ 6–11. As adverse retaliatory action, plaintiff alleges that defendant Stormer verbally harassed him and filed a false misconduct report resulting in disciplinary proceedings,

which he was precluded from attending in person; denied him commissary access in order to permit his purchase of such items as tobacco, stamps, and personal hygiene products; and severed the electrical supply to his cell, leaving him without television access, or lights for four days. *Id.*

**\*2** Plaintiff's claims against the other remaining defendant, Dr. Raymond Maddock, a physician at Great Meadow, stem from an alleged denial of access to adequate medical care. Complaint (Dkt. No. 1) ¶¶ 40–41. Plaintiff asserts that Dr. Maddock wrongfully deprived him of a permit for medical boots, necessitated by a bullet lodged in his right femur and the surgical removal of a toenail, and additionally complains of the denial of a permit for back and hand braces, and inadequate treatment of Hepatitis C. *Id.* Plaintiff alleges that in response to his request for treatment of the latter condition Dr. Maddock told him to "drink coffee". *Id.*

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 3, 2010, filing a complaint comprised of ten separate causes of action and naming as defendants. eighteen DOCCS employees assigned to Great Meadow. Dkt. No. 1. Accompanying plaintiff's complaint was an application for leave to proceed *in forma pauperis* ("IFP"). Dkt. No. 2. On January 4, 2011, District Judge Glenn T. Suddaby issued a decision and order in which, *inter alia,* he granted plaintiff's IFP application and dismissed all but two of the claims asserted by the plaintiff in his complaint on the basis that they lacked facial merit, without prejudice and with leave to replead. Dkt. No. 14. As a result of that decision and plaintiff's failure to amend, the sole remaining claims in this action are a First Amendment retaliation claim against Corrections Officer Stormer and an Eighth Amendment deliberate medical indifference cause of action against Dr. Raymond Maddock.

The two remaining defendants, who have now been served, moved on March 17, 2011 seeking dismissal of the remaining two causes of action for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, additionally asserting their entitlement to qualified immunity from suit. Dkt. No. 24. Defendants' motion,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

which plaintiff has opposed, *see* Dkt. No. 27, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Governing Legal Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

**\*3** To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of Twombly and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

### B. *Legal Sufficiency of Plaintiff's Retaliation Claim*

In his first cause of action plaintiff asserts that defendant Stormer engaged in a series of actions toward him, motivated by his filing of grievances against Stormer and his friends. Defendants maintain that this claim, while surviving the court's initial, *sua sponte* review, fails to state a plausible cause of action. Although this is less than clear, it appears the defendant's argument is focued upon the alleged inability of plaintiff to meet the adverse action prong of the governing retaliation test.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

**\*4** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

As can be seen, analysis of retaliation claims requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are stated in only a conclusory fashion, without any allegations of fact tending to show the requisite elements of protected conduct, adverse action, and a nexus between the two, dismissal is warranted.

Plaintiff alleges that he engaged in protected activity by filing grievances against defendant Stormer and his friends. It is well established that the right to petition the government for the redress of grievances is a fundamental right that derives from the First Amendment, and the filing of grievances thus can constitute protected conduct. *Franco,* 854 F.2d at 590; *see also Alnutt v. Cleary,* 913 F.Supp. 160, 169 (W.D.N.Y.1996). Plaintiff's retaliation claim therefore satisfies the first of the three prongs of the governing retaliation standard.

Plaintiff further asserts that in retaliation for the filing of those grievances defendant Stormer retaliated by

harassing him, making religious remarks, issuing a false misbehavior report, and failing to allow him to attend a resulting disciplinary hearing Complaint (Dkt. No. 1) ¶ 6–7, 10–11. In addition, plaintiff alleges that defendant Stormer interfered with his access to the commissary in order to purchase necessary supplies and interrupted the supply of electrical power to his cell for a period of four days. *Id.* at ¶¶ 8–9. Applying a Rule 12(b)(6) standard in order to gauge the sufficiency of these allegations, in his January 4, 2011 decision District Judge Suddaby found that while in isolation potentially none of those allegations rises to a level sufficient to support a finding of adverse action, collectively they could suffice to constitute adverse action.[FN5] *See* Memorandum Decision and Order (Dkt. No. 14) pp. 16–17. Defendants' motion provides no basis to disturb that finding.

> **FN5.** In his decision District Judge Suddaby did note that the interference with Dabney's right to be present during a disciplinary hearing could alone suffice to establish an adverse action. *See* Memorandum Decision and Order dated January 4, 2011 (Dkt. No. 14) p. 17.

**\*5** Neither Judge Suddaby's decision nor defendants' pending motion addresses the third element of the retaliation claim, requiring a showing of a connection between the protected activity and allegedly resulting adverse action. That required link can be supplied, among other things, by the fact that adverse action closely followed the protected activity, thereby giving rise to an inference of relatedness. *Mateo v. Gundrum,* No. 9:10–CV–1103, 2011 WL 5325790, at \*6 (N.D.N.Y. Aug.30, 2011) (Lowe, M.J.) (citing *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009)), *Report and Recommendation Adopted,* 2011 WL 5325794 (N.D.N.Y. Nov.3, 2011) (Sharpe, J.).[FN6]

> **FN6.** Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

In this instance, plaintiff alleges that he filed a grievance against defendant Stormer on November 13,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

2008 and that several of the adverse actions now claimed to have been retaliatory closely followed, including the denial of commissary slips on that same day, the loss of power to his cell thirteen days later, and the denial of the right to be present at his misconduct hearing on November 29, 2008.[FN7] These allegations are sufficient to plausibly support a finding of a connection between plaintiff's protected activity and the adverse actions alleged. Accordingly, since the plaintiff has made a plausible showing at this early procedural juncture sufficient to meet the three essential elements of a cognizable retaliation claim, I recommend that the portion of defendants' motion seeking dismissal of that cause of action be denied.

> FN7. The chronology concerning the inability of plaintiff to appear at his disciplinary hearing is unclear. At one point in his complaint plaintiff alleges that defendant Stormer and another co-defendant conspired on November 29, 2008 to deny him the right to be present at a misconduct hearing. Complaint (Dkt. No. 1) ¶ 10. At another point he references the denial of his right to be present at a disciplinary hearing on April 5, 2009. *Id.* at ¶ 11. It appears from the complaint, and the court assumes, that plaintiff is alleging the denial of his right to be present at two separate disciplinary hearings, one held in November 2008 and the other in April 2009.

C. *Medical Indifference Cause of Action*

The other surviving claim in this action is set forth in plaintiff's tenth cause of action, which succinctly alleges that defendant Maddock has denied him a permit for medical boots, a back brace and a hand brace, and additionally has provided inadequate treatment for his Hepatitis C condition. In their motion defendants assert that these allegations fail to support a plausible claim of violation of plaintiff's rights under the Eighth Amendment.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and

wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

**\*6** A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at \*7–8 (E.D.N.Y. Mar.8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

1. *Objective Requirement*

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

**\*7** Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at \*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

The allegations supporting plaintiff's deliberate indifference claim are inadequate to plausibly satisfy the objective prong of the deliberate indifference test. Plaintiff's complaint fails to provide elaboration concerning the condition requiring that he be provided with a back brace and hand brace. While plaintiff does provide some information regarding the need for medical boots for recreation, indicating that he has a bullet lodged in his right femur and has had a toenail surgically removed, these allegations fall far short of establishing the existence of a condition of urgency, capable of producing death, degeneration or extreme pain.[FN8] *See, e.g., Harris v. Morton,* No. 9:05–CV–1049, at \*3, n.2 (N.D.N.Y. Feb. 29, 2008) (Kahn, J. and Treece, M.J.) ("We note that although Plaintiff states he suffered from a 'snapped' neck, he does not indicate he suffered from anything other than a generic neck injury."); *Bennett v. Hunter,* No. 9:02–CV–1365, 2006 WL 1174309, \*3 (N.D.N.Y. May 1, 2006) (Scullin, S.J. and Lowe, M.J.) (pinched nerve not a serious medical need); *Jones v. Furman,* No. 02–CV–939F, 2007 WL 894218, at \*10 (W.D.N.Y. Mar.21, 2007) (soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs do not constitute the requisite serious medical need) (citing *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998)); *Tapp v. Tougas,* No. 9:05–CV–0149, 2008 WL 4371766, at \* 9 (N.D.N.Y. Aug.11, 2008) (Peebles, M.J.) (citing *Peterson v. Miller,* No.9:04–CV–797, 2007 WL 2071743, at \*7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (citation omitted), *Report and Recommendation Adopted in Part and Rejected in Part,* 2008 WL 4371762 (N.D.N.Y. Sep 18, 2008) (Mordue, C.J.); *Salaam v. Adams,* No. 03–CV–0517, 2006 WL 2827687, \*10 (N.D.N.Y. Sept. 29, 2006) (intermittent back pain requiring pain relievers and physical therapy, a gastrointestinal problem with stomach pains, and a psychological problem requiring Wellbutrin and/or Neurontin did not constitute serious medical conditions) (Kahn, J. and Lowe, M.J.); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at \*12 & n. 70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim);

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

*Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713, at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious).

FN8. Although this information is not included in plaintiff's complaint, in his papers in opposition to defendants' motion plaintiff identifies a condition resulting in his need for a neck and back brace as chronic arthritis, Plaintiff's Memorandum (Dkt. No. 27) at p. 5. *Hale v. Rao,* No. 9:08–CV–1612, 2009 WL 3698420, at *3, n. 8 (N.D.N.Y. Nov.3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.). Nonetheless, he has failed to allege enough to establish the existence of a serious medical condition. *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Veloz v. New York,* 339 F.Supp.2d 505, 522–26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *but see Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need).

*8 To be sure, as Judge Suddaby has held, the other condition implicated in plaintiff's medical indifference claim, Hepatitis C, potentially constitutes a serious medical condition. *See, e.g., Motta v. Wright,* 9:06–CV–1047, 2009 WL 1437589, at *15 (N.D.N.Y. May 20, 2009) ("No one disputes that [Hepatitis C] is a 'serious medical condition.' ") (Mordue, C.J. and DiBianco, M.J.); *Muniz v. Goord,* 9:04–CV–0479, 2007 WL 2027912, at *8, n. 38 (N.D.N.Y. July 11, 2007) (McAvoy, J. and Lowe, M.J.) ("the bulk of district court decisions addressing the issue finds that Hepatitis C is a serious medical need.") (citing cases). The objective prong of the deliberate indifference standard, however, requires the court to look beyond whether a serious medical condition exists to determine if there has been a complete failure to provide treatment, or instead inadequate or delayed treatment. *Salahuddin,* 467 F.3d at 280. In this case, it is unclear from plaintiff's complaint whether the sole response by Dr. Maddock to his Hepatitis C condition and symptomology was the advice that he "drink coffee", and particularly whether there has been a complete absence of treatment. Under the circumstances, I am unable to conclude that a plausible claim has been stated meeting the objective element of the deliberate indifference test.

2. *Subjective Element*

The second, subjective requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer); Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811).

In addition to failing to meet the objective prong of the controlling deliberate indifference test, plaintiff's complaint also fails to include facts which, if proven, would demonstrate defendant Maddock's subjective

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

indifference to plaintiff's serious medical condition.

Because plaintiff's complaint fails to demonstrate the existence of a plausible deliberate indifference claim meeting both the objective and subjective prongs of the governing test, I recommend that his deliberate medical indifference claim be dismissed.

### D. *Qualified Immunity*

**\*9** In their motion defendants assert their entitlement to qualified immunity from suit as an additional basis for dismissal of plaintiff's claims against them.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is an objective inquiry: whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at 232, 129 S.Ct. at 815–16. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN9] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 430, n. 9 (citing *Saucier* ).[FN10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure

that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[FN11] *Pearson,* 555 U.S. at 236, 242, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer required to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

> FN9. In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

> FN10. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

> FN11. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231, 129 S.Ct. at 815 (quoting *Hunter v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)

(Cite as: 2011 WL 7479164 (N.D.N.Y.))

*Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

**\*10** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430, n. 9 (quoting *Pearson* ). "The [Saucier two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

In this case, I am unable to conclude that qualified immunity should be invoked in this case. Both of the rights at stake in plaintiff's first and tenth causes of action were established long before the relevant conduct in this case. Since I have already found that plaintiff has failed to state a deliberate medical indifference claim, there is no need under *Saucier* and *Pearson* to address the second prong of the governing test with respect to that claim. Turning to plaintiff's retaliation cause of action, I am unable to conclude at this early procedural juncture that a reasonable person in defendants' circumstances would have believed that his or her conduct did not run afoul of plaintiff's well-established First Amendment right to be free from unlawful retaliation for having engaged in protected conduct. I therefore recommend against a finding of qualified immunity in favor of defendant Stormer in connection with plaintiff's first cause of action.

### E. *Whether to Permit Leave to Replead*

Having determined that plaintiff's deliberate medical indifference cause of action is insufficiently stated, the next question to be addressed is whether he should be afforded leave to amend in an effort to state a cognizable Eighth Amendment claim. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also*

*Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). In this instance, I discern no basis for finding that the plaintiff is not entitled to the benefit of this general rule, given the procedural history of the case.

In the event that the plaintiff does opt for amendment, he is advised that the law in this circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). In any amended complaint, plaintiff therefore must clearly set forth the facts, including the wrongful acts that give rise to the claim, the dates, times and places of the alleged acts, and each individual(s) who committed each alleged wrongful act. Such an amended complaint, must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see* *Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); Fed.R.Civ.P. 10(a), and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### F. *Protective Order*

**\*11** In their motion defendants have also moved pursuant to Federal Rule of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss. Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

[a] party or any person from whom discovery is sought may move for a protective order in the court where the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed.R.Civ.P. 26(c)(1). This rule is often invoked to avoid potentially expensive and wasteful discovery during the pendency of a determination which could potentially reshape pending claims. *See, e.g., Spencer Trask Software and Information Services, LLC v. RPost Intern. Ltd., 206 F.R.D. 367, 368 (S.D.N.Y.2002)* (granting stay of discovery pending determination of motion to dismiss where court found defendants presented "substantial arguments" for dismissal of many if not all of the claims in the lawsuit); *United States v. Cnty. of Nassau, 188 F.R.D. 187, 188–89 (E.D.N.Y.1999)* (granting stay of discovery during the pendency of a motion to dismiss where the "interests of fairness, economy and efficiency ... favor[ed] the issuance of a stay of discovery," and where the plaintiff failed to claim prejudice in the event of a stay.).

In this case, until the issues are framed and a standard Rule 16 pretrial scheduling order is issued, no useful purpose would be served in permitting the parties to engage in discovery. Moreover, the court has been presented with no reason to conclude that plaintiff will be prejudiced by a modest delay occasioned by a stay of discovery at this stage. Accordingly, I recommend that defendants' request for a stay of discovery be granted.

IV. *SUMMARY AND RECOMMENDATION*

In their motion defendants challenge the two remaining claims in this action. Addressing first plaintiff's retaliation cause of action against defendant Stormer, I conclude that his complaint plausibly alleges the three necessary elements of a retaliation claim and therefore recommend against dismissal of that cause of action. Plaintiff's medical indifference claim against defendant Maddock, however, does not contain sufficient factual support to permit the court to conclude that a plausible Eighth Amendment violation has been stated. Accordingly, I recommend dismissal of that cause of action, with leave to replead.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 24) be GRANTED, in part, and that plaintiff's tenth cause of action, alleging deliberate medical indifference, be DISMISSED, with leave to replead, but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

**\*12** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2011.

Dabney v. Maddock
Not Reported in F.Supp.2d, 2011 WL 7479164 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Bartram Yihni DABNEY, Plaintiff,
v.
Dr. Ray MADDOCK, Physician, Great Meadow
Correctional Facility; and M. Stormer, Corrections
Officer, Great Meadow Correctional Facility,
Defendants.
No. 9:10–CV–0519 (GTS/DEP).

March 7, 2012.
Bartram Yihni Dabney, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, William J. McCarthy, Jr., Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Bartram Yihni Dabney
("Plaintiff") against the above-captioned New York State
correctional employees ("Defendants"), are the following:
Defendants' motion to dismiss Plaintiff's Complaint for
failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6);
United States Magistrate Judge David E. Peebles'
Report–Recommendation recommending Defendants
motion be granted in part and denied in part; and
Plaintiff's Objection to the Report–Recommendation.
(Dkt.Nos.24, 33, 34.) For the reasons set forth below,
Magistrate Judge Peebles' Report–Recommendation is
accepted and adopted in its entirety; Defendants' motion
is granted in part and denied in part; Plaintiff's Eighth
Amendment inadequate-medical-care claim against
Defendant Dr. Raymond Maddock is dismissed with leave
to replead during the pendency of this action in
accordance with Fed.R.Civ.P. 15; and Plaintiff's First

Amendment retaliation claim against Defendant
Corrections Officer M. Stormer survives Defendants'
motion.

### I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Plaintiff filed his Complaint on May 3, 2010. (Dkt.
No. 1.) By the Court's Decision and Order dated January
4, 2011, all of Plaintiff's claims were dismissed, except for
the following two claims: (1) Plaintiff's First Amendment
retaliation claim against Defendant Stormer, arising from
the adverse action allegedly taken by Defendant Stormer
between November 13, 2008, and November 29, 2008
(asserted in Plaintiff's First Cause of Action); and (2)
Plaintiff's Eighth Amendment inadequate-medical-care
claim against Defendant Maddock, arising from the
wrongful and reckless denial of various medical care and
permits between approximately August of 2009 and
February of 2010 (constituting Plaintiff's Tenth Cause of
Action). (Dkt. No. 14.)

Because this Decision and Order is intended primarily
for the review of the parties, the Court will not recite in
detail the factual allegations giving rise to these claims,
but will refers the reader the Court's Decision and Order
of January 4, 2011, and Magistrate Judge Peebles'
Report–Recommendation, which accurately summarize
those factual allegations. (Dkt.Nos.14, 33.)

### B. Magistrate Judge Peebles'
### Report–Recommendation

On November 29, 2011, Magistrate Judge Peebles
issued a Report–Recommendation recommending that
Defendants' motion to dismiss for failure to state a claim
be granted in part and denied in part in the following
respects: that Plaintiff's Eighth Amendment
inadequatemedical-care claim against Defendant Dr.
Raymond Maddock be dismissed with leave to replead
during the pendency of this action in accordance with
Fed.R.Civ.P. 15; and that Plaintiff's First Amendment
retaliation claim against Defendant Corrections Officer M.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

Stormer survive Defendants' motion. (*See generally* Dkt. No. 33.) [FN1] More specifically, Magistrate Judge Peebles concluded that Plaintiff's Eighth Amendment inadequate-medical-care claim was deficiently pled for each of two alternative reasons: (1) even when construed with the utmost of special liberality Plaintiff's Complaint does not allege facts plausibly suggesting that, even after Defendant Stormer's treatment of Plaintiff, Plaintiff suffered from a condition of urgency, one that may produce death, degeneration or extreme pain; and (2) even when construed with the utmost of special liberality Plaintiff's Complaint does not allege facts plausibly suggesting that Defendant Stormer acted with a sufficiently culpable mental state (akin to criminal recklessness) during the time in question. (*Id.* at 13–22.)

> FN1. Magistrate Judge Peebles also recommended that the Court grant Defendants' additional request for a stay of discovery pending the Court's issuance of a decision on Defendants' motion to dismiss. (Dkt. No. 33, at 27–29.) Because it appears from the docket sheet that no discovery has occurred since the filing of Defendants' motion, the Court finds that it is not necessary to address this aspect to Defendants' motion.

### C. Plaintiff's Objection to the Report–Recommendation

**\*2** On December 9, 2011, Plaintiff filed an Objection to the Report–Recommendation. (Dkt. No. 34.) Liberally construed, Plaintiff's Objection asserts the following three arguments in support of challenge to Magistrate Judge Peebles' recommendation that the Court dismiss (without prejudice) Plaintiff's inadequate-medical-care claim against Defendant Dr. Raymond Maddock: (1) Defendant Maddock knowingly refused to continue the pain medication that a prior treating physician had prescribed for Plaintiff to treat his arthritis condition; (2) in addition, Defendant Maddock knowingly refused to continue the permits for a medical boot, back brace, and hand brace that a prior treating physician had issued to Plaintiff to treat his arthritis condition; and (3) Dr. Maddock knowingly failed to follow DOCS guidelines governing the treatment of inmates afflicted with Hepatitis C. (*Id* .)

### II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [FN2] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [FN3]

> FN2. *See also Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir.2002)* ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

> FN3. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[FN4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[FN5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [FN6]

> FN4. *See also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

> FN5. *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806

F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

> FN6. *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard of Review Governing a Dismissal Pursuant to Fed.R.Civ.P. 12(b)(6)**

**\*3** The legal standard governing a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) was correctly recited in the Court's Decision and Order of January 4, 2011, and Magistrate Judge Peebles' Report–Recommendation. (Dkt. No. 14, at 5–10; Dkt. No. 33, at 6–8.) As a result, this standard is incorporated by reference in this Decision and Order, which (again) is intended primarily for the review of the parties.

**III. ANALYSIS**

As an initial matter, when liberally construed, Plaintiff's Objection *attempts* to challenge both Magistrate Judge Peebles' finding regarding the objective prong of the deliberate-indifference test, and the subjective prong of that test. Specifically, with regard to the objective prong, Plaintiff argues that, when Defendant treated Plaintiff, Plaintiff had already been prescribed pain medication by

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

a prior treating physician. (Dkt. No. 34.) Similarly, with regard to the subjective prong, Plaintiff argues that, when Defendant treated Plaintiff, Defendant knew about the prescription and permits issued by Plaintiff's prior treating physician. (*Id.*) (In addition, Plaintiff argues that Defendant failed to follow DOCS guidelines governing the treatment of inmates afflicted with Hepatitis C.)

The problem is that both assertions are late-blossoming in that they were never presented in Plaintiff's Complaint. (Dkt. No. 1, at ¶¶ 40–41.) Nor were they asserted in Plaintiff's papers in opposition to Defendants' motion. (Dkt. No. 27, at 7–9.) As a result, they could not be considered by Magistrate Judge Peebles in his Report–Recommendation. (Dkt. No. 33.) As explained above in Part II.A. of this Decision and Order, a district court will ordinarily refuse to consider material that could have been, but was not, presented to the magistrate judge in the first instance. Here, the Court finds that considering these late-blossoming allegations as "challenges" to a report-recommendation that never had the benefit of the allegations would frustrate the purpose of the Magistrates Act. (The Court notes that the third argument asserted in Plaintiff's Objection, which regards Defendant Maddock's failure to follow DOCS guidelines governing the treatment of inmates afflicted with Hepatitis C, is merely a reiteration of the same argument made by Plaintiff in his original papers submitted to the Magistrate Judge Peebles.)

For these reasons, the Court finds that it need subject Magistrate Judge Peebles' Report–Recommendation to a clear-error review, which it survives. Even if the Court were to subject the Report–Recommendation to a *de novo* review, it would reach the same conclusion: the Court can find no error in the Report–Recommendation; Magistrate Judge Peebles employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, Magistrate Judge Peebles' Report–Recommendation is accepted and adopted in its entirety for the reasons stated therein.

The Court would add only that, even if it were to construe Plaintiff's Objections as effectively amending his Complaint (which, again, it does not, given the waste of judicial resources that would result), it would find that those amended allegations (as presented in Plaintiff's

two-page Objections and two-paragraph Tenth Cause of Action) fail to state an Eighth Amendment inadequate-medical-care claim against Defendant Maddock.

**\*4** For these reasons, and for the reasons stated by Magistrate Judge Peebles in his Report–Recommendation, Plaintiff's First Amendment retaliation claim against Defendant Stormer survives Defendants' motion, and Plaintiff's claims against Defendant Maddock are dismissed with leave of the Court to replead during the pendency of this action in accordance with Fed.R.Civ.P. 15.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles' Report–Recommendation (Dkt. No. 33) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 24) is ***GRANTED*** in part, and ***DENIED*** in part, in the following respects:

(1) Plaintiff's Eighth Amendment inadequate-medical-care claim against Defendant Dr. Raymond Maddock (constituting Plaintiff's Tenth Cause of Action) is **DISMISSED with leave to replead** during the pendency of this action in accordance with Fed.R.Civ.P. 15; but

(2) Plaintiff's First Amendment retaliation claim against Defendant Stormer (asserted in Plaintiff's First Cause of Action) **SURVIVES** Defendants' motion; and it is further

**ORDERED** that Defendant Stormer shall file and serve an answer to plaintiff's complaint by 3/28/12; and then this case shall be referred to the Magistrate Judge to issue pretrial scheduling deadlines. The clerk is directed to terminate Defendant Maddock from this action.

N.D.N.Y.,2012.

Dabney v. Maddock
Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 760748 (N.D.N.Y.)

(Cite as: 2012 WL 760748 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Efrain J. MUNIZ, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
No. 9:04-CV-0479.

July 11, 2007.

Efrain J. Muniz, Gouverneur, NY, pro se.

Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Hon. Andrew M. Cuomo, Attorney General for the State of New York, Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, United States District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the May 2, 2007 Report-Recommendation have been raised. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report-Recommendation for the reasons stated therein. It is, therefore, Ordered that:

(1) Defendants' motion for judgment on the pleadings is DENIED;

(2) Plaintiff's claims under the Ninth Amendment is DISMISSED;

(3) Plaintiff's claims under the Fourteenth Amendment are DISMISSED; and

(4) The claims against Defendant Taylor are DISMISSED.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to Local Rule 72.3(c) and 28 U.S.C. § 636(b). Efrain J. Muniz ("Plaintiff") commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against three employees of the New York State Department of Correctional Services ("DOCS")-DOCS Commissioner Glenn S. Goord, DOCS Chief Medical Officer Dr. Lester Wright, and Gouverneur Correctional Facility ("Gouverneur C.F.") Superintendent Justin Taylor. (Dkt. No. 1.) Generally, Plaintiff alleges that Defendants violated his rights under the Eighth, Ninth and Fourteenth Amendments by denying him medical treatment for, and routine testing with regard to the progress of, his Hepatitis C medical condition because he refused, in or around October and November of 2003, to participate in the Residential Substance Abuse Treatment ("RSAT") Program at Gouverneur C.F. (*See generally* Dkt. No. 1 and Exs. A-D; Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3.) Currently before the Court is Defendants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 27.) For the reasons that follow, I recommend that Defendants' motion be denied, but that Plaintiff's Ninth Amendment claim and Fourteenth Amendment claim should be *sua sponte* dismissed pursuant to the Court's authority under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A, and Rule 12(h)(3) of the Federal Rules of Civil Procedure.

### I. STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)." [FN1]

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

FN1. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

A defendant may move to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To prevail on a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," a defendant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief," [FN2] or the defendant must show that the plaintiff's claim "fails as a matter of law." [FN3] Thus, a defendant may base a Rule 12(b)(6) motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [FN4] or (2) a challenge to the legal cognizability of the claim. [FN5]

FN2. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (citations omitted); *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (internal quotations and citation omitted).

FN3. *Phelps v. Kapnolis,* 308 F.3d 180, 187 (2d Cir.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 108, n. 16 [1976].)

FN4. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion

under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN5. *See Swierkiewicz* 534 U.S. at 514 ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig .,* 2005 U.S. Dist. LEXIS 6686 (S.D.N.Y. Apr. 20, 2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim.") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01 Civ. 4430, 2002 U.S. Dist. LEXIS 1658, *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

**\*2** Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case,[FN6] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[FN7] The purpose of this rule is to "facilitate a proper decision on the merits."[FN8] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[FN9]

> FN6. *See Swierkiewicz,* 534 U.S. at 511-512, 515.

> FN7. *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

> FN8. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) (quoting *Conley,* 355 U.S. at 48).

> FN9. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential

authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513-514 (2002) (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake."). However, even this liberal notice pleading standard "has its limits."[FN10]

> FN10. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g., Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635 (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001],

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." [FN11] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[FN12] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN13]

FN11. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN12. *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

FN13. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN14] However, "all normal rules of pleading are not absolutely suspended." [FN15] For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN16]

FN14. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"). Of course, granting a *pro se* plaintiff

an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.

FN15. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980) (citations omitted), *accord, Gil v. Vogilano,* 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).

FN16. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

Finally, as with a Rule 12(b)(6) motion, Rule 12(c) motions are limited to the facts alleged in the complaint and must be converted into a motion for summary judgment if the court considers materials outside the pleadings. [FN17] Having said that, it should be emphasized that, on a motion to dismiss, the court may, without converting the motion to dismiss into a motion for summary judgment, consider (1) any documents relied on and/or referenced in the complaint (even if those documents are not attached to the complaint, if those documents are provided by defendants in their motion to dismiss), [FN18] and (2) any documents provided by the plaintiff in opposition to defendants' motion to dismiss, to the extent those documents are consistent with the allegations in the complaint.[FN19]

FN17. *See* Fed.R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

FN18. *See Chambers v. Time Warner,* 282 F.3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

147, 153 & n. 3 (2d Cir.2002) (district court's consideration of certain contracts attached to defendant's motion to dismiss was appropriate where plaintiff relied on documents in drafting his complaint) [collecting cases]; *Levy v. Southbrook Int'l Invest., Ltd.,* 263, F.3d 10, 13, n. 3 (2d Cir.2001) (noting that "it was appropriate for the district court to refer to documents attached to the motion to dismiss since the documents were referred to in the complaint") [citation omitted]; *San Leandro Emergency Med. Group v. Philip Morris Co., Inc., 75 F.3d 801, 808 (2d Cir.1996)* (a document that is "intergral" to the complaint may be considered by the district court on a motion to dismiss "despite the fact that the complaint only contains limited quotations from that document") [collecting cases]; *Harsco Corp. v. Segui, 91 F.3d 337, 341, n. 1 (2d Cir.1996)* ("This letter, though cited to and described in the complaint, was not attached to the complaint. We may nonetheless review the letter in its entirety [in deciding defendants' motion to dismiss].") [citation omitted]; *Cortec Indus., Inc. v. Sum Holding LP, 949 F.2d 42, 48 (2d Cir.1991)* ("When plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir.1991)* ("We ... decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference.") [citations omitted].

FN19. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum."

*Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, *1, n. 2 (S.D.N.Y. Nov. 17, 1997)* (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004).

## II. ANALYSIS

### A. Failure to Exhaust Administrative Remedies

**\*3** Defendants argue that Plaintiff's action should be dismissed because his Complaint acknowledges that he failed to exhaust his available administrative remedies before filing suit in April of 2004. (Dkt. No. 27, Part 3.) Specifically, Defendants argue that Plaintiff's Complaint alleges that the "final result" of Plaintiff's Inmate Grievance Complaint regarding the matters in question (i.e., Grievance No. GOV-10351/03) was that the Gouverneur C.F. Inmate Grievance Resolution Committee's ("IGRC's") denial of that grievance was, on appeal, affirmed by Defendant Taylor. (*Id.*) Defendants argue that, through this allegation, Plaintiff implicitly concedes that he subsequently failed to appeal Defendant Taylor's decision to DOCS' Central Office Review Committee ("CORC"), as required by the Prison Litigation Reform Act of 1996. (*Id.*) Finally, Defendants argue that, because Plaintiff had been (at the time in question) an inmate within DOCS for 26 years, it is inconceivable that he was unaware of his right to appeal to CORC (which fact was, incidentally, stated on the written decision issued by Defendant Taylor). (*Id.*)

Liberally construed, Plaintiff's response asserts what is, in essence, a four-prong argument. First, he argues, it would have been "fruitless" (or futile) to appeal to CORC since Defendant Wright's policy pre-determined the outcome of any grievance regarding prison officials'

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

failure to provide Hepatitis C treatment due to the prisoner's failure to participate in a RSAT or ASAT (although Plaintiff concedes that on February 10, 2006, Defendant Wright ceased requiring such participation in a RSAT or ASAT). (Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3.) Second, Plaintiff argues, he was not able to appeal to CORC due to the fact that he was suffering from the effects of Hepatitis C. (*Id.* at ¶ 3.) Third, he argues, he "reasonably" and "sincerely" believed that he was excused from having to appeal to CORC due to the health effects of his Hepatitis C condition (even if that belief was, ultimately, mistaken). (*Id.* at ¶¶ 4-5.) Fourth, he argues, any "technical mistakes" committed by him during the exhaustion process should be excused due to the special leniency that is to be afforded *pro se* litigants such as Plaintiff, who is "a layman in matters of law." (*Id.* at ¶¶ 1, 4-5.)

Defendants' reply asserts two arguments. First, argue Defendants, Plaintiff's response should be disregarded because it was filed and served between 15 and 17 days late, in violation of Local Rule 7.1(b)(1), (the "return date" of Defendants' motion being December 11, 2006, the date of filing of Plaintiff's response being December 8, 2006, and the date of service of Plaintiff's response being December 11, 2006). (Dkt. No. 28, Part 1.) Second, argue Defendants, Plaintiff's implication that his poor health precluded him from appealing Defendant Taylor's decision to CORC during the days following that decision (on November 26, 2003) is "disingenuous at best," given that Plaintiff's health was good enough for him to file a lengthy, coherent, and typed Complaint (complete with six exhibits) five months later, in April of 2004. (*Id.*)

**\*4** The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN20] DOCS has available a well-established three-step grievance program:

FN20. 42 U.S.C. § 1997e.

First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

*White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN21]

FN21. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. See *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

Here, the parties' arguments raise several issues falling under Parts 1 and 3 of the above-described three-part test.[FN22] I note that no issue appears to exist under Part 2 of that test since (1) Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer (Dkt. No. 16, Part 1, ¶ 16), and (2) no allegation (or evidence) exists that any Defendant engaged in conduct that hindered or prevented Plaintiff from being able to appeal to CORC sufficient to estop that Defendant from raising this defense (*see* Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3 [arguing that it would have been "fruitless" to appeal to CORC, not that any Defendant took actions preventing Plaintiff from appealing to CORC] ).

> FN22. I reject Defendants' argument that the Court should disregard Plaintiff's response papers as late, because of (1) Defendants' failure to show prejudice as a result of the lateness, and (2) Plaintiff's special status as a *pro se* civil rights litigant (who was, during the time in which he was supposed to file his response papers, allegedly sick).

**\*5** The issue that falls under Part 1 of the above-described test is created by Plaintiff's argument that it would have been futile to appeal to CORC since Defendant Wright's policy pre-determined the outcome of any grievance regarding prison officials' failure to provide Hepatitis C treatment due to the prisoner's failure to participate in a RSAT or ASAT. I reject this argument for two reasons. First, Plaintiff confuses a prisoner's *ability* to appeal to CORC with a prisoner's *chances of success* during such an appeal. Simply because a prisoner might not stand a realistic chance of success during an appeal does not mean that the administrative appellate process is not "available" to the prisoner. (If so, then any prisoner with an unmeritorious or frivolous claim would not have the administrative appellate process "available" to him.) Second, Plaintiff concedes that on February 10, 2006, Defendant Wright ceased requiring such participation in a RSAT or ASAT. As a result, Plaintiff has alleged facts indicating that, in fact, it might not have been futile for him to appeal to CORC.

The issues that fall under Part 3 of the above-described test are created by Plaintiff's remaining three arguments-(1) that he was not physically able to appeal to CORC due to the fact that he was suffering from the effects of Hepatitis C, (2) that he "reasonably" and "sincerely" believed that he was excused from having to appeal to CORC due to his Hepatitis C condition (even if that belief was, ultimately, mistaken), and (3) that any "technical mistakes" committed by him during the exhaustion process should be excused due to the special leniency that is to be afforded *pro se* litigants such as Plaintiff.

Taking the arguments out of order, I reject the second argument for three reasons. First, the test in question is not whether Plaintiff "sincerely" believed that he was excused from having to appeal to CORC due to his Hepatitis C condition but whether he "reasonably" believed he was so excused (i.e., the test is an objective one, not a subjective one). Second, Plaintiff does not allege any facts whatsoever indicating why he "reasonably" believed that he was excused from having to appeal to CORC due to his Hepatitis C condition. For example, Plaintiff does not allege any facts indicating that any New York State DOCS regulations were confusing.[FN23] Indeed, the regulation in question rather clearly provides that, if mitigating circumstances exist, a prisoner may request an exception to the time limit for filing an appeal to CORC (not that he be excused from having to file an appeal to CORC). *See* DOCS Directive No. 4040 § V(A)(1) (Aug. 22, 2003), codified at 7 N.Y.C.R.R. § 701.6(g) (2007) (formerly codified at 7 N .Y.C.R.R. § 701.7[a], which was repealed and amended on June 28, 2006). Third, Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC? Simply stated, I can imagine no factual circumstances, consistent with the allegations of Plaintiff's Complaint (and his response papers), in which he reasonably believed that he was excused from having to appeal to CORC due to his Hepatitis C condition.

> FN23. *See Giano v. Goord,* 380 F.3d 670, 676, 678-679 & n. 9 (2d Cir.2004) (it was reasonable

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

for plaintiff to have raised his complaints through disciplinary appeals process rather than by filing a separate grievance because the relevant DOCS regulations permitted such conduct or were confusing, for example, being misinterpreted by "a learned federal district court judge not long ago"); *Hemphill v. New York Dep't of Corr. Servs.,* 380 F.3d 680, 690-691 (2d Cir.2004) (remanding to district court to determine, *inter alia,* whether the allegedly confusing nature of New York DOCS regulations justified plaintiff's failure to file a grievance in manner that DOCS officials now prescribe); *Johnson v. Testman,* 380 F.3d 691, 696-697 (2d Cir.2004) (remanding to district court to determine, *inter alia,* "whether ... the BOP grievance regulations were sufficiently confusing so that a prisoner like Johnson might reasonably have believed that he could raise his claim against Testman as part of his defense in disciplinary proceedings.").

**\*6** Moreover, I reject the third argument for two reasons. First, while special leniency might be sufficient to overcome a certain lack of specificity in a pleading and/or to excuse certain minor procedural mistakes, I am aware of no authority suggesting that it is sufficient to excuse a failure to comply with a federal statute such as the PLRA.[FN24] Second, special leniency is normally afforded *pro se* litigants because of their *inexperience* (or lack of familiarity with legal procedures or terminology).[FN25] However, here, Plaintiff has some experience,[FN26] especially when it comes to court actions in which he is alleged to have not exhausted his available administrative remedies prior to filing suit .[FN27] Moreover, I note that Plaintiff's papers in this action have been fairly good-being organized and cogent, and often being typed, supported by exhibits, affidavits, and memorandum of law. (*See* Dkt. Nos. 1, 2, 19, 23.) Indeed, Plaintiff knew enough about court procedure to apply for and receive both an order dismissing the current proceeding without prejudice and an order reopening the proceeding. (*See* Dkt. Nos. 19, 22, 23, 26.) Clearly, Plaintiff is a litigant of at least some level of experience and sophistication.[FN28] While I do not believe that Plaintiff's experience is so extensive that it warrants altogether *revoking* the special status normally afforded pro se civil rights litigants,[FN29] I believe that his

experience warrants somewhat *diminishing* his special status.[FN30] Moreover, I believe that this special leniency should be diminished as a sanction due to his apparent lack of candor with the Court. Specifically, Plaintiff apparently made a material misrepresentation to the Court in his Verified Complaint, wherein he made a sworn assertion that he had never "filed any other lawsuits in any state [or] federal court relating to [his] imprisonment" (Dkt. No. 1, ¶ 5[a] ), when, in fact, as of the date of the signing of his Complaint (April 28, 2004), Plaintiff had apparently done so.[FN31] Numerous cases exist from within the Third Circuit for sanctioning *pro se* litigants for abusing the litigation process, as well as some cases from within the Second Circuit.[FN32]

> **FN24.** *See Houze v. Segarra,* 217 F.Supp.2d 394, 395-396 (S.D.N.Y.2002) (dismissing prisoner's complaint for failure to exhaust administrative remedies, as required by PLRA, after acknowledging that prisoner, as *pro se* litigant, is afforded special leniency); *see also Smith v. Keane,* 96-CV-1629, 1998 U.S. Dist. LEXIS 3702, at \*6, 9-18 (S.D.N.Y.1998) (dismissing prisoner's complaint for failure to comply with applicable statute of limitations, after acknowledging that prisoner, as pro se litigant, is afforded special leniency); *Turner v. Johnson,* 177 F.3d 390, 391-392 (5th Cir.1999) ("[N]either a party's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits [excusing the party's failure to comply with a statute of limitations].").

> **FN25.** *See Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (affording special leniency to "a *pro se* litigant unfamiliar with the requirements of the legal system"); *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (liberally construing *pro se* complaints benefits persons "unfamiliar with the lawyerlike method of pleading claims"); *Edwards v. Selsky,* 04-CV-1054, 2007 WL 748442, at \*2-3 (N.D.N.Y. March 6, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.) (stating that pro se litigants' "lack of [experience] is the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

reason for conferring the special status upon *pro se* litigants"); *see also Korsunskiy v. Gonzales,* 461 F.3d 847, 850 (7th Cir.2006); *Int'l Bus. Prop. v. ITT Sheraton Corp.,* 65 F.3d 175, at *2 (9th Cir.1995); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir.1979); *Zaczek v. Fauquier County,* 764 F.Supp. 1071, 1078 (E.D.Va.1991); *Life Science Church v. U.S.,* 607 F.Supp. 1037, 1039 (N.D.Ohio 1985); John C. Rothermich, *Ethical and Procedural Implications of 'Ghostwriting' for Pro Se Litigants: Toward Increased Access to Civil Justice,* 67 FORDHAM L.REV. 2687, 2697 (Apr.1999) [citing cases].

FN26. Specifically, it appears that Plaintiff has filed between two and eight state court actions or appeals. *See, infra,* note 31 of this Report-Recommendation.

FN27. *Muniz v. David,* No. 96428, Memorandum and Order at 2 (N.Y.App.Div., 3d Dept., March 24, 2005) (indicating that defendants in that action had argued before the trial court, at some point before the issuance of its judgment on June 4, 2004, that Plaintiff had "failed to exhaust the administrative remedies through the available grievance procedures or establish any exceptions thereto").

FN28. When assessing a *pro se* litigant's experience for purposes of deciding whether or not to revoke his special status, courts sometimes examine things such as (1) the quality of his pleadings (e .g., whether they are typed, crafted in accordance with the relevant rules of civil procedure, etc.), (2) the cogency of his motion papers (e.g., whether they are supported by applicable legal authorities, filed in accordance with court rules, etc.), and (3) the ultimate success of any motions, actions or appeals he has previously filed (or the failure of any motions he has previously opposed). *See, e. g., Edwards,* 2007 WL 748442, at *3; *Rolle v. Garcia,* 04-CV-0312, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.), adopting Report-Recommendation, 2007 WL 672679, at

*4 (N.D.N.Y. Feb. 28, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 WL 951447, at *3-4 (N.D.N.Y. Feb. 12, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *see also Farmer v. Haas,* 990 F.2d 319, 322 (7th Cir.1993); *Ab v. Sekendur,* 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct. 28, 2004). Such a practice seems appropriate in that it is consistent with the standard often used by courts to decide whether or not to appoint counsel to a *pro se* litigant. *See, e.g., Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *see also Tabron v. Grace,* 6 F.3d 147, 155-156 (3d Cir.1993); *Farmer,* 990 F.2d at 322; *Terrell v. Brewer,* 935 F.2d 1015, 1017 (9th Cir.1991); *Long v. Shillinger,* 927 F.2d 525, 527 (10th Cir.1991).

FN29. *See, e.g., Johnson v. Eggersdorf,* 8 Fed. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *Gill v. Pidvlpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, J., adopting report-recommendation of Treece, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

(W.D.N.Y. Sept. 29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct. 11, 1991).

FN30. My review of the applicable law suggests that courts need not treat special status as an "all or nothing" benefit but may confer special status to a semi-experienced *pro se* litigant on a "sliding scale," treating the litigant more leniently than represented litigants but not as leniently as wholly inexperienced *pro se* litigants. *See, e.g., Kilkenny v. Greenberg Traurig, LLP,* 05-CV-6578, 2006 23399, at *18 (S.D.N.Y. Apr. 26, 2006) ("While plaintiff's *pro se* status does not insulate him from the imposition of sanctions under Rule 11 ..., *pro se* litigants are held to a more lenient standard, and the application of Rule 11 may be determined on a sliding scale according to the litigant's level of sophistication.") [citations and internal quotation marks omitted]; *Holsey v. Bass,* 519 F.Supp. 395, 407 n. 27 (D.Md.1981) ("This Court is of the opinion that it is proper to apply a sliding scale of liberality in construing a *pro se* complaint.") [citation omitted]; *see also* Julie M. Bradlow, *Procedural Due Process Rights of Pro se Civil Litigants,* 55 U. CHI. L.REV.. 659, 660 (Spring 1988) (asserting that, in *pro se* civil litigation, a "sliding scale" of due process should be employed by judges to ensure that they give "such leniency and special attention as the particular case merits").

FN31. *See, e.g., Efraim Muniz v. David,* No. 96428, Memorandum and Order (N.Y.App.Div., 3d Dept., March 24, 2005) (stating, "This proceeding was commenced in October 2003"). I note that the plaintiff in the aforementioned prisoner action-"Efraim Muniz" of Governor C.F.-bears the same name of record as the prisoner of record bearing New York State

DOCS Inmate Number 80-A-0959, the inmate number claimed by Plaintiff in the current action. I note also that, according to the New York DOCS Inmate Locator System, no other prisoner in the New York State DOCS has ever been named "Efraim Muniz." In other words, either the DOCS Inmate Locator System contains a typographical error for Plaintiff's record entry or Plaintiff answers to both names.

Finally, I note that it is unclear whether several other prisoner actions and appeals were also brought by Plaintiff or the one other "Efrain Muniz" who has ever been incarcerated by the New York State DOCS. *See, e.g., Efrain J. Muniz v. N.Y.S. Div. of Parole,* 695 N.Y.S.2d 619 (N.Y.App.Div., 3d Dept., 1999); *Efrain Muniz v. Selsky,* No. 91967, Memorandum and Judgment (N.Y.App.Div., 3d Dept., Jan. 9, 2003); *Efrain J. Muniz v. Goord,* 820 N.Y.S.2d 368 (N.Y.App.Div., 3d Dept., 2006).

FN32. *See, e.g., Iwachiw v. N.Y.S. Dept. of Motor Veh.,* 396 F.3d at 528-529 & n. 1 (2d Cir.2005); *McDonald v. Head Crim. Ct. Supervis. Officer,* 850 F.2d 121, 124-125 (2d Cir.1988); *Mora v. Bockelmann,* 03-CV-1217, 2007 WL 603410, at *4 (N.D.N.Y. Feb. 22, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Mitchell v. Harriman,* 04-CV-0937, 2007 WL 499619, at *3 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J., adopting Report-Recommendation of Homer, M.J.); *Tibbetts v. Robinson,* 97-CV-2682, 2005 WL 2146079, at *7 (D.Conn. Aug. 31, 2005).

Finally, I am skeptical of the first arguments for two reasons. First, Plaintiff does not allege specific facts indicating why he was not able (presumably, physically able) to file an appeal to CORC during the days or weeks following November 26, 2003. (For example, was it because he did not have the strength to think clearly or write, or was it because he did not have access to paper and legal materials for some reason? Was he housed in the prison's infirmary during this time period, and how long was he allegedly incapacitated?) I note that Plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

allegation that he was unable to file an appeal to CORC during the days or weeks following November 26, 2003, appears undermined somewhat by Exhibit C to his Complaint, which indicates that, on January 12, 2004 (approximately six weeks after November 26, 2003), Plaintiff was in a good enough physical condition to write a letter to a DOCS official (apparently Brenda Tracy, a Nurse Administrator), regarding a doctor's decision to not prescribe vitamins for Plaintiff. (Dkt. No. 1, Ex. C.) FN33 Second, Plaintiff does not allege facts indicating why he did not, or was not able to, request an exception to the time limit for filing an appeal to CORC due to the "mitigating circumstances" created by his illness (and then, if necessary, file a separate grievance regarding any denial of that request for an exception). *See* DOCS Directive No. 4040 § V(A)(1) (Aug. 22, 2003), codified at 7 N.Y.C.R.R. § 701.6(g) (2007) (formerly codified at 7 N.Y.C.R.R. § 701.7[a], which was repealed and amended on June 28, 2006).

> FN33. However, I am not persuaded by Defendants' argument that Plaintiff must have been physically able to file an appeal to CORC during the days or weeks following November 26, 2003, because Plaintiff was able to file his Complaint in this action approximately five months later, in April of 2004. Setting aside the issue of whether the Court's consideration of such a fact would arguably necessitate converting Defendants' motion into a motion for summary judgment, I note the lengthy time lag between the two dates.

*7 However, despite this skepticism about Plaintiff's first argument, I am reluctant to recommend dismissal of Plaintiff's Complaint based on a failure to exhaust his administrative remedies. Specifically, I am mindful of how low the pleading standard is under Rules 8 and 12 of the Federal Rules of Civil Procedure and various Supreme Court precedents. *See, supra,* Part I of this Report-Recommendation. Moreover, I am mindful that, within the Second Circuit, "it may often be premature to decide the issue of exhaustion in the context of a motion to dismiss the complaint under Rule 12(b)(6); rather it may be necessary for the Court to address the issue at the summary judgment stage." *Flynn v. Wright,* 05-CV-1488, 2007 WL 241332, at *12 (S.D.N.Y. Jan. 26, 2007) (citing *Ziemba v. Wezner,* 366 F.3d 161, 163-164 [2d Cir.2004] [vacating magistrate judge's granting of defendants' motion for judgment on pleadings for failing to exhaust administrative remedies] ).FN34 Finally, I am mindful that, recently, the Supreme Court expressed disapproval of dismissing prisoner actions for failure to exhaust administrative remedies under a Rule 12(b)(6) analysis. *See Jones v. Block,* 127 S.Ct. 910, 919-923 (2007).

> FN34. *Accord, Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *8 (S.D.N.Y. Dec. 6, 2006).

More specifically, I find that Plaintiff's assertions, in his response papers, FN35 that, in light of his Hepatitis C condition, he "did the very best [his] ability and health allowed [him] at the time" to grieve the matters at issue in this action "plausibly alleges" the existence of "special circumstances" justifying his failure to appeal to CORC (as permitted by *Hemphill v. State of New York,* 380 F.3d 680 [2d Cir.2004] and its companion cases), and meets-albeit *barely*-the "modest" pleading threshold set by Rules 8 and 12 of the Federal Rules of Civil Procedure and Supreme Court precedent such as *Jones v. Block,* 127 S.Ct. 910 (2007), *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), and *Leatherman v. Tarrant County Narc. and Intell. Coord. Unit,* 507 U.S. 163 (1993). I note that at least one analogous case exists, from within the Second Circuit, in which a prisoner was found to have plausibly alleged special circumstances due to physical incapacitation. FN36

> FN35. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, inter alia, *Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN36. *See Barad v. Comstock,* 03-CV-0736, 2005 U.S. Dist. LEXIS 38418, at *10-11, 16-17, 21-23 (W.D.N.Y. June 30, 2005) (prisoner plausibly alleged special circumstances where he alleged, in part, that time to commence grievance had lapsed while he had been hospitalized due to kidney stones, although his complaint was ultimately dismissed under a summary judgment analysis); *cf. Bonilla v. Janovick,* 01-CV-3988, 2005 U.S. Dist. LEXIS 325, at *6-7 (E.D.N.Y. Jan. 7, 2005) ("[P]laintiff's hospitalization and physical injuries may have prevented the filing of an administrative complaint, [necessitating] further discovery and additional depositions ... to determine whether the admitted failure to exhaust should nevertheless be excused [due to the 'special circumstances' exception]."

As a result, I recommend that the Court deny Defendants' motion for judgment on the pleadings. However, I express no opinion about whether Plaintiff would or would not be able to survive a motion for *summary judgment* (premised on a failure to exhaust administrative remedies), should Defendants choose to file such a motion.[FN37]

FN37. *See Barad,* 2005 U.S. Dist. LEXIS 38418, at *21, 22, 25 (during summary judgment

analysis, accepting defendants' argument that plaintiff "was physically able to file a grievance" during his fourteen-day hospitalization due to kidney stones because "plaintiff testified that he was able to write [and attend a program] during his hospitalization," although ultimately finding that plaintiff had established other special circumstances, i.e., [1] that the correctional facility's medical staff had erroneously told plaintiff that his time to commence a grievance had lapsed, and [2] that plaintiff had relied on Second Circuit law at that time [in 1999] which did not require exhaustion of administrative remedies for such deliberate indifference claims); *cf. Goldenberg v. St. Barnabas Hosp.,* 01-CV-7435, 2005 U.S. Dist. LEXIS 2730, at *11-16 (S.D.N.Y. Feb. 22, 2005) (granting defendants' motion for summary judgment, in part because plaintiff adduced no evidence in support of his claim that administrative remedies were not "available" to him [i.e., during an analysis of Part 1 of the Second Circuit's three-part test] insofar as he was, during the relevant time period, in a physically and mentally debilitated state).

**B. Duty of Court to *Sua Sponte* Analyze Pleading Sufficiency of Claims**

An analysis of Defendants' failure-to-exhaust argument does not end the Court's review of Plaintiff's claims. This is because, under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A, and Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court has the authority (and duty) to *sua sponte* dismiss prisoner claims that fail to state a claim upon which relief may be granted or over which the Court lacks subject-matter jurisdiction. As a result, I will analyze Plaintiff's Eight, Ninth and Fourteenth Amendment claims for such defects.

**1. Failure to State a Claim Under the Eighth Amendment**

**\*8** Generally, to state a claim of inadequate medical care under the Eighth Amendment, Plaintiff must allege facts indicating two things: (1) that he had a sufficiently serious medical need; and (2) that Defendants were deliberately indifferent to that serious medical need.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

*Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). With regard to the second element, an official is "deliberately indifferent" (in other words, he has a sufficiently culpable state of mind) when he " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (citing *Farmer v. Brennan,* 511 U.S. 825, 837 [1994] ).

Here, I will assume for the sake of argument that Plaintiff's Hepatitis C condition constitutes a "serious medical need" for purposes of the Eighth Amendment.[FN38] The more problematic question is whether Plaintiff has alleged facts indicating the sort of culpable state of mind (which is akin to criminal recklessness) necessary for liability under the Eighth Amendment.[FN39] It is arguable that he has simply alleged facts indicating a disagreement with his prescribed medical care, or perhaps negligence, neither of which is enough to make a defendant liable to a plaintiff under the Eighth Amendment.[FN40] For example, the documents relied on and/or referenced in Plaintiff's Complaint (and thus deemed part of Plaintiff's Complaint) *appear* to suggest that, at the time that Plaintiff was denied medical treatment for Hepatitis C, it was not deemed medically appropriate for Plaintiff to engage in such medical treatment without having first enrolled in the RSAT Program, due to the increased risk of liver damage.[FN41] If those documents more clearly indicated a medical rationale for the requirement that Plaintiff participate in the RSAT Program, I would be inclined to conclude that Plaintiff has not alleged facts indicating a violation of the Eighth Amendment.[FN42] However, they do not do so. Moreover, again, I am mindful of how low the pleading standard is under Rules 8 and 12 of the Federal Rules of Civil Procedure. I am also mindful that, unlike many similar cases brought by prisoners, Plaintiff alleges not only a denial of treatment for Hepatitis C but of *testing* for the progress of that disease (which denial appears to be more difficult to justify under the rationale apparently proffered in Exhibits A2 and D to Plaintiff's Complaint).

FN38. Some district court decisions from within the Second Circuit have found Hepatitis C to not constitute a serious medical need. *See Vondette*

*v. McDonald,* 00-CV-6874, 2001 WL 1551152, at *4-5 (S.D.N.Y. Dec. 5, 2001). However, it appears that the bulk of district court decisions addressing the issue finds that Hepatitis C is a serious medical need. *See Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

FN39. " 'The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.' " *Evering v. Rielly,* 98-CV-6718, 2001 U.S. Dist. LEXIS 15549, at *30 (S.D.N.Y. Sept. 28, 2001) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 [2d Cir.1998] ).

FN40. *See Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

FN41. (*See* Dkt. No. 1, Ex. A2 ["[T]he facility is acting in accordance with direction provided by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

Central Office. The policy regarding Hepatitis C Treatment/Substance Abuse Treatment is addressed in a memorandum dated January 8, 2002, which states in part: 'Any inmate who is diagnosed with Hepatitis C and requires medical treatment must have completed or have enrolled in an Alcohol Substance Abuse Treatment, Comprehensive Alcohol Substance Abuse Treatment, Resident Substance Abuse Treatment, or Pre-Treatment Workbook Program ....'"]; Dkt. No. 1, Ex. D ["While to the general public hepatitis is simply a disease, the medical community views it more accurately as an inflamed liver.... Most new [Hepatitis C] infections are caused by intravenous drug use. Disease progression can ... occur more often if the person drinks alcohol."].)

FN42. *See* *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at \*13-15 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.) (finding that prisoner's Eighth Amendment claim regarding denial of hepatitis treatment based on his non-participation in ASAT program should be dismissed on alternative ground that he failed to state a claim, given that the documents attached to prisoner's complaint and response papers clearly indicated that, at the time, it was not deemed medically appropriate for the plaintiff to engage in medical treatment for Hepatitis C without having first enrolled in the ASAT Program).

As a result, I am unable to conclude, without briefing by Defendants, that Plaintiff has failed to state an Eighth Amendment claim under the circumstances.[FN43] However, again, I express no opinion about whether Plaintiff would or would not be able to survive a motion for summary judgment (with respect to his Eighth Amendment claim), should Defendants choose to file such a motion. *See* *Lewis v. Alves,* 01-CV-0640, 2004 WL 941532, at \*5-7 (W.D.N.Y. March 22, 2004) (granting defendants' motion for summary judgment with respect to plaintiff's Eighth Amendment claim alleging, *inter alia,* deliberate indifference to plaintiff's Hepatitis C condition due to his

non-participation in an ASAT Program), *accord, Rose v. Alves,* 01-CV-0648, 2004 WL 2026481, at \*6 (W.D.N.Y. Sept. 9, 2004); *cf. Graham v. Wright,* 01-CV-9613, 2003 U.S. Dist. LEXIS 16106, at \*6 n. 5 (S.D.N.Y. Sept. 12, 2003) ("[W]e note that the portions of the [DOCS] Guidelines challenged by plaintiff, namely that the inmate must successfully complete an ASAT program ... [before he receives treatment for Hepatitis C] appear to be highly rational in light of the fact that severe side effects, including death, may result from treatment of the patient with interferon-apha-2b or 2a combined with ribavirin for 6-12 months, and that active substance abuse, including alcohol abuse, can cause life threatening consequences to a patient following the treatment regimen.").

FN43. *See* *McKenna v. Wright,* 386 F.3d 432, 434, 437 (2d. Cir.2004) (prisoner stated Eighth Amendment claim for deliberate indifference to his Hepatitis C based on his non-participation in ASAT program where he alleged that he had been deemed "ineligible for the [ASAT] program because of his medical condition"); *Hatzfield v. Goord,* 04-CV-0159, 2007 WL 700961, at \*1-5 (N.D.N.Y. Feb. 28, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.) (prisoner stated First, Eighth and Fourteenth Amendment claims with regard to defendants' failure to treat his Hepatitis C condition based on his non-participation in RSAT/ASAT program where he alleged that his participation in the RSAT/ASAT program would have violated his religious beliefs); *Hilton v. Wright,* 235 F.R.D. 40, 44-55 (N.D.N.Y. Feb. 27, 2006) (Hurd, J.) (assuming, without specifically deciding, that class of prisoners had stated a viable Section 1983 claim regarding DOCS' policy of requiring prisoners' participation in ASAT/RSAT program before prisoners could receive treatment for Hepatitis C).

**2. Failure to State a Claim Under the Ninth Amendment**

**\*9** In one paragraph of his Complaint, Plaintiff states that his claims are brought pursuant to, *inter alia,* the Ninth Amendment. (Dkt. No. 1, ¶ 7.3.) The Ninth

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

Amendment to the United States Constitution provides, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const., amend. IX. I can find no factual allegations in Plaintiff's Complaint in support of his Ninth Amendment claim. (*See generally* Dkt. Nos. 1, 29.) Moreover, I can imagine no set of factual circumstances, consistent with the allegations of Plaintiff's Complaint, in which such a Ninth Amendment claim might exist. (*Id.*) As explained by the Tenth Circuit:

Although the Ninth Amendment may restrict the activities of state actors ..., it has never been applied to prevent the denial of medical treatment to prisoners. Indeed, such an application would be inappropriate, since the Ninth Amendment only protects those rights not otherwise 'enumerat[ed] in the Constitution,' ... and the Eighth Amendment specifically addresses itself to the mistreatment of prisoners ....

*Parnisi v. Colo. State Hosp.,* No. 92-1368, 1993 U.S.App. LEXIS 9128, at *2, 4-5 (10th Cir. Apr. 15, 1993) (affirming district court's dismissal of prisoner's Ninth Amendment claim, arising from allegedly inadequate medical treatment) [citations omitted].[FN44] Courts from within the Second Circuit have similarly recognized the inapplicability of the Ninth Amendment to prisoner Section 1983 claims. *See, e.g., Diaz v. City of New York,* 00-CV-2944, 2006 U .S. Dist. LEXIS 93923, at *21-22 (E.D.N.Y. Dec. 29, 2006) ("[T]he Ninth Amendment is a rule of construction, not one that protects any specific right, and so no independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action.") [internal quotation marks and citations omitted], *accord, Bussey v. Phillips,* 419 F.Supp.2d 569, 586 (S.D.N.Y.2006) [citing case].

FN44. *See also Taylor v. Roper,* 83 F. App'x 142, 143 (8th Cir.2003) ("We also agree with the district court that [the prisoner's] allegations [regarding inadequate medical care] provided no basis for his claims ... under ... the Ninth Amendment ...."); *Gaberhart v. Chapleau,* No. 96-5050, 1997 U.S.App. LEXIS 6617, at *3 (6th Cir. Apr. 4, 1997) (dismissing the prisoner's Ninth Amendment claim, arising from allegedly inadequate medical treatment, in part because he "never explained the theory or at least the basis" for that claim).

The closest that Plaintiff comes to stating such a Ninth Amendment claim is when he alleges that prisoners are being "denied mental health services for Hapatitis C[-]related mental *disturbances* and anxiety," and that their "confidentiality is being violated." (Dkt. No. 1, "Third Cause of Action." [emphasis in original].) Granted, the Ninth Amendment may, in some circumstances, protect the disclosure of some personal information about a prisoner (e.g., regarding the prisoner's mental health). *See Morgan v. Rowland,* 01-CV-1107, 2006 U.S. Dist. LEXIS 11081, at *28-30 (D.Conn. March 17, 2006) (granting defendants' motion for summary judgment with regard to such a claim); *see also Hunnictt v.. Armstrong,* 152 F. App'x 34 (2d Cir.2005) (unpublished decision), *vacating in part,* 305 F.Supp.2d 175, 187-188 (D.Conn.2004) (presuming that prisoner was not alleging Ninth Amendment right-to-privacy claim).[FN45] However, again, Plaintiff asserts no factual allegations in support of this claim. For example, Plaintiff does not allege any facts indicating that Defendants discussed Plaintiff's private or personal mental health issues in front of other prisoners and DOCS employees, violating either the psychiatrist-patient privilege or psychologist-patient privilege. (*See generally* Dkt. Nos. 1, 29.) Furthermore, Plaintiff's request to litigate this matter as a class action was denied; thus, it is not relevant, *for purposes of this action,* what wrongs *other* prisoners (especially unidentified prisoners) are allegedly experiencing.

FN45. *But see In re State Police Litig.,* 888 F.Supp. 1235, 1258 (D.Conn.1995) ("[T]he [Ninth] [A]mendment does not guarantee any constitutional right [e.g., to privacy] sufficient to support a claim under 42 U.S.C. § 1983.") [citations omitted], *appeal dismissed,* 88 F.3d 127 (2d Cir.1996); *accord, Salaman v. Bullock,* 05-CV-0876, 2007 U.S. Dist. LEXIS 24432, at *8 (D.Conn. March 15, 2007), *DeLeon v. Little,* 981 F.Supp. 728, 734 (D.Conn.1997), *Doe v. Episcopal Soc. Servs.,* 94-CV-9171, 1996 U.S. Dist. LEXIS 1278, at *3-4 (S.D.N.Y. Feb. 7, 1996).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

**\*10** As a result, I recommend that the Court *sua sponte* dismiss Plaintiff's Ninth Amendment claim. However, because the defect in any right-to-privacy claim that Plaintiff may be attempting to assert appears to be formal instead of substantive, I recommend that the dismissal of any such right-to-privacy claim be conditioned on Plaintiff's failure to file an Amended Complaint asserting a viable Ninth Amendment claim within 30 days of the Court's final decision on Defendants' motion.

### 3. Failure to State a Claim Under the Fourteenth Amendment

In one paragraph of his Complaint, Plaintiff states that his claims are brought pursuant to, *inter alia*, the Fourteenth Amendment. (Dkt. No. 1, ¶ 7.3.) Assuming that Plaintiff is not simply relying on the Fourteenth Amendment to the extent that it makes the Eighth Amendment applicable to the states, the only conceivable claims to which Plaintiff might be referring are his claims for a violation of his right to substantive due process, procedural due process, or equal protection. However, I can find no factual allegations in support of any such claims.

Specifically, to the extent that Plaintiff is attempting to assert some sort of due process claim, any such claim is in actuality an Eighth Amendment claim, which I have already analyzed above in Part II.B.1. of this Report-Recommendation. *See Hatzfield v. Goord,* 04-CV-0159, 2007 WL 700961, at \*1 n. 3 (N.D.N.Y. Feb. 28, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.) (citing *Pabon v. Wright,* 459 F.3d 241, 253 [2d Cir.2006] ); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at \*9 (S.D.N.Y. March 4, 2002).

To the extent that Plaintiff is attempting to assert some sort of equal protection claim, he has not alleged facts indicating that either (1) he was treated differently than other people in similar circumstances or (2) the unequal treatment was the result of intentional and purposeful discrimination. *See, e.g., Verley,* 2004 WL 526740, at \*20-21; *McKenna,* 2002 WL 338375, at \*10-12. Furthermore, to the extent that Plaintiff is somehow implicitly alleging that he was treated differently than persons suffering from cancer or AIDS, I note that, as stated earlier, the exhibits to Plaintiff's own Complaint appear to suggest that, at the time that Plaintiff was denied medical treatment for Hepatitis C, he was being denied such treatment because of the possible damage such treatment would do to his liver (which was already being affected by Hepatitis C) if he was currently abusing alcohol or drugs. [FN46]

> [FN46.](#) *See, supra,* note 41 of this Report-Recommendation.

As a result, I recommend that the Court *sua sponte* dismiss Plaintiff's Fourteenth Amendment claim. However, because the defect in any equal protection claim that Plaintiff may be attempting to assert appears to be formal instead of substantive, I recommend that the dismissal of any such equal protection claim be conditioned on Plaintiff's failure to file an Amended Complaint asserting a viable equal protection claim within 30 days of the Court's final decision on Defendants' motion.

### 4. Lack of Personal Involvement

**\*11** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ). [FN47] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. [FN48] If the defendant is a supervisory official, such as a DOCS Commissioner or correctional facility superintendent, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. [FN49] In other words, supervisory officials may not be held liable merely because they held a position of authority. [FN50] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN51]

> FN47. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978).

> FN48. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> FN49. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> FN50. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> FN51. *Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) [citations omitted].

Here, liberally construed, Plaintiff's Complaint alleges that Defendant Goord (the DOCS Commissioner) and Defendant Wright (the DOCS Chief Medical Officer) approved and allowed the current policy of forced participation in RSAT prior to receiving treatment for Hepatitis C. (Dkt. No. 1, ¶ 6; Dkt. No. 29, Rebuttal Mem. of Law, ¶¶ 2-3.) More specifically, Plaintiff has alleged that Defendants Goord and Wright created an unconstitutional policy, or at least knowingly allowed such a policy to continue. (*Id.*) For these reasons, I am unable to conclude, without briefing by Defendants, that Plaintiff has failed to allege facts indicating the personal involvement of Defendants Goord and Wright in the constitutional violation(s) alleged. *See, e.g., Hatzfield,* 2007 WL 700961, at *3.

However, the same cannot be said of Plaintiff's allegations against Defendant Taylor. Plaintiff alleges that Defendant Taylor (the Gouverneur C.F. Superintendent) violated his constitutional rights when he affirmed the

IGRC's denial of Plaintiff's grievance and upheld the policy of forced participation in RSAT before receiving treatment for Hepatitis C. (Dkt. No. 1, ¶ 4.b. & Exs. A, A1, A2.) Two problems exist with regard to Plaintiff's claim(s) against Defendant Taylor.

First, the documents attached to Plaintiff's Complaint (and thus incorporated into that Complaint, *see* Fed.R.Civ.P. 10[c] ) indicate that it was not Defendant Justin Taylor but someone else (either a deputy superintendent or an acting superintendent) who personally affirmed the IGRC's denial of Plaintiff's grievance. (Dkt. No. 1, Ex. A.2.) It is well-established that when a "supervisory official like [a] ... prison [s]uperintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable." *Walker v. Pataro,* 99-CV-4607, 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002), *accord, Hatzfield,* 2007 WL 700961, at *3; *Ramos v. Artuz,* 00-CV-0149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001). "Thus, receipt of the grievance alone, without more, cannot suffice to allege personal involvement." *Hatzfield,* 2007 WL 700961, at *3.

**\*12** Second, even if Defendant Taylor had personally affirmed the IGRC's decision, a fair reading of the Complaint reveals that Plaintiff is alleging that the policy of denying medical treatment for Hepatitis C was DOCS-wide rather than Gouverneur C.F.-specific. (Dkt. No. 1, ¶ 6; Dkt. No. 29, Rebuttal Mem. of Law, ¶¶ 2-3.) "There can be, therefore, no claim that [the superintendent] either created the policy [denying medical treatment for Hepatitis C] or allowed it to continue as there is no allegation that he had the power to create or to terminate the policy." *Hatzfield,* 2007 WL 700961, at *3; *see also Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *15-16 (S.D.N.Y. Jan. 23, 2004) (dismissing similar claims against prison superintendent based on failure to allege facts indicating personal involvement).

The closest Plaintiff comes to involving Defendant Taylor in the constitutional violations alleged is when Plaintiff alleges not simply a denial of medical *treatment* for his Hepatitis C condition but a denial of routine *testing* with regard to the progression of his Hepatitis C condition.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

Specifically, Plaintiff alleges that "routine testing" of Hepatitis C in "numerous inmates" is not being conducted by "medical staff" at Gouverneur C.F. (Dkt. No. 1, ¶ 6[c].) The problem is that this claim of a denial-of-testing was not raised in the grievance that Plaintiff appealed to Defendant Taylor. (Dkt. No. 1, Ex. A.) Thus, there are no factual allegations indicating that Defendant Taylor either knew of the practice in question or that he allowed it to continue. However, it is conceivable to me that Plaintiff *might* be able to assert such factual allegations. *See, e.g. Johnson v. Wright,* 234 F.Supp.2d 352, 364 (S.D.N.Y.2002).

As a result, I recommend that Plaintiff's claims against Defendant Taylor should be dismissed *sua sponte.* However, because the defect in Plaintiff's denial-of-testing claim against Defendant Taylor appears to be formal instead of substantive, I recommend that the dismissal of that claim be conditioned on Plaintiff's failure to file an Amended Complaint asserting a viable such claim within 30 days of the Court's final decision on Defendants' motion.

**5. Mootness**

Plaintiff alleges that, on February 10, 2006 (after Plaintiff filed his Complaint on April 28, 2004), DOCS and Defendant Wright rescinded its policy of requiring that a prisoner participate in an ASAT/RSAT Program before receiving treatment for Hepatitis C. (Dkt. No. 29, Rebuttal Mem. of Law, ¶ 3.) [FN52]

> FN52. I note that, apparently, this decision was made as early as October 13, 2005. *See Hilton v. Wright,* 235 F.R.D. 40, 46 (N.D.N.Y. Feb. 27, 2006) (Hurd, J.) ("On October 13, 2005, Dr. Wright rescinded the ASAT/RSAT requirement from the [DOCS' Hepatitis C Primary Care Practice] Guideline.").

This factual allegation is significant because, as the relief requested in this action, Plaintiff seeks (1) "[i]mmediate comprehensive multi-vitamin treatment for those inmates that find themselves lacking the strength or ability to function normally due to their illness," (2) "[i]mmediate laboratory testing, and liver biopsies, etc ... to determine [the] stage of their illness, in accordance with Federal and National Institute of Health [requirements]," and (3) "[u]pon determination and diagnosis of the illness, immediate commencement of treatment without regard[ ] to any DOCS recommended program(s)." (Dkt. No. 1, ¶ 9.) In other words, Plaintiff does not seek any monetary relief. (*Id.*)

**\*13** However, given the Court's rather recent decision in *Wilton v. Wright,* 235 F.R.D. 40 (N.D.N.Y.2006) (Hurd, J.) (rejecting defendants' mootness argument under somewhat analogous circumstances), I am unable to conclude, without briefing by Defendants (and perhaps the occurrence of discovery), that Plaintiff's claims are mooted by DOCS' apparent decision to rescind the policy in question after Plaintiff filed suit. I note, however, that *Wilson* appears to be somewhat distinguishable from the instant case in that (1) the claims in *Wilson* were brought by a class of prisoners (including prisoners affected in the future), unlike the claims in this case, and (2) in any event, the plaintiffs in *Wilson* sought monetary relief in addition to injunctive relief, unlike Plaintiff in this case.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 27) be *DENIED;* and it is

**RECOMMENDED** that, pursuant to the Court's authority under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A, and Rule 12(h)(3) of the Federal Rules of Civil Procedure,

(1) Plaintiff's Ninth Amendment inadequate-medical-care claim and Fourteenth Amendment due process claim be *sua sponte* **DISMISSED with prejudice,**

(2) Plaintiff's Ninth Amendment right-to-privacy claim and his Fourteenth Amendment equal protection claim be *sua sponte* **DISMISSED conditionally,** i.e., if Plaintiff fails to file an Amended Complaint asserting a viable right-to-privacy claim and equal protection claim within 30 days of the Court's final decision on Defendants' motion, and

(3) Plaintiff's claims against Defendant Taylor be *sua*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)

(Cite as: 2007 WL 2027912 (N.D.N.Y.))

*sponte* ***DISMISSED* with prejudice** except his denial-of-testing claim, which should be *sua sponte* ***DISMISSED* conditionally,** i.e., on the same condition as mentioned above; and it is

**ORDERED** that the Clerk's Office shall serve a copy of this Report-Recommendation on Plaintiff at his address of record in this action (listed in the caption on the docket) and **also** at his apparent actual current address (listed on Dkt. No. 27, Part 4, Dkt. No. 28, and Dkt. No. 29, Part 2, as well as on the New York State DOCS Inmate Locator System), which is **Oneida Correctional Facility, 6100 School Road, Rome, N.Y. 13440.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.

Muniz v. Goord
Not Reported in F.Supp.2d, 2007 WL 2027912 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))



Only the Westlaw citation is currently available.
United States District Court,

D. Connecticut.
Andrew N. MATTHEWS, Plaintiff,
v.
STATE OF CONNECTICUT, Department of Public
Safety, Leonard C. Boyle, Defendants.
No. 3:10cv325 (MRK).

Oct. 8, 2010.

Jacques J. Parenteau, Katalin A. Demitrus, Madsen, Prestley & Parenteau, LLC–NL, New London, CT, Kera L. Paoff, Madsen, Prestley & Parenteau, LLC, Hartford, CT, for Plaintiff.

John P. Shea, Jr., Zachary David Schurin, Sullivan, Schoen, Campane & Connon, LLC, Hartford, CT, for Defendants.

## RULING AND ORDER

MARK R. KRAVITZ, District Judge.

**\*1** In this case, Connecticut State Police Sergeant Andrew N. Matthews alleges that his employer unlawfully retaliated against him for speaking out against a variety of misconduct by his fellow officers and against his employer's attempts to cover up that misconduct. Defendants are the State of Connecticut; Mr. Matthews' employer, the Department of Public Safety; and Leonard C. Boyle, the Department's former Commissioner. Pending before the Court is Defendants' Renewed Motion to Dismiss [doc. # 33] for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' Motion to Dismiss [doc. # 33] is GRANTED.

## I.

As it must, the Court accepts the factual allegations in Mr. Matthews' Second Amended Complaint [doc. # 29] as true, and draws all reasonable inferences in Mr. Matthews' favor. *See* Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir.2009). Mr. Matthews joined the Department of Public Safety in January 1998. In July 2004, he was promoted to Sergeant and transferred to the Internal Affairs Division. While Mr. Matthews was a member of the Internal Affairs Division, he learned that Department management had a practice of covering up a variety of misconduct by state police officers, including alcohol abuse, drunk driving, sexual abuse, and domestic violence. Mr. Matthews complained about the misconduct and the cover-ups to others in the Department.

Mr. Matthews first complained to the Connecticut Attorney General's Office about the misconduct and cover-ups in June 2005. Mr. Boyle, who was at that time the Department's Commissioner, knew that Mr. Matthews contacted the Attorney General's Office. On June 16, 2005, Mr. Boyle authorized a meeting to request that Mr. Matthews allow the Department to handle his complaint internally. Mr. Matthews refused and sent a letter to Mr. Boyle informing him that he intended to file a formal retaliation complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

On July 7, 2005, Mr. Boyle authorized Mr. Matthews' transfer from the Internal Affairs Division to the newly-created Risk Management Unit. Although the Risk Management Unit was located in the Department's Professional Standards building in Meriden, Mr. Boyle assigned Mr. Matthews to remain in a cubicle at the Department's Middletown Headquarters. Mr. Boyle later changed the Department's table of organization to make it appear that Mr. Matthews' transfer to the Risk Management Unit was non-disciplinary.

Mr. Matthews contacted the Attorney General's Office for a second time in August 2005, and on August 22, 2005, he filed a grievance with his union about his transfer to the Risk Management Unit. On September 7, 2005, Mr. Boyle authorized the Department to issue a negative Personnel Evaluation Report regarding Mr. Matthews' performance as a member of the Internal Affairs Division. Mr. Matthews received the lowest performance rating of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

all the members of the Internal Affairs Division, which was not consistent with his other performance ratings. For example, on September 8, 2005, Mr. Matthews received a "Superior" rating for his performance as a member of the Risk Management Unit.

**\*2** On September 21, 2005, an officer acting under Mr. Boyle's authority held a meeting with Mr. Matthews. The officer told Mr. Matthews that he "would do anything to prevent something from smearing the image of the agency." On September 23, 2005, Mr. Boyle's Chief of Staff held a meeting with Mr. Matthews to discuss his complaints about the Department. When Mr. Matthews returned to his desk, he found a handwritten note on his desk that read: "CANCER." Mr. Matthews reported the incident to his superiors, and Mr. Boyle opened an Internal Affairs investigation. However, the Internal Affairs Division lost the note and never completed the investigation. Mr. Matthews requested that Mr. Boyle open a criminal investigation, but Mr. Boyle failed to do so. Mr. Matthews began to fear for his physical safety and voluntarily elected to work out of the Department's Meriden building—where the other members of the Risk Management Unit were located—rather than out of the Middletown Headquarters.

Beginning in October 2005, the Department called in the New York State Police to conduct an independent investigation of the Internal Affairs Division. The New York State Police investigation lasted for approximately one year. In mid-October 2005, after the New York State Police investigation was under way, Mr. Matthews again contacted the Attorney General's Office to complain about the "CANCER" note and the Department's failure to sufficiently investigate the note.

In March 2006, an Internal Affairs officer designated Mr. Matthews as the target of an Internal Affairs investigation. Mr. Boyle assigned the officer who filed the complaint against Mr. Matthews to investigate the allegations against him. When Mr. Matthews requested that the Department provide him with a copy of the complaint against him before his interview with the investigator, Mr. Boyle refused to do so.

As a member of the Risk Management, it was Mr.

Matthews' duty to review other officers' use of force reports. In April 2006, Mr. Matthews made a complaint within the Department about another officer's improper use of force report and about the Department's failure to investigate that report. Mr. Matthews held a meeting with a superior officer regarding his complaint on April 26, 2006. At the meeting, the officer informed Mr. Matthews that Mr. Boyle had decided to move the Risk Management Unit from the Meriden building back to the Middletown Headquarters. The officer also informed Mr. Matthews that Mr. Boyle had decided that the Risk Management Unit would no longer be responsible for reviewing use of force reports.

On May 24, 2006, Mr. Matthews wrote a letter to Mr. Boyle complaining that he did not want to return to the Middletown Headquarters because he considered it a hostile work environment. On May 26, 2006, Mr. Matthews filed a grievance with his union regarding the transfer. Nevertheless, Mr. Matthews returned to the Middletown Headquarters as ordered on June 6, 2006. In May or June 2006, around the time of Mr. Matthews' return, Mr. Boyle permanently locked the door to the "Commissioner's Suite." The Suite housed Mr. Boyle's office as well as mailboxes for other officers, including Mr. Matthews. The Suite had previously been routinely left open for all officers to access. After May or June 2006, it was only accessible via keycard, and Mr. Matthews was not provided with a keycard to access the Suite.

**\*3** On June 15, 2006, Mr. Matthews filed a retaliation complaint with the CHRO. On June 22, 2006, he wrote the Attorney General's Office requesting protection from the Department's management, including Mr. Boyle. He also filed a retaliation complaint with the Attorney General's Office. During the Attorney General's investigation of the complaint, Mr. Boyle requested that the Department's internal legal advisor be permitted to sit in on witness interviews. The Attorney General's Office granted Mr. Boyle's request.

On November 21, 2006, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be reassigned to a different work location outside the Middletown Headquarters. Mr. Boyle approved the request. However,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

Mr. Boyle did not immediately provide Mr. Matthews with an alternative workspace. Starting in November 2006, rather than work from the Middletown Headquarters, Mr. Boyle began working out of his police cruiser.

On December 4, 2006, the New York State Police issued a report based on its investigation of the Internal Affairs Division. The report concluded that the Internal Affairs Division had a pattern and practice of tolerating unethical and unlawful acts by Department officers and managers. On December 7, 2006, Mr. Matthews again wrote to the Attorney General's Office requesting protection from further retaliation. On January 12, 2007, Mr. Matthews' union wrote to Mr. Boyle to request that in light of the report, Mr. Matthews should not be transferred back to the Middletown Headquarters.

In February 2007, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be placed on paid leave pending the completion of the Attorney General's investigation. On February 7, 2007, Mr. Boyle denied the request for paid leave. However, Mr. Boyle approved a transfer of Mr. Matthews out of the Middletown Headquarters and into Department office space in Hartford. The Hartford office space was being used at the time to conduct criminal interviews stemming from the New York State Police investigation into the Internal Affairs Division.

On February 20, 2007, Mr. Matthews' union wrote to office space at the Department's Meriden building until the criminal interviews at the Hartford office space were completed. On February 26, 2007, Mr. Boyle approved that request. Mr. Matthews was assigned to work from a mailroom that also housed a soda machine. Mr. Matthews was not allowed to use any of the common areas in the building, including the lunch room. On February 28, 2007, Mr. Boyle met with a superior officer and complained that the mailroom was not a sufficiently secure location for his work. Sometime in early 2007, Mr. Boyle referred Mr. Matthews to the Department's Employee Assistance Program for psychological counseling. Mr. Boyle left the Department on March 1, 2007 to begin federal government service.

Mr. Matthews filed his Complaint [doc. # 1] against the State of Connecticut, the Connecticut Department of Public Safety, and Mr. Boyle in the Connecticut Superior Court on February 4, 2010.[FN1] The complaint asserted a claim against the State of Connecticut and the Connecticut Department of Public Safety under Connecticut General Statutes § 31–59q. It also asserted a First Amendment retaliation claim against Mr. Boyle under 42 U.S.C. § 1983. Defendants filed a Notice of Removal [doc. # 1] in this Court on March 4, 2010. Defendants were able to remove the case to federal court because of Mr. Matthews' federal law claim against Mr. Boyle.

> FN1. Mr. Matthews filed a complaint against other defendants premised on essentially the same set of facts nearly three years earlier. *See Matthews v. Blumenthal,* No. 3:07cv739 (WWE) (D. Conn. filed May 9, 2007).

**\*4** Defendants filed their first Motion to Dismiss [doc. # 15] for failure to state a claim pursuant to Rule 12(b)(6) on May 13, 2010. The Court denied that motion without prejudice to renewal because Mr. Matthews requested leave to file an amended complaint. *See* Order [doc. # 22] dated May 25, 2010. Mr. Matthews filed his Amended Complaint [doc. # 25] on June 21, 2010. The Amended Complaint asserted the same claims as the original Complaint, but included a number of additional factual allegations. On July 8, 2010, the parties filed a Consent Motion [doc. # 27] to permit Mr. Matthews to amend his complaint a second time to make minor corrections to some of those additional factual allegations. The Court granted the motion, *see* Order [doc. # 28] dated July 8, 2010, and Mr. Matthews filed his Second Amended Complaint [doc. # 29] the same day.

Defendants filed their renewed Motion to Dismiss [doc. # 33] on July 14, 2010. In support of the motion, Defendants argue in support of their motion that the Eleventh Amendment bars Mr. Matthews' § 1983 claim insofar as it seeks damages against Mr. Boyle in his official capacity, and that the Second Amended Complaint fails to state a First Amendment retaliation claim against Mr. Boyle. Mr. Matthews filed an Opposition to the Motion to Dismiss [doc. # 34] on August 4, 2010.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

Defendants filed a Reply to Mr. Matthews' Opposition [doc. # 40] on August 30, 2010.

## II.

The standard of review this Court must apply on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is a familiar one. In reviewing a complaint for failure to state a claim, the Court must "accept [ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Holmes,* 568 F.3d at 335. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The "plausible grounds" requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly,* 550 U.S. at 556; *see also Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120–21 (2d Cir.2010) ("[W]e reject [the] contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible.").

## III.

The only federal law claim in Mr. Matthews' Second Amended Complaint is his First Amendment retaliation claim against Mr. Boyle under § 1983. In opposition to the pending motion, Mr. Matthews concedes that he does not seek damages against Mr. Matthews in his official capacity. Nevertheless, the Court notes that the Eleventh Amendment prohibits Mr. Matthews from seeking damages from Mr. Boyle in his official capacity.

**\*5** The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Absent waiver by a State or valid abrogation by Congress, the Eleventh Amendment bars any damage action against a State in federal court. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). It also bars suits against

state officials when they are sued for damages in their individual capacities. *See id.* Section 1983 does not abrogate Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The Court is therefore precluded from awarding Mr. Matthews any damages against Mr. Boyle in his official capacity.

## IV.

In support of their motion to dismiss, Defendants argue that the statute of limitations bars Mr. Matthews' First Amendment retaliation claim against Mr. Boyle under § 1983 insofar as it seeks damages based on Mr. Boyle's conduct before February 4, 2007. In Connecticut, the statute of limitations applicable to claims under § 1983 is Connecticut's three-year statute of repose for tort claims. *See* Conn. Gen.Stat. § 52–577; *Walter v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005) (applying § 52–577 to a § 1983 claim); *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997) (holding that § 1983 claims are governed by the state statute of limitations for personal-injury actions); *Ruston v. World Wrestling Entm't,* No. 3:07cv1650 (MRK), 2008 WL 824217, at \*2 (D.Conn. Mar. 25, 2008) (applying the three year statute of limitations to a § 1983 claim). Both parties agree that § 52–577 is the applicable statute of limitations in this case.

Under § 52–577 of the Connecticut General Statutes, the relevant dates are the date of the defendant's alleged wrongful conduct and the date on which the plaintiff's action was originally filed. *See Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC,* 69 Conn.App. 151, 159, 795 A.2d 572 (2002). Mr. Matthews filed his original Complaint in the Superior Court on February 4, 2010. Thus, unless an exception to the ordinary statute of limitations applies here, the Court agrees with Defendants that Mr. Matthews' § 1983 claim is time-barred with respect to any actions before February 4, 2007.

Mr. Matthews argues in opposition to the pending motion that Mr. Boyle's actions as alleged in the Second Amended Complaint constituted a continuing violation of federal law. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996). The continuing violation doctrine—which was originally developed in the context of Title VII claims—is an "exception to the normal know-or-should-have known accrual date" if there is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"evidence of an ongoing ... policy or practice." *Id.* The continuing violation doctrine applies to ongoing circumstances that combine to form a single violation that "cannot be said to occur on any particular day." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *cf. OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.,* 503 F.Supp.2d 490, 510–11 (D.Conn.2007) (discussing the analogous continuing course of conduct doctrine). Discrete incidents that are not part of an ongoing policy or practice are not continuing violations. *See Washington v. Cnty. of Rockland,* 373 F.3d 310, 317 (2d Cir.2004).

**\*6** If the continuing violation doctrine applies to Mr. Matthews' First Amendment retaliation claim under § 1983, that claim is not time-barred with respect to *any* of his factual allegations so long as he can allege one act in furtherance of the continuing violation that occurred within the three-year limitations period. *See Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999). Neither the Supreme Court nor the Second Circuit has had occasion to consider whether the continuing violation doctrine can be applied to a First Amendment relation claim brought under § 1983. However, the Second Circuit recently held that the continuing violation doctrine can apply to an Eighth Amendment deliberate indifference claim brought under § 1983. *See Shomo v. City of New York,* 579 F.3d 176, 181–82 (2d Cir.2009). The Court sees no reason why the continuing violation doctrine would apply to an Eighth Amendment deliberate indifference claim under § 1983, but not to other constitutional claims under § 1983, including First Amendment retaliation claims.

Assuming, however, that the continuing violation doctrine can be applied to First Amendment retaliation claims under § 1983, the Court concludes that Mr. Matthews has not alleged a continuing First Amendment violation here. Instead, Mr. Matthews has alleged numerous *discrete* First Amendment violations by Mr. Boyle. *See Washington,* 373 F.3d at 318. In a First Amendment retaliation claim, the federal law violation is an adverse employment action causally related to the employment's exercise of his right to free speech. *See Morris v. Lindau,* 196 F.3d 102, 110–11 (2d Cir.1999). In the First Amendment retaliation context, an adverse

employment action is any action that might well dissuade a reasonable worker from exercising his right to free speech. *See Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 227 (2d Cir.2006). According to the Second Amended Complaint, before February 4, 2007, Mr. Boyle:(1) forcibly transferred Mr. Matthews from the Internal Affairs Division to the Risk Management Unit, a different unit with significantly different work responsibilities; (2) issued an untruthful negative report about Mr. Matthews' performance as a member of the Internal Affairs Division; (3) failed to investigate a threatening note to Mr. Matthews apparently sent by another officer in the Department; (4) initiated an Internal Affairs investigation of Mr. Matthews; (5) forced Mr. Matthews to return to the Middletown Headquarters even though he had left it based on fears for his safety; (6) excluded Mr. Matthews from a common space at the Middletown headquarters used by other officers; and (7) ordered Mr. Matthews transferred out of the Middletown headquarters without providing him with any alternative workspace. Any one of those seven allegations could have formed the basis for a timely retaliation claim under § 1983 against Mr. Boyle, but Mr. Matthews sat on his rights.

Mr. Matthews failure to file a timely retaliation claim under § 1983 based on any one of those alleged discrete retaliatory actions is particularly surprising in light of the fact that Mr. Matthews first threatened to file retaliation claims against Mr. Boyle and others as early as June 2005, and that he actually filed retaliation claims with both the CHRO and the Attorney General's Office in June 2006. Mr. Matthews' inaction is even more surprising in light of the fact that he filed timely § 1983 claims in federal court against a number of *other* individuals based on essentially the same set of facts in 2007, nearly three years before he filed this action. *See Matthews v. Blumenthal,* No. 3:07cv739 (WWE) (D. Conn. filed May 9, 2007).

**\*7** The Court is not at all persuaded by Mr. Matthews' repeated invocation of the phrase "pattern and practice" in opposition to the pending motion. *See, e.g.,* Pl.'s Opp. to Mot. to Dismiss [doc. # 34] at 17. The Second Circuit rejected the precise argument that Mr. Matthews makes here in *Washington v. County of Rockland,* where it held that a "series of separate acts [cannot] be characterized as an ongoing policy ... sufficient to toll the applicable statute

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

of limitation." 373 F.3d at 318. The Court therefore concludes that Mr. Boyle is time-barred from seeking damages from Mr. Boyle based on any acts that occurred before February 4, 2007.

**V.**

Mr. Matthews' Second Amended Complaint alleges only four acts by Mr. Boyle after February 4, 2007. After February 4, 2007, Mr. Boyle: (1) denied Mr. Matthews' union's request to place him on paid leave; (2) approved a request to transfer Mr. Matthews out of the Middletown Headquarters; (3) approved a request to transfer Mr. Matthews to the Department's Meriden building; and (4) referred Mr. Matthews to the Department's Employee Assistance Program for psychological counseling. FN2 Although Mr. Matthews' Second Amended Complaint refers to a number of other events that occurred after February 4, 2007—namely, that Mr. Matthews was required to work out of an unsecured mailroom and excluded from common areas at the Meriden building—Mr. Matthews nowhere alleges that Mr. Boyle had personal knowledge of those events or was in any fashion personally responsible for those events. *See Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003) (recognizing that supervisor liability in a § 1983 action depends on a showing of personal responsibility). The Court concludes that Mr. Matthews cannot seek to hold Mr. Boyle responsible for those events without alleging that he played some personal role in those events. *See Iqbal,* 129 S.Ct. at 1952.

> FN2. Mr. Matthews' Second Amended Complaint alleges that the referral occurred sometime in early 2007. Construing that allegation in the light most favorable to Mr. Matthews, the Court assumes that it occurred after, rather than before, February 4, 2007.

The Court also concludes that as a matter of law, none of Mr. Boyle's alleged conduct after February 4, 2007 could support Mr. Matthews' § 1983 claim. To prevail on a First Amendment retaliation claim under § 1983, a plaintiff must show: (1) that he spoke on a matter of public concern; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between his speech and the adverse employment action. *See Singh v. New York,* 524 F.3d 361 (2d Cir.2008). As discussed above, an adverse employment action is any action that might dissuade a reasonable worker from exercising his right to free speech. *See Kaytor,* 609 F.3d at 555. The Court assumes without deciding that Mr. Matthews spoke on matters of public concern. FN3 However, none of Mr. Boyle's alleged actions after February 4, 2007 constituted an adverse employment action.

> FN3. The Court notes that Mr. Matthews almost certainly did not engage in constitutionally protected speech when he made his initial complaints about officer misconduct and conduct to his superiors in the Department. *See Garcetti v. Ceballos,* 547 U.S. 410, 426, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) ("We reject ... the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties."). However, because Mr. Matthews later made retaliation allegations to the Attorney General's Office and the CHRO, the Court concludes that *Garcetti* does not necessarily control the outcome here.

Mr. Boyle's first alleged action—denying the union's request to have Mr. Matthews placed on paid leave—was not an adverse employment action. Neither the Supreme Court nor the Second Circuit has ever had occasion to consider whether an employer's *denial* of a request for paid leave can constitute an adverse employment action in the First Amendment retaliation context. The argument is somewhat unusual. In this Court's experience, it is more typical for employees to argue that *requiring* an employee to take paid leave constitutes an adverse employment action. *See, e.g., Krukenkamp v. State Univ. of N.Y. at Stony Brook,* No. 09–4933–cv, 2010 WL 3894970, at * 1 (2d Cir. Oct.6, 2010).

**\*8** The Court nevertheless concludes that Mr. Boyle's denial of the union's request did not constitute an adverse employment action for three reasons. First, in an unpublished summary order, the Second Circuit has held that denial of a request for a leave of absence does not constitute an adverse employment action in the equal protection context. *See Williams v. N.Y. City Housing Auth.,* 335 Fed. App'x 108, 110 (2d Cir.2009). Although the phrase "adverse employment action" has a somewhat

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

different meaning in that context—specifically, "a materially adverse change in the terms and conditions of ... employment," *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2010)—the Court still finds the Second Circuit's conclusion instructive. Second, at least one other district court within the Second Circuit has rejected the argument that denial of a request for leave can constitute an adverse employment action in the First Amendment retaliation context. *See Casale v. Reo,* 522 F.Supp.2d 420, 427 (N.D.N.Y.2007) ("[N]o reasonable jury could find that refusing to recommend a third consecutive year of leave would dissuade a reasonable employee from engaging in protected speech."). Third, even assuming there are situations in which an employee might, for example, be entitled under a contract to take leave at will—and in which an employer *could* be forced to face a Hobson's choice between granting a request for leave and facing civil liability for retaliation—Mr. Matthews does not allege that he was entitled to take leave at will.

Mr. Boyle's next two alleged actions—approving the union's request to transfer Mr. Matthews out of the Middletown Headquarters, and, after Mr. Matthews' union objected to the Hartford location, approving the union's request for a transfer to the Meriden office—were actually actions taken for Mr. Matthew' *benefit.* Those actions were taken only at the request of Mr. Matthews' union. The Court finds it inconceivable that an employer's decision to grant an employee a benefit at the employee's own request could ever dissuade a reasonable worker from exercising his First Amendment rights. *See Kaytor,* 609 F.3d at 555.

Mr. Matthews' fourth alleged action—referring Mr. Matthews to the Department's Employee Assistance Program for psychological counseling—also did not constitute an adverse employment action. Although no Supreme Court or Second Circuit precedent is directly on point, the Court believes that no reasonable jury could conclude that a supervisor's mere referral of an employee to an internal counseling service would dissuade a reasonable worker from exercising his right to free speech. *See id.; cf. Breaux v. City of Garland,* 205 F.3d 150 (5th Cir.2000) (holding that requiring an employee to undergo a single psychological exam was not an adverse employment action in the First Amendment retaliation

context). The result could conceivably be different if Mr. Boyle had forced Mr. Matthews to undergo psychological treatment, or had publicized his decision to refer Mr. Matthews for psychological counseling to others in the Department. However, Mr. Matthews makes no such allegations in his Second Amended Complaint.

### VI.

**\*9** In sum, the Court concludes that the Eleventh Amendment bars Mr. Matthews from seeking damages against Mr. Boyle in his official capacity; that Mr. Matthews' claim against Mr. Boyle is time-barred insofar as it seeks damages based on acts that occurred before February 4, 2007; and that none of Mr. Boyle's alleged conduct after February 4, 2007 amounted to an adverse employment action. Because the only federal law claim in Mr. Matthews' Second Amended Complaint fails as a matter of law, the Court declines to exercise supplemental jurisdiction over Mr. Matthews' state law claim against the State of Connecticut and the Connecticut Department of Public Safety. *See Castellano v. Board of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758–59 (2d Cir.1991). Mr. Matthews may pursue that claim in state court if he wishes to do so.

Defendants' Motion to Dismiss [doc. # 33] is therefore GRANTED. **The Clerk of the Court is directed to enter judgment for Mr. Boyle on the § 1983 claim and to close this file.**

IT IS SO ORDERED.

D.Conn.,2010.

Matthews v. Connecticut, Dept. of Public Safety
Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)

(Cite as: 2008 WL 850594 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Patrick TRACY, Plaintiff,
v.
Patrick J. FRESHWATER; Peter Meskill, Tompkins County Sheriff, and the Tompkins County Sheriff's Department, Defendants.
No. 5:01-CV-0500(NPM/GHL).

March 28, 2008.
Patrick Tracy, Terre Haute, IN, pro se.

County of Tompkins, Jonathan Wood, County Attorney, of Counsel, Ithaca, NY, for Defendants.

MEMORANDUM DECISION AND ORDER

NEAL P. McCURN, Senior District Judge.
**\*1** On July 31, 2007, this Court FN1 issued an Order granting summary judgment in favor of Defendants. Plaintiff, proceeding *pro se,* now moves for reconsideration of or relief from that decision under Federal Rule of Civil Procedure 59(e).

FN1. By order (Dkt. No. 176) dated March 28, 2008, this case. previously assigned to Senior Judge Howard G. Munson, was reassigned to Senior Judge Neal P. McCurn.

First, the court needs to determine if this motion has been properly presented under Fed.R.Civ.P. 59(e)-"[m]otion to alter or amend judgment-or Fed.R.Civ.P. 60(b)"[r]elief from judgment or order". The Second Circuit Court of Appeals has long held that a post-judgment motion made within 10 days of entry of judgment that seeks reconsideration of matters properly encompassed within a decision on the merits is a motion under Rule 59(e). *Jones v. UNUM Life Insurance Co. of America,* 223 F.3d 130, 137 (2d Cir.2000). "[M]otions filed after the 10-day period, no matter how styled, are to

be treated as Rule 60(b)(1) motions seeking relief from the judgment. *Feldberg v. Quechee Lakes Corp.,* 463 F.3d 195, 198-99 (2d Cir.2006). The docket sheet in the instant case shows that Defendants' motion for summary judgment was granted on July 31, 2007, and Plaintiff's present Rule 59e motion was filed on August 20, 2007. While these entries clearly indicate that Plaintiff's motion was not timely filed, nevertheless, the prison mail box rule provided a timely filing of Plaintiff's motion.

The prison mailbox rule provides that a *pro se* inmate's motion is deemed filed on the date it is given to prison officials. *Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (establishing the prison mailbox rule) In cases where it is unclear when the inmate gave his petition to prison officials, courts have assumed that the petitioner submitted the petition on the same date it was purportedly signed and dated. *Porter v. Greiner,* 2005 WL 3344828, at \*7 (E.D.N.Y. Nov. 18, 2005); *Corrigan v. Barbery,* 371 F.Supp.2d 325, 328 n. 4 (W.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 66 n. 2 (S.D.N.Y.2004). The rule is premised on the *pro se* inmate's lack of control-his dependence on the prison mail system and lack of counsel to assure timely filing with the court. *Garraway v. Broome County,* 2006 WL 931729, at \*3 (N.D.N.Y. Apr. 7, 2006).

Plaintiff's proof of service document was sworn to, signed by Plaintiff on July 13, 2007, placed in a First Class postage paid correctly addressed envelopes and placed in the institutional mail box at his correctional institution. The ten day time limit for filing a Rule 59(e) motion had not expired on that date because the intermediate Saturdays and Sundays are excluded when the time period allowed is less than eleven days. (Rule 6(a) Fed.R.Civ.P. Ergo, Plaintiff's Rule 59(e) motion was timely filed.

While some courts hold that a Rule 59(e) motion to alter or amend the judgment can be brought only after a trial, "[m]ost courts, however, including those in this circuit, allow a motion to amend a grant of summary judgment to be brought under Rule 59(e)." *Patel v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)

(Cite as: 2008 WL 850594 (N.D.N.Y.))

*Lutheran Medical Center, Inc.,* 775 F.Supp. 592, 596 (E.D.N.Y.1991)

**\*2** Rule 59(e) is not an appropriate vehicle for a party dissatisfied with a court's ruling to secure a rehearing on the merits with respect to issues already decided, *USA Certified Merchants, LLC v. Koebel,* 273 F.Supp.2d 501, 503 (S.D.N.Y.2003); *Griffin Industries, Inc. v.. Petrojam, Ltd.,* 72 F.Supp.2d 365, 368 (S.D.N.Y.1999), or to advance " 'new facts, issues or arguments not previously presented to the court.' " *Wechsler v. Hunt Health Systems, Ltd.,* 186 F.Supp.2d 402, 410 (S.D.N.Y.2002). In other words, "[a] party seeking reconsideration 'is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.' " *Polsby v. St. Martin's Press, Inc.,* 2000 WL 98057, at *1 (S.D.N .Y. Jan. 18, 2000). Thus, Rule 59(e) should be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court," *Williams v. New York City Department of Corrections,* 9 F.R.D. 78, 83 (S.D.N.Y.2003), and "to prevent the rule from being used as a substitute for appealing a final judgment." *USA Certified Merchants,* 273 F.Supp.2d at 503.

"Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.' " *Montanile v. National Broadcasting Company,* 216 F.Supp.2d 341, 342 (S.D.N.Y.2002) (quoting *In re Health Management Systems Inc. Securities. Litigation.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000)).

In his motion for reconsideration, Plaintiff does not assert that this court overlooked or misapplied any controlling legal authority. Rather, he seeks to relitigate the same issues presented to this court before when he objected to the Magistrate Judge's Report and Recommendation. The strict requirements for reconsideration under Rule 59(e) are specifically designed to preclude this type of reargument. *Sutherland v. New York State Department of Law,* 1999 WL 600522, at *1 (S.D.N.Y. Aug. 10, 1999), "A Rule 59(e) motion is a not

a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."

Accordingly, the Plaintiff's motion for reconsideration is denied.

It is so ORDERED:

N.D.N.Y.,2008.

Tracy v. Freshwater
Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.